## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| DELFASCO, INC., | : | Case No. 08-11578 (MFW) |
| | : | |
| a Delaware corporation, | : | |
| | : | |
| Debtor. | : | |

## DISCLOSURE STATEMENT FOR PLAN OF LIQUIDATION OF

## DELFASCO, INC. AS AMENDED MARCH 4, 2010

POTTER ANDERSON & CORROON LLP
Steven M. Yoder (No. 3885)
Theresa V. Brown-Edwards (No. 4225)
Etta R. Wolfe (No. 4164)
R. Stephen McNeill (No. 5210)
Hercules Plaza, Seventh Floor
1313 N. Market Street
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

Counsel for Debtor and Debtor in Possession

Dated: March 4, 2010

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................... 1

    A.     Summary of Classification and Treatment of Claims............................ 3

    B.     Summary of Unclassified Claims ........................................................ 6

II.    VOTING INSTRUCTIONS ................................................................... 6

    A.     Manner of Voting on the Plan............................................................. 7

    B.     Classes Impaired Under the Plan ........................................................ 7

    C.     Claim Holders Entitled to Vote........................................................... 8

    D.     Vote Required for Class Acceptance ................................................... 8

III.   THE DEBTOR AND ITS OPERATIONS ............................................ 9

    A.     General Background ........................................................................... 9

    B.     Pre-Petition Capital Structure .......................................................... 10

    C.     Decision to Sell the Forge Division .................................................. 11

    D.     Corporate Structure ......................................................................... 11

    E.     Financial Information........................................................................ 12

IV.    THE CHAPTER 11 CASE .................................................................. 16

    A.     Events Leading to the Chapter 11 Filing .......................................... 16

    B.     Significant Events Since Commencement of the Chapter 11 Case ..... 19

        1.     Stay of Litigation .................................................................. 19

        2.     Post-Petition Financing and Use of Cash Collateral............... 19

        3.     Other First Day Orders........................................................... 20

        4.     Retention of Professionals ..................................................... 20

        5.     Appointment of the Official Committee of Unsecured Creditors........... 20

        6.     Extensions of Statutory Deadlines .......................................... 21

        7.     Asset Sales ............................................................................ 22

        8.     Establishment of a Bar Date .................................................. 25

        9.     The EPA's Adversary Complaint and Administrative Claim................. 25

        10.    TCEQ Claim and Liability...................................................... 29

        11.    Marketing Efforts Result in a Final Transaction...................... 30

V.     SUMMARY OF THE PLAN ................................................................ 32

    A.     General............................................................................................ 33

|   |   | 1. | Brief Explanation of the Chapter 11 Process | 33 |
|   |   | 2. | Acceptance of the Plan | 34 |
|   |   | 3. | Classification of Claims and Interests Generally | 34 |
|   | B. | Classification and Treatment of Claims Under the Debtor's Plan | | 35 |
|   |   | 1. | Unclassified Claims | 35 |
|   |   | 2. | Classified Claims and Interests | 38 |
|   | C. | Conditions to and Means for Consummation of the Plan | | 43 |
|   |   | 1. | Conditions to the Occurrence of the Effective Date | 43 |
|   |   | 2. | Conditions to the Occurrence of the Conversion and Transfer Date | 44 |
|   |   | 3. | Means for Implementing the Plan | 45 |
|   | D. | Provisions Regarding Distributions | | 46 |
|   |   | 1. | General Provisions Regarding Time and Manner of Distributions | 46 |
|   |   | 2. | Unclaimed Distributions | 46 |
|   | E. | Injunction and Exculpation | | 46 |
|   |   | 1. | Injunction | 46 |
|   |   | 2. | Exculpation | 47 |
|   | F. | Executory Contracts and Leases | | 48 |
|   | G. | General Provisions and Retention of Jurisdiction | | 49 |
|   |   | 1. | Retention of Jurisdiction | 49 |
|   |   | 2. | Notices | 50 |
|   |   | 3. | Severability | 52 |
|   |   | 4. | Dissolution of the Committee | 52 |
|   |   | 5. | Post-Confirmation Payment of Statutory Fees | 53 |
|   | H. | Provisions Concerning Causes of Action | | 53 |
|   | I. | Modification of The Plan | | 54 |
|   | J. | Procedure for Resolving Disputed Claims | | 54 |
|   |   | 1. | Objections to Claims | 54 |
|   |   | 2. | Estimation of Claims | 54 |
|   |   | 3. | Payments and Distributions on Disputed Claims | 55 |
| VI. | | CONFIRMATION PROCEDURES | | 55 |
|   | A. | Solicitation of Votes; Acceptance | | 56 |
|   | B. | Confirmation Hearing | | 56 |
|   | C. | Best Interests Test/Liquidation Analysis | | 58 |

    D.     "Cramdown" ............................................................................................... 60

VII.    CERTAIN FEDERAL INCOME TAX CONSIDERATIONS........................................ 61

VIII.   CONCLUSION.................................................................................................... 62

CAPITALIZED TERMS NOT OTHERWISE DEFINED HEREIN HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN OF LIQUIDATION ATTACHED HERETO AS EXHIBIT A.

## I.    INTRODUCTION

On July 28, 2008, Delfasco, Inc. filed a voluntary petition under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. Pursuant to section 1125 of the Bankruptcy Code, the Debtor submits this Disclosure Statement relating to its Plan of Liquidation of Delfasco, Inc., as amended, dated March 4, 2010 (the "Plan").

The Debtor is providing this Disclosure Statement to the Debtor's known creditors, interest holders and other parties in interest in order to provide adequate information sufficient to enable such parties to determine whether to vote for or against the Plan.

**The summary of the Plan and other statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan.    In the event of any inconsistency between the terms of the Disclosure Statement and the Plan, the terms of the Plan shall govern.**

By Order dated March __, 2010, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable the Debtor's creditors to make an informed judgment about the Plan. The Bankruptcy Court will consider final approval of the Plan at the Confirmation Hearing. The Bankruptcy Court's approval of the Disclosure Statement does not constitute a recommendation by the Bankruptcy Court either for or against the Plan. No statements or information concerning the Plan and the transactions contemplated thereby have been authorized, other than the statements and information set forth in this Disclosure Statement.    Unless separately approved by the

1

Bankruptcy Court, all other statements regarding the Plan and the transactions contemplated thereby, whether written or oral, are unauthorized.

The Bankruptcy Court has scheduled a hearing to consider Confirmation of the Plan (*i.e.* the Confirmation Hearing) for **April 9, 2010 at 9:30 a.m.,** at the Bankruptcy Court, which is located at 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time without further notice other than by announcement in Bankruptcy Court on the scheduled date of the Confirmation Hearing. At the Confirmation Hearing, the Court will consider whether the Plan satisfies the various requirements for Confirmation under the Bankruptcy Code. The Court will also receive and consider a ballot report prepared by the Debtor that summarizes the votes received by the Debtor for acceptance or rejection of the Plan from parties entitled to vote.

The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan be filed and served on or before **April 2, 2010 at 4:00 p.m.** (Prevailing Eastern Time). Please see section VI of this Disclosure Statement for additional information and instructions regarding Confirmation.

THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING EASTERN TIME) ON _____, 2010, UNLESS EXTENDED BY THE BANKRUPTCY COURT. YOUR VOTE ON THE PLAN IS IMPORTANT. PLEASE SEE SECTION II OF THIS DISCLOSURE STATEMENT FOR ADDITIONAL INSTRUCTIONS AND INFORMATION REGARDING VOTING ON THE PLAN.

THIS DISCLOSURE STATEMENT IS BASED UPON INFORMATION REASONABLY AVAILABLE TO THE DEBTOR AS OF THE DATE HEREOF AND DOES NOT REFLECT EVENTS THAT OCCURRED OR MAY OCCUR SUBSEQUENT TO THAT

DATE, WHICH MAY HAVE A MATERIAL IMPACT ON THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT. ALTHOUGH THE DEBTOR'S PROFESSIONALS HAVE ASSISTED IN PREPARING THIS DISCLOSURE STATEMENT BASED UPON FACTUAL INFORMATION AND ASSUMPTIONS PROVIDED BY THE DEBTOR, THE DEBTOR'S PROFESSIONALS HAVE NOT INDEPENDENTLY VERIFIED THE INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND MAKE NO REPRESENTATIONS OR WARRANTIES AS TO SUCH INFORMATION.

## A.     Summary of Classification and Treatment of Claims

The following is a summary of the classification of all Claims and Interests under the Plan and the proposed treatment of each such Class under the Plan. This summary is qualified in its entirety by reference to the Plan, the terms of which are controlling.

The Plan designates and classifies seven (7) Classes of Claims and Interests, which are further described below. These Classes are generally treated as follows under the Plan:

Class 1:     Class 1 consists of Priority Non-Tax Claims. Allowed Priority Non-Tax Claims, if any, shall be paid in full on or prior to the Effective Date. Class 1 is not impaired under the Plan and is deemed to accept the Plan.

Class 2:     Class 2 consists of Property Damage Claims. If Class 2 votes to accept the Plan, all Property Damage Claims properly filed on or before the Bar Date shall be deemed to be Allowed Property Damage Claims, and holders of such Allowed Property Damage Claims shall receive a Pro Rata share of $15,000 on or prior to the Effective Date. If Class 2 votes to reject the Plan, holders of Allowed Class 2 Claims shall receive nothing on account of their contingent, unliquidated Claims. Class 2 is impaired, and holders of Allowed Class 2 Claims are entitled to vote on the Plan.

3

Class 3:     Class 3 consists of the EPA Claim and Liability.  The EPA Claim and Liability shall be treated as follows:  On or prior to the Effective Date, the EPA Allocation shall be deposited into a segregated trust account which shall be used by the Chapter 7 Trustee exclusively to (i) comply with the Administrative Order, as it may be modified from time to time, with EPA oversight or (ii) if authorized in writing by EPA, fund any other environmental clean-up liabilities with respect to the Grand Prairie Property including the surrounding areas. Second, the portion of the EPA Claim and Liability related to penalties in the amount of $1.5 million (the "Subordinated Claim") shall be deemed Allowed and on the Effective Date subordinated and extinguished without any recovery.  The remainder of the EPA Claim and Liability shall be a deficiency claim in the amount of $490,834 (the "EPA Deficiency Claim"). However, EPA has agreed to a reduction in the amount payable on the EPA Deficiency Claim to 17.6% of the total Allowed amount of the EPA Deficiency Claim ($85,896) which is the equivalent estimated Pro Rata recovery for Trade Claims under this Plan.  The EPA Deficiency Claim shall not be entitled to any recovery under this Plan, however, the EPA Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer. Class 3 is impaired, and the EPA is entitled to vote on the Plan.

Class 4:     Class 4 consists of Trade Claims.  Except to the extent the holder of an Allowed Trade Claim agrees to a different treatment, the Debtor shall pay holders of Allowed Trade Claims their Pro Rata share of the Trade Claims Payment in full satisfaction of such Allowed Trade Claims on or prior to the Effective Date. Class 4 is impaired, and holders of Allowed Class 4 Claims are entitled to vote on the Plan.

Class 5:     Class 5 consists of Convenience Claims.  Notwithstanding the treatment provided to holders of Allowed General Unsecured Claims under any other provision of the Plan,

4

any holder of a General Unsecured Claim whose Face Amount is either (a) $1,500 or less, or (b) greater than $1,500 but as to which the holder thereof submits a valid Convenience Class Election by the Ballot Deadline (thereby electing to reduce the Face Amount of their Claim to $1,500), shall receive Cash in the amount of their Allowed Convenience Claim on or prior to the Effective Date; provided, however, that if the aggregate amount of Allowed Convenience Claims exceeds $50,000, those having the lowest initial Face Amount shall be deemed to be Allowed Convenience Claims, and the remaining Convenience Claims shall be treated as Allowed Trade Claims for distribution purposes. Class 5 is impaired, and holders of Allowed Class 5 Claims are entitled to vote on the Plan.

Class 6:    Class 6 consists of the TCEQ Claim and Liability. The TCEQ Claim and Liability shall be Allowed in the amount of $17.2 million. However, TCEQ has agreed to a reduction in the amount payable on the TCEQ Claim and Liability to 17.6% of the total Allowed amount of the TCEQ Claim and Liability ($3,027,200) which is the equivalent estimated Pro Rata recovery for Trade Claims under this Plan. The TCEQ Claim and Liability shall be treated as follows:

(i)    TCEQ shall receive no later than the Effective Date cash in the amount of $625,000, in partial satisfaction of the TCEQ Claim and Liability. After the Effective Date, TCEQ shall spend not less than $625,000 exclusively to implement environmental response actions, including environmental investigation activities, and pay oversight costs with respect to onsite and offsite contamination associated with the Grand Prairie Property, in consultation with EPA.

