# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | ) | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| DELFASCO, INC., | ) | Case No. 08-11578 (MFW) |
| | ) | |
| Debtor. | ) | **Re: Docket No. 488** |
| | ) | |

## DECLARATION OF EDWARD T. GAVIN IN SUPPORT OF CONFIRMATION OF THE PLAN OF LIQUIDATION OF DELFASCO, INC., AS AMENDED

I, Edward T. Gavin, hereby declare under penalty of perjury:

1. I am a Principal of NHB Advisors, Inc. ("NHB") and hold the Certified Turnaround Professional designation from the Association of Certified Turnaround Professionals. NHB is a financial advisory and turnaround management firm headquartered in Philadelphia, Pennsylvania, with additional offices located in New York, Boston, Dallas and Wilmington, among other locations. NHB has extensive experience as financial advisors in bankruptcy and reorganization proceedings, and I have several years experience providing financial advisory and management services to debtors, creditors committees and other parties-in-interest in chapter 11 bankruptcy proceedings throughout the country. A copy of my curriculum vitae is attached hereto as Exhibit A.

2. On November 17, 2008, the United States Bankruptcy Court for the District of Delaware entered an order authorizing the Official Committee of Unsecured Creditors (the "Committee") of Delfasco, Inc. (the "Debtor") to retain NHB as the Committee's financial advisor. I am the person at NHB with primary responsibility for NHB's representation of the Committee.

3. As such, and unless otherwise indicated, I have personal knowledge of the facts set forth herein. I am authorized to make this declaration on the Committee's behalf in

support of confirmation of the Plan of Liquidation of Delfasco, Inc., As Amended (the "Plan").[1]
I have reviewed and am familiar with the terms and provisions of the Plan and the disclosure statement for the Plan (the "Disclosure Statement"). If called upon to testify, I could and would testify to each of the facts set forth herein.

A.  **Solicitation of Exit Financing Offers or, Alternatively, Offers to Acquire Substantially All of the Debtor's Assets**

4.  In or about October 2009, NHB, at the Debtor's request and with the Committee's authorization and consent, initiated extensive marketing efforts (the "Solicitation Efforts") to solicit offers from potential exit financiers to provide exit financing and post-petition working capital required for the Debtor to reorganize. In addition to soliciting offers for exit financing, NHB, at the Debtor's request and with the Committee's authorization and consent, also solicited offers from parties potentially interested in acquiring the Debtor's assets as a going concern.

5.  In preparing for and conducting the Solicitation Efforts, and continually throughout the process, I was advised and informed by the Debtor and its counsel that the primary focus and goal of the Solicitation Efforts was to procure exit financing to allow the Debtor to reorganize, and that offers to purchase the Debtor's assets as a going concern were being solicited as a back-up in the event exit financing on commercially reasonable terms was not available. Potential purchasers who expressed interest in acquiring the Debtor's assets as a going concern were advised that the Debtor's primary goal was to obtain exit financing to facilitate a stand-alone reorganization of the Debtor.

6.  To implement the Solicitation Efforts, NHB prepared an overview of the Debtor's business and operations that contained non-confidential material about the Debtor (the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Plan.

"Teaser"). The Teaser was based on information the Debtor provided to NHB and other public information regarding the Debtor's business and the industry in which the Debtor operates. A copy of the Teaser is attached hereto as Exhibit B.

7. Simultaneously with its preparation of the Teaser, NHB also created and hosted an electronic data room (the "Data Room") containing information necessary for interested parties to perform due diligence regarding a potential transaction. The Data Room was populated with various information obtained from the Debtor, and it also included projections and other financial information/models describing the Debtor's business that were created by NHB and reviewed and approved by the Debtor, which were based on information provided by the Debtor.

