# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| DELFASCO, INC., | : | Case No. 08-11578 (MFW) |
|  | : |  |
| a Delaware corporation, | : |  |
|  | : |  |
| Debtor. | : |  |

## PLAN OF LIQUIDATION OF DELFASCO, INC., AS AMENDED

**POTTER ANDERSON & CORROON LLP**
Steven M. Yoder (No. 3885)
Theresa V. Brown-Edwards (No. 4225)
Etta R. Wolfe (No. 4164)
R. Stephen McNeill (No. 5210)
Hercules Plaza, Seventh Floor
1313 N. Market Street
Wilmington, Delaware 19801
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Counsel for Debtor and Debtor in Possession*

Dated: March 4, 2010, as modified April 8, 2010

# ARTICLE 1

# INTRODUCTION

Delfasco, Inc. hereby proposes the following Plan of Liquidation, as amended (the "Plan") for the resolution of outstanding Claims against and Interests in Delfasco. For a detailed description of the Plan, and voting thereon, please review the Revised Disclosure Statement for the Plan dated March 4, 2010.

**This Plan amends and supersedes the Plan of Reorganization filed at docket number 443 by Delfasco on January 20, 2010.**

# ARTICLE II

# DEFINITIONS

In addition to such other terms as are defined in other sections of this Plan, the capitalized terms below have the following meanings as used in the Plan:

**"Administrative Bar Date"** means the applicable date by which Administrative Expense Claims are required to be filed, as established by order of the Bankruptcy Court. The first Administrative Bar Date was set by Bankruptcy Court order as February 2, 2009, and applied to all Administrative Expense Claims accruing between the Petition Date and November 30, 2008. **All other Administrative Expense Claims arising from November 30, 2008 through the Effective Date shall be filed within thirty (30) days of the Effective Date or any Person asserting such Claims shall be forever barred from asserting such Administrative Expense Claims against the Debtor, the Estate, its successors or assigns, or the property of any of the foregoing.**

**"Administrative Expense Claim"** means any right to payment constituting a cost or expense of administration of the Chapter 11 Case Allowed under sections 330, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code, including, without limitation, (a) any actual and necessary

costs and expenses of preserving the Debtor's estate, (b) any actual and necessary costs and expenses of preserving the Debtor's business, (c) any indebtedness or obligations incurred or assumed by the debtor-in-possession during the Chapter 11 Case, and (d) Claims pursuant to section 503(b)(9) of the Bankruptcy Code, for the value of goods received by the Debtor in the 20 days immediately prior to the Petition Date and sold to the Debtor in the ordinary course of the Debtor's business, without the need for application to or approval of the Bankruptcy Court. Any fees or charges assessed against the Debtor's estate under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claims and shall be paid in accordance with this Plan.

"**Administrative Order**" means that administrative order titled "RCRA § 7003 Unilateral Administrative Order" assigned EPA Docket No. RCRA-06-2008-0907 issued by EPA to Delfasco on July 2, 2008.

"**Allowed Amount**" means the dollar amount of an Allowed Claim.

"**Allowed [_____] Claim**" means any Allowed Claim of a specified Class.

"**Allowed Claim**" means a Claim that: (1) (a) either (i) is set forth in a proof of claim that was or is timely filed or, by order of the Bankruptcy Court, is not and will not be required to be filed, or (ii) has been listed in the Schedules as undisputed, non-contingent and liquidated and the Claimant has not filed a proof of claim or agreed to an amount or priority different than that listed in the Schedules; and (b) either (i) no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules or the Bankruptcy Court, or (ii) has been allowed by a Final Order of the Bankruptcy Court; or (2) is allowed pursuant to the terms of the Plan in an amount set forth herein.

"**Asset Purchase Agreement**" means the Asset Purchase Agreement dated as of ~~March~~ ~~—,~~April 8, 2010, including all schedules, supplements and amendments thereto, by and among Delfasco Finance, LLC and Delfasco, Inc., which provides for, *inter alia*, the sale of substantially all of the Debtor's assets to the Purchaser, except for the Grand Prairie Property, and its related assets as defined herein as Chapter 7 Estate Assets, and any Excluded Assets as that term is defined in the Asset Purchase Agreement.

"**Avoidance Actions**" means all claims, rights and causes of action asserted or assertable by the Debtor or the Estate pursuant to chapter 5 of the Bankruptcy Code or similar State law provisions, whether or not asserted or pending on the Confirmation Date.

"**Ballot**" means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan.

"**Ballot Deadline**" means such deadline for the submission of Ballots as shall be set by the Court.

"**Bankruptcy Code**" means title 11 of the United States Code, as now in effect for this Chapter 11 Case or hereafter amended.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware.

"**Bankruptcy Rules**" means, collectively (a) the Federal Rules of Bankruptcy Procedure and (b) the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, as now in effect or hereafter amended.

"**Bar Date**" means February 2, 2009, the deadline established by the Bar Date Order for filing proofs of claim against the Estate, and any supplemental bar dates established by the Bankruptcy Court pursuant to any other Final Order.

"**Bar Date Order**" means the Order Establishing Bar Dates for Filing Proofs of Claim and Administrative Claim Requests, Including Section 503(b)(9) Claim Requests, and Approving Form, Manner and Sufficiency of Notice Thereof that the Bankruptcy Court entered in the Chapter 11 Case on December 17, 2008.

"**Business Day**" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

"**Cash**" means legal tender and cash equivalents including bank deposits, checks, wire transfers and other similar items.

"**Causes of Action**" means any and all claims, causes of action or rights to legal or equitable remedies, whether known or unknown, reduced to judgment or not, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, and whether asserted or assertable directly or derivatively, in law, equity or otherwise, including Avoidance Actions.

"**CERCLA**" means the Comprehensive Environmental Response, Compensation and Liability Act.

"**Chapter 7**" means Chapter 7 of the Bankruptcy Code.

"**Chapter 7 Case**" means Delfasco's converted Chapter 11 Case as provided for pursuant to the terms of this Plan.

"**Chapter 7 Estate**" means the estate created by the conversion of the Debtor's Chapter 11 Case to Chapter 7 on the Conversion and Transfer Date consisting exclusively of the Chapter 7 Estate Assets and Chapter 7 Estate Liabilities.

"**Chapter 7 Estate Assets**" means (i) the Grand Prairie Property, (ii) the Grand Prairie Lease, (iii) the EPA Allocation, (iv) any Causes of Action related exclusively to the Grand Prairie Property and the Grand Prairie Lease, (v) rights or Causes of Action related to the

assessment or payment of *ad valorem* property taxes related to the Grand Prairie Property, and (vi) any Excluded Assets and/or Refused Assets (as those terms are defined in the Asset Purchase Agreement). Chapter 7 Estate Assets specifically excludes (i) Avoidance Actions, (ii) other rights and Causes of Action waived, satisfied or released in accordance with the provisions of this Plan, including, without limitation, any payments to creditors, Professional Persons and other parties-in-interest during the Chapter 11 Case and/or pursuant to this Plan and/or the Confirmation Order, and (iii) any Acquired Assets (as defined in the Asset Purchase Agreement).

"**Chapter 7 Estate Liabilities**" means the TCEQ Deficiency Claim and the EPA Deficiency Claim (collectively, the "Deficiency Claims"), the Administrative Order, including any modifications made by EPA to the Administrative Order and any costs associated with the administration of the Chapter 7 Estate in accordance with the provisions of chapter 7 of the Bankruptcy Code and related rules, procedures and court orders.

"**Chapter 7 Trustee**" means the trustee appointed or elected to administer the Chapter 7 Estate and any successors thereto.

"**Chapter 11**" means Chapter 11 of the Bankruptcy Code.

"**Chapter 11 Case**" means Delfasco's above-captioned case under Chapter 11 of the Bankruptcy Code, pending in the Bankruptcy Court as Case No. 08-11578 (MFW).

"**Chapter 11 Estate**" means the estate created in the Chapter 11 Case by operation of section 541 of the Bankruptcy Code.