(ii)    The remainder of the Allowed TCEQ Claim and Liability shall be a deficiency claim in the amount of $2,402,200 (the "TCEQ Deficiency Claim"). The TCEQ Deficiency

5

Claim shall not be entitled to any recovery under this Plan, however, the TCEQ Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer. Class 6 is impaired, and TCEQ is entitled to vote on the Plan

Class 7:     Class 7 consists of Equity Security Interests. Holders of Equity Security Interests shall not receive any payment or distributions on account of their Equity Security Interests. All such Equity Security Interests shall be discharged and extinguished in accordance with the Plan and all such Equity Security Interests shall be deemed cancelled and extinguished as of the Effective Date without further court order or action under any applicable agreement, law, regulation or rule. Class 7 is impaired and deemed to reject the Plan.

**B.     Summary of Unclassified Claims**

Administrative Expense Claims, Priority Tax Claims and Professional Compensation and Reimbursement Claims are not classified under the Plan. Rather, unless otherwise agreed to by parties holding such Claims, Allowed Administrative Expense Claims and Allowed Priority Tax Claims will be paid in full in Cash on or prior to the Effective Date. Allowed Professional Compensation and Reimbursement Claims will be paid in full upon allowance of such Claims by the Bankruptcy Court, prior to the Conversion and Transfer Date, subject to the terms of the Fee Cap Agreement and the right of Committee Chapter 11 Case Professionals to be compensated from the Claims Objection Reserve for fees and expenses incurred to prosecute claims objections to Final Order after the Effective Date.

**II.     VOTING INSTRUCTIONS**

This Disclosure Statement and the Plan should be read in their entirety before casting any vote upon the Plan.

6

A.    **Manner of Voting on the Plan**

Accompanying this Disclosure Statement is a Ballot for acceptance or rejection of the Plan. Your Claims may be classified in multiple Classes, in which case you will receive a Ballot for each Class of Claim.

**The Bankruptcy Court has directed that, to be counted for voting purposes, Ballots for the acceptance or rejection of the Plan must be filed with the Debtor at the following address by no later than 4:00 p.m. Prevailing eastern Time on [          ] (*i.e.* the Ballot Deadline): Potter Anderson & Corroon, LLP, Attn: Delfasco Voting, 1313 N. Market Street, 6th Floor, P.O. Box 951, Wilmington, DE  19899-0951**

Ballots not received by the Debtor by the Ballot Deadline may not counted, and Ballots that do not indicate either an acceptance or rejection of the Plan will not be counted.

It is important for all creditors that are entitled to vote on the Plan exercise their right to vote to accept or reject the Plan. Even if you do not vote to accept the Plan, you may be bound by the Plan if it is accepted by the requisite holders of Claims and confirmed by the Bankruptcy Court.

B.    **Classes Impaired Under the Plan**

Bankruptcy Code section 1124 provides generally that a Class is impaired if the legal, equitable or contractual rights of the Claims or Interests in that Class are altered. Under the Bankruptcy Code, any holders of Claims or Interests in Classes that are "impaired" under the Plan are entitled to vote to accept or reject the Plan, unless such Class neither receives nor retains any property under the Plan (in which case such Class is deemed to have rejected the Plan). Any controversy as to whether any Claim or Interest holder or Class of Claims or Interest holders is impaired under the Plan shall, after notice of any hearing, be determined by the Bankruptcy Court.

PAC 948964v.10

Classes 2, 3, 4, 5 and 6 are "impaired" and entitled to vote to accept or reject the Plan. Class 7 will receive no distributions under the Plan and is deemed to reject the Plan.

### C.    Claim Holders Entitled to Vote

Subject to the exceptions provided below, any Claimholder whose Claim is impaired under the Plan is entitled to vote if either (i) its Claim has been scheduled by the Debtor and such Claim is not listed on the Schedules as disputed, contingent or unliquidated, or (ii) such Claimholder has filed a proof of Claim. A holder of a Disputed Claim is not entitled to vote on the Plan unless such Claim is temporarily allowed by the Debtor or by an order of the Bankruptcy Court allowing such Claim in an estimated amount for the purpose of voting to accept or reject the Plan.

A Claim or Interest to which an objection has been filed by the Debtor or a Claim (i) which is listed on the Debtor's Schedules as disputed, unliquidated or contingent and (ii) with respect to which a superseding proof of Claim has not been filed, is not a valid claim for voting purposes, unless the Claim is Allowed for purposes of the Plan, settled by agreement or the Bankruptcy Court allows the Claim (in whole or in part) by Final Order. Upon request of a party-in-interest, the Court may temporarily allow or estimate a Disputed Claim or Interest for the purpose of voting on the Plan.

### D.    Vote Required for Class Acceptance

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of impaired Claims as acceptance by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of holders of Allowed Claims in that Class who cast ballots.

8

## III.   THE DEBTOR AND ITS OPERATIONS

### A.   General Background

The Debtor was founded in Wilmington, Delaware in 1950 and was originally known as the David B. Lilly Company, Inc. in honor of its founder. In 1977, the Debtor acquired a metal fabrication business in Greeneville, Tennessee, and in 1980, the Debtor further expanded by acquiring a forging business that is now housed in Hurst, Texas. In 1998, the Debtor's corporate name was changed to Delfasco, Inc. As of the Filing Date, the Debtor had three operating divisions: David B. Lilly Sales Division, Delfasco of Tennessee Division, and Delfasco Forge Division.[1] The Debtor maintains its corporate headquarters in New Castle, Delaware and employs approximately 125 employees in Delaware, Tennessee, and Texas.

The Debtor has been a major supplier of products to the United States Department of Defense for many years and is known for its impeccable quality record of "on time" delivery performance. The Debtor is HUB Zone certified and is the exclusive provider of 25-pound practice bombs used in training by pilots in the United States Air Force and the United States Navy. The Debtor is also the prime contractor for ammunition containers, bomb fins, and forged suspension lugs that are used on both practice and live bombs by the United States military. In fact, the Debtor has been the exclusive supplier of suspension lugs to the United States military for the past seven years.

Historically, the Debtor has been a financially healthy company—in 2004, sales peaked at a high of $38.7 million, and the Debtor generated substantial profits. Over the past eleven years, the Debtor has invested approximately $9.4 million in equipment and facilities so that it can remain state of the art in both the forging and manufacturing areas of its business.

---

[1] As discussed more fully below, the Debtor sold its Forge Division during the Chapter 11 Case.

Unfortunately, due to the prolonged war in Afghanistan and Iraq, the Debtor's business has deteriorated. Pilots have continued to be rotated on active duty and, as a result, training activities—and the need for practice bombs supplied by the Debtor—have decreased. This lower sales volume also comes at a time when the price of steel, as well as electricity costs, have increased dramatically. In 2008, the Debtor suffered a net operating loss on sales below $20 million.

### B.    Pre-Petition Capital Structure

The Debtor did an outstanding job reducing its debt over the last few years. In July of 2005, the Debtor was indebted to Wachovia Bank, N.A. ("Wachovia") in an amount that exceeded $4.7 million. Over the last three years, the Debtor consistently retired its debt obligations to Wachovia and, as of the Filing Date, had reduced its debt to Wachovia to approximately $1,654,780 (the "Total Secured Debt Obligation"). As of the Filing Date, the Total Secured Debt Obligation consisted of a line of credit drawn in the amount of $1,300,000 (the "Line of Credit"), a Term Loan A in the amount of $279,763, and a Term Loan D in the amount of $75,017 (collectively, with Term Loan A, the "Term Loans"). The Total Secured Debt Obligation was secured by substantially all of the Debtor's assets. As of the Filing Date, the Debtor was current with respect to the repayment terms on the Total Secured Debt Obligation.

In addition to the Total Secured Debt Obligation, as of the Filing Date, the Debtor also owed approximately $1.5 million to its trade vendors and other unsecured creditors, an amount that is less than one month of trade payables incurred in the normal operation of the Debtor's business.

As of the Filing Date, the Debtor had an accounts receivable base that exceeded $1.7 million (the "Accounts Receivable") and had no aged receivables that it deemed to be

10

uncollectible. Including the Accounts Receivable, as of May 2008, the Debtor's books and records reflected total combined assets of approximately $10.1 million and total combined liabilities of $3.2 million. Through the first five months of 2008, the Debtor generated slightly more than $8 million in revenue (as compared to $10.2 million through the same time period in 2007), but incurred an operating loss of slightly under $100,000.

## C.     Decision to Sell the Forge Division

In late 2007, the Debtor's board of directors made a strategic decision to pursue a sale of the Debtor's forging business located in Hurst, Texas (the "Forge Division"). The Debtor's decision to sell the Forge Division was due, in large part, to the fact that the Debtor's president had decided to begin his exit from the Debtor for health reasons and a desire to spend more time with his family. Accordingly, in early 2008, the Debtor engaged Quantum Management (US), Inc. ("Quantum"), a mergers and acquisitions advisory firm with a special focus on companies in the forging business, to assist the Debtor with a sale of the Forge Division. A comprehensive prospectus was prepared and mailed to over 150 potentially interested parties. As of the Filing Date, the Debtor believed that as many as six parties remained interested in the Forge Division, and that as many as three were prepared to submit letters of intent on an expedited basis. Until the occurrence of the events described below, the Debtor was prepared to complete the sale process, pay off its remaining obligations to Wachovia, and continue operating its most profitable divisions in manufacturing and sales.

## D.     Corporate Structure

The Debtor is co-owned by Philip Kadlecek, Mark W. Benko and David Lilly, Jr., referred to as the "Owners" in the Plan, as they collectively hold all issued and outstanding shares of the Debtor.

11

The Debtor's present management consists of Philip Kadlecek, President; Mark W. Benko, Vice President and General Manager of the Debtor's Greenville, Texas plant; and David Lilly, Jr. Messrs. Kadlecek, Bencko and Lilly are responsible for the day to day management of the Debtor.

### E.   **Financial Information**

Attached hereto as **Exhibit B** is the most recent monthly operating report for the Debtor. Copies of all other monthly operating reports filed from the Filing Date through the most recent report can be found on the Court's docket maintained in this case. The Debtor's four (4) year cash flow projections through the period ending December 31, 2013, prepared by the Debtor and NHB (the "Projections") in conjunction with the Debtor's initial plan of reorganization and corresponding disclosure statement, are attached hereto as **Exhibit C**. The Projections estimate the revenues, expenses and resulting cash flow of the Debtor if it were to reorganize instead of liquidate in accordance with the compromise set forth in the Plan among the Debtor and its various constituencies including the Committee, the Purchaser, TCEQ and EPA. As set forth below, the modified liquidation scenario set forth in the Plan does not substantially modify the projected recoveries to creditors. The Plan provides that holders of Allowed Claims will receive the following approximate Distributions on account of their Allowed Claims:

| Class | Description | Treatment Under the Plan | Estimated Recovery | Voting Status |
|-------|-------------|--------------------------|--------------------|---------------|
| 1 | Non-Priority Tax Claims | Allowed Priority Non-Tax Claims, if any, shall be paid in full on or prior to the Effective Date. | 100% | Unimpaired; not entitled to vote |
| 2 | Property Damage Claims | If Class 2 votes to accept the Plan, all Property Damage Claims properly filed on or before the Bar Date shall be deemed to be Allowed Property Damage Claims, and holders of such Allowed Property | TBD | Impaired; entitled to vote |