8. NHB sent the Teaser to, among other parties, strategic operating companies who might have an interest in the Debtor's business, financial purchasers and financing sources such as private equity funds and hedge funds, regulated depository institutions and non-regulated institutions, investment bankers, attorneys and other restructuring professionals who might know of additional parties interested in the Debtor's business. Among the strategic operating companies contacted included those determined by the Debtor to be strategic competitors and of whom the Debtor advised NHB.

9. The Teaser was received by 1,029 parties. Of those parties, thirty-one (31) executed a non-disclosure agreement and gained access to the Data Room.

10. Twelve (12) of the parties who gained access to the Data Room subsequently submitted letters of intent regarding potential exit financing for the Debtor (collectively, the "Financing Offers"). NHB also received three (3) letters of intent from parties

interested in serving as a plan sponsor or purchasing the Debtor's assets (collectively, the "Sponsorship/Purchasing Offers").

11. All of the Financing Offers consisted of asset-based lending facilities with availability ranging from $1.5 to 2.5 million, subject to borrowing base limitations. After accounting for fees and interest, the "all-in" pricing offered under the Financing Offers ranged from 9.00% to 29.00%.

12. The Sponsorship/Purchasing Offers included (a) two (2) offers from private equity firms to purchase the Debtor's assets pursuant to a section 363 sale (the "Purchase Offers"), and (b) an offer from Delfasco Finance LLC ("Delfasco Finance") to sponsor a plan of reorganization of the Debtor (the "Delfasco Finance Offer").

13. Pursuant to the Delfasco Finance Offer, Delfasco Finance offered to provide a $1.5 million exit financing facility to the Debtor at 5% interest, plus the assumption of certain liabilities of the Debtor. After accounting for purchase price adjustments, the other Purchase Offers provided less than the $1.5 million offered by Delfasco Finance. The interest rate offered by Delfasco Finance is also substantially lower than the all-in rates quoted under the Financing Offers.

14. I understand that the Debtor reviewed all of the Financing and Sponsorship/Purchasing Offers and, in consultation with its counsel, the Committee and counsel for the Committee, determined that the Delfasco Finance Offer represented the highest offer and the best likelihood for consummating a transaction that will preserve the Debtor's going concern value, jobs and also provide the highest and best recovery to creditors.

15. Based on my review of the Financing and Sponsorship/Purchasing Offers, as well as my understanding of the Debtor's financial condition and business operations, I agree

that the Delfasco Finance Offer represents the highest and best offer received through the Solicitation Efforts.

B. **Projections and Liquidation Analysis Submitted in Support of the Plan**

16. In connection with the development of the Plan, the Debtor and NHB prepared four (4) year cash flow projections through the period ending December 31, 2013 (collectively, the "Projections"). NHB prepared the Projections in good faith based on information provided by the Debtor and assumptions believed to be reasonable. The Debtor reviewed and approved the Projections as being accurate and reasonable.

17. The Projections estimate the revenues, expenses and resulting cash flow of the Debtor if it were to reorganize instead of liquidate according to the compromises set forth in the Plan between the Debtor and its various constituencies, including the Committee, Delfasco Finance, TCEQ and the EPA.

18. The Projections show, among other things, that the Debtor is projected to have sufficient cash on the Effective Date to satisfy Claims in accordance with their treatment under the Plan.

19. In connection with the development of the Plan, the Debtor and NHB also prepared a liquidation analysis (the "Liquidation Analysis"). NHB prepared the Liquidation Analysis in good faith based on information provided by the Debtor and assumptions believed to be reasonable.

20. The Liquidation Analysis demonstrates the estimated value the Debtor's creditors might obtain if the Debtor's assets were liquidated pursuant to chapter 7 of the Bankruptcy Code, contrasted against projected creditor recoveries under the Plan.

21. The Liquidation Analysis reflects that, if the Debtor's assets were liquidated in a chapter 7 proceeding, holders of Allowed Claims would receive less on account of such Claims than they are projected to receive under the Plan.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on April 6, 2010 at Wilmington, Delaware.

_____
Edward T. Gavin