"**Claim**" means a claim as defined in section 101(5) of the Bankruptcy Code.

"**Claimant**" or "**Claimholder**" means a person asserting a Claim against the Debtor, property of the Debtor, or the Estate.

"**Class**" means each of the classifications of Claims or Interests described in Article V of this Plan.

6

"**Committee**" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Case on August 11, 2008 pursuant to section 1102 of the Bankruptcy Code and presently consisting of Gerdau MacSteel; CMC Steel Texas; Kreher Steel Company, LLC; Richmond Casting Company; and Ryerson, Inc.

"**Committee Chapter 11 Case Professionals**" means (a) the law firm of Kelley Drye and Warren LLP, 101 Park Avenue, New York, New York 10178; (b) the law firm of Benesch Friedlander Coplan & Aranoff, LLP, 222 Delaware Avenue, Suite 801, Wilmington, Delaware 19801-1611; (c) the law firm of Saul Ewing LLP, 222 Delaware Avenue, Suite 1200, Wilmington, Delaware 19899; and (d) NHB, 919 N. Market Street, Suite 1410, Wilmington, Delaware 19801

"**Confirmation**" means entry of the Confirmation Order.

"**Confirmation Date**" means the date on which the Bankruptcy Court enters the Confirmation Order on its docket.

"**Confirmation Hearing**" means the hearing held by the Bankruptcy Court regarding confirmation of the Plan, as such hearing may be continued from time to time.

"**Confirmation Objection Deadline**" means the deadline established by the Bankruptcy Court for filing an objection to Confirmation.

"**Confirmation Order**" means the order of the Bankruptcy Court confirming the Plan under section 1129 of the Bankruptcy Code.

"**Convenience Claim**" means a Trade Claim in a Face Amount of $1,500 or less, or greater than $1,500 if the Claimholder has voluntarily reduced the Claim by exercising the Convenience Class Election on the Ballot in accordance with Article VI of the Plan.

"**Convenience Class Election**" means the timely submission by a Trade Claimant of a Ballot for Claim in Class 4 indicating such Trade Claimant's election to have its Trade Claim

treated as a Convenience Claim under the Plan, which Convenience Class Election shall be effective only upon the receipt thereof by the Debtor prior to the Ballot Deadline. Once a Convenience Class Election is made and received by the Debtor, such election shall be irrevocable and binding on any successor-in-interest or assignee with respect to such Claim.

**"Conversion and Transfer"** means the conversion of the Chapter 11 Case to the Chapter 7 Case and the transfer of the Chapter 7 Case to the Texas Bankruptcy Court.

**"Conversion and Transfer Date"** means the date on which all conditions precedent to the Conversion and Transfer Date set forth in Article IX(B) of this Plan have been satisfied and the Chapter 11 Case becomes the Chapter 7 Case and is transferred to the Texas Bankruptcy Court.

**"Debtor-in-Possession"** means the Debtor when acting in its capacity as a representative of the Chapter 11 Estate.

**"Debtor"** and/or **"Delfasco"** means Delfasco, Inc. and its successors and assigns.

**"Debtor's Chapter 11 Case Professionals"** means (a) the law firm of Potter Anderson & Corroon LLP, Hercules Plaza, Seventh Floor, 1313 N. Market Street, Wilmington, Delaware 19801; (b) the law firm of Thompson & Knight LLP, 98 San Jacinto Boulevard, Suite 1900, Austin, Texas 78701; (c) the accounting firm of Horty & Horty, P.A., 29 Hill Road, Wilmington, Delaware 19806; and (d) the investment banking firm of Quantum Management (U.S.), Inc., 12 Ames Crescent, Aurora, Ontario, Canada L4G0C3.

**"Disallowed Claim"** means, with respect to a particular Disputed Claim, the amount, if any, by which the Face Amount of such Claimant's Disputed Claim exceeds the Allowed Amount of such Claim.

**"Disclosure Statement"** means the Disclosure Statement of Delfasco, Inc. for the Debtor's Plan of Liquidation, as amended, dated March 4, 2010 (and all exhibits and schedules

annexed thereto or referred to therein) that relates to the Plan and that is approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, as the same may be amended, modified or supplemented.

"**Disputed Claim**" means any Claim that is not an Allowed Claim.

"**Disputed Claims Reserve**" means the portion of the Trade Claims Payment that the Chapter 11 Debtor is required to reserve on account of Trade Claims that are not Allowed plus any additional amounts that the Chapter 11 Debtor is required to reserve on account of Disputed Claims pursuant to Article XVII.C of this Plan.

"**Distribution**" means any transfer by the Chapter 11 Debtor of Cash due to Claimants and others (*e.g.* Professional Persons) under the Plan.

"**Distribution Date**" means any Business Day on or prior to the Effective Date on or by which Distributions of Cash are to be made pursuant to the Plan.

"**Effective Date**" means the first Business Day that is thirty (30) days after which the Conditions Precedent to the Effective Date have been satisfied or waived, and the effectiveness of the Confirmation Order or enforceability of the Plan has not been stayed or enjoined or such other date as shall be permitted by the Court.

"**EPA**" means the United States Environmental Protection Agency.

"**EPA Adequate Protection Liens**" means those liens granted to the EPA with respect to the IRS Tax Refund pursuant to the EPA Cash Collateral Order.

"**EPA Allocation**" means allocation of the IRS Tax Refund in the amount of $389,834 in accordance with the terms of this Plan.

"**EPA Cash Collateral Order**" means the Order (A) Authorizing the use of Cash Collateral; (B) Granting Adequate Protection; and (C) Preserving Parties Rights that the Bankruptcy Court entered in the Chapter 11 Case on September 30, 2009.

"**EPA Claim and Liability**" means any and all civil Claims, liabilities, rights and/or obligations, including, but without limitation, penalties, asserted by the EPA against the Debtor, including, but not limited to, (i) Claims asserted pursuant to a properly filed proof of Claim or request for payment of an Administrative Expense Claim, (ii) liability arising from or related to the EPA Litigation, (iii) the EPA Secured Claim, (iv) liability arising from or related to the Grand Prairie Property, and (v) liability arising under or related to CERCLA and /or RCRA.

"**EPA Litigation**" means the adversary proceeding the EPA commenced against the Debtor in the Bankruptcy Court on December 15, 2008 as Adv. Pro. No. 08-51878 (MFW) and removed to the United States District Court for the District of Delaware on July 15, 2009, captioned U.S. v. Delfasco, Inc., C.A. No. 09-0136.

"**EPA Secured Claim**" means the EPA's claimed right to setoff a portion of the EPA Claim and Liability against the IRS Refund and any Adequate Protection Obligations (as defined in the EPA Cash Collateral Order) secured by the EPA Adequate Protection Liens, all of which are subject to Debtor and/or the Committee' right to object.

"**Equity Security**" means a share in Delfasco, whether or not transferrable or denominated "stock" or similar security.

"**Equity Security Holder**" means a holder of an Equity Security of Delfasco.

"**Face Amount**" means with respect to any Claim, (a) if the holder of such Claim has not timely filed proof thereof with the Bankruptcy Court, the amount, if any, of such Claim listed in the Schedules as undisputed, non-contingent and liquidated; (b) if the holder of such Claim has timely filed proof thereof with the Bankruptcy Court, the liquidated amount as stated in such proof of Claim; (c) if an Allowed Amount has been established or determined, the amount of such Claimant's Allowed Claim; or (d) if no liquidated amount is listed in such proof of Claim or

the Schedules, then zero ($0) dollars or such other amount as may be fixed or estimated by Final Order of the Bankruptcy Court.

**"Fee Cap"** means $~~889,140.38~~889,140.38

**"Fee Cap Agreement"** means, to the extent that the aggregate Allowed Professional Compensation and Reimbursement Claims of Professional Persons (other than Quantum Management (U.S.), Inc., Saul Ewing LLP, Thompson & Knight LLP or Horty & Horty, whose fees shall not be reduced) exceed the Fee Cap, all Professional Persons, other than those excluded by the preceding language, shall allocate any shortfall amount themselves Pro Rata in reduction of their respective fees or according to such other terms as such Professional Person may agree. Notwithstanding the foregoing, NHB shall reduce its fees by $50,000 and such reduction shall be deducted from NHB's Pro Rata share of its Allowed Professional Compensation and Reimbursement Claim under the Fee Cap).