12

| | | | | |
|---|---|---|---|---|
| | | Damage Claims shall receive a Pro Rata share of $15,000 on or prior to the Effective Date. If Class 2 votes to reject the Plan, holders of Allowed Class 2 Claims shall receive nothing on account of their contingent, unliquidated Claims. | | |
| 3 | EPA Claim and Liability | On or prior to the Effective Date, the EPA Allocation shall be deposited into a segregated trust account which shall be used by the Chapter 7 Trustee exclusively to (i) comply with the Administrative Order, as it may be modified from time to time, with EPA oversight or (ii) if authorized in writing by EPA, any other environmental clean-up liabilities with respect to the Grand Prairie Property including the surrounding areas. Second, the portion of the EPA Claim and Liability related to penalties in the amount of $1.5 million (the "Subordinated Claim") shall be deemed Allowed and, on the Effective Date, subordinated and extinguished without any recovery. The remainder of the EPA Claim and Liability shall be a deficiency claim in the amount of $490,834 (the "EPA Deficiency Claim"). However, EPA has agreed to a reduction in the amount payable on the EPA Deficiency Claim to 17.6% of the total Allowed amount of the EPA Deficiency Claim ($85,896) which is the equivalent estimated Pro Rata recovery for Trade Claims under the Plan. The EPA Deficiency Claim shall not be entitled to any recovery under the Plan, however, the EPA Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer. | The treatment of the EPA Claim and Liability is the result of detailed and significant arm's length negotiations between various constituencies and is incapable of quantification by percentage. | Impaired; Entitled to Vote |

PAC 948964v.10

| 4 | Trade Claims | Except to the extent the holder of an Allowed Trade Claim agrees to a different treatment, the Debtor shall pay Allowed Trade Claims a Pro Rata share of the Trade Claims Payment in full satisfaction of such Allowed Trade Claim on or prior to the Effective Date. | 17.6% | Impaired; Entitled to Vote |
|---|---|---|---|---|
| 5 | Convenience Claims | Notwithstanding the treatment provided to holders of Allowed General Unsecured Claims under any other provision of the Plan, any holder of a General Unsecured Claim whose Face Amount is either (a) $1,500 or less, or (b) greater than $1,500 but as to which the holder thereof submits a valid Convenience Class Election by the Ballot Deadline (thereby electing to reduce the Face Amount of their Claim to $1,500), shall receive Cash in the amount of their Allowed Convenience Claim on or prior to the Effective Date; provided, however, that if the aggregate amount of Allowed Convenience Claims exceeds $50,000, those having the lowest initial Face Amount shall be deemed to be Allowed Convenience Claims, and the remaining Convenience Claims shall be treated as Allowed Trade Claims for distribution purposes. | 100% so long as aggregate amount of Allowed Convenience Claims do not exceed $50,000 | Impaired; Entitled to Vote |
| 6 | TCEQ Claim and Liability | The TCEQ Claim and Liability shall be Allowed in the amount of $17.2 million. However, TCEQ has agreed to a reduction in the amount payable on the TCEQ Claim and Liability to 17.6% of the total Allowed amount of the TCEQ Claim and Liability ($3,027,200) which is the equivalent estimated Pro Rata recovery for Trade Claims under this Plan. The TCEQ Claim and | The treatment of the TCEQ Claim and Liability is the result of detailed and significant arm's length negotiations between various constituencies and is incapable of precise | Impaired; Entitled to Vote |

14

| | | | | |
|---|---|---|---|---|
| | | Liability shall be treated as follows:<br><br>(i)    TCEQ shall receive no later than the Effective Date cash in the amount of $625,000, in partial satisfaction of the TCEQ Claim and Liability. After the Effective Date, TCEQ shall spend not less than $625,000 exclusively to implement environmental response actions, including environmental investigation activities, and pay oversight costs with respect to the onsite and offsite contamination associated with the Grand Prairie Property in consultation with EPA.<br><br>(ii)    The remainder of the Allowed TCEQ Claim and Liability shall be a deficiency claim in the amount of $2,402,200 (the "TCEQ Deficiency Claim"). The TCEQ Deficiency Claim shall not be entitled to any recovery under the Plan, however, the TCEQ Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer. | quantification. However, the approximate percentage is estimated to be 17.6%. | |
| 7 | Equity Security Interests | Holders of Equity Security Interests shall not receive any payment or distributions on account of their Equity Security Interests. All such claims shall be extinguished in accordance with the Plan and all such Equity Security Interests will be deemed cancelled. | 0% | Impaired; Not Entitled to Vote |

PAC 948964v.10

## IV. THE CHAPTER 11 CASE

### A. Events Leading to the Chapter 11 Filing

The Debtor's sudden entry into bankruptcy was the result of: (i) the issuance by the EPA of a unilateral administrative order (*i.e.* the Administrative Order) with respect to the Grand Prairie Property, and (ii) the resulting notice of default issued by Wachovia and the corresponding freeze of the Line of Credit.

The Debtor purchased the Grand Prairie Property in 1980 from the prior owner in a transaction that was done as a deed in lieu of foreclosure. The Debtor conducted operations at the Grand Prairie Property from 1980 through 1999, when the Debtor relocated to a larger facility in Hurst, Texas. In 2002, the Debtor had a prospective buyer for the Grand Prairie Property and during the negotiations for a sale of the property, a Phase II environmental study was conducted that involved ground water testing. The Grand Prairie Property is currently leased to an automotive repair shop pursuant to the Grand Prairie Lease.

During that study it was determined that a condition existed in which Trichloroethylene ("TCE") and related compounds exceeded the relevant standards. The Debtor maintains that TCE was found despite the fact that (a) the Debtor did not use TCE on the site after 1988, and (b) the Environmental Director of the City of Ground Prairie (the "City") found no evidence of TCE use by the Debtor in the mid-1980's when the City began surveying chemicals in use at facilities in the City. Interviews conducted with a former employee suggest that TCE was used as a degreaser to clean equipment and parts prior to 1988. The Debtor remains steadfast in its belief that the TCE in the groundwater is largely the result of the use of TCE for decades by the prior owner before the EPA even existed and long before a determination was made, in or about 1984, that TCE was harmful and a potential carcinogen. The EPA has not adopted the Debtor's position.

16

In an effort to cooperate with remediation efforts, the Debtor followed the regulations of TCEQ by reporting the evidence of the TCE contamination of the groundwater and entering into a Voluntary Cleanup Agreement with the TCEQ in 2002. During the period from late 2002 until 2008, the Debtor spent over $850,000 on environmental testing to define the plume of the contamination, the pursuit of a Municipal Settings Designation (the "MSD") with the City, and legal fees incurred to cooperate with the regulatory agencies. During the environmental testing, it was revealed that the plume of contamination extends under approximately 65 acres of land that includes approximately 150 residential lots adjacent to the Grand Prairie Property.

In 2006, a limited number of residential neighbors commenced a lawsuit against the Debtor in Texas state court (the "Texas Litigation") alleging property damage as the result of the contamination plume deemed to extend beneath their properties. The Texas Litigation has been removed to federal court and was set to go to trial in May 2009.

In April 2008, while the Debtor was pursuing the MSD with the City, EPA became involved and informed the Debtor that the Grand Prairie Property was one of several sites in Texas, Louisiana, and Arkansas that the EPA had selected for vapor intrusion testing. In the last week of June 2008, the EPA called representatives of the Debtor to schedule a meeting. On July 1, 2008, the meeting (the "July Meeting") took place in the EPA's Dallas office, and test data was presented to the Debtor indicating that ten of the eighteen structures tested showed signs of vapor intrusion that exceeded standards set by the state of California.

At the July Meeting, the EPA requested that the Debtor enter into an eighty-four page consent order which would require the Debtor to, among other things: (i) remediate the homes identified as exceeding the California standards, (ii) identify which additional homes required sampling, (iii) set up a trust fund providing assurance to the EPA of initial action and perpetual

17

maintenance, and (iv) submit a remediation plan. During the July Meeting, the Debtor indicated it was financially unable to comply with the consent order, given its broad scope. The EPA asked the Debtor what portions of the proposed consent order it could do financially, but the Debtor insisted that it was unable to perform any of the tasks required by such an order. The next day, after the close of business, the Debtor received an e-mail attaching the EPA's thirty-nine page Administrative Order with instructions to reply to the EPA within less than twenty-four hours. The EPA requested that the Debtor agree to perform the tasks set forth in the Administrative Order—which, in the Debtor's view, were more onerous than the requirements set forth in the EPA's initial consent order. On July 3, 2008, the Debtor replied to the EPA and indicated that it could not possibly comply with the requests contained in the Administrative Order.

Following the issuance of the Administrative Order and after being provided a copy of both the Administrative Order and the Debtor's reply, Wachovia issued a notice of default pursuant to the existing loan documents between Wachovia and the Debtor, and indicated that Wachovia was going to freeze the Debtor's existing Line of Credit. When the notice of default was issued, the Debtor had approximately $700,000 of availability under the Line of Credit.

The issuance of the Administrative Order, the corresponding lack of liquidity, the prolonged conflict in Iraq and Afghanistan, and the impending strategic need to sell the Forge Division all coalesced very quickly into a perfect storm that forced a formerly robust small business to seek the protection of the Bankruptcy Court to deal with these issues in a manner that will maximize the value of the Debtor's assets for all creditors.

Accordingly, on the Filing Date, the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. The Debtor's Chapter 11 Case is pending before the

Honorable Mary F. Walrath, United States Bankruptcy Judge for the District of Delaware. No trustee or examiner has been appointed, and the Debtor continues to operate and manage its property as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

**B.     Significant Events Since Commencement of the Chapter 11 Case**

**1.     Stay of Litigation**

An immediate effect of the filing of a bankruptcy case is the imposition of the automatic stay under the Bankruptcy Code. With limited exceptions, on the Filing Date, the automatic stay enjoined the commencement or continuation of all litigation against the Debtor. This injunction will remain in effect until the Effective Date, unless otherwise modified by the Bankruptcy Court.

**2.     Post-Petition Financing and Use of Cash Collateral**

On the Filing Date, the Debtor filed its Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, and 507 and Federal Rules of Bankruptcy Procedure 4001 (A) Authorizing Debtor to Obtain Interim Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status; (B) Authorizing the Use of Cash Collateral; (C) Modifying the Automatic Stay; (D) Authorizing Debtor to Enter Into Agreements with Wachovia Bank, National Association and Granting Adequate Protection; and (E) Scheduling Interim and Final Hearings (the "DIP Motion"). In the DIP Motion, the Debtor requested authority to enter into a senior revolving facility in a committed amount up to $1.8 million, provided that the post-petition amounts outstanding did not exceed $250,000 on an interim basis and $500,000 on a final basis (the "Loan Proceeds") to fund the Debtor's post-petition operations. The Bankruptcy Court granted the DIP Motion on an interim basis on July 30, 2008 and entered a revised interim order granting the DIP Motion on August 28, 2008. On September 17, 2009, the Bankruptcy Court entered an order granting the DIP Motion on a final basis.

19

### 3. Other First Day Orders

Shortly following the Filing Date, the Debtor obtained a series of orders from the Bankruptcy Court designed to minimize any disruption in the Debtor's business operations and to facilitate the Debtor's reorganization. Specifically, the Bankruptcy Court (i) authorized the Debtor to satisfy certain outstanding obligations relating to wages, compensation, and employee benefits; (ii) prohibited the Debtor's utility service providers from altering, refusing, or discontinuing service upon the furnishing of an escrow account and establishment of certain procedures for determining adequate assurance of payment; (iii) permitted the Debtor to continue using its existing bank accounts, business forms and centralized cash management system; and (iv) authorized the Debtor to pay prepetition claims of shippers in an amount up to $40,000 to maintain a reliable, efficient and smooth shipping system.

### 4. Retention of Professionals

The Debtor is represented in the Chapter 11 Case by Potter Anderson & Corroon LLP ("Potter Anderson"). In addition, Thompson & Knight LLP was appointed as special counsel to the Debtor. The Debtor also retained Horty & Horty, P.A. as its accountant and Quantum as a sales consultant to aid in the sale of the Debtor's Forge Division.

### 5. Appointment of the Official Committee of Unsecured Creditors

On August 11, 2008, the United States Trustee appointed the Committee. The Committee originally consisted of Gerdau MacSteel; CMC Steel Texas; Kreher Steel Company, LLC; Richmond Casting Company; and The Sherwin Williams Company. The Sherwin Williams Company resigned from the Committee on August 14, 2008 and was replaced by Ryerson, Inc. (also known as Ryerson Coil) effective October 21, 2008. On November 14, 2008, the Bankruptcy Court approved the Committee's retention of NHB as financial advisors. On November 18, 2008, the Bankruptcy Court approved the Committee's retention of Kelley Drye

20

& Warren LLP as lead counsel and Benesch Friedlander Coplan & Aranoff, LLP as Delaware counsel. Subsequently, on December 17, 2008, the Bankruptcy Court approved the appointment of Saul Ewing LLP as conflicts counsel to the Committee.