**"Filing Date"** means July 28, 2008, the date that the Debtor commenced this Chapter 11 Case.

**"Final Order"** means an order, ruling or judgment, as entered by the Bankruptcy Court or other court of competent jurisdiction, (a) that has not been reversed, modified or amended, and is not stayed, (b) as to which the time to or the right to appeal from or to seek reconsideration, review or rehearing or petition for certiorari has expired or been waived by the Purchaser (without regard to whether the time to seek relief from a judgment under Bankruptcy Rule 9024 of the Federal Rules of Bankruptcy Procedure has expired), and (c) as to which no appeal or petition for reconsideration, review, rehearing or certiorari is pending.

**"General Unsecured Claim"** means every Unsecured Claim against the Debtor (including, but not limited to, every such Claim arising from the rejection of an executory contract or unexpired lease and every Claim which is the undersecured portion of any Secured

11

Claim), which is not an Administrative Expense Claim, or a Priority Unsecured Claim and which is classified and treated under Classes 2, 3, 4, 5, or 6 of the Plan.

**"General Unsecured Creditor"** means the holder of a General Unsecured Claim.

**"Grand Prairie Lease"** means the lease and purchase agreements between the Debtor and Lawler Properties, Inc. (formerly 210 South Bagdad, Grand Prairie, TX 75050) now at 114 NE 28th Street, Grand Prairie, TX 75050 related to the Grand Prairie Property

**"Grand Prairie Property"** means the Debtor's real property, land and building(s), located at 114 NE 28th Street, Grand Prairie, TX 75050.

**"Interest"** or **"Interests"** means ownership of an Equity Security of Delfasco.

**"IRS Tax Refund"** means the federal income tax refund in the amount of $389,834 that the Debtor has received from the Internal Revenue Service for taxes paid prior to the Filing Date.

**"Lien"** means with respect to an asset or interest of the Debtor, any mortgage, lien, pledge, charge, encumbrance or other security interest of any kind affecting such asset or interest.

**"NHB"** means NHB Advisors, Inc. (f/k/a NachmanHaysBrownstein, Inc.), the Chapter 11 Committee's financial advisors.

**"Notice Parties"** means the Persons listed in Article XIV(B) of the Plan.

**"Owners"** means the following individuals who currently hold all of the Equity Security Interests of the Debtor: Philip E. Kadlecek, David B. Lilly, Jr., and Mark Benko, individuals with a mailing addresses c/o Delfasco, 15 Bellecor Drive Industrial Park Place, New Castle, Delaware 19720.

**"Person"** means an individual, partnership, corporation, limited liability company, association, joint venture, government or agency or political subdivision thereof or any other form of legal entity.

"**Plan**" means this Plan and all exhibits and schedules annexed hereto, or referred to herein, as the same may be amended, modified and supplemented.

"**Priority Non-Tax Claim**" means a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than (a) an Administrative Expense Claim, or (b) a Priority Tax Claim.

"**Priority Tax Claim**" means any Claim by a governmental unit entitled to priority pursuant to any provision of section 507(a)(8) of the Bankruptcy Code.

"**Professional Compensation and Reimbursement Claim**" means any Claim of an entity seeking award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date (without prejudice to the right of the Committee Chapter 11 Case Professionals to be compensated from the Claims Objection Reserve for fees and expenses incurred to prosecute claims objections to Final Order pursuant to Article XIV.D of the Plan) under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code and including services rendered and expenses incurred in connection with the preparation and prosecution of applications for allowance of compensation and reimbursement after such date.

"**Professional Persons**" means Persons retained prior to the Confirmation Date by Final Order of the Bankruptcy Court pursuant to sections 327 or 1103 of the Bankruptcy Code.

"**Property Damage Claim**" means any contingent, unliquidated Claim asserted by a residential real property owner for damage to residential real property resulting from the alleged release of environmental contaminants at the Grand Prairie Property.

"**Pro Rata**" means the proportion that the amount of a Claim in a particular Class bears to the aggregate amount of all Claims (including Disputed Claims) in such Class.

"**Purchaser**" means Delfasco Finance, LLC.

**"RCRA"** means the Resource Conservation and Recovery Act, 42 U.S.C. §§ 6901 *et. seq.*

**"Schedules"** means the Schedules of Assets and Liabilities filed by the Debtor with the Bankruptcy Court on September 2, 2008 pursuant to section 521(a)(1) of the Bankruptcy Code and rule 1007 of the Bankruptcy Rules, and any amendments thereto.

**"Secured Claim"** means any Claim or portion thereof that is subject to setoff under section 553 of the Bankruptcy Code to the extent of the amount subject to setoff or any Claim that is secured by a Lien encumbering property in which the Debtor has an interest to the extent of the value of the holder's interests in the Debtor's interest in such property, as determined pursuant to section 506(a) of the Bankruptcy Code. As of the date of this Plan, other than potential setoff rights, the EPA Secured Claim is the only Secured Claim asserted against the Debtor.

**"TCEQ"** means the Texas Commission on Environmental Quality.

**"TCEQ Claim and Liability"** means TCEQ's Allowed General Unsecured Claim pursuant to and memorialized by its proof of claim filed February 2, 2009 (Claims Registry No. 93-1) as amended by the amended proof of claim filed February 12, 2010 (Claims Registry No. 93-2).

**"Term Sheet"** means that certain Term Sheet for Chapter 11 Plan of Delfasco, Inc. dated January 5, 2010 executed by the Debtor, the Committee, the Purchaser and certain Professional Persons that has been amended and superseded in part by the Asset Purchase Agreement.

**"Texas Bankruptcy Court"** means the United States Bankruptcy Court for the Southern District of Texas, Corpus Christi Division, the court to which the Chapter 7 Case will be transferred on the Conversion and Transfer Date.

**"Trade Claim"** means any General Unsecured Claim other than the EPA Claim and Liability, the TCEQ Claim and Liability, a Property Damage Claim or a Convenience Claim.

**"Trade Claims Payment"** means the $300,000 payment from the Debtor to fund distributions to holders of Allowed Trade Claims. The Plan as modified by this amendment dated April 8, 2010 provides for the consensual reduction of the Trade Claims Payment in the amount of $33,778.90, which reduction accounts for the allowance of a section 503(b)(9) Administrative Expense Claim in the amount of $191,925.50 (the "Additional 503(b)(9) Claim") that was allowed after the version of the Plan dated March 4, 2010, and preserves the projected percentage recovery to holders of remaining Allowed Trade Claims after the Additional 503(b)(9) Claim is removed from Class 4.

**"Transfer Taxes"** means any and all transfer, stamp, sales or similar taxes that may be required to be paid in connection with any transactions contemplated by this Plan.

**"Unsecured Claim"** means every Claim or portion thereof, regardless of the priority of such Claim, which is not a Secured Claim.

## ARTICLE III

## INTERPRETATION, COMPUTATION OF TIME AND GOVERNING LAW

### A.   Defined Terms

Any term used in this Plan that is not defined in this Plan, either in Article II (Definitions) or elsewhere, but that is used in the Bankruptcy Code or Bankruptcy Rules, has the meaning assigned to that term in the Bankruptcy Code or Bankruptcy Rules.

### B.   Rules of Interpretation

For purposes of this Plan, (a) whenever from the context it is appropriate, each term, whether stated in the singular or plural, shall include both the singular and the plural; (b) any reference in the Plan to a contract, instrument, release or other agreement or document being in a

particular form or on particular terms and conditions, means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in the Plan to an existing document or exhibit filed or to be filed means such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified in a particular reference, all references in the Plan to sections, articles or exhibits are references to sections, articles or exhibits of or to the Plan; (e) the words "herein", "hereof", "hereto" or "hereunder" and others of similar import refer to the Plan in its entirety rather than to only a particular portion of the Plan; (f) captions and headings to Articles or sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan; and (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

### C.    Time Periods

In computing any period of time prescribed or allowed by the Plan, the provisions of Bankruptcy Rule 9006(a) shall apply.