### 6. Extensions of Statutory Deadlines

#### a. Extensions of Exclusivity

Section 1121(b) of the Bankruptcy Code provides for an initial period of 120 days (the "Exclusive Filing Period") after the commencement of a chapter 11 case during which a debtor has the exclusive right to propose and file a chapter 11 plan. If a debtor files a plan during the Exclusive Filing Period, section 1121(c)(3) of the Bankruptcy Code grants the debtor a period of 180 days after the commencement of the case to solicit acceptances of that plan, during which time no other party in interest may file a competing plan (the "Solicitation Period," and together with the Exclusive Filing Period, the "Exclusivity Periods"). Pursuant to section 1121(d) of the Bankruptcy Code, where the initial Exclusivity Periods provided for in the Bankruptcy Code prove to be an unrealistic timeframe for the proposal and solicitation of a plan, the Court may extend the Exclusivity Periods for cause.

The Debtor's initial Exclusivity Periods were set to lapse on November 25, 2008 and January 24, 2009, respectively. Recognizing its need to address various issues in the Chapter 11 Case before it could formulate and file a plan, including, *inter alia*, the pending sale of the Forge Division, the ongoing dispute with the EPA over the Grand Prairie Property, and other unresolved matters, the Debtor sought and obtained several extensions of the Exclusivity Periods. The Debtor's most recent extension of the Exclusivity Period expired on December 23, 2009.

#### b. Extensions of Removal Deadline

21

Section 1452 of title 28 of the United States Code and Bankruptcy Rule 9027 govern the removal of pending civil actions related to chapter 11 cases. Specifically, Rule 9027 provides that pending civil actions must be removed within 90 days of the petition date in most circumstances (the "Removal Period"). Bankruptcy Rule 9006, however, permits the Court to extend the Removal Period for cause shown. During the Chapter 11 Case, the Debtor sought and received various extensions of the Removal Period, which is presently scheduled to expire on March 26, 2010, however, the Debtor is considering filing a request for an additional extension prior to the expiration of the current deadline.

c.     <u>Extension of time to Assume or Reject Leases Pursuant to section 365(d)(4)</u>

Section 365(d)(4)(a) of the Bankruptcy Code provides a debtor in possession 120 days to decide whether to assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee. This time period may be extended for an additional 90 days for cause. On December 15, 2009, the Bankruptcy Court granted the Debtor's motion to extend the Debtor's time to assume or reject unexpired leases for an additional 90 days. On April 13, 2009, the Court entered its final order approving extensions of the deadline to assume or reject unexpired leases. Accordingly, the Debtor was required to decide whether to assume or reject its unexpired leases by no later than August 24, 2009, absent a further extension with the landlord's consent.

7.     <u>Asset Sales</u>

a.     <u>The Sale of the Forge Division</u>

Prior to the Filing Date and up to the date of its sale, the Forge Division had been the subject of a full and robust marketing and sale process. The Debtor engaged Quantum to assist in the marketing and sale of the Forge Division. Quantum was employed by the Debtor in the

22

months leading up to the Filing Date because of its specific expertise in this particular market niche and because of Quantum's familiarity with likely prospects interested in purchasing the Forge Division. The principal of Quantum has nearly twenty-five years business experience, including dealing with mergers and acquisitions generally and the forging industry specifically.

Quantum contacted approximately 150 potentially interested purchasers for the Forge Division. Approximately ten parties executed confidentiality agreements. The Debtor received two other formal offers for the purchase of the Forge Division. The Debtor considered these bids in conjunction with the bid submitted by Modern Forge Texas, Inc. (the "Forge Purchaser") and determined that Forge Purchaser's proposal represented the highest and best offer. In fact, the final bid submitted by Forge Purchaser was significantly higher than the initial bid placed by Forge Purchaser prior to the Filing Date.

Consequently, the Debtor, in its business judgment, agreed to sell the Forge Division to the Forge Purchaser and entered an asset purchase agreement to effectuate the sale (the "Forge Asset Purchase Agreement"). The Debtor thoroughly negotiated the terms of the Forge Asset Purchase Agreement, evaluated all reasonably available alternatives, and believed the Forge Asset Purchase Agreement represented the highest and best offer reasonably available for the Forge Division. Moreover, the Debtor believed that the consideration to be received from Forge Purchaser for the Forge Division would be more than sufficient to pay off the Total Secured Debt Obligation (including the DIP Loan Proceeds) and provide a significant infusion of Cash back into the Estate.

To effectuate the sale, on or about October 31, 2008, the Debtor filed its Motion of the Debtor and Debtor in Possession for an Order (A) Approving Bidding Procedures and Bid Protections in Connection with the Sale of Certain of the Debtor's Assets, (B) Establishing

23

Procedures to Assume and Assign Certain Executory Contracts and Unexpired Leases, and (C) Approving the Form and Manner of Notice of the Sale Hearing (the "Bid Procedures Motion") and the Motion for an Order (A) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (B) Approving the Proposed Sale of Certain of the Debtor's Assets; and (III) Granting Related Relief (the "Sale Motion"). Pursuant to the Sale Motion, the Debtor proposed to sell the Forge Division to Forge Purchaser for $2.6 million. After extensive negotiations among the Debtor, Committee, Wachovia and the United States Trustee, the Bankruptcy Court granted the Bid Procedures Motion on November 13, 2008. On December 8, 2009, the Bankruptcy Court approved the sale of the Forge Division to the Forge Purchaser. After closing the sale, the Debtor paid off the Total Secured Debt Obligation with a portion of the sale proceeds.

b.     <u>The Sale of Miscellaneous Assets</u>

In addition to selling the Forge Division, on November 17, 2008, the Debtor filed a Motion for an Order Pursuant to sections 105 and 363 of the Bankruptcy Code Establishing Procedures for Miscellaneous Asset Sales (the "Miscellaneous Asset Motion"). Pursuant to the Miscellaneous Asset Motion, the Debtor established procedures (the "*De Minimis* Procedures") to sell certain miscellaneous assets of *de minimis* value that were not included in the sale of the Forge Division and were no longer necessary for the continued operation or reorganization of the Debtor's business. The Bankruptcy Court granted the Miscellaneous Asset Motion on December 15, 2008.

Pursuant to the *De Minimis* Procedures, the Debtor was authorized to sell assets of less than $50,000 without the need for a separate motion if (i) the Debtor sent notice to all interested parties, (ii) no interested party objected in writing within five (5) days of receiving notice of the sale, and (iii) the Debtor submitted a report every two months summarizing all sales

24

consummated pursuant to the *De Minimis* Procedures during that time period. During the Chapter 11 Case, the Debtor used the *De Minimis* Procedures to sell a 2006 Honda Pilot EX and a 2008 Nissan Quest S Minivan, which sales were approved by the Bankruptcy Court on February 26, 2009.

### 8.  **Establishment of a Bar Date**

On December 17, 2008, the Bankruptcy Court entered the Bar Date Order establishing February 2, 2009 as the Bar Date for filing proofs of Claim and Administrative Claim Requests in the Chapter 11 Case. The Debtor served notice of the Bar Date in accordance with the Bar Date Order.

### 9.  **The EPA's Adversary Complaint and Administrative Claim**

On December 15, 2008, the United States, on behalf of the EPA, commenced an adversary proceeding against the Debtor seeking injunctive and declaratory relief with respect to the alleged environmental violations at the Grand Prairie Property discussed above (the "EPA Litigation"). The EPA also sought the payment of statutory penalties for each day that the Debtor allegedly refused to comply with the Administrative Order.

Four days later, the EPA filed a motion to withdraw the reference (the "Withdrawal Motion") and remove the EPA Litigation to the District Court for the District of Delaware (the "District Court"), arguing that the conflict between the Bankruptcy Code and federal environmental law required the District Court to decide the dispute. The Debtor objected to the Withdrawal Motion as procedurally improper because the EPA did not first file a motion to determine core status with the Bankruptcy Court as required by Local Rule 5011-1.

The EPA cured its procedural defect on January 14, 2009 by filing the United States' Local Rule 5011-1 Motion for a Determination by the Bankruptcy Court of the Core Status of the Causes of Action in the United States of America's Adversary Complaint. Afterwards, the

Debtor filed a supplemental objection and the Bankruptcy Court, by order entered on February 25, 2009, held that the second cause of action asserted in the EPA Litigation was a non-core matter, but the first and third causes of action were core matters. On March 3, 2009, the EPA Litigation was transferred to the District Court. United States v. Delfasco, Inc., 409 B.R. 704 (D. Del. 2009).

In addition to filing the EPA Litigation, on February 2, 2009, the United States, at the request of the EPA, filed a proof of Claim and an Administrative Expense Claim for the following amounts:

- RCRA Claim: A general unsecured claim under RCRA section 7003(b) for $17.2 million for recovery of the estimated cost of complying with the Administrative Order. The RCRA claim was asserted as an alternative "protective" claim if Debtor is not required to comply with the Administrative Order. In its proof of claim, the United States stated that it expected that Delfasco would be required to comply with the requirements of the RCRA 7003 order. The United States also noted that Delfasco had contended, erroneously in the United States' view, that the United States' cause of action for enforcement of the RCRA 7003 order was a monetary claim. The proof of claim stated that, in the event that the United States was wrong and Delfasco was correct, then Delfasco would be liable to the United States for such monetary claim. The proof of claim stated that the United States estimated that the cost to Delfasco's estate of complying with the RCRA 7003 order would be approximately $17.2 million. The proof of claim specified that the claim was protective in nature as to Delfasco's injunctive obligation under the adversary proceeding, that the claim was filed in a protective fashion to protect the United States' rights with respect to such obligations of Delfasco, that the

United States reserved the right to take future actions to enforce any such obligations of Delfasco, and that nothing in the claim constituted a waiver of any rights of the United States.

- CERCLA Claim: A general unsecured claim under CERCLA section 107(a) comprised of (i) past response costs of $161,000 incurred by the EPA when the EPA elected to perform certain of the Debtor's obligations under the Administrative Order pursuant to an Action Memorandum, and (ii) future unliquidated response costs for completing the Debtor's performance.

- RCRA Penalties: Claims for civil penalties in the statutory maximum amounts under RCRA section 7003(b) comprised of (i) a general unsecured claim of $143,000 for unpaid penalties assessed prepetition, and (ii) an Administrative Expense Claim of (x) $1,256,000 for unpaid penalties assessed postpetition, plus (y) an additional penalty of $7,500 assessed for each day after February 2, 2009 that the Debtor does not comply with the Administrative Order.

The EPA provided initial disclosures in the EPA Litigation pursuant to Federal Rule of Civil Procedure 26(a)(1)(A). The parties also held the required pre-trial conference on March 13, 2009, and had begun the discovery process prior to their mutual agreement to stay the litigation pending the outcome of an expedited mediation process. In an attempt to resolve the EPA Litigation, on June 26, 2009, the Debtor, the Committee and the EPA engaged in lengthy mediation.

a.    The Mediation and Proposed EPA Settlement

On June 26, 2009, the EPA, the Debtor and the Committee participated in mediation (the "Mediation") in an attempt to resolve the EPA's claims against the Debtor. At the conclusion of the Mediation, the parties made significant progress toward a settlement (the "Proposed EPA Settlement"). The parties anticipated that, once finalized, the terms of this settlement in principle would be incorporated into a settlement agreement with standard covenants not to sue for

27

environmental settlements with debtors. The settlement agreement would then require the approval of the Assistant Attorney General for the Environmental and Natural Resources Division of the U.S. Department of Justice and would thereafter be incorporated into a plan. Nothing stated herein prejudices the rights of the United States to object to the proposed treatment of the EPA Claim in the Plan.

In furtherance of the mediated resolution, the parties agreed to stay the EPA Litigation. The District Court granted the parties' request for a stay and administratively closed the adversary proceeding.

As of the filing of this Disclosure Statement, the parties to the Proposed EPA Settlement have yet to finalize a settlement agreement due, in part, to some unexpected complications, including new terms incorporated into the Plan and a dispute over the IRS Tax Refund.

<b>b.     <u>The Tax Refund Dispute</u></b>

The Debtor was entitled to receive from the IRS a federal income tax refund from the IRS for taxes paid prior to Filing Date in the amount of $389,834 (the "Tax Refund"). The EPA asserted that it had a right to set off its claims against the Tax Refund.

In August 2009, the EPA instructed the IRS to place an administrative freeze on the Tax Refund, ostensibly to protect the EPA's asserted right of set off pending approval of the mediated global settlement. The Debtor contested the EPA's claimed right of setoff and requested that the EPA immediately lift the administrative freeze it had placed on the Tax Refund.