### D.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with the laws of the State of Delaware, without giving effect to its conflicts of law provisions or choice of law rules.

## ARTICLE IV

## UNCLASSIFIED CLAIMS

Pursuant to section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Priority Tax Claims, and Professional Compensation and Reimbursement Claims are not classified under the Plan.

### A.     Administrative Expense Claims

Except to the extent the holder of an Allowed Administrative Expense Claim agrees to a different treatment, the Debtor shall pay Allowed Administrative Expense Claims in Cash in full upon or prior to the later of (i) the Effective Date or (ii) the date on which such Administrative Expense Claim becomes Allowed. All requests for payment of Allowed Administrative Expense Claims accruing after November 30, 2008 (the first administrative expense claim bar date) to and including the Effective Date shall be filed no later than thirty (30) days after the date of notice of the Effective Date. Failure to timely file a request for payment of an Administrative Expense Claim by such deadline shall result in such Administrative Expense Claim being forever barred and disallowed.

### B.     Priority Tax Claims

Each holder of an Allowed Priority Tax Claim that has not been paid in full prior to the Effective Date shall receive Cash equal to such Allowed Priority Tax Claim on the later of (a) the Effective Date, and (b) the date on which such Priority Tax Claim becomes an Allowed Claim. The holder of an Allowed Priority Tax Claim shall not be entitled to receive any payment on account of interest, or on account of any penalty arising with respect to or in connection with such Allowed Priority Tax Claim, except to the extent such interest or penalty is Allowed pursuant to section 507(a)(1) of the Bankruptcy Code.

### C.     Professional Compensation and Reimbursement Claims

All Persons seeking awards by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), 503(b)(5) of the Bankruptcy Code shall (a) file, on or before the date that is thirty (30) days after the Effective Date, their respective applications for final allowances of compensation for services rendered and reimbursement of

17

expenses incurred and (b) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court in accordance with the order relating to or Allowing any such Professional Compensation and Reimbursement Claim, provided however, that the aggregate amount of payments to Professional Persons subject to the Fee Cap shall not exceed the Fee Cap. Holders of such Professional Compensation and Reimbursement Claims that are required to file and serve applications for final allowance of their Professional Compensation and Reimbursement Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such claims against the Debtor, its properties, successor and assigns, or the Chapter 7 Estate. Objections to any Professional Compensation and Reimbursement Claims must be filed and served on the Notice Parties and the Professional Person(s) to whom the objection(s) is/are directed no later than twenty (20) days (or such larger period as may be allowed by order of the Bankruptcy Court) after the date on which the relevant application(s) for final allowance of such Professional Compensation and Reimbursement Claims was/were filed and served.

Notwithstanding the foregoing, to the extent that the Allowed Professional Compensation and Reimbursement Claims of Professional Persons exceed the Fee Cap, the Professional Persons (other than Quantum Management (U.S.), Inc., Thompson & Knight LLP, Saul Ewing LLP or Horty & Horty, whose fees shall not be reduced) shall allocate any shortfall in the payment of their Allowed Professional Compensation and Reimbursement Claims among themselves Pro Rata in reduction of their respective fees or according to such other terms as such Professional Persons may agree. Notwithstanding the foregoing, NHB shall reduce its fees by $50,000 and such reduction shall be deducted from NHB's Pro Rata share of its Allowed Professional Compensation and Reimbursement Claim under the Fee Cap). Payment of all

Allowed Professional Compensation and Reimbursement Claims of Professional Persons shall be made before the Conversion and Transfer Date.

## ARTICLE V

## CLASSIFICATION OF CLAIMS AND INTERESTS

The Classes of Claims and Interests under the Plan are designated and classified as follows:

| | |
|---|---|
| Class 1: | Priority Non-Tax Claims |
| Class 2: | Property Damage Claims |
| Class 3: | EPA Claim and Liability |
| Class 4: | Trade Claims |
| Class 5: | Convenience Claims |
| Class 6: | TCEQ Claim and Liability |
| Class 7: | Equity Security Interests |

## ARTICLE VI

## TREATMENT OF CLASSIFIED CLAIMS AND INTERESTS

Class 1:     Class 1 consists of Priority Non-Tax Claims.  Allowed Priority Non-Tax Claims, if any, shall be paid in full on or prior to the Effective Date.  Class 1 is not impaired under the Plan and is deemed to accept the Plan.

Class 2:     Class 2 consists of Property Damage Claims.  If Class 2 votes to accept the Plan, all Property Damage Claims properly filed on or before the Bar Date shall be deemed to be Allowed Property Damage Claims, and holders of such Allowed Property Damage Claims shall receive a Pro Rata share of $15,000 on or prior to the Effective Date.  If Class 2 votes to reject the Plan, holders of Allowed Class 2 Claims shall receive nothing on account of their

contingent, unliquidated Claims. Class 2 is impaired, and holders of Allowed Class 2 Claims are entitled to vote on the Plan.

Class 3:     Class 3 consists of the EPA Claim and Liability.  The EPA Claim and Liability shall be treated as follows:  On or prior to the Effective Date, the EPA Allocation shall be deposited into a segregated trust account which shall be used by the Chapter 7 Trustee exclusively to (i) comply with the Administrative Order, as it may be modified from time to time, with EPA oversight or (ii) if authorized in writing by EPA, fund any other environmental clean-up liabilities with respect to the Grand Prairie Property including the surrounding areas. Second, the portion of the EPA Claim and Liability related to penalties in the amount of $1.5 million (the "Subordinated Claim") shall be deemed Allowed and on the Effective Date subordinated and extinguished without any recovery.  The remainder of the EPA Claim and Liability shall be a deficiency claim in the amount of $490,834 (the "EPA Deficiency Claim"). However, EPA has agreed to a reduction in the amount payable on the EPA Deficiency Claim to 17.6% of the total Allowed amount of the EPA Deficiency Claim ($85,896) which is the equivalent estimated Pro Rata recovery for Trade Claims under this Plan.  The EPA Deficiency Claim shall not be entitled to any recovery under this Plan, however, the EPA Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer. Class 3 is impaired, and holders of Allowed Class 3 Claims are entitled to vote on the Plan.

Class 4:     Class 4 consists of Trade Claims.  Except to the extent the holder of an Allowed Trade Claim agrees to a different treatment, the Debtor shall pay holders of Allowed Trade Claims their Pro Rata share of the Trade Claims Payment in full satisfaction of such Allowed Trade Claims on or prior to the Effective Date. Class 4 is impaired, and holders of Allowed Class 4 Claims are entitled to vote on the Plan.

Class 5: Class 5 consists of Convenience Claims. Notwithstanding the treatment provided to holders of Allowed General Unsecured Claims under any other provision of the Plan, any holder of a General Unsecured Claim whose Face Amount is either (a) $1,500 or less, or (b) greater than $1,500 but as to which the holder thereof submits a valid Convenience Class Election by the Ballot Deadline (thereby electing to reduce the Face Amount of their Claim to $1,500), shall receive Cash in the amount of their Allowed Convenience Claim on or prior to the Effective Date; provided, however, that if the aggregate amount of Allowed Convenience Claims exceeds $50,000, those having the lowest initial Face Amount shall be deemed to be Allowed Convenience Claims, and the remaining Convenience Claims shall be treated as Allowed Trade Claims for distribution purposes. Class 5 is impaired, and holders of Allowed Class 5 Claims are entitled to vote on the Plan.