Initially, the EPA refused, but, ultimately, the Debtor and the EPA agreed that the EPA would consent to the Debtor's use of the Tax Refund (which the EPA contended was "cash collateral" under the Bankruptcy Code), so long as the EPA received adequate protection of its asserted interest in the Tax Refund (the "Adequate Protection Liens") pursuant to sections 361

28

and 363(c)(2) of the Bankruptcy Code. The Adequate Protection Liens were granted in an amount equal to the aggregate diminution in value of the cash collateral used by the Debtor or resulting from the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (the amount of such diminution in value, the "Adequate Protection Obligations"). The EPA's entitlement to adequate protection, the Adequate Protection Claim (as defined below) and Adequate Protection Liens remain subject to the right of the Debtor, the Committee or any other party-in-interest to challenge the EPA's asserted right of setoff and status as a secured creditor.

To obtain Bankruptcy Court approval of the Cash Collateral Agreement with the EPA, the Debtor filed its Emergency Motion for Order Pursuant to 11 U.S.C. §§ 105, 361, 362, and 363 (A) Authorizing the Use of Cash Collateral; (B) Modifying the Automatic Stay; and (C) Granting Adequate Protection [D.I. 3172] (the "Cash Collateral Motion") on September 21, 2009. The Bankruptcy Court granted the Cash Collateral Motion on September 30, 2009 and entered the EPA Cash Collateral Order.

### 10.    TCEQ Claim and Liability

TCEQ and the Debtor entered into an executory contract agreement styled Texas Commission on Environmental Quality Voluntary Cleanup Program Agreement dated April 23, 2003, as amended in March 2004 (the "Delfasco VCP Agreement"). Pursuant to the Delfasco VCP Agreement, the Debtor was required to investigate and remediate, as necessary, environmental liabilities existing on the Grand Prairie Property. As of July 28, 2008, when Delfasco filed the Chapter 11 Case, Delfasco could no longer afford to perform under the terms of the Delfasco VCP Agreement. Accordingly, on February 2, 2009, TCEQ timely filed a contingent, unliquidated Claim (Claim No. 93-1), as amended (Claim No. 93-2), for any and all liabilities arising out of the Grand Prairie Property, including, but not limited to, cleanup costs and civil fines and penalties. On January 20, 2010, the Debtor filed its proposed initial

29

disclosure statement and plan, which indicated its intention to reject certain executory contracts, apparently including the Delfasco VCP Agreement. Accordingly, on or about February 10, 2009, TCEQ filed the amended Claim, asserting a general unsecured claim in the amount of $17.2 million alleging liabilities arising out of the Debtor's failure to comply with the Delfasco VCP Agreement.

To the extent that the EPA and TCEQ claims arise from the same set of circumstances, that is, the need to address contamination at and emanating from the Grand Prairie Property, the claims are overlapping.

However, under the terms of the Plan, while EPA will have primary regulatory authority over the work required pursuant to its Administrative Order, as may be modified from time to time, the TCEQ will be the environmental regulatory agency with primary regulatory authority over the remaining environmental response work to be conducted at and in the vicinity of the Grand Prairie Property.

### 11. Marketing Efforts Result in a Final Transaction

NHB, at the request of the Debtor and with the consent of the Committee engaged in an extensive marketing effort to attract parties interested in providing exit financing and post-petition working capital for the Debtor to reorganize, or, in the alternative, purchasing the Debtor's assets as a going concern. To that end NHB, with the Debtor, prepared an overview of the Debtor's business and operations which contained non-confidential material about the Debtor (the "Teaser") and collected information necessary for an interested party to perform due diligence regarding a potential transaction. NHB in conjunction with the Debtor, compiled this data into an electronic data room (the "Data Room") hosted by NHB. NHB sent the Teaser to strategic operating companies who might have an interest in the Debtor's business, financial purchasers and financing sources such as private equity funds and hedge funds; regulated

30

depository institutions and non-regulated institutions, investment bankers, and attorneys and other restructuring professionals who might know of parties that might have an interest in the Debtor's business. The Teaser was read by 1,029 parties. Of that group, thirty-one (31) parties executed a non-disclosure agreement pursuant to which they received access to the Data Room. From the group executing the non-disclosure agreements and reviewing information in the Data Room, NHB received twelve (12) letters of intent from parties wishing to offer financing and three (3) letters of intent offering to purchase the company (collectively, the "LOIs"). All of the LOIs were shared with the Debtor and its counsel as well as counsel for the Committee. The Debtor reviewed the LOIs and, in consultation with counsel and with counsel for the Committee, selected Delfasco Finance, LLC as being the highest offer and having the best likelihood for consummating a transaction that will result in the preservation of value, and jobs and also provide the highest and best recovery to creditors.

Delfasco Finance, LLC initially proposed to fund a plan of reorganization whereby it would retain the right to either purchase the Debtor's assets or reorganize the Debtor as a going concern. On January 20, 2010, the Debtor filed its Plan of Reorganization of Delfasco, Inc. and the attendant disclosure statement seeking approval of the Term Sheet that had been negotiated with Delfasco Finance, LLC [Docket Nos. 443 and 444, respectively]. A hearing on approval of the initial disclosure statement was set for February 17, 2010. On February 10, 2010, TCEQ filed its objection to the proposed disclosure statement (the "TCEQ Objection"). In addition to the TCEQ Objection, the Debtor received comments from EPA and the Office of the United States Trustee. During discussions to resolve these objections, a revised transaction emerged. Thus, at the hearing on February 17, 2010, the Debtor described the parties' agreements and proposed Plan structure to the Court and, since that time, has worked extensively with the

31

Committee, EPA, the Purchaser and TCEQ to re-formulate the Term Sheet into an Asset Purchase Agreement, and revise the Plan and Disclosure Statement to their current form. The Plan and Disclosure Statement propose no new treatment for Claims and Interests, but instead provide for the sale of the Debtor's assets to the Purchaser (thereby removing the Purchaser's option to reorganize the Debtor through a purchase of the Debtor's Equity Interests) and subsequent Conversion and Transfer of the Chapter 11 Case.

On the Effective Date, the proceeds of the sale of the Debtor's assets as set forth in the Asset Purchase Agreement attached hereto as **Exhibit D,** will be used to fund the Distributions under the Plan in the following manner: (a) cash sufficient to pay all Administrative Expense Claims, Allowed Priority Non-Tax Claims and Professional Compensation and Reimbursement Claims, giving effect to the Fee Cap; (b) the Trade Claims Payment to holders of Allowed Trade Claims; (c) Cash not to exceed $50,000 (the "Convenience Claim Payment") to holders of Allowed Convenience Claims; (d) $15,000 to holders of Allowed Property Damage Claims, if Class 2 votes to accept the Plan; (e) the EPA Allocation; and (f) the $625,000 cash payment to TCEQ.

## V. SUMMARY OF THE PLAN

THE DEBTOR SUBMITS THAT, BASED ON THE FINANCIAL INFORMATION ANNEXED HERETO, THE TREATMENT OF CREDITORS UNDER THE PLAN IS FAR MORE FAVORABLE THAN THE TREATMENT CREDITORS WOULD RECEIVE IF THE CHAPTER 11 CASE WAS CONVERTED TO CHAPTER 7 OUTSIDE OF THE PLAN BECAUSE THE PLAN COMPROMISES THE CLAIMS OF THE EPA AND TCEQ THAT OTHERWISE WOULD DWARF AND COMPLETELY DILUTE ANY RECOVERY FOR HOLDERS OF TRADE AND PROPERTY DAMAGE CLAIMS. THUS, THE PLAN PROVIDES FOR EQUITABLE TREATMENT FOR ALL OF THE DEBTOR'S CREDITORS,

ALLOWS FOR THE PURCHASE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS WITH AN OPPORTUNITY FOR THE NEW COMPANY TO CONTINUE IN OPERATION, THEREBY PRESERVING JOBS AND VALUE FOR CREDITORS WHO CONTINUE TO BE EMPLOYED BY OR DO BUSINESS WITH THE NEW COMPANY. THE SUMMARY OF THE PLAN SET FORTH BELOW IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PROVISIONS SET FORTH IN THE PLAN, THE TERMS OF WHICH CONTROL.

### A.    General

#### 1.    Brief Explanation of the Chapter 11 Process

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize or liquidate its business for the benefit of its creditors and interest holders. Confirmation and consummation of a plan of reorganization or liquidation is the principal objective of a chapter 11 case. In general, a plan divides the Claims against, and Interests in, a debtor into separate Classes and allocates plan distributions among those Classes.

As discussed in section II(B) above, only certain impaired classes of claims are entitled to vote on a chapter 11 plan. Generally, each impaired class must vote to accept the Plan; however, as discussed further in section VI(D) below, the Bankruptcy Court may confirm the Plan in certain circumstances without the acceptance of all impaired classes if at least one (1) impaired class votes to accept the Plan and certain other statutory tests are satisfied.

A further explanation of the requirements of confirmation if an impaired class rejects the plan is set forth below in this Disclosure Statement. Many of these tests are designed to protect the interests of creditors and interest holders who either do not vote or vote to reject the Plan but who nonetheless will be bound by the Plan if it is confirmed by the Bankruptcy Court.

PAC 948964v.10

## 2. Acceptance of the Plan

As a condition to Confirmation, section 1129(a) of the Bankruptcy Code requires that: (a) each impaired Class of Claims or Interests votes to accept the plan; and (b) the Plan meets the other requirements of section 1129(a). Pursuant to section 1126(f) of the Bankruptcy Code, classes that are unimpaired are conclusively presumed to have accepted the Plan and, therefore, are not entitled to vote. Pursuant to section 1126(g), Classes that do not receive or retain any property under the Plan are deemed to have rejected the Plan and are likewise not entitled to vote. Accordingly, acceptances of the Plan are being solicited only from those parties who hold Claims in impaired Classes that may receive Distributions under the Plan, *i.e.* Classes 2, 3, 4, 5 and 6.

## 3. Classification of Claims and Interests Generally

Section 101(5) of the Bankruptcy Code defines a Claim as: (a) a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, legal, equitable, secured or unsecured;" or (b) a "right to an equitable remedy for breach or performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured."

Section 1123 of the Bankruptcy Code provides that a plan shall designate classes of claims against and interests in a debtor. Section 1122 of the Bankruptcy Code further requires that each class of claims and interests contain only claims or interests that are "substantially similar" to each other. The Debtor believes that it has classified all Claims and Interests in compliance with the requirements of sections 1122 and 1123 of the Bankruptcy Code.

However, it is possible that a holder of a Claim or Interest may challenge such classification and that the Bankruptcy Court may find that a different classification is required

for the Plan to be confirmed. In such event, the Debtor would, to the extent permitted by the Bankruptcy Court, modify the Classes in the Plan as required and use the acceptances received in this solicitation for the purpose of obtaining the approval of a Class or Classes of which the accepting holder is ultimately deemed to be a member. Any such reclassification could adversely affect the Class of which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required of that Class for approval of the Plan. Furthermore, a reclassification of Claims or Interests could necessitate a resolicitation of votes.

**B.      Classification and Treatment of Claims Under the Debtor's Plan**

The following describes the classification of Claims and Interests under the Plan and the treatment that holders of Allowed Claims and Allowed Interests will receive if the Plan is confirmed and becomes effective. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in a different Class to the extent that any remainder of the Claim or Interest fits within the description of such different Class.

**1.      Unclassified Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Plan does not classify Administrative Expense Claims or Priority Tax Claims, but does provide for the following treatment of such Claims:

    **(a)      Administrative Expense Claims** – An Administrative Expense Claim is any right to payment constituting a cost or expense of administration of the Chapter 11 Case Allowed under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary costs and expenses of preserved the Debtor's estate, (b) any actual and necessary costs and

35

expenses of preserving the Debtor's business, (c) any indebtedness or obligations incurred or assumed by the debtor-in-possession during the Reorganization Case, and (d) Claims pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtor in the 20 days immediately prior to the Petition Date and sold to the Debtor in the ordinary course of the Debtor's business

The Plan provides that, except to the extent a holder of an Allowed Administrative Expense Claim agrees to a different treatment, each holder of an Allowed Administrative Expense Claim (including, without limitation, any statutory fees due and owing on the Effective Date) shall be paid in Cash in full by the Reorganized Debtor on the later of (a) the Effective Date, or (b) the date upon which such holder's Administrative Expense Claim becomes an Allowed Claim.