Class 6: Class 6 consists of the TCEQ Claim and Liability. The TCEQ Claim and Liability shall be Allowed in the amount of $17.2 million. However, TCEQ has agreed to a reduction in the amount payable on the TCEQ Claim and Liability to 17.6% of the total Allowed amount of the TCEQ Claim and Liability ($3,027,200) which is the equivalent estimated Pro Rata recovery for Trade Claims under this Plan. The TCEQ Claim and Liability shall be treated as follows:

(i) TCEQ shall receive no later than the Effective Date payment to TCEQ in the amount of $625,000 in cash, in partial satisfaction of the TCEQ Claim and Liability. After the Effective Date, TCEQ shall spend not less than $625,000 exclusively to implement environmental response actions, including environmental investigation activities, and pay oversight costs with respect to the onsite and offsite contamination associated with the Grand Prairie Property, in consultation with EPA.

21

(ii)     The remainder of the Allowed TCEQ Claim and Liability shall be a deficiency claim in the amount of $2,402,200 (the "TCEQ Deficiency Claim").  The TCEQ Deficiency Claim shall not be entitled to any distribution under this Plan, however, the TCEQ Deficiency Claim shall be a Chapter 7 Liability and, as such, shall survive the Conversion and Transfer.

Class 6 is impaired, and holders of Allowed Class 6 Claims are entitled to vote on the Plan

Class 7:     Class 7 consists of Equity Security Interests.  Holders of Equity Security Interests shall not receive any payment or distributions on account of their Equity Security Interests.  All such Equity Security Interests shall be discharged and extinguished in accordance with the Plan and all such Equity Security Interests shall be deemed cancelled and extinguished as of the Effective Date without further court order or action under any applicable agreement, law, regulation or rule.  Class 7 is impaired and deemed to reject the Plan.

## ARTICLE VII

## CONTROVERSY WITH RESPECT TO IMPAIRMENT

In the event of a controversy about whether a Class of Claims or Interests is impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy.

## ARTICLE VIII

## MEANS FOR PERFORMANCE OF THE PLAN

A.     Asset Purchase Agreement

The Debtor and the Purchaser have agreed on the terms of the Asset Purchase Agreement.  The funds received from the sale of the Acquired Assets (as defined in the Asset Purchase Agreement) pursuant to the Asset Purchase Agreement in conjunction with the

remaining non-purchased assets are sufficient to enable the Debtor to make all of the payments it is required to make under this Plan.

The Confirmation Order shall constitute approval by the Bankruptcy Court of the Asset Purchase Agreement and the transactions contemplated thereby as if its terms were set forth fully therein.

## B.   Liquidation of the Grand Prairie Property

As set forth in Article IX.B below, on the Conversion and Transfer Date, by agreement reached among the Debtor, the Committee, the Purchaser, TCEQ and EPA, the Debtor's Chapter 11 Case will be converted to the Chapter 7 Case, and venue of the Chapter 7 Case will be transferred to the Texas Bankruptcy Court. The Chapter 7 Trustee will administer the Grand Prairie Property and the other Chapter 7 Estate Assets. The EPA may modify its Administrative Order so that it is made applicable to the Chapter 7 Trustee to the extent of available funds in accordance with this Plan. The revenue or proceeds from the Grand Prairie Lease and any sale of the Grand Prairie Property or any portions or parcels thereof or improvements thereon shall be Chapter 7 Estate Assets, thus, available to satisfy the costs and fees associated with the administration of the Chapter 7 Estate and payment of its professionals in accordance with the provisions of chapter 7 of the Bankruptcy Code.

## C.   Exemption from Transfer Taxes

There will be no Transfer Taxes owed by Delfasco on any transaction in connection with or in contemplation of this Plan.

## D.   The Retiree Settlement

As part of the formulation of the Plan, the Debtor engaged in negotiations with the individuals entitled to retiree benefits in order to satisfy sections 1114 and 1129 of the Bankruptcy Code. The result of the negotiations was a consensual modification (the "Retiree

Settlement") of the retiree benefits due to William T. Ramsey and David B. Lilly, Jr. and their spouses (collectively, the "Retirees") as set forth below:

The Retirees were, subject to certain conditions, entitled to have the Debtor pay for health insurance for the duration of their lives (the "Health Insurance Benefits").

The Retirees and the Debtor have reached agreement that the Health Insurance Benefits will be modified such that the Retirees will receive a one-time lump-sum payment on or prior to the Effective Date of $24, 422 (the "Settlement Sum") to be allocated such that Mr. Ramsey and his wife together as one shall receive $12,211 and Mr. Lilly and his wife will together as one shall receive $12,211 in full and final satisfaction of the Debtor's Health Insurance Benefits obligations. In exchange for the consideration provided for under the terms of the Retiree Settlement, each party will execute a Settlement and Release Agreement substantially in the form annexed hereto as Exhibit A. The parties have not yet executed the Settlement and Release Agreement, but such document shall be executed as a condition to the Effective Date and as a condition to the payment of the Settlement Sum.

## ARTICLE IX

## EFFECTIVE DATE/CONVERSION AND TRANSFER DATE AND CONDITIONS PRECEDENT THERETO

### A. Conditions to the Occurrence of the Effective Date

The following are conditions precedent to the occurrence of the Effective Date:

- the Confirmation Order shall have been entered on or before April 9, 2010 and shall have become a Final Order on or before April 26, 2010

- the Confirmation Order shall expressly provide: (a) (i) that all payments made during the course of the Chapter 11 Case and/or under the Plan before the Conversion and Transfer Date are final and unavoidable by any party, including, without limitation, the Chapter 7 Trustee, or any successor thereto, and (ii) any Causes of Action related to such claims or their payment are extinguished, waived, released; and (b) that the provisions of the Plan and Confirmation Order are binding on the Debtor, and the

Chapter 11 Estate's successors and assigns, including without limitation, the Chapter 7 Trustee or any successor thereto;

- all Classes entitled to vote on the Plan either (a) voted to accept the Plan or (b) have been "crammed down" pursuant to section 1129(b) of the Bankruptcy Code;

- all payments required to be made prior to the Effective Date have been made; including but not limited to, the deposit of the EPA Allocation into a segregated trust account and payment of the Trade Claims Payment in accordance with the provisions hereof;

- The Retiree Settlement documents shall have been executed in accordance with the provision above describing the Retiree Settlement; and

- all the terms and conditions of the Asset Purchase Agreement required to be satisfied by the Effective Date shall have been met or waived in writing by the parties thereto and the sale contemplated thereby has closed.

The Debtor, the Committee, TCEQ, EPA and the Purchaser, in their sole discretion, may agree in writing to waive any of the foregoing Conditions Precedent to the Effective Date and/or may agree in writing to extend any of the time periods or deadlines established by this Article IX of the Plan.

### B. Conditions to the Occurrence of the Conversion and Transfer Date

In addition to the conditions precedent to the Effective Date, the following are conditions precedent to the occurrence of the Conversion and Transfer Date:

- the Effective Date shall have occurred;

- all payments contemplated to be made prior to the occurrence of the Conversion and Transfer Date under the provisions of this Plan shall have been made;

- The EPA Litigation shall have been dismissed;

- all transactions contemplated by the Asset Purchase Agreement shall have been fully consummated; and

- an order, substantially in the form included with the plan supplement to be filed on or before March 26, 2010, effecting the conversion of the Chapter 11 Case to the Chapter 7 Case and the transfer of the Chapter 7 Case to the Texas Bankruptcy Court shall have been entered and have become a Final Order.

All such conditions precedent to the occurrence of the Conversion and Transfer Date shall have been met no later than 120 days after the Effective Date, provided however, that any party in interest may file a motion with the Bankruptcy Court to extend such deadline for good cause shown. Alternatively, the Debtor, the Committee, the Purchaser, EPA and TCEQ, in their sole discretion, may agree in writing to waive any of the foregoing Conditions Precedent to the Conversion and Transfer Date and/or may agree in writing to extend any of the time periods or deadlines established by this Article IX of the Plan.

## ARTICLE X

## PROVISIONS REGARDING DISTRIBUTIONS

### A.    Time of Distributions Under the Plan

Any Distributions to be under the Plan shall be made as specified herein.