**(b)** **Priority Tax Claims** – The Plan defines Priority Tax Claims as an Allowed Claim by a governmental unit entitled to priority pursuant to any provision of section 507(a)(8) of the Bankruptcy Code. The Plan provides that each holder of an Allowed Priority Tax Claim that has not been paid in full prior to the Effective Date shall receive Cash equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date, and (b) the date on which such Priority Tax Claim becomes an Allowed Claim. The holder of an Allowed Priority Tax Clam shall not be entitled to receive any payment on account of interest, or on account of any penalty arising with respect to or in connection with the Allowed Tax Priority Claim, except to the extent such interest or penalty is Allowed pursuant to section 507(a)(1) of the Bankruptcy Code.

**(c)** **Professional Compensation and Reimbursement Claims** - The Plan further provides that all Persons seeking awards by the Bankruptcy Court of

compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is thirty (30) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Professional Compensation and Reimbursement Claim, provided however, that the aggregate amount of payments to Professional Persons subject to the Fee Cap shall not exceed the Fee Cap. Holders of such Professional Compensation and Reimbursement Claims that are required to file and serve applications for final allowance of their Professional Compensation and Reimbursement Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such claims against the Debtor, its properties or the Chapter 7 Estate (subject to the right of the Committee Case Professionals to be compensated from the Claims Objection Reserve for fees and expenses incurred to prosecute claims objections to Final Order after the Effective Date). Objections to any Professional Compensation and Reimbursement Claims must be filed and served on the Notice Parties and the Professional Person(s) to whom the objection(s) is/are directed no later than twenty (20) days (or such larger period as may be allowed by order of the Bankruptcy Court) after the date on which the relevant application(s) for final allowance of such Professional Compensation and Reimbursement Claims was/were filed and served.

PAC 948964v.10

Notwithstanding the foregoing, to the extent that the Allowed Professional Compensation and Reimbursement Claims of Professional Persons exceed the Fee Cap, the Professional Persons (other than Quantum Management (U.S.), Inc., Thompson & Knight LLP, Saul Ewing LLP or Horty & Horty, whose fees shall not be reduced) shall allocate any shortfall in the payment of their Allowed Professional Compensation and Reimbursement Claims among themselves Pro Rata in reduction of their respective fees or according to such other terms as such Professional Persons may agree.

### 2. Classified Claims and Interests

(a) **Class 1: Priority Non-Tax Claims** – The Plan defines Priority Non-Tax Claims as Claims entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (a) Administrative Expense Claims, and (b) Priority Tax Claims. The Plan provides that holders of Allowed Priority Non-Tax Claims shall be paid in full on the later of (a) the Effective Date, or (b) the date such Priority Non-Tax Claim becomes an Allowed Claim.

Class 1 is unimpaired and is deemed to accept the Plan.

(b) **Class 2: Property Damage Claims** – The Plan defines Property Damage Claims as contingent, unliquidated Claims asserted by residential real property owners for damage to residential real property resulting from the alleged release of environmental contaminants at the Grand Prairie Property. The Plan provides that, if Class 2 votes to accept the Plan, all Property Damage Claims properly filed on or before the Bar Date shall be deemed to be Allowed Property Damage Claims, and holders of such Allowed Property Damage Claims shall receive a Pro Rata share of $15,000 on the Effective Date.

38

If Class 2 votes to reject the Plan, the Plan provides that holders of Allowed Class 2 Claims shall receive nothing on account of their contingent, unliquidated Claims.

If Class 2 votes to reject the Plan, however, the Debtor and the Committee anticipate that the amount of Allowed Property Claims will be $0 following challenges by the Debtor and the Committee to the legal validity and allowability of such claims under the Bankruptcy Code.

Class 2 is impaired, and holders of Allowed Class 2 Claims are entitled to vote on the Plan.

(c)     **Class 3: EPA Claim and Liability** — The EPA Claim and Liability shall be treated as follows: On or prior to the Effective Date, the EPA Allocation shall be deposited into a segregated trust account which shall be used by the Chapter 7 Trustee exclusively to (i) comply with the Administrative Order, as it may be modified from time to time, with EPA oversight or (ii) if authorized in writing by EPA, fund any other environmental clean-up liabilities with respect to the Grand Prairie Property including the surrounding areas. Second, the portion of the EPA Claim and Liability related to penalties in the amount of $1.5 million (the "Subordinated Claim") shall be deemed Allowed and on the Effective Date subordinated and extinguished without any recovery. The remainder of the EPA Claim and Liability shall be a deficiency claim in the amount of $490,834 (the "EPA Deficiency Claim"). However, EPA has agreed to a reduction in the amount payable on the EPA Deficiency Claim to 17.6% of the total Allowed amount of the EPA Deficiency Claim ($85,896) which is the equivalent estimated Pro Rata recovery for Trade Claims under this Plan. The EPA Deficiency Claim shall not be entitled to any recovery under this Plan, however, the EPA

39

Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer.

Class 3 is impaired, and the EPA is entitled to vote on the Plan.

(d)     **Class 4: Trade Claims** — The Plan defines Trade Claims as any General Unsecured Claims that are not (a) the EPA Claim and Liability, (b) Property Damage Claims, (c) Convenience Claims, or (d) the TCEQ Claim and Liability. The Plan provides that the Debtor shall pay $300,000 to the holders of Allowed Trade Claims (the "Trade Claims Payment"). Holders of Allowed Trade Claims shall receive a Pro Rata share of the Trade Claims Payment on or before the Effective Date.

The Debtor shall establish and maintain the Disputed Claims Reserve with respect to Trade Claims that are not Allowed on the Effective Date. Upon the payment and complete distribution of the Trade Claims Payment, the Trade Claims will be deemed discharged and extinguished.

The aggregate amount of Trade Claims filed against or scheduled by the Debtor on or before the Bar Date is approximately $1.7 million. The Debtor and the Committee, however, anticipate that the amount of Allowed Trade Claims will be reduced following challenges by the Debtor and/or the Committee. Specifically, the Committee has filed two (2) omnibus objections to Claims that seek orders from the Bankruptcy Court disallowing or reducing duplicate Claims, superseded Claims, previously paid Claims, and Claims that are subject to other objections.

Class 4 is impaired, and holders of Allowed Class 4 Claims are entitled to vote on the Plan.

40

**(e)** **Class 5: Convenience Claims** — The Plan defines Convenience Claims as any Allowed Trade Claim in a Face Amount of $1,500 or less, or greater than $1,500 if the Claimholder has voluntarily reduced the Claim by exercising a Convenience Class Election. Claimholders can exercise a Convenience Class Election by completing and timely submitting the Ballot for Claim in Class 4 that is included with these solicitation materials. To be effective, the Ballot must be received by Potter Anderson & Corroon, LLP, Attn: Delfasco Voting, 1313 N. Market Street, 6th Floor, P.O. Box 951, Wilmington, DE 19899-0951 by the Ballot Deadline, and once validly submitted, a Convenience Class Election shall be irrevocable and binding on any successor-in-interest or assignee of such Claim.

The Plan provides that, notwithstanding the treatment provided to holders of Allowed General Unsecured Claims under any other provision of the Plan, any holder of a General Unsecured Claim whose Face Amount is either (a) $1,500 or less, or (b) greater than $1,500 but as to which the holder thereof submits a valid Convenience Class Election by the Ballot Deadline (thereby electing to reduce the Face Amount of their Claim to $1,500), shall receive Cash in the amount of their Allowed Convenience Claim on or prior to the Effective Date; provided, however, that if the aggregate amount of Allowed Convenience Claims exceeds $50,000, those having the lowest initial Face Amount shall be deemed to be Allowed Convenience Claims, and the remaining Convenience Claims shall be treated as Allowed Trade Claims for distribution purposes.

Class 5 is impaired, and holders of Allowed Class 5 Claims are entitled to vote on the Plan.

41

(f)    **Class 6:  TCEQ Claim and Liability** — Class 6 consists of the TCEQ Claim and Liability.  The TCEQ Claim and Liability shall be Allowed in the amount of $17.2 million.  However, TCEQ has agreed to a reduction in the amount payable on the TCEQ Claim and Liability to 17.6% of the total Allowed amount of the TCEQ Claim and Liability ($3,027,200) which is the equivalent estimated Pro Rata recovery for Trade Claims under this Plan.  The TCEQ Claim and Liability shall be treated as follows:

(i)    TCEQ shall receive no later than the Effective Date payment to TCEQ in the amount of $625,000 in cash, in partial satisfaction of the TCEQ Claim and Liability.  After the Effective Date, TCEQ shall spend not less than $625,000 exclusively to implement environmental response actions, including environmental investigation activities, and pay oversight costs with respect to the onsite and offsite contamination associated with the Grand Prairie Property, in consultation with EPA.

(ii)    The remainder of the Allowed TCEQ Claim and Liability shall be a deficiency claim in the amount of $2,402,200 (the "TCEQ Deficiency Claim").  The TCEQ Deficiency Claim shall not be entitled to any recovery under this Plan, however, the TCEQ Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer.

Class 6 is impaired, and TCEQ is entitled to vote on the Plan.

(g)    **Class 7:  Equity Security Interests** — The Plan defines Equity Security Interests as the ownership of a share in Delfasco, whether or not transferable or denominated "stock" or similar security.  The Plan provides that all such Equity Security Interests shall be discharged and extinguished in accordance with the Plan and all such

42

Equity Security Interests shall be deemed cancelled and extinguished as of the Effective Date without further court order or action under any applicable agreement, law, regulation or rule.

Class 7 is impaired, and holders of Equity Security Interests are deemed to reject the Plan.

## C. Conditions to and Means for Consummation of the Plan

### 1. Conditions to the Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

- the Confirmation Order shall have been entered on or before April 9, 2010 and shall have become a Final Order on or before April 26, 2010;

- the Confirmation Order shall expressly provide: (a) (i) that all payments made during the course of the Chapter 11 Case and/or under the Plan before the Conversion and Transfer Date are final and unavoidable by any party, including, without limitation, the Chapter 7 Trustee, or any successor thereto, and (ii) any Causes of Action related to such claims or their payment are extinguished, waived, released; and (b) that the provisions of the Plan and Confirmation Order are binding on the Debtor, and the Chapter 11 Estate's successors and assigns, including without limitation, the Chapter 7 Trustee or any successor thereto;

- all Classes entitled to vote on the Plan either (a) voted to accept the Plan or (b) have been "crammed down" pursuant to section 1129(b) of the Bankruptcy Code;

- all payments required to be made prior to the Effective Date have been made; including but not limited to, the deposit of the EPA Allocation into a segregated trust account and payment of the Trade Claims Payment in accordance with the provisions hereof; and

PAC 948964v.10

- all the terms and conditions of the Asset Purchase Agreement required to be satisfied by the Effective Date shall have been met or waived in writing by the parties thereto and the sale contemplated thereby has closed.

## 2. Conditions to the Occurrence of the Conversion and Transfer Date

In addition to the conditions precedent to the Effective Date, the following are conditions precedent to the occurrence of the Conversion and Transfer Date:

- the Effective Date shall have occurred;

- all payments contemplated to be made prior to the occurrence of the Conversion and Transfer Date under the provisions of this Plan have been made;

* the EPA shall have filed a motion to dismiss the EPA Litigation;

- all transactions contemplated by the Asset Purchase Agreement have been fully consummated; and

- an order, substantially in the form included with the plan supplement to be filed by the Debtor with the Bankruptcy Court on or before March 26, 2010, effecting the conversion of the Chapter 11 Case to the Chapter 7 Case and the transfer of the Chapter 7 Case to the Texas Bankruptcy Court shall have become a Final Order.

All such conditions precedent to the occurrence of the Conversion and Transfer Date shall have been met no later than 120 days after the Effective Date, provided however, that any party in interest may file a motion with the Bankruptcy Court to extend such deadline for good cause shown. Alternatively, the Debtor, the Committee, the Purchaser, EPA and TCEQ, in their sole discretion, may agree in writing to waive any of the foregoing Conditions Precedent to the Conversion and Transfer Date and/or may agree in writing to extend any of the time periods or deadlines established by the Plan.

44

### 3. Means for Implementing the Plan

#### a. Asset Purchase Agreement

The Debtor and the Purchaser have agreed on the terms of the Asset Purchase Agreement. The funds received from the sale of the assets pursuant to the Asset Purchase Agreement in conjunction with the remaining non-purchased assets are sufficient to enable the Debtor to make all of the payments it is required to make under this Plan.