### B.    Payment Dates

Whenever any Distribution to be made under the Plan shall be due on a day other than a Business Day, such payment or Distribution shall be made, without interest, on the next Business Day.

### C.    Manner of Payments Under the Plan

Payments made by the Debtor pursuant to the Plan shall be made in Cash by check drawn on a domestic bank or by wire transfer from a domestic bank.

### D.    Unclaimed Distributions

If any Distribution under the Plan remains unclaimed for a period of one hundred eighty (180) days after such Distribution has been made (or after such delivery has been attempted) in accordance with the Plan to a Claimholder entitled thereto, such unclaimed Distribution shall be

deemed forfeited by such Claimholder, whereupon all right, title and interest in and to such unclaimed Distribution will immediately and irrevocably revest in the Chapter 7 Estate.

## ARTICLE XI

## VESTING OF PROPERTY

As of the Conversion and Transfer Date, the Chapter 7 Estate Assets and Chapter 7 Estate Liabilities shall vest in the Chapter 7 Estate.

## ARTICLE XII

## INJUNCTION AND EXCULPATION

### A.    Injunction

Except as otherwise expressly provided herein and in any related documents, and except in connection with the enforcement of the terms of this Plan or any documents provided for or contemplated in this Plan, all entities who have held, hold or may hold Claims or Causes of Action against or interests in the Debtor or the Chapter 11 Estate that arose prior to the Effective Date, including, without limitation, the EPA Claim and Liability and the TCEQ Claim and Liability, except with regard to the Chapter 7 Estate Liabilities, are, with respect to such Claim, interest or Cause of Action, permanently enjoined from: (a) commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, any of its property, and of its agents, successors and assigns, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing persons or entities, including, without limitation, the Purchaser, (b) enforcing, levying, attaching, collecting or otherwise recovering by any manner or means, whether directly or indirectly, on any judgment, award, decree or order against the Debtor, any of its property, or any direct or indirect transferee of any property of, or direct or indirect

successor-in-interest to, any of the foregoing persons or entities, or any property of any such transferee or successor-in-interest, including, without limitation, the Purchaser, (c) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any encumbrance or Lien of any kind against the Debtor or any of its property, or any direct or indirect transferee of any property of, or successor-in-interest to, any of the foregoing persons or entities, including, without limitation, the Purchaser, provided however, that nothing in this Plan releases, nullifies or enjoins the enforcement of any liability to a governmental unit under police and regulatory statutes or regulations that any entity would be subject to as the owner or operator of property arising after the Effective Date. Further, notwithstanding any provision of this Plan or the Confirmation Order to the contrary, nothing herein shall preclude any environmental regulatory authority from seeking injunctive relief against the Chapter 7 Trustee or Chapter 7 Estate in any court of competent jurisdiction.

## B. Exculpation

Other than as provided for in the Plan, none of the Debtor, the Purchaser, the Owners, or the Committee and the members thereof in their capacity as such, nor any of their respective officers, directors, employees or other agents, financial advisors, attorneys, and accountants shall have any liability to any holder of any Claim or interest, including, without limitation, the EPA Claim and Liability and the TCEQ Claim and Liability, for any act or omission in connection with or arising out of the negotiation, preparation and pursuant of confirmation of the Plan, the consummation of the Plan, the administration of the Plan, the Chapter 11 Case or the property to be distributed under the Plan. Nothing in this section shall (i) be construed to exculpate any entity from fraud, gross negligence, willful misconduct, malpractice, criminal conduct, misuse of confidential information that causes damages, or *ultra vires* acts; or (ii) limit the liability of the

professionals of the Debtor and the Committee to their respective clients pursuant to DR 6-102 of the Code of Professional Responsibility.

Except as expressly provided herein, nothing in any section of this Plan shall effect a release in favor of any Person other than the Debtor or the Purchaser, or any of their respective financial advisors, attorneys, and accountants with respect to any debt owed to the United States Government, any state, city or municipality for any liability of such Person arising under (i) the Internal Revenue Code, or any state, city or municipal tax code, (ii) the environmental laws of the United States, any state, city or municipality or (iii) any criminal laws of the United States, any state, city or municipality.

## ARTICLE XIII

## EXECUTORY CONTRACTS AND LEASES

As of the Confirmation Date, any executory contract or unexpired lease of personal property entered into by Delfasco that has not been assumed or rejected or subject to a pending motion to assume or reject, other than the Grand Prairie Lease, shall be deemed rejected as of the Confirmation Date including, but not limited to, the Texas Commission on Environmental Quality Voluntary Cleanup Program Agreement by and between the Debtor and TCEQ dated April 23, 2003 and amended in March 2004.

To the extent that the Debtor's rejection of executory contracts results in Allowed Claims for rejection damages that increase the aggregate pool of Allowed Trade Claims by 5% or more, the Trade Claims Payment shall be increased by an amount sufficient to preserve the projected return to holders of Allowed Trade Claims, including such Allowed Trade Claims resulting from Allowed Claims for rejection damages.

Presently, the list of executory contracts and unexpired leases of personal property that shall be assumed by the Debtor and assigned to the Purchaser is as set forth in the Asset Purchase

Agreement. The Purchaser shall have the right through the Confirmation Date to designate additional executory contracts or unexpired leases of personal property for assumption by the Debtor as set forth in the Asset Purchase Agreement.

The Confirmation Order shall be deemed an order under sections 365 and 1123 of the Bankruptcy Code, without further need for court order or action by any party rejecting any such executory contracts and leases of personal property, including but not limited to the Texas Commission on Environmental Quality Voluntary Cleanup Program Agreement by and between the Debtor and TCEQ dated April 23, 2003, but specifically excluding the Grand Prairie Lease.

For clarity, the only federal contracts the debtor is seeking to assume and assign are Department of Defense contracts (the "DOD Contracts"). Notwithstanding any provision in any motion, this Plan, the APA, or other order to the contrary, the DOD Contracts shall be treated, determined, paid and administered pursuant to all applicable non-bankruptcy law, federal regulations and statutes in the ordinary course of business. Moreover, without limiting the foregoing, nothing shall be interpreted to set cure amounts or to require the government to novate or otherwise consent to the transfer of any federal government contract, agreement or interest. The government's rights to offset or recoup any amounts due under, or relating to, any contracts, agreements or other interests are expressly preserved.

## ARTICLE XIV
## GENERAL PROVISIONS AND RETENTION OF JURISDICTION

### A.    Retention of Jurisdiction by the Court

The Bankruptcy Court shall retain jurisdiction up to and including the time of the occurrence of the Conversion and Transfer Date for the following purposes:

(a)    To hear and determine any dispute relating to the Plan or any property described in the Plan and to enforce its provisions;

(b)    To hear and determine all issues arising out of any motions, applications, adversary proceedings or contested or litigated matters in the Chapter 11 Case pending at the Confirmation Date;

(c)    To order recovery of any assets of Delfasco;

(d)    To hear and determine all issues relating to any purchases, sales or contracts made or undertaken by Delfasco during the pendency of the Chapter 11 Case;

(e)    To hear and determine all objections to Claims and all controversies concerning classification, allowance, valuation, liquidation, estimation, satisfaction, subordination, re-characterization or reclassification of Claims to the extent not resolved prior or on to the Confirmation Date;

(f)    To make orders allowing amendment of the Schedules filed in the Chapter 11 Case for any purpose including, without limitation, to prosecute objections to Claims not previously listed as disputed, contingent or unliquidated;

(g)    To hear and determine all applications by Professional Persons for compensation of fees and reimbursement of expenses arising out of or relating to the Chapter 11 Case or any Claims;

(h)    To make such other orders or give such directions as permitted by Section 1142 of the Bankruptcy Code;

(i)    To consider and order any modifications or amendments requested to the Plan;

(j)    To remedy any defect or omission or reconcile any inconsistency in the Plan or the Confirmation Order in such manner as may be necessary or desirable to carry out the purposes and intent of the Plan;

(k)    To make all orders necessary or appropriate to carry out the provisions of the Plan;

(l)     To enforce all orders previously entered by the Bankruptcy Court;

(m)     To enforce the injunctions contained in this Plan; and

(n)     To determine such other matters as may be provided for in the Confirmation Order or as may be authorized under the Bankruptcy Code.