The Confirmation Order shall constitute approval by the Bankruptcy Court of the Asset Purchase Agreement and the transactions contemplated thereby as if its terms were set forth fully therein.

#### b. Liquidation of the Grand Prairie Property

As set forth in Article IX.B below, on the Conversion and Transfer Date, by agreement reached between the Debtor, the Committee, the Purchaser, TCEQ and EPA, the Debtor's Chapter 11 Case will be converted to the Chapter 7 Case, and venue of the Chapter 7 Case will be transferred to the Texas Bankruptcy Court. The Chapter 7 Trustee will administer the Grand Prairie Property and the other Chapter 7 Estate Assets. The EPA may modify its Administrative Order so that it is made applicable to the Chapter 7 Trustee to the extent of available funds in accordance with the Plan. The revenue or proceeds from the Grand Prairie Lease and any sale of the Grand Prairie Property or any portions or parcels thereof or improvements thereon shall be available to satisfy the costs and fees associated with the administration of the Chapter 7 Estate and payment of its professionals in accordance with the provisions of chapter 7 of the Bankruptcy Code.

#### c. Exemption from Transfer Taxes

There will be no Transfer Taxes owed by Delfasco on any transaction in connection with or in contemplation of this Plan.

D.    **Provisions Regarding Distributions**

  1.    **General Provisions Regarding Time and Manner of Distributions**

Any Distributions to be made by the Debtor under the Plan shall be made at the times specified in the Plan and discussed throughout this Disclosure Statement. Whenever any Distribution to be made under the Plan is due on a day other than a Business Day, such Distribution shall be made, without interest, on the next Business Day. Distributions shall be made in Cash by check drawn on a domestic bank or by wire transfer from a domestic bank.

  2.    **Unclaimed Distributions**

If any Distribution under the Plan remains unclaimed for a period of one hundred eighty (180) days after such Distribution has been made (or after such delivery has been attempted) in accordance with the Plan to a Claimholder entitled thereto, such unclaimed Distribution shall be deemed forfeited by such Claimholder, whereupon all right, title and interest in and to such unclaimed Distribution will immediately and irrevocably revest in the Chapter 7 Estate.

E.    **Injunction and Exculpation**

  1.    **Injunction**

Except as otherwise expressly provided herein and in any related documents, and except in connection with the enforcement of the terms of this Plan or any documents provided for or contemplated in this Plan, all entities who have held, hold or may hold Claims or Causes of Action against or interests in the Debtor or the Chapter 11 Estate that arose prior to the Effective Date, including, without limitation, the EPA Claim and Liability and the TCEQ Claim and Liability, except with regard to the Chapter 7 Estate Liabilities, are, with respect to such Claim, interest or Cause of Action, permanently enjoined from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including without limitation, any proceeding in a judicial, arbitral, administrative or other

46

forum) against or affecting the Debtor, any of its property, and of its agents, successors and assigns, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing persons or entities, including, without limitation, the Purchaser, (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, on any judgment, award, decree or order against the Debtor, any of its property, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing persons or entities, or any property of any such transferee or successor-in-interest, including, without limitation, the Purchaser, (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance or Lien of any kind against the Debtor or any of its property, or any direct or indirect transferee of any property of, or successor-in-interest to, any of the foregoing persons or entities, including, without limitation, the Purchaser, provided however, that nothing in this Plan releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property arising after the Effective Date. Further, notwithstanding any provision of this Plan or the Confirmation Order to the contrary, nothing herein shall preclude any environmental regulatory authority from seeking injunctive relief against the Chapter 7 Trustee or Chapter 7 Estate in any court of competent jurisdiction.

## 2. **Exculpation**

Other than as provided for in the Plan, none of the Debtor, the Purchaser, the Owners, or the Committee and the members thereof in their capacity as such, nor any of their respective officers, directors, employees or other agents, financial advisors, attorneys, and accountants shall have any liability to any holder of any Claim or interest, including, without limitation, the EPA Claim and Liability and the TCEQ Claim and Liability, for any act or omission in connection

47

with or arising out of the negotiation, preparation and pursuant of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the Chapter 11 Case or the property to be distributed under the Plan. Nothing in this section shall (i) be construed to exculpate any entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, misuse of confidential information that causes damages, or ultra vires acts; or (ii) limit the liability of the professionals of the Debtor and the Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

Except as expressly provided herein, nothing in any section of this Plan shall effect a release in favor of any Person other than the Debtor or the Purchaser, or any of their respective financial advisors, attorneys, and accountants with respect to any debt owed to the United States Government, any state, city or municipality for any liability of such Person arising under (i) the Internal Revenue Code, or any state, city or municipal tax code, (ii) the environmental laws of the United States, any state, city or municipality or (iii) any criminal laws of the United States, any state, city or municipality.

**F.    Executory Contracts and Leases**

As of the Confirmation Date, any executory contract or unexpired lease of personal property entered into by Delfasco that has not been assumed or rejected or subject to a pending motion to assume or reject, other than the Grand Prairie Lease, shall be deemed rejected as of the Confirmation Date, including, but not limited to, the Texas Commission on Environmental Quality Voluntary Cleanup Program Agreement by and between the Debtor and TCEQ dated April 23, 2003 and amended in March 2004.

To the extent that the Debtor's rejection of executory contracts results in Allowed Claims for rejection damages that increase the aggregate pool of Allowed Trade Claims by 5% or more, the Trade Claims Payment shall be increased by an amount sufficient to preserve the projected

48

return to holders of Allowed Trade Claims, including such Allowed Trade Claims resulting from Allowed Claims for rejection damages.

Presently, the list of executory contracts and unexpired leases of personal property that shall be assumed by the Debtor and assigned to the Purchaser is as set forth in the Asset Purchase Agreement. The Purchaser shall have the right through the Confirmation Date to designate additional executory contracts or unexpired leases of personal property for assumption by the Debtor as set forth in the Asset Purchase Agreement.

The Confirmation Order shall be deemed an order under sections 365 and 1123 of the Bankruptcy Code, without further need for court order or action by any party rejecting any such executory contracts and leases of personal property, including but not limited to the Texas Commission on Environmental Quality Voluntary Cleanup Program Agreement by and between the Debtor and TCEQ dated April 23, 2003 and amended in March 2004, but specifically excluding the Grand Prairie Lease.

## G.   General Provisions and Retention of Jurisdiction

### 1.   Retention of Jurisdiction

The Bankruptcy Court shall retain jurisdiction up to and including the time of the occurrence of the Conversion and Transfer Date for the following purposes:

a.    To hear and determine any dispute relating to the Plan or any property described in the Plan and to enforce its provisions;

b.    To hear and determine all issues arising out of any motions, applications, adversary proceedings or contested or litigated matters in the Chapter 11 Case pending at the Confirmation Date;

c.    To order recovery of any assets of Delfasco;

d.    To hear and determine all issues relating to any purchases, sales or contracts made or undertaken by Delfasco during the pendency of the Chapter 11 Case;

49

e.  To hear and determine all objections to Claims and all controversies concerning classification, allowance, valuation, liquidation, estimation, satisfaction, subordination, re-characterization or reclassification of Claims to the extent not resolved prior or on to the Confirmation Date;

f.  To make orders allowing amendment of the Schedules filed in the Chapter 11 Case for any purpose including, without limitation, to prosecute objections to Claims not previously listed as disputed, contingent or unliquidated;

g.  To hear and determine all applications by Professional Persons for compensation of fees and reimbursement of expenses arising out of or relating to the Chapter 11 Case or any Claims;

h.  To make such other orders or give such directions as permitted by Section 1142 of the Bankruptcy Code;

i.  To consider and order any modifications or amendments requested to the Plan;

j.  To remedy any defect or omission or reconcile any inconsistency in the Plan or the Confirmation Order in such manner as may be necessary or desirable to carry out the purposes and intent of the Plan;

k.  To make all orders necessary or appropriate to carry out the provisions of the Plan;

l.  To enforce all orders previously entered by the Bankruptcy Court;

m.  To enforce the injunctions contained in this Plan; and

n.  To determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the Bankruptcy Code.

## 2.  **Notices**

Any notice, demand, claim or communication under this Plan shall be in writing and shall be deemed to have been given upon receipt by or the personal delivery thereof of service by next day delivery service or upon the seventh day following mailing thereof, if sent by registered mail, return receipt requested, postage prepaid by next day delivery, to the respective address of

the Notice Parties set forth below, or to such other address as a Notice Party may specify by notice given as herein provided:

If to Delfasco to:

Delfasco, Inc.
15 Bellecor Drive
Industrial Park Place
New Castle, DE 19720
Attn: Philip Kadlecek

with copies to:

Potter Anderson & Corroon LLP
1313 North. Market Street, 6th Floor
Wilmington, DE 19801
Attn: Steven M. Yoder, Esq.

If to the Committee to:

Official Committee of Unsecured Creditors of Delfasco, Inc.
c/o Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attn: Eric R. Wilson, Esq.
        Kristin S. Elliot, Esq.

If to the Purchaser:

Pillar Capital Holdings, LLC
61 Broadway
Suite 2607
New York, NY 10006
Attn: Jack Goldenberg

with copies to:

Hahn & Hessen LLP
488 Madison Ave.
New York, NY 10022
Attn: Gilbert Backenroth, Esq.
        James C. Kardon, Esq.

51

Jeffrey Zawadzki, Esq.

### 3.    Severability

Should any provision in the Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability or operative effect of any or all other provisions of the Plan.

### 4.    Dissolution of the Committee

As of the later of (i) the Effective Date, and (ii) the date on which all objections to General Unsecured Claims have been filed and prosecuted and/or otherwise resolved pursuant to Final Order, the Committee shall be dissolved, and all members of the Committee and the Committee's Professionals shall be discharged from their duties as members of, and professionals retained by, the Committee. Notwithstanding the dissolution of the Committee, the members of the Committee retain the right to seek reimbursement of expenses (in the case of members of the Committee) and final compensation (as to Committee Chapter 11 Professionals). Neither the members of the Committee, nor any of its retained professionals, employees or agents shall be liable for any act taken, suffered or omitted to be taken in their capacity as members of the Committee or in reliance on any provision of the Plan, except for acts of gross negligence or willful misconduct (which gross negligence or willful misconduct must be determined by a Final Order in a court of competent jurisdiction), in the performance of duties for the Committee. Notwithstanding anything herein to the contrary, in no event shall any member of the Committee or its professionals be liable to any party on account of the performance of duties for the Committee in an amount that exceeds the fees and expenses such Committee member or professional has received for its service on or to the Committee. Notwithstanding anything to the contrary herein, if the Committee remains in existence after the Effective Date to prosecute and/or resolve pending objections to General Unsecured Claims, an

52

amount equal to $10,000 shall be reserved from the Fee Cap to pay the reasonable fees and expenses incurred by Committee Chapter 11 Case Professionals to prosecute and/or resolve pending objections to General Unsecured Claims (the "Claims Objection Reserve"), which fees and expenses shall not be subject to Bankruptcy Court approval. Any unused portion of the Claims Objection Reserve shall be distributed among the Professional Persons subject to the Fee Cap pursuant to the terms of the Fee Cap Agreement.

### 5. Post-Confirmation Payment of Statutory Fees

From and after the Effective Date, the Debtor shall pay all fees payable under section 1930 of title 28 of the United States Code as and when such fees are due until the Conversion and Transfer Date.

### H. Provisions Concerning Causes of Action

In consideration of the compromises made by the Committee in negotiating the Plan, on the Confirmation Date, the Debtor, on behalf of itself and the Estate shall be deemed to have waived any and all Avoidance Actions the Estate may have against holders of Claims. The waiver of Avoidance Actions shall be binding on the Debtor's and the Chapter 11 Estate's successors and assigns, including, without limitation, the Chapter 7 Trustee.

The Chapter 7 Trustee may enforce only those claims, rights or Causes of Action expressly included among the Chapter 7 Estate Assets, and any recovery therefrom shall inure to the benefit of and become a Chapter 7 Estate Asset. By way of example, and not limitation, the Chapter 7 Estate shall retain any causes of action not specifically released under the Plan for environmental claims or liabilities related to the Grand Prairie Property against any third parties provided however, that any claims, rights, or Causes of Action against the United States of America or the State of Texas or any agencies or instrumentalities relating to any environmental

PAC 948964v 10

law or regulation or any claim alleged with regard to the automatic stay under section 362 of the Bankruptcy Code are fully waived, extinguished and released under the Plan.