**B.     Notices**

Any notice, demand, claim or communication under this Plan shall be in writing and shall be deemed to have been given upon receipt by or the personal delivery thereof of service by next day delivery service or upon the seventh day following mailing thereof, if sent by registered mail, return receipt requested, postage prepaid by next day delivery, to the respective address of the Notice Parties set forth below, or to such other address as a Notice Party may specify by notice given as herein provided:

If to Delfasco to:

Delfasco, Inc.
15 Bellecor Drive
Industrial Park Place
New Castle, DE  19720
Attn: Philip Kadlecek

with copies to:

Potter Anderson & Corroon LLP
1313 North. Market Street, 6th Floor
Wilmington, DE  19801
Attn:   Steven M. Yoder, Esq.

If to the Committee to:

Official Committee of Unsecured Creditors of Delfasco, Inc.
c/o Kelley Drye & Warren LLP
101 Park Avenue
New York, New York 10178
Attn: Eric R. Wilson, Esq.
      Kristin S. Elliot, Esq.

If to the Purchaser:

Pillar Capital Holdings, LLC
61 Broadway
Suite 2607
New York, NY 10006
Attn: Jack Goldenberg

with copies to:

Hahn & Hessen LLP
488 Madison Ave.
New York, NY 10022
Attn: Gilbert Backenroth, Esq.
     James C. Kardon, Esq.
     Jeffrey Zawadzki, Esq.

**C.    Severability**

Should any provision in this Plan be determined to be unenforceable following the Effective Date, such determination shall in no way limit or affect the enforceability or operative effect of any or all other provisions of this Plan.

**D.    Dissolution of the Committee**

As of the later of (i) the Effective Date, and (ii) the date on which all objections to General Unsecured Claims have been filed and prosecuted and/or otherwise resolved pursuant to Final Order, the Committee shall be dissolved, and all members of the Committee and the Committee's Professionals shall be discharged from their duties as members of, and professionals retained by, the Committee. Notwithstanding the dissolution of the Committee, the members of the Committee retain the right to seek reimbursement of expenses (in the case of members of the Committee) and final compensation (as to professionals retained by the Committee). Neither the members of the Committee, nor any of its retained professionals, employees or agents shall be liable for any act taken, suffered or omitted to be taken in their capacity as members of the Committee or in reliance on any provision of the Plan, except for acts of gross negligence or willful misconduct (which gross negligence or willful misconduct must be determined by a Final Order in a court of competent jurisdiction), in the performance of duties

33

for the Committee. Notwithstanding anything herein to the contrary, in no event shall any member of the Committee or its professionals be liable to any party on account of the performance of duties for the Committee in an amount that exceeds the fees and expenses such Committee member or professional has received for its service on or to the Committee. Notwithstanding anything to the contrary herein, if the Committee remains in existence after the Effective Date to prosecute and/or resolve pending objections to General Unsecured Claims, an amount equal to $10,000 shall be reserved from the Fee Cap to pay the reasonable fees and expenses incurred by Committee Chapter 11 Case Professionals to prosecute and/or resolve pending objections to General Unsecured Claims (the "Claims Objection Reserve"), which fees and expenses shall not be subject to Bankruptcy Court approval. Any unused portion of the Claims Objection Reserve shall be distributed among Professional Persons subject to the Fee Cap pursuant to the terms of the Fee Cap Agreement.

### E. Post-Confirmation Payment of Statutory Fees

From and after the Effective Date, the Debtor shall pay all fees payable under section 1930 of title 28 of the United States Code as and when such fees are due up to and until the Conversion and Transfer Date.

### ARTICLE XV

### PROVISIONS CONCERNING CAUSES OF ACTION

In consideration of the compromises made by the Committee in negotiating the Plan, on the Confirmation Date, the Debtor, on behalf of itself and the Estate shall be deemed to have waived any and all Avoidance Actions the Estate may have against holders of Claims. The waiver of Avoidance Actions shall be binding on the Debtor's and the Chapter 11 Estate's successors and assigns, including, without limitation, the Chapter 7 Trustee and any successors thereto.

34

The Chapter 7 Trustee may enforce only those claims, rights or Causes of Action expressly included among the Chapter 7 Estate Assets, and any recovery therefrom shall inure to the benefit of and become a Chapter 7 Estate Asset. By way of example, and not limitation, the Chapter 7 Estate shall retain any causes of action not specifically released under the Plan for environmental claims or liabilities related to the Grand Prairie Property against any third parties provided however, that any claims, rights, or causes of action against the United States of America or the State of Texas or any agencies or instrumentalities relating to any environmental law or regulation or any claim alleged with regard to the automatic stay under section 362 of the Bankruptcy Code are fully waived, extinguished and released under the Plan.

## ARTICLE XVI

## MODIFICATION OF THE PLAN

The Debtor reserves the right to propose amendments to or modifications of this Plan under section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date. After the Confirmation Date, Delfasco may modify this Plan in accordance with section 1127(b) of the Bankruptcy Code to remedy any defects or omissions or to reconcile any inconsistency in this Plan or in the Confirmation Order in such a manner as may be necessary to carry out the purposes and intent of this Plan, so long as the rights of Claimants or Equity Security Holders are not materially modified or altered to their detriment without their express written consent.

## ARTICLE XVII

## PROCEDURE FOR RESOLVING DISPUTED CLAIMS

### A.    Objections to Claims

The Debtor or the Committee shall have the authority to object to the allowance of Claims or Interests filed with the Bankruptcy Court where the Debtor or the Committee, if applicable, disputes liability or allowance in whole or in part. The Debtor or the Committee, if

applicable, will file and serve all objections to Claims as soon as practicable, but in no event later than the Confirmation Date.

## B.  Estimation of Claims

The Debtor or the Committee may, at any time, request that the Bankruptcy Court estimate any contingent or unliquidated Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether the Debtor or the Committee previously objected to such contingent or unliquidated Claim or whether the Bankruptcy Court ruled on any such objection. Subject to the provisions of section 502(j) of the Bankruptcy Code, if the Bankruptcy Court estimates any contingent or unliquidated Claim, the amount so estimated will constitute the Allowed Amount of such contingent or unliquidated Claim.

## C.  Payments and Distributions on Disputed Claims

No payments or other Distributions will be made to a holder of a Disputed Claim unless and until such Disputed Claim becomes an Allowed Claim.

At the time any Distributions are made to holders of Allowed Claims, an amount sufficient to have paid each holder of a Disputed Claim its Pro Rata share of such Distribution, calculated according to the Face Amount of such Claim, shall be reserved and held in escrow by the Debtor (*i.e.* held in the Disputed Claims Reserve) for the potential benefit of the holder of the Disputed Claim, and thereafter an amount based upon the Allowed Amount of the Claim shall be distributed as set forth above, but in the event that a creditor asserts duplicative, overlapping or multiple Claims, the total amount reserved shall not exceed the total amount subject to Distribution to such holder on account of such Claim.

The Disputed Claims Reserve shall be held by the Debtor in an interest bearing account.

If a Disputed Claim is disallowed by Final Order, any Cash held in the Disputed Claims Reserve on account of such Claim shall be reallocated and distributed on a Pro Rata basis among

holders of Allowed Claims of the Class in which the disallowed Claim was classified under the

Plan.

Dated: Wilmington, DE
        March 4, April 8, 2010

**DELFASCO, INC.**

/s/ Philip E. Kadlecek
By:  Philip E. Kadlecek
Its:  President and Chief Executive Officer

**POTTER ANDERSON & CORROON LLP**
1313 NORTH MARKET STREET, 6TH FLOOR
WILMINGTON, DELAWARE  19801
Tel. No. (302) 984-6000
Fax No. (302) 658-1192

/s/
Steven M. Yoder (No. 3885)
Theresa V. Brown-Edwards (No. 4225)
Etta R. Wolfe (No. 4164)
R. Stephen McNeill (No. 5210)

COUNSEL TO THE DEBTOR AND THE DEBTOR-IN-POSSESSION

# EXHIBIT A

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------------x

In re:                                            Chapter 11

DELFASCO, INC.,                                    Case No. 08-11578 (MFW)
a Delaware Corporation,

                              Debtor.