## I.    Modification of The Plan

The Debtor reserves the right to propose amendments to or modifications of this Plan under section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date, Delfasco may modify this Plan in accordance with section 1127(b) of the Bankruptcy Code to remedy any defects or omissions or to reconcile any inconsistency in this Plan or in the Confirmation Order in such a manner as may be necessary to carry out the purposes and intent of this Plan, so long as the rights of Claimants or Equity Security Holders are not materially modified or altered to their detriment without their express written consent.

## J.    Procedure for Resolving Disputed Claims

### 1.    Objections to Claims

The Debtor or the Committee shall have the authority to object to the allowance of Claims or Interests filed with the Bankruptcy Court where the Debtor or the Committee, if applicable, disputes liability or allowance in whole or in part. The Debtor or the Committee, if applicable, will file and serve all objections to Claims as soon as practicable, but in no event later than the Confirmation Date.

### 2.    Estimation of Claims

The Debtor or the Committee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor previously objected to such contingent or unliquidated Claim or whether the Bankruptcy Court ruled on any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, if the Bankruptcy Court estimates any contingent or

54

unliquidated Claim, the amount so estimated will constitute the Allowed Amount of such contingent or unliquidated Claim.

### 3. Payments and Distributions on Disputed Claims

No payments or other Distributions will be made to a holder of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

At the time any Distributions are made to holders of Allowed Claims, an amount sufficient to have paid each holder of a Disputed Claim its Pro Rata share of such Distribution, calculated according to the Face Amount of such Claim, shall be reserved and held in escrow by the Debtor (i.e. held in the Disputed Claims Reserve) for the potential benefit of the holder of the Disputed Claim, and thereafter an amount based upon the Allowed Amount of the Claim shall be distributed as set forth above, but in the event that a creditor asserts duplicative, overlapping or multiple Claims, the total amount reserved shall not exceed the total amount subject to Distribution to such holder on account of such Claim.

The Disputed Claims Reserve shall be held by the Debtor in an interest bearing account.

If a Disputed Claim is disallowed by Final Order, any Cash held in the Disputed Claims Reserve on account of such Claim shall be reallocated and distributed on a Pro Rata basis among holders of Allowed Claims of the Class in which the disallowed Claim was classified under the Plan.

## VI. CONFIRMATION PROCEDURES

In order for the Plan to be confirmed by the Bankruptcy Court, all of the applicable requirements of Bankruptcy Code Section 1129 must be met. These include, among others, requirements that the Plan: (i) is accepted by all impaired Classes or, if rejected by an impaired Class, "does not discriminate unfairly" and is "fair and equitable" as to each rejecting Class; (ii)

is feasible; and (iii) is in the best interests of holders of Claims or Interests in each impaired Class.

### A.      Solicitation of Votes; Acceptance

The Debtor is soliciting the acceptance of the Plan from all holders of Claims in Classes that are impaired under the Plan and may receive Distributions on account of their Claims. The Classes of Claims entitled to vote on the Plan are Classes 2, 3, 4, 5 and 6. Class 1 is not impaired under the Plan. Since that Class is unimpaired, its members are deemed to have accepted the Plan and, therefore, they are not entitled to vote to accept or reject the Plan. Members of Class 7 will not receive any Distributions on account of their Interests, as applicable under the Plan, and therefore, they are impaired and deemed to reject the Plan.

### B.      Confirmation Hearing

Bankruptcy Code Section 1128(a) requires the Bankruptcy Court, after notice, to hold a hearing on confirmation of the Plan after the period for submission of Ballots has expired. The Bankruptcy Court has scheduled the Confirmation Hearing for April 9, 2010 at 9:30 a.m. at the United States Bankruptcy Court, which is located at 824 North Market Street, Wilmington, Delaware 19801. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Debtor without further notice except for an announcement of the postponement made at the Confirmation Hearing.

Bankruptcy Code Section 1128(b) provides that any party in interest may object to Confirmation of the Plan. Objections to Confirmation must be in writing and specify in detail the name and address of the objector, all grounds for the objection and the nature and amount of the Claim or Interest held by the objector, and must otherwise comply with the requirements of the Bankruptcy Rules and the Local Bankruptcy Rules. Objections must be filed with the Clerk of the Bankruptcy Court, with a courtesy copy delivered to the chambers of the Honorable Mary

56

F. Walrath, United States Bankruptcy Judge, and served upon the parties so designated in the Order and Notice accompanying this Disclosure Statement by the Confirmation Objection Deadline.

**FAILURE TO TIMELY FILE AND SERVE AN OBJECTION TO CONFIRMATION MAY BE DEEMED BY THE BANKRUPTCY COURT TO BE CONSENT TO CONFIRMATION OF THE PLAN.**

At the Confirmation Hearing, the Bankruptcy Court will determine, among other things, whether the following confirmation requirements specified in Bankruptcy Code section 1129 have been satisfied:

1.    The Plan complies with the applicable provisions of the Bankruptcy Code;

2.    The Debtor has complied with the applicable provisions of the Bankruptcy Code.

3.    The Plan has been proposed in good faith and not by any means proscribed by law.

4.    Any payment made or promised by the Debtor, or by a person issuing securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Case, has been approved by the Bankruptcy Court as reasonable, or is subject to Bankruptcy Court approval.

5.    Each holder of a Claim in an impaired Class either has accepted the Plan or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such entity would receive or retain if the Debtor were liquidated on such date under Chapter 7 of the Bankruptcy Code. (*See* the discussion of the "Best Interests Test" below.)

6.    Except to the extent that the holder of a Claim has agreed to different treatment, the Plan provides that: (a) Allowed Administrative Claims will be paid in full on the later of the

57

Effective Date or the date the Claim becomes an Allowed Claim; (b) other Priority Non-Tax Claims will be paid in full on the Effective Date or the date such Claims become Allowed Claims; and (c) Priority Tax Claims will be paid in full on the Effective Date or the date such Claims become Allowed Claims.

7.      At least one impaired Class has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class.

### C.      **Best Interests Test/Liquidation Analysis**

The "best interests of creditors" test requires that the Bankruptcy Court find either that all members of each impaired class have accepted the Plan or that each holder of an Allowed Claim or Interest in each impaired Class of Claims or Interests will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtor were liquidated under Chapter 7 of the Bankruptcy Code on such date.

To calculate what holders of Claims would receive if the Debtor was hypothetically liquidated under Chapter 7 of the Bankruptcy Code, the Bankruptcy Court must first determine the dollar amount that would be realized from the liquidation (the "Chapter 7 Liquidation Fund"). The Chapter 7 Liquidation Fund would consist of the net proceeds from the disposition of the Debtor's assets (after satisfaction of all valid Liens) augmented by the Cash held by the Debtor and recoveries on actions against third parties, if any. The Chapter 7 Liquidation Fund would then be reduced by the costs of the liquidation.

The costs of liquidation under Chapter 7 would include the fees and expenses of a Chapter 7 trustee, as well as those of counsel and other professionals that might be retained by the trustee, selling expenses, any unpaid expenses incurred by the Debtor during the Chapter 11 Case (such as Professional fees)—which would be allowed in a Chapter 7 proceeding, and

interest expense on secured debt and Secured Claims incurred by the Debtor during the pendency of the Chapter 11 Case. These Claims would be paid in full from the Chapter 7 Liquidation Fund before the balance of the Chapter 7 Liquidation Fund, if any, would be available to distribute to holders of Allowed General Unsecured Claims.

Additionally, the costs of the Chapter 7 trustee and other Claims arising during the pendency of a Chapter 7 proceeding would dilute the balance of the Chapter 7 Liquidation Fund available to holders of Claims in the Chapter 11 Case. Upon the commencement of a Chapter 7 proceeding, a new bar date would also be established, which might result in the allowance of additional claims against the Estate that would further dilute the recoveries available to holders of Allowed Claims in a Chapter 7 liquidation.

Once these factors are accounted for, the present value of estimated distributions available from the Chapter 7 Liquidation Fund are then compared with the present value of the property offered to each of the Classes of Claims and holders of Interests under the Plan to determine if the Plan is in the best interests of each holder of a Claim.

The Debtor believes that a Chapter 7 liquidation of the Debtor's assets outside this Plan would result in lower distributions to holders of Allowed Claims than they will receive under the Plan. This belief is based upon, among other factors: (a) the compromised treatment of claims the Debtor was able to negotiate with EPA and TCEQ; (b) the substantial time which would elapse before creditors would receive any distribution in respect of their Claims due to the Chapter 7 trustee's need to familiarize him or herself with the Chapter 11 Case and the Debtor's books and records, and the Chapter 7 trustee's duty to conduct independent investigations; (c) the additional Unsecured Claims that may be asserted against the Debtor in a Chapter 7 proceeding; (d) the substantial cost and delay that the Plan can avoid and, most importantly; (e)

59

the costs and uncertainty of outcome related to the litigation that would be required to obtain the bargained for benefits under the Plan.

As indicated in the liquidation analysis submitted in conjunction herewith, the Debtor believes that a liquidation of the Debtor's assets under Chapter 7 outside of this Plan would result in no recovery to any existing Unsecured Creditors other than EPA and TCEQ. Further, even if the EPA Claim and Liability and TCEQ Claim and Liability were expunged or subordinated, the Debtor maintains, as shown in the liquidation analysis that creditors would still receive a greater distribution under the Plan than they would receive in a liquidation of the Debtor under Chapter 7 outside of this Plan largely as a result of the Purchaser's willingness to consummate the transaction proposed by the Plan and Asset Purchase Agreement.

### D.    **"Cramdown"**

The Bankruptcy Code provides a mechanism by which a plan may be confirmed even if it has been rejected by an impaired class of claims. Under the "cram down" provisions of section 1129(b) of Bankruptcy Code, the Debtor may request that the Plan be confirmed over the rejection by an impaired class if the Plan (i) does not discriminate unfairly against the dissenting impaired Class, and (ii) is fair and equitable with respect to such Class.

The Bankruptcy Code sets forth specific guidelines for determining whether a plan is fair and equitable with respect to a particular Class of Claims. Under section 1129(b) of the Bankruptcy Code, a plan is "fair and equitable" to a class if, among other things, the plan provides: (a) with respect to secured claims, that each holder of a claim included in the rejecting class will receive or retain on account of its claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; and (b) with respect to unsecured claims and equity interests, that the holder of any claim or equity interest that is junior to the claims or equity interests of such class will not receive or retain on account of such junior claim

60

or equity interest any property at all unless the senior class is paid in full. A plan does not discriminate unfairly if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are similar to those of the dissenting class and if no class receives more than it is entitled to receive on account of its claim or interest.

THE DEBTOR INTENDS TO SEEK CONFIRMATION OF THE PLAN IF LESS THAN THE REQUISITE AMOUNTS OF CLAIMS OR INTERESTS IN ANY ONE OR MORE CLASSES VOTE TO ACCEPT THE PLAN.

## VII. CERTAIN FEDERAL INCOME TAX CONSIDERATIONS

**CREDITORS AND INTEREST HOLDERS ARE ADVISED TO CONSULT WITH THEIR OWN TAX ADVISORS REGARDING THE TAX CONSEQUENCES TO THEM AND TO THE DEBTOR OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES.** Since the tax consequences for each creditor will depend to a considerable extent upon its particular situation, the Debtor recommends that each creditor review the entire Plan and this Disclosure Statement to best determine the tax consequences of the Plan.

PAC 948964v.10

## VIII. CONCLUSION

**Debtor and Committee's Recommendation.** The Debtor and the Committee believe that Confirmation and implementation of the Plan is in the best interests of creditors, is preferable to any other alternative and recommends that creditors entitled to vote on the Plan vote in favor of the Plan.

Dated: Wilmington, Delaware
  March 4, 2010

**DELFASCO, INC.**

By:  /s/ Philip E. Kadlecek
  Name: Philip E. Kadlecek
  Title:  President

Prepared By:
**POTTER ANDERSON & CORROON LLP**
*Attorneys for Delfasco, Inc.*

Steven M. Yoder (No. 3885)
Theresa V. Brown-Edwards (No. 4225)
Etta R. Wolfe (No. 4164)
Stephen McNeill (No.5210)
1313 North Market Street
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

PAC 948964v.10