-----------------------------------------------------------------x

## SETTLEMENT AND RELEASE AGREEMENT

This settlement and release agreement (the *"Settlement Agreement"*) by and between Delfasco, Inc. (the *"Debtor"*), on one hand, and _____ (the *"Former Director"*) and his wife, _____, on the other, sets forth the terms upon which the Former Director, his spouse and the Debtor (collectively, the *"Parties"*) have agreed to settle the matter described below.

## RECITALS

**WHEREAS**, on July 28, 2008 (the *"Petition Date"*), the Debtor filed a voluntary petition for relief (the *"Bankruptcy Case"*) under chapter 11 of title 11 of the United States Code (the *"Bankruptcy Code"*) in the United States Bankruptcy Court for the District of Delaware (the *"Bankruptcy Court"*);

**WHEREAS**, prior to the Petition Date, the Former Directors served as directors and/or officers of the Debtor prior to their respective retirements;

**WHEREAS**, on November 9, 1993, the Board of Directors of the Debtor passed a resolution (the *"Resolution"*) providing for the payment of health insurance for officers, their spouses and minor children for life, subject to certain conditions;

**WHEREAS**, pursuant to the Resolution, the Debtor has been paying the health insurance (Medicare supplemental coverage) of the Former Director and his wife (the *"Health Insurance Benefits"*);

**WHEREAS**, on March 4, 2010, the Debtor filed with the Bankruptcy Court the *Plan of Liquidation of Delfasco, Inc.* (the *"Plan"*);

**WHEREAS**, the Plan, among other things, provides for the liquidation of the Debtor through the sale of substantially all of the Debtors' assets to Delfasco Finance, LLC (the *"Purchaser"*);

**WHEREAS**, the Parties desire to modify the Health Insurance Benefits pursuant to section 1114 of the Bankruptcy Code on the terms and subject to the conditions set forth in this Settlement Agreement; and

**NOW, THEREFORE**, in consideration of the promises and mutual covenants contained

herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is stipulated and agreed by and between the Parties, as follows:

1.      In full and final settlement and satisfaction of the Health Insurance Benefits, on the effective date of the Plan, the Debtor shall pay, as consideration for the settlement, the sum of Twelve Thousand Two Hundred and Eleven Dollars ($12,211) (the "Settlement Sum") to the Former Director and his wife together as one.

2.      The Parties understand and acknowledge that this Settlement Agreement is subject to approval by the Bankruptcy Court and that this Settlement Agreement shall not be binding upon the Parties until the entry by the Bankruptcy Court or an appellate court, where applicable, of an order approving this Settlement Agreement (a "*Final Order*"). For purposes of this Settlement Agreement, a "Final Order" means an order, the operation or effect of which has not been stayed, reversed or amended and as to which the time to appeal or move for review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending.

3.      If this Settlement Agreement is not approved by the Bankruptcy Court or the Bankruptcy Court's order approving this Settlement Agreement in its entirety is reversed by a higher court, the Settlement Agreement shall be deemed null and void.

4.      Upon the Former Director's receipt of payment of the Settlement Sum in good funds, the Former Director and his spouse hereby (a) consent to the termination of the Health Insurance Benefits, and (b) release, acquit and discharge the Debtor, its estate, and its agents, successors and assigns, or any direct or indirect transferee of any property of, or direct or indirect successor-in-interest to, any of the foregoing persons or entities, including without limitation, the Purchaser, of and from any claims, damages, actions, suits, causes of action, rights, liens, demands, obligations and/or liabilities arising from or related to the Health Insurance Benefits; *provided, however*, that nothing contained herein shall be deemed to release any obligations that the Debtor has under this Settlement Agreement.

5.      Upon the effectiveness of the releases set forth in paragraph 3 above and the entry of a Final Order, the Debtor hereby releases, acquits and discharges the Former Director, his spouse, and their successors and assigns from and against any claims, damages, actions, suits, causes of action, rights, liens, demands, obligations and/or liabilities arising from or related to the Health Insurance Benefits; *provided, however*, that nothing contained herein shall be deemed to release any obligations that the Former Director or his spouse have under this Settlement Agreement.

6.      The Parties acknowledge that this Settlement Agreement is a compromise of disputed claims and that neither admits, and each expressly denies, any liability on its part.

7.      Each person signing this Settlement Agreement represents and warrants that he/she has been duly authorized and has the requisite authority to execute and deliver this Settlement Agreement on behalf of such Party, to bind his or her respective client or clients to the terms and conditions of this Settlement Agreement and to act with respect to the rights and claims that are being altered or otherwise affected by this Settlement Agreement.

960924v.1

8.     The Parties represent and acknowledge that, in executing this Settlement Agreement, they do not rely and have not relied upon any representation or statement made by any Party or any of their agents, shareholders, representatives or attorneys, with regard to the subject matter, basis or effect of this Settlement Agreement or otherwise, other than as specifically stated in this Settlement Agreement.

9.     The Parties further declare that, in making this Settlement Agreement, they rely entirely upon their own judgment, beliefs and interest and the advice of their counsel (for whose expense each shall be solely responsible) and that they have had a reasonable period of time to consider this Settlement Agreement.

10.     The Parties agree that each Party has reviewed this Settlement Agreement and that each fully understands and voluntarily accepts all the provisions contained in this Settlement Agreement. The Parties further agree that this Settlement Agreement was the product of negotiations between the Parties and that any rule of construction that ambiguities are to be resolved against the drafting party shall not apply in the interpretation of this Settlement Agreement.

11.     The language of all parts of this Settlement Agreement shall in all cases be construed as a whole, according to its fair meaning and not strictly for or against any of the Parties.

12.     Should any immaterial provision of this Settlement Agreement be declared or be determined by any court of competent jurisdiction to be illegal, invalid or unenforceable, the legality, validity and enforceability of the remaining parts, terms or provisions shall not be affected thereby and said illegal, unenforceable or invalid part, term or provision shall be deemed not to be a part of this Settlement Agreement.

13.     This Settlement Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings, written or oral, between the Parties pertaining to the subject matter hereof.

14.     No modification of this Settlement Agreement shall be binding or enforceable unless in writing and signed by the Parties.

15.     This Settlement Agreement shall be binding upon and inure to the benefit of the Parties, their respective heirs, executors, successors, administrators and assigns.

16.     This Settlement Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Delaware (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. Notwithstanding any conversions of the Bankruptcy Case or transfer of the Bankruptcy Case or jurisdiction over the Debtor, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Settlement Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court; *provided, however*, that if the Bankruptcy Court no longer accepts jurisdiction for the adjudication of any matters arising under or in connection

with the Settlement Agreement, the Parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Settlement Agreement, and consent to the jurisdiction of, any state or federal court located in the a State of Delaware.

17.     This Settlement Agreement may be executed in one or more counterparts, including by facsimile and/or electronic mail, each of which shall be deemed an original, but all of which together constitute one and the same instrument.

Dated: _____ ___, 2010
      Wilmington, Delaware

**[Add Signatures]**

Document comparison by Workshare Professional on Thursday, April 08, 2010 5:56:54 PM

| Input: | |
|---|---|
| Document 1 ID | PowerDocs://PAC/949884/10 |
| Description | PAC-#949884-v10-Delfasco_Plan_with_Pillar_as_Plan_Proponent |
| Document 2 ID | PowerDocs://PAC/949884/11 |
| Description | PAC-#949884-v11-Delfasco_Plan_with_Pillar_as_Plan_Proponent |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 18 |
| Deletions | 5 |
| Moved from | 0 |
| Moved to | 0 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 23 |