## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

```
------------------------------------------------------x
                                          :
In re:                                    :
                                          :
DELFASCO, INC.,                           :     Chapter 11
a Delaware Corporation,                   :
                                          :     Case No. 08-11578 (MFW)
                    Debtor.               :
------------------------------------------------------x
```

### SUPPLEMENT TO DECLARATION OF JACK GOLDENBERG IN SUPPORT OF CONFIRMATION OF THE PLAN OF LIQUIDATION OF DELFASCO, INC. AS AMENDED MARCH 4, 2010

I, JACK GOLDENBERG, hereby declare as follows:

1. I am a member of Delfasco Finance, LLC, a Delaware corporation ("Plan Sponsor") and am authorized to submit this declaration on behalf of the Plan Sponsor.

2. I have attached hereto a true copy of the executed *Asset Purchase Agreement*, dated as of April 7, 2010, entered into by and and among the Plan Sponor, as buyer, and Delfasco, Inc., as seller, and referenced in the *Declaration of Jack Goldenberg in Support of Confirmation of the Plan of Liquidation of Delfasco, Inc. as Amended March 4, 2010* previously filed with this Court.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Dated: April 7, 2010

_____
JACK GOLDENBERG

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------x
In re:                                                     :
                                                           :
DELFASCO, INC.,                                            :    Chapter 11
a Delaware Corporation,                                    :
                                                           :    Case No. 08-11578 (MFW)
                                       Debtor.             :
-----------------------------------------------------------x

### SUPPLEMENT TO DECLARATION OF JACK GOLDENBERG IN
### SUPPORT OF CONFIRMATION OF THE PLAN OF LIQUIDATION
### OF DELFASCO, INC. AS AMENDED MARCH 4, 2010

I, JACK GOLDENBERG, hereby declare as follows:

1.      I am a member of Delfasco Finance, LLC, a Delaware corporation ("Plan Sponsor")

and am authorized to submit this declaration on behalf of the Plan Sponsor.

2.      I have attached hereto a true copy of the executed *Asset Purchase Agreement*, dated

as of April 7, 2010, entered into by and and among the Plan Sponor, as buyer, and Delfasco, Inc., as

seller, and referenced in the *Declaration of Jack Goldenberg in Support of Confirmation of the Plan*

*of Liquidation of Delfasco, Inc. as Amended March 4, 2010* previously filed with this Court.

I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

Dated: April 7, 2010

_____
JACK GOLDENBERG

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of April 8, 2010 (the "Execution Date"), is entered into by and among Delfasco Finance, LLC ( "Buyer") and Delfasco, Inc. (the "Seller").

### WITNESSETH:

WHEREAS, Seller is in the business of contract metal fabrication (the "Business");

WHEREAS, Seller has filed a voluntary petition for reorganization pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") initiating bankruptcy case number 08-11578 (MFW) (the "Bankruptcy Case") and is currently operating as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code;

WHEREAS, Buyer wishes to purchase from Seller, and Seller desires to sell to Buyer, substantially all of the assets of Seller relating to the Business (other than the Excluded Assets (as defined hereinafter));

WHEREAS, on January 20, 2010, the Seller filed with the Bankruptcy Court a Disclosure Statement for Plan of Reorganization of Delfasco, Inc., and on March 4, 2010, the Seller filed with the Bankruptcy Court a revised Disclosure Statement for Plan of Liquidation of Delfasco, Inc. (the "Disclosure Statement") which includes a Plan of Liquidation of Delfasco, Inc. (the "Plan");

WHEREAS, the Plan, among other things, authorizes the Seller to enter into an asset purchase agreement in substantially the form of this Agreement;

WHEREAS, capitalized terms not otherwise defined herein shall have the meaning set forth in the Plan;

NOW, THEREFORE, in consideration of the respective representations, warranties, covenants and agreements set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

## 1.    DEFINED TERMS

1.1.    Defined Terms.    As used in this Agreement, except as otherwise expressly provided, the following terms, when used in capitalized form, shall have the meanings indicated below.

"Acquired Assets" has the meaning ascribed to it in Section 2.1.

"Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly, controls, or is controlled by, or is under direct or indirect common control with, such Person. For the purposes of this definition, "control," when used with respect to any specified Person, shall mean the possession of the power to, directly or indirectly, whether

through ownership of voting securities or partnership or other ownership interests, by contract or otherwise, direct or cause the direction of the management and policies of such Person. The terms "controlling" and "controlled" shall have correlative meanings.

"Agreement" means this Asset Purchase Agreement, all Schedules hereto, and all amendments made hereto and thereto by written agreement between the parties

"Applicable Law(s)" means all applicable provisions of any constitution, statute, law, ordinance, code, rule, regulation, decision, order, decree, judgment, release, license, permit, stipulation or other official pronouncement enacted or issued by any federal, state, local or foreign legislative, executive, judicial or other public authority, agency, department, bureau, division, or court.

"Approval Motions" has the meaning ascribed to it in Section 9.1.

"Assignment Agreement" has the meaning ascribed to it in Section 4.2(c).

"Assumed Contracts" means all rights under Contracts that are assumed and assigned or otherwise transferred to Buyer pursuant to 363, 365 or 1123 of the Bankruptcy Code, which Assumed Contracts are set forth in Schedule 1, as such schedule may be amended by Buyer at any time before Closing as set forth in Section 7.2(c).

"Assumed Liabilities" has the meaning ascribed to it in Section 2.3.

"Assumption Order" has the meaning ascribed to it in Section 9.1(b).

"Bankruptcy Case" has the meaning ascribed to it in the Recitals.

"Bankruptcy Code" has the meaning ascribed to it in the Recitals.

"Bankruptcy Court" has the meaning ascribed to it in the Recitals.

"Bill of Sale" has the meaning ascribed to it in Section 4.2(a).

"Business" has the meaning ascribed to it in the Recitals.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in New York, New York are authorized by law or other governmental action to close.

"Buyer" is identified in the opening paragraph of this Agreement.

"Cash" means cash and cash equivalents.

"Cash Consideration" has the meaning ascribed to it in Section 3.1.

"Cash Transfer" has the meaning ascribed to it in Section 3.1(b).

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended, and shall include the regulations, rules and orders promulgated thereunder.

"Claims" has the meaning ascribed to it in Section 2.3.

"Closing" has the meaning ascribed to it in Section 4.1.

"Closing Court Orders" means, collectively, the Confirmation Order and the Assumption Order.

"Closing Date" has the meaning ascribed to it in Section 4.1.

"COBRA" means the requirements of Section 1001 of the Consolidated Omnibus Budget Reconciliation Act of 1980, as amended, and shall include the regulations, rules and orders promulgated thereunder.

"Committee" means the Official Committee of Unsecured Creditors appointed in the Bankruptcy Case.

"Confidential Information" has the meaning ascribed to it in Section 5.8(g).

"Confirmation Hearing" means hearing of the Bankruptcy Court to confirm the Plan.

"Confirmation Order" has the meaning ascribed to it in Section 9.1(a).

"Contract" means any agreement, contract, lease, commitment, or other binding arrangement or understanding (including purchase orders), whether written or oral.

"Copyrights" has the meaning ascribed to it in Section 2.1(d).

"Cure Costs" has the meaning ascribed to it in Section 2.3.

"Deposit" has the meaning ascribed to it in Section 3.3.

"Designated Employees" shall mean the Employees listed on Schedule 8.2(c).

"Employees" has the meaning ascribed to it in Section 5.11(c).

"Employee Matters" has the meaning ascribed to it in Section 5.11(c).

"Employee Plans" means all employee benefit plans, including benefit plans as defined by Section 3(3) of ERISA, specified fringe benefits plan as defined in Section 6039D of the Internal Revenue Service Code, 401(k) plans, all compensation, pay, severance pay, salary continuation, paid time off, life insurance contracts paid for by the Business, whether held by the Business or an individual, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind and all other employee benefit plans, programs, funds or arrangements (whether written or oral,

3867098/008-1822037.12

qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

"Environmental and Safety Laws" means all applicable federal, state and local statutes, ordinances, rules, orders, judgments, junctions, decrees, regulations and other provisions having the force of law, all judicial and administrative orders and determinations, and all common law concerning pollution or protection of human health and the environment, or that classify, regulate, call for the remediation of, require reporting with respect to, or list or define air, water, groundwater, solid waste, hazardous or toxic substances, materials, wastes, pollutants or contaminants, or which are intended to assure the safety of employees, workers or other persons, including the public.

"ERISA" means the Employment Retirement Income Security Act of 1974, as amended.

"Excluded Assets" has the meaning ascribed to it in Section 2.2.

"Excluded Liabilities" means any indebtedness, liabilities or obligations of any kind or nature whatsoever, whether direct or indirect, known or unknown, absolute or contingent, that are indebtedness, liabilities or obligations of Seller, or any other Affiliate of Seller, other than the Assumed Liabilities. In furtherance and not in limitation of the foregoing, the Excluded Liabilities include, without limitation: (i) any indebtedness, liabilities or obligations for any act, omission, condition or event caused by or attributable to Seller to the extent occurring or existing prior to the Closing Date, (ii) any of Seller's liabilities in respect of Taxes, (iii) any investment banking, financial advisory, brokers' or finders' fees arising by reason of Seller's dealings with brokers or other third parties, or other liability of Seller for costs and expenses (including legal fees and expenses) incurred in connection with this Agreement, (iv) any indebtedness, liabilities or obligations arising out of or in connection with any relationship with any customer, supplier or partner of Seller, except for the Assumed Liabilities, (v) any indebtedness, liabilities or obligations for Seller's employees, including pre-Closing salary, wages, benefits and costs, severance, termination pay, pension, profit sharing or any other Employee Plans, compensation or retiree medical and other benefits and obligations, or any obligation, claim or amount under WARN, OSHA, Fair Labor Standards Act, ERISA, and other federal, state and local laws, unfair labor practices, employee claims, discrimination claims, health insurance claims, benefits claims, and any other employment related claims, errors and omissions, litigation, violations of law and tort claims or actions, whether disclosed or undisclosed, (vi) any obligation or liability arising as a result of or whose existence is a breach of Seller's representations, warranties, agreements or covenants contained in this Agreement or otherwise, (vii) any indebtedness, liabilities or obligations arising out of or in connection with the Excluded Assets or Refused Assets, (viii) any Affiliate indebtedness, liabilities or obligations, (ix) rebates, allowances, commissions, deductions and/or price discrepancies relating in any manner to Products sold by Seller prior to the Closing Date, (x) any indebtedness, liabilities or obligations under any Contract that is not an Assumed Contract, (xi) any indebtedness, liabilities or obligations under any Assumed Contract, except for the Assumed Liabilities, and (xii) any indebtedness, liabilities or obligations arising out of, relating to or otherwise in respect of any Environmental and Safety Laws or alleged breach thereof, including any indebtedness, liabilities or obligations arising out of, relating to or

otherwise in respect of the Grand Prairie Property, whether asserted by the EPA, the TCEQ or any other Person or Government Entity.

"Execution Date" has the meaning ascribed to it in the opening paragraph of this Agreement.

"Expense Reimbursement" has the meaning ascribed to it in Section 9.5.

"Facilities" means all buildings and improvements on the Real Property.

"Final Order" means an order of the Bankruptcy Court in the Bankruptcy Case (i) as to which the time to appeal, petition for certiorari, or move for re-argument, rehearing or new trial has expired and as to which no appeal, petition for certiorari, or other proceedings for re-argument, rehearing or new trial shall then be pending; (ii) as to which any right to appeal, petition for certiorari, reargue, rehear, or retry shall have been waived in writing; or (iii) in the event that an appeal, petition for certiorari, re-argument, rehearing or new trial has been sought, as to which (a) such order of the Bankruptcy Court shall have been affirmed by the highest court to which such order is appealed; or (b) certiorari has been denied as to such order; or (c) re-argument or rehearing or new trial shall have been denied, and the time to take any further appeal, petition for certiorari, or move for re-argument, rehearing or new trial shall have expired without such actions having been taken.

"GAAP" means generally accepted accounting principles, consistently applied.

"Government" means any agency, division, subdivision or governmental or regulatory authority or any adjudicatory body thereof, of the United States, or any state thereof.

"Government Entity" means any federal, state or local court, administrative body or other governmental or quasi-governmental entity with competent jurisdiction.

"Grand Prairie Property" has the meaning ascribed to it in Section 2.2(a).

"Hazardous Materials" means any hazardous or toxic substance or waste or any contaminant or pollutant regulated or otherwise creating liability under Environmental and Safety Laws, including, without limitation, "hazardous substances" as defined by the Comprehensive Environmental Response Compensation and Liability Act, as amended; "toxic substance" as defined by the Toxic Substance Control Act, as amended; "hazardous wastes" as defined by the Resource Conservation and Recovery Act, as amended; "hazardous materials" as defined by the Hazardous Materials Transportation Act, as amended; and thermal discharges, radioactive substances, PCBs, natural gas, petroleum products or byproducts and crude oil.

"Intellectual Property" means patents, trademarks, trade names, service marks, domain names, database rights, copyrights, and any applications therefor, mask works, net lists, schematics, technology, know-how, trade secrets, inventory, ideas, algorithms, processes, computer software programs or applications (in both source code, except in circumstances where Seller only possesses a license to the object code form, and object code form), and tangible or intangible proprietary information or material.

"IP Assignment Documents" means trademark assignments, copyright assignments, patent assignments and assignments of general intangibles in forms acceptable to Buyer, and any other documents requested by Buyer necessary or desirable to document or effectuate the transfers contemplated hereunder and to record such transfers with the appropriate offices or registries, including any releases, powers of attorney, consents or other documents, in accordance with the law of the United States and the laws of foreign countries, as applicable, to vest or to reflect the vesting of all right, title and interest in the trademarks, copyrights, patents and other Seller Intellectual Property in the Buyer and to permit the Buyer to effectuate the recordation thereof at the United States Patent and Trademark Office and with all applicable foreign offices, agencies, departments or authorities.

"Knowledge" means (i) the actual knowledge of Seller and (ii) any knowledge that could be obtained after reasonable inquiry and investigation of the matter in question.

"Lien" means any lien, charge claim, pledge security interest, conditional sale agreement or other title retention agreement, lease, mortgage, security interest, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Marks" has the meaning ascribed to it in Section 2.1(d).

"Material Adverse Change" means any circumstance, development or event that, alone or together with other circumstances, developments or events has resulted or is reasonably likely to result in a material adverse change in the Acquired Assets, the Assumed Liabilities or the results of operations or prospects of the Business or the Seller.

"Ordinary Course of Business" means the ordinary course of business of the Business, consistent with past custom and practice of the Seller.

"OSHA" means the Occupational Safety and Health Administration.

"Parties" means the Seller and Buyer.

"Patents" has the meaning ascribed to it in Section 2.1(d).

"PCBs" means polychlorinated biphenyls.

"Permits" has the meaning ascribed to it in Section 2.1(w).

"Person" means an individual, firm, partnership, association, unincorporated organization, trust, corporation, Government, governmental subdivision or agency, or any other entity.

"Pre-Closing Tax Returns" has the meaning ascribed to it in Section 7.1(k).

"Products" has the meaning ascribed to it in Section 2.1(d).

"Purchase Price" has the meaning ascribed to it in Section 3.1(a).

"Real Property" means any land, buildings, structures, improvements, fixtures or other interest in real property, which is used or intended to be used in, or otherwise related to, the Business, that Seller owns or in which Seller holds a leasehold or subleasehold estate or is granted the right to use or occupy.

"Refused Assets" has the meaning ascribed to it in Section 2.2(d).

"Seller" is identified in the opening paragraph of this Agreement.

"Seller Cash" has the meaning ascribed to it in Section 3.1(b).

"Seller Contracts" has the meaning ascribed to it in Section 5.10(a).

"Seller Intellectual Property" has the meaning ascribed to it in Section 2.1(d).

"Services" has the meaning ascribed to it in Section 5.15(b).

"Tangible Personal Property" has the meaning ascribed to it in Section 2.1(a).

"Taxes" means all taxes, charges, fees, duties, levies or other assessments, including, without limitation, income, gross receipts, net proceeds, ad valorem, real and personal property (tangible and intangible), sales, use, franchise, excise, value added, payroll, unemployment, stamp, leasing, lease, user, transfer, occupational, employees' income withholding and Social Security taxes imposed by the United States or any other country or by any state, municipality, subdivision or instrumentality of the United States or of any other country or by any other tax authority, including all applicable penalties and interest.

"Term Sheet" has the meaning ascribed to it in Section 3.3.

"TCEQ" means the Texas Commission on Environmental Quality.

"Third Party Intellectual Property Rights" has the meaning ascribed to it in Section 5.8(b).

"Third Party Sale" has the meaning ascribed to it in Section 9.5.

"Trade Secrets" has the meaning ascribed to it in Section 2.1(d).

"Transferred Information" has the meaning ascribed to it in Section 6.4.

"Transaction Documents" means the Agreement, the Bill of Sale, the Assignment Agreement, the IP Assignment Documents and each of the other documents and other agreements delivered and executed in connection with the transactions contemplated hereby.

"WARN" means the Worker Adjustment and Retraining Notification Act codified at 29 U.S.C. §§ 2101 et seq. and any similar statute in any state or territory of the United States of America.

## 2.     Purchase and Sale of Assets

2.1.     <u>Agreements to Purchase and Sell</u>. Subject to the terms and conditions of this Agreement, and except for the Excluded Assets, at the Closing, Seller shall sell, transfer, convey, assign and deliver to Buyer, or a designee of Buyer, and Buyer, or a designee of Buyer, shall purchase and accept from Seller, free and clear from any Liens, Claims and encumbrances pursuant to sections 363 and 1123 of the Bankruptcy Code, with all valid Liens to attach to the proceeds of sale, all right, title and interest of Seller in and to all of the assets, properties, interests and rights comprising the Business, of every kind and description, existing as of the date of this Agreement or acquired through the Closing, including all of the following assets (collectively, the "<u>Acquired Assets</u>"):

(a)     all tangible assets, including but not limited to tooling, equipment, computer systems and software, furniture, machinery, office equipment, furnishings and instruments (the "<u>Tangible Personal Property</u>");

(b)     all cash, accounts receivable and notes receivable existing as of the Closing Date and any proceeds therefrom and payments collected thereon subsequent to the Closing Date;

(c)     all goodwill directly arising from, related to or resulting from the Business;

(d)     all Seller intellectual property assets (the "<u>Seller Intellectual Property</u>"), including any and all of the following, as they exist throughout the world: (i) patents, patent applications of any kind, patent rights, inventions, discoveries and invention disclosures (whether or not patented) (collectively, "<u>Patents</u>"); (ii) rights in registered and unregistered trademarks, service marks, the corporate name of Seller, trade names, trade dress, logos, packaging design, slogans and internet domain names and registrations and applications for registration of any of the foregoing (collectively, "<u>Marks</u>"); (iii) registered and material unregistered copyrights in both published and unpublished works, and all copyright registrations and applications, and all derivatives, translations, adaptations and combinations of the above, including copyrights in (x) all design history files, (y) manufacturing instructions, and (z) all documents primarily related to the Seller's products (the "<u>Products</u>") and controlled by Seller (collectively, "<u>Copyrights</u>"); (iv) know-how, trade secrets, confidential or proprietary information, research in progress, algorithms, data, designs, processes, formulae, drawings, schematics, blueprints, flow charts, models, strategies, prototypes, techniques, customer lists and contact numbers/addresses, business strategies, forecasts, testing procedures and testing results (collectively, "<u>Trade Secrets</u>"); (v) any and all other intellectual property rights and/or proprietary rights relating to any of the foregoing; (vi) all licenses and other contracts under which Seller has sold, licensed, leased or otherwise transferred or granted any interest or rights to any Marks, Patents, Copyrights or Trade Secrets, (vii) goodwill, franchises, permits, consents, approvals, and claims of infringement and misappropriation against third parties, and (viii) any analysis and documentation on any enforcement activity related to the items (i)-(vii);

(e)     all inventory including all inventory of the Products together with all inventory of raw materials, work-in-progress related to the Products and finished goods

inventory of the Products, whether held at a location or facility of Seller (or of any other person on behalf of Seller) or in transit to or from Seller (or any such other person), any inventory on loan to or being used by any customers or others for evaluation, testing or in conjunction with any studies or trials, including any inventory that is acquired by Seller between the date of this Agreement and the Closing Date;

    (f)    all rights in or under the Assumed Contracts;

    (g)    all source code, object code, localization resource files, developer documentation, API documentation, build documentation, user documentation, implementation documentation and test scripts and routines for the software related to all Products; all computers, laptops, servers, network gear and related software utilized by the Seller or any Affiliate of the Seller to conduct its business;

    (h)    all regulatory approvals to the extent transferable;

    (i)    all general intangibles, including all rights to Tax refunds, including any refunds under the Pre-Closing Tax Returns;

    (j)    all support data on all support activity for all customers;

    (k)    all manufacturing instructions;

    (l)    all documentation on all support or maintenance obligations that (i) have yet to be fulfilled or (ii) have expired and not been renewed;

    (m)    all other assets directly arising out of, relating to or resulting from the Business, of every nature whatsoever, tangible and intangible, and wherever located, such as any business records; customer lists; customer records and histories; customer invoices; lists of suppliers and vendors and all records relating thereto; list of sales agents; price lists; engineering drawings; records with respect to production, engineering, and product development costs; advertising matter; catalogues; photographs; instruction manuals; sales literature and materials; purchasing materials; media materials; manufacturing and quality control records and procedures; research and development files; design history files; data and laboratory books and media materials and plates; and copies of all files relating to the Seller Intellectual Property, including all applications, registrations, assignments, correspondence to and from the United States Patent and Trademark Office and any other foreign patent and trademark offices, dockets, workbooks, legal opinions, prior art searches, notes, memoranda and other related information;

    (n)    all marketing materials and related source files for all Products, including price books, website, web pages, brochures, presentations, demos, tradeshow booths, promos, packaging and advertising;

    (o)    all license agreements and, if there are no agreements, purchase orders (if such agreements or purchase orders are Assumed Contracts) for all customers that have purchased or are evaluating the Products;

(p) all active and inactive maintenance and support agreements (if such agreements are Assumed Contracts) for all customers that have purchased the Products;

(q) all active and inactive licenses, reseller and distributor agreements (if such licenses and agreements are Assumed Contracts) with third parties granted rights to sell, distribute, or implement the Products;

(r) contact details and database of all existing customers and sales opportunities currently in the Seller's pipeline, including all details on each such opportunity;

(s) all deposits and pre-paid expenses;

(t) all telephone numbers, web sites and domain names and URL addresses used in connection with the Business;

(u) all vendor, distributor, reseller, service provider, contractor and customer relationships;

(v) all records and documentation (including all disks, tapes and other media storage data and information) relating to its customers, distributors, partners and suppliers (including all customer, distributor and supplier lists and files), all current and historic records related to (and copies of) Contracts (regardless of whether such Contracts are active or have terminated or expired) and all other current and historic business records of Seller;

(w) all licenses, sublicenses, permits, approvals, certifications, endorsements, qualifications, accreditations and authorizations of all Government Entities necessary for the conduct of the Business, to the extent transferable (collectively, the "Permits");

(x) all books (including corporate minute books), documents, records of Seller and Seller's Affiliates as may exist on the Closing Date necessary to the Business as maintained by Seller; and

(y) all other assets of the Seller other than Excluded Assets.

2.2. Excluded Assets. The Acquired Assets shall not include the following (the "Excluded Assets"):

(a) any interests in certain Real Property located at 114 NE 28th Street, Grand Prairie, Texas 75050 (the "Grand Prairie Property");

(b) Causes of action of Seller against any person or entity that are not related to the Acquired Assets, whether asserted or unasserted, including all causes of action under Title 11, Chapter 5 of the Bankruptcy Code, or otherwise;

(c) any capital stock or other equity interests of Seller or any Affiliate of Seller; and

(d)    any assets of Seller (previously included as Acquired Assets), as determined by the Buyer in its sole discretion, of which Buyer delivers notice of prior to Closing that it shall not purchase under this Agreement (the "Refused Assets").

2.3.    Assumed Liabilities. On the Closing Date, Buyer shall not assume any liabilities of Seller except those set forth on Schedule 2.3 hereto ("Assumed Liabilities"). Buyer shall not assume or be responsible for any Excluded Liabilities and Buyer shall not assume or be responsible for any claims (as such term is defined in Bankruptcy Code § 101(5)) asserted by any such person or entity against Seller, and/or the Acquired Assets (collectively, the "Claims"), whether such Claims and Excluded Liabilities are known or unknown, contingent or otherwise, and whether such Claims and Excluded Liabilities arise under, in connection with or with respect to, or are calculable by reference to, Seller, Seller's operations, the Acquired Assets, the Business, the Excluded Assets, or otherwise. Seller shall continue to be solely responsible for all such Claims and Excluded Liabilities. In furtherance and not in limitation of the foregoing, Seller shall be solely liable and responsible for payment of such amounts as are determined by the Bankruptcy Court to be necessary to cure any defaults under the Assumed Contracts pursuant to Bankruptcy Code § 365(b) (the "Cure Costs"), which payment shall be funded in accordance with Section 3.1(b)(i) below. Disclosure of any indebtedness, obligation or liability on any schedule to this Agreement shall not create an Assumed Liability or other liability of Buyer, except where such disclosed obligation has been expressly assumed by Buyer as an Assumed Liability.

2.4.    Non-Assignment of Contracts. Notwithstanding any provision herein contained to the contrary, this Agreement shall not constitute an agreement to assign any Assumed Contract, if, notwithstanding the provisions of sections 363, 365 and 1123 of the Bankruptcy Code, an attempted assignment thereof, without the consent of the third party thereto, would constitute a breach thereof or in any way negatively affect the rights of Seller or Buyer, as the assignee of such Assumed Contract, as the case may be, thereunder. If, notwithstanding the provisions of Sections 363, 365 and 1123 of the Bankruptcy Code, such consent or approval is required but not obtained, Seller shall, without further consideration, provide Buyer with the benefits of or under any such Assumed Contract. Any assignment to Buyer of any Assumed Contract that shall, notwithstanding the provisions of sections 363, 365 and 1123 and 365 of the Bankruptcy Code, require the consent or approval of any third party for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

## 3.    Purchase Price

3.1.    Purchase Price. (a) In consideration of the sale by Seller to Buyer of the Acquired Assets, Buyer agrees to (i) provide the Debtor at Closing with funds in an amount up to $2,654,784.27 in US Dollars in cash or certified funds (the "Cash Consideration") as set forth in paragraph 3.1(b) below, and (ii) assume the Assumed Liabilities (such assumption together with the Cash Consideration, the "Purchase Price").

(b)    The Cash Consideration shall be payable at Closing as follows:

(i)    The Cash Consideration shall be funded by delivery to the Debtor of (A) an amount equal to up to the sum of $1,154,784.27 minus the Deposit by

cash transfer from the Buyer (the "Cash Transfer"), plus (B) $1,500,000 in cash from the Acquired Assets (the "Seller Cash") for the payment of those items necessary to fund the Plan as set forth in Schedule 3.1 (the "Source and Use of Funds Schedule"). To the extent that $2,654,784.27 exceeds the amount required to pay in full those items designated on the Source and Use of Funds Schedule, including, without limitation, the payment of Professional Compensation and Reimbursement Claims to the extent set forth in the Plan (as they may be reduced by agreement with certain Professional Persons (as defined in the Plan)) or any agreed reduction in the Trade Claims Payment (as defined in the Plan), the Cash Consideration and the Purchase Price shall be reduced in an amount equal to such excess on a dollar for dollar basis by reducing the Cash Transfer or, if necessary, by payment from Seller to Buyer after Closing; and

      (ii)     An amount equal to the Deposit shall be released to the Seller.

3.2.    Purchase Price Allocation. After the Closing, the Buyer shall provide the Seller with an allocation of the Purchase Price for Tax purposes, which allocation shall be in compliance with Section 1060 of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder. Seller and Buyer agree to file all Tax returns or reports for their respective taxable years in which the Closing occurs, to reflect such allocation and agree not to take any position inconsistent therewith before any governmental agency charged with the collection of any Tax or in any judicial proceeding.

3.3.    Deposit. As security for Buyer's obligation to close the transaction contemplated hereby, Buyer has previously delivered to Potter Anderson & Corroon LLP, counsel to the Seller, as escrow agent under the term sheet, dated January 5, 2010 (the "Term Sheet") a refundable good faith deposit in the aggregate amount equal to $325,000 (together with any interest earned thereon, the "Deposit"). The Deposit may be retained by Seller in the event of Buyer's breach of this Agreement as liquidated damages. At the Closing, the Deposit shall be applied in partial satisfaction of the Purchase Price. In the event of the occurrence of a termination under Section 9.3 hereof, other than as a result of termination by Seller pursuant to Section 9.3(b)(iii) or (iv), the Deposit, together with any interest earned thereon, shall be returned to Buyer not later than two (2) Business Days after the occurrence of such termination. Pending the occurrence of the Closing hereunder, the Deposit shall be held in an interest bearing escrow account.

## 4.    Closing

4.1.    Closing. The consummation of the transactions contemplated by this Agreement (the "Closing") shall take place at the offices of counsel for the Seller at the earliest practicable date following the satisfaction (or waiver) of the conditions precedent set forth in Article 8 of this Agreement, or at such other time and place as may be mutually agreed upon in writing between Buyer and Seller (the "Closing Date"); provided, however, that if such conditions are satisfied (or waived), Closing shall occur on the Effective Date of the Plan.

4.2.    Deliveries by Seller. Subject to the conditions set forth herein, at the Closing, Seller shall deliver to Buyer:

(a)     A bill of sale in a form acceptable to Buyer and Seller (the "Bill of Sale");

(b)     A true and complete copy of the Closing Court Orders along with certification from counsel for Seller that counsel has reviewed the docket in the Bankruptcy Case and no appeal of or motion to reconsider any Closing Court Order has been filed;

(c)     An assignment and assumption agreement with respect to the Assumed Contracts and Assumed Liabilities in a form acceptable to Buyer and Seller (the "Assignment Agreement");

(d)     The IP Assignment Documents; and

(e)     All other documents, certificates, consents, authorizations, permits, and instruments of sale, transfer, conveyance and assignment as Seller or Buyer may reasonably require to effect the transactions contemplated under this Agreement.

4.3.     Deliveries by Buyer.  Subject to the conditions set forth herein, at the Closing, Buyer shall take the actions and make the payments described in Section 3.1(a) and 3.1(b)(i), and (ii) above and shall deliver to Seller:

(a)     The portion of the Cash Consideration described in Section 3.1(b)(i) above to a bank account or bank accounts designated in writing by Seller, by wire transfer of immediately available funds;

(b)     The Assignment Agreement; and

(c)     All other documents, certificates, consents, authorizations, permits, and instruments of sale, transfer, conveyance and assignment as Seller or Buyer may reasonably require to effect the transactions contemplated under this Agreement.

## 5.     Representations and Warranties of Seller

The Seller makes the following representations and warrants to its Knowledge:

5.1.     Organization and Good Standing.  Except as set forth on Schedule 5.1, Seller is a corporation duly organized, validly existing and is in good standing under the laws of the State of Delaware.  Except as set forth on Schedule 5.1, Seller has qualified to do business and is in good standing as a foreign corporation in all states where such qualification is necessary and has the corporate power and authority to own, lease, and operate its properties and assets and carry on the Business as such operations are now being conducted.

5.2.     Authority.  Seller has all requisite power and authority to enter into this Agreement and all documents and agreements hereunder to which Seller is or becomes a party, and, subject to the Bankruptcy Court's entry of the Closing Court Orders, to carry out the transactions and perform its obligations contemplated hereby and thereby.  The Transaction Documents when executed will be duly and validly executed and delivered by Seller and, subject to the entry of the Closing Court Orders, constitute legal, valid and binding obligations enforceable against Seller in accordance with their terms.

5.3.     Consents; No Violation.  Subject to the entry of the Closing Court Orders, there is no requirement applicable to Seller to make any filing with, or to obtain any permit, authorization, consent or approval of, any governmental authority as a condition to the lawful consummation by Seller of the transactions contemplated hereby and the execution and delivery of the Transaction Documents by Seller and, the execution, delivery and performance of the Transaction Documents by Seller will not: (a) violate or conflict with any provision of the certificate of incorporation or by-laws of Seller, (b) violate or conflict with, or result in a breach of any of the terms or provisions of or constitute (with notice or lapse of time, or both) a default (or give rise to any right of termination, cancellation or acceleration) under any of the terms, conditions or provisions of any Contract relating to the Business and to which Seller is a party or to which any of the Acquired Assets may be subject, or (c) violate any law, statute, rule, regulation, order, writ, injunction or decree of any governmental authority that is applicable to Seller or any of the Acquired Assets.

5.4.     Subsidiaries.  Seller does not own, directly or indirectly, any equity interests in any Person.

5.5.     Title to Acquired Assets.  At the Closing, Buyer will obtain good and marketable title to the Acquired Assets, which shall be transferred to Buyer, or its designees, free and clear of all Liens, Claims and encumbrances.

5.6.     Compliance with Laws.  Seller  has conducted the Business in accordance with all Applicable Laws.  Seller has not received notice of any violation of any Applicable Law and Seller is not in default with respect to any order, writ, judgment, award, injunction or decree of any Government Entity.

5.7.     Customers, Partners and Suppliers.  None of the customers of the Seller that individually accounted for more than 15% of the gross revenues of the Seller during the 12 month period preceding the date hereof has terminated any agreement with Seller or indicated that it will stop, or decrease the rate of, purchasing Products from Seller.  As of the date hereof, no material supplier of Seller has terminated any agreement with Seller or indicated that it will stop, or decrease the rate of, supplying materials, products or services to Seller.  As of the date hereof, no material partner of Seller has terminated any agreement with Seller or indicated that it will terminate its partner relationship and/or any agreement with Seller.  Seller has not knowingly breached any agreement with, or engaged in any fraudulent conduct with respect to, any customer, partner or supplier of Seller, except for any breach arising under an agreement that provides that the filing for Chapter 11 is considered an event of default.

5.8.     Intellectual Property.

(a)     Seller owns, or is licensed or otherwise possesses legally enforceable and unencumbered rights to use, all Seller Intellectual Property.  Seller owns and possesses source code for all software owned by Seller and owns or has valid licenses and possesses source code for all Products owned, distributed and presently supported by Seller.  Seller has not (i) licensed or disclosed any Seller Intellectual Property in source code form to any party or as part of any shareware or other open source software arrangement, (ii) without limitation on clause (i), deposited or provided any Seller Intellectual Property in source code form in any escrow or

similar arrangement, or (iii) entered into any exclusive agreements relating to Seller Intellectual Property. No royalties or other continuing payment obligations are due in respect of Third Party Intellectual Property Rights (as defined below).

(b)     Schedule 5.8(b) lists (i) all patents and patent applications and all registered trademarks, trade names and service marks, registered copyrights, and mask works included in Seller Intellectual Property, including the jurisdictions in which each such Intellectual Property right has been issued or registered or in which any application for such issuance and registration has been filed, (ii) all material non-registered Intellectual Property, (iii) all licenses, sublicenses and other agreements as to which Seller is a party and pursuant to which any person is authorized to use any Seller Intellectual Property (except for non-material licenses entered into by Seller in the Ordinary Course of Business), (iv) all material licenses, sublicenses and other agreements as to which Seller is a party and pursuant to which any person is authorized to sell, resell or distribute any Seller Intellectual Property and (v) all material licenses, sublicenses and other agreements as to which Seller is a party and pursuant to which Seller is authorized to use any third party patents, trademarks or copyrights, including software ("Third Party Intellectual Property Rights"), which are incorporated in, are, or form a part of any Product, other than commercially available, off-the-shelf software.

(c)     To Seller's Knowledge, there is no unauthorized use, disclosure, infringement or misappropriation of any Seller Intellectual Property rights, or any Intellectual Property right of any third party to the extent licensed by or through Seller, by any third party, including any employee or former employee of Seller. Neither Seller has entered into any agreement to indemnify any other person against any charge of infringement of any Intellectual Property, other than indemnification provisions contained in purchase orders, license agreements and distribution and other customer agreements arising in the Ordinary Course of Business.

(d)     Seller is not, nor will it be as a result of the execution and delivery of this Agreement or the performance of its obligations under this Agreement, in breach of any license, sublicense or other agreement relating to the Seller Intellectual Property or Third Party Intellectual Property Rights; and there are no pending or threatened claims or actions against Seller relating to the Seller Intellectual Property or Third Party Intellectual Property Rights.

(e)     Seller has not been sued in, received notice of, or to Seller's Knowledge been threatened with, any suit, action or proceeding challenging the validity, enforceability or ownership by the Seller of any of the Seller Intellectual Property. Seller (i) has not been sued in any suit, action or proceeding (or received any notice or, to Seller's Knowledge, threat) which involves a claim of infringement of any patents, trademarks, service marks, copyrights or violation of any trade secret or other proprietary right of any third party and (ii) has not brought any action, suit or proceeding for infringement of Seller Intellectual Property or breach of any license or agreement involving Seller Intellectual Property against any third party. The manufacture, marketing, licensing or sale of Seller's Products does not infringe any patent, trademark, service mark, copyright, trade secret or other proprietary right of any third party.

(f)     Seller has secured valid written assignments from all consultants and employees who contributed to the creation or development of Seller Intellectual Property of the rights to such contributions that Seller does not already own by operation of law.

(g)     Seller has taken all reasonably necessary steps to protect and preserve the confidentiality of all Seller Intellectual Property not otherwise protected by patents or patent applications or copyright ("Confidential Information"). All use, disclosure or appropriation of Confidential Information owned by Seller by or to a third party has been pursuant to the terms of a written agreement between Seller and such third party. All use, disclosure or appropriation of Confidential Information not owned by Seller has been pursuant to the terms of a written agreement between Seller and the owner of such Confidential Information, or is otherwise lawful.

(h)     Except as set forth on Schedule 5.8(h), Seller has taken all actions that were required to be taken by Seller as of the date hereof in order to protect its interests in the Seller Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of any responses to the U.S. Patent and Trademark Office actions, documents, applications or certificates for the purposes of obtaining, maintaining, perfecting or preserving or renewing any Seller Intellectual Property. Except as set forth on Schedule 5.8(h), there are no actions that must be taken within six months of the Closing Date that, if not taken, will result in the loss of any Seller Intellectual Property, including the payment of any registration, maintenance or renewal fees or the filing of any responses to the U.S. Patent and Trademark Office actions, documents, applications or certificates for the purposes of obtaining, maintaining, perfecting or preserving or renewing any Seller Intellectual Property.

(i)     Seller has not received any opinion of counsel, written or oral, that any third party patents apply to any of the Products.

(j)     No funding, facilities or personnel of any educational institution or Government Entity were used, directly or indirectly, to develop or create, in whole or in part, any Seller Intellectual Property owned or purported to be owned by the Seller including any portion of a Product.

5.9.     Permits. Schedule 5.9 sets forth a true and complete list of all Permits, and all pending applications therefore held by Seller. Seller has provided Buyer with true, complete and correct copies of all such Permits.

5.10.     Contracts.

(a)     Schedule 5.10(a) lists all Contracts to which Seller is a party (the "Seller Contracts") other than (i) Contracts that have terminated and/or expired and are no longer in effect and (ii) immaterial Contracts that are no longer used by the Seller in the Business;

(b)     Seller has provided Buyer with true, complete and correct copies of each Seller contract; and

(c)     Schedule 5.10(c) lists the Cure Costs.

5.11. Employee/Labor Matters.

(a) Except as set forth on Schedule 5.11(a), Seller is not a party to any collective bargaining agreement or other labor union contract nor does Seller know of any activities or proceedings of any labor union to organize any such Employees.

(b) No labor dispute, walk out, strike, slowdown, hand billing, picketing, work stoppage (sympathetic or otherwise), or other "concerted action" involving the Employees has occurred, is in progress or has been, to the Knowledge of Seller, threatened.

(c) Attached as Schedule 5.11(c) is a true, complete and accurate list (and, as indicated below, description) as of the date of this Agreement (and updated as of the Closing Date) of: (i) the names and titles of all consultants, independent contractors, full-time, part-time, temporary or casual employees employed by Seller (collectively, "Employees"), together with their status and location of their employment; (ii) the date each Employee was hired or retained; (iii) a list of all written employment, consulting or service contracts or offer letters between Seller and the Employees; (iv) the rate of annual remuneration of each Employee at the date hereof, any bonuses paid since the end of the last completed financial year and all other bonuses, incentive schemes and benefits to which such Employee is entitled; (v) the amount of vacation pay or number of weeks of vacation to which each Employee is entitled as of the date hereof; (vi) the names of all inactive Employees, the reason they are inactive Employees, whether they are expected to return to work, and if so when, and the nature of any benefits to which such inactive Employees are entitled from Seller; (vii) any employee handbook or personnel policies or procedures manual in effect that governs the terms and conditions or privileges of employment of the Employees; and (viii) particulars of all other material terms and conditions of employment or engagement of the Employees and the positions, title or classification held by them (collectively, "Employee Matters"). Seller has provided to Buyer correct and complete copies of all documents relating to the Employee Matters.

(d) Seller is in compliance in all material respects with all currently applicable laws and regulations respecting employment, discrimination in employment, terms and conditions of employment, wages, hours, leaves, classification of workers as employees and independent contractors, and occupational safety and health and employment practices, and is not engaged in any unfair labor practice, except where the failure to be in compliance or the engagement in such unfair labor practices would not result in a Material Adverse Change. Seller has withheld all amounts required by law or by agreement to be withheld from the wages, salaries, and other payments to employees; and is not liable for any arrears of wages or any taxes or any penalty for failure to comply with any of the foregoing. Seller is not liable for any payment to any trust or other fund or to any governmental or administrative authority, with respect to unemployment compensation benefits, social security or other benefits or obligations for Employees (other than routine payments to be made in the normal course of business and consistent with past practice). There are no pending claims, or claims reasonably expected or threatened, against Seller for any amounts under any workers compensation plan or policy or for long-term disability. Except as set forth on Schedule 5.11(d), Seller has no obligations under COBRA with respect to any former Employees or qualifying beneficiaries thereunder. To the Knowledge of Seller, there are no controversies pending or threatened between Seller, on the one hand, and any of its Employees, on the other hand, which controversies have or would

reasonably be expected to result in an action, suit, proceeding, claim, arbitration, audit or investigation before any agency, court or tribunal, foreign or domestic.

(e) Seller has provided the Employees with all wages, benefits, stock options, bonuses and incentives, and all other compensation that became due and payable through the Closing Date.

(f) Except as set forth on Schedule 5.11(f), in the last five (5) years, no citation has been issued by OSHA or by a state or provincial occupational safety and health board or agency against Seller and no notice of contest, claim, complaint, charge, investigation or other administrative enforcement proceeding involving Seller has been filed or is pending or, to the Knowledge of Seller, threatened against Seller under OSHA or any provincial occupational safety and health board or any other applicable law relating to occupational safety and health.

(g) Neither the actions of Seller prior to the Closing Date the transactions contemplated in this Agreement will constitute a "mass layoff," "mass termination" or "plant closing" within the meaning of WARN or would otherwise trigger notice requirements or liability under any federal, local, state or foreign plant closing notice or collective dismissal law.

(h) No employees of Seller are in violation of any term of any employment contract, confidentiality agreement, patent disclosure agreement, noncompetition agreement, or any restrictive covenant to a former employer relating to the right of any such Employee to be employed by Seller because of the nature of the business conducted or presently proposed to be conducted by Seller or to the use of trade secrets or proprietary information of others. No Designated Employee has given notice to Seller, nor does Seller have knowledge that any such Designated Employee intends to terminate his or her employment with Seller.

(i) There are no liabilities with respect to any Employee Plan for which Buyer could become liable as a result of consummation of the transactions contemplated by this Agreement.

5.12. Taxes. Except as set forth on Schedule 5.12, Seller has paid all Taxes required to be paid with respect to the Business or the Purchased Assets when due and payable, and filed or caused to be filed on a timely basis, or if late, will file before the Closing Date, all tax returns and all reports with respect to Taxes that are or were required to be filed. There are no liens for a material amount of Taxes upon the assets of Seller except liens for current Taxes not yet due and payable and for which adequate reserves are maintained in the Financial Statements in accordance with GAAP. No Tax return of Seller is currently under audit or examination by any taxing authority, and no notice of such an audit or examination has been received by Seller. Each deficiency resulting from any audit or examination relating to Taxes by any taxing authority has been timely paid.

5.13. Litigation. Except as set forth on Schedule 5.13, (i) there are no legal, administrative, arbitration or other proceedings or governmental investigations pending or, to the Knowledge of Seller, threatened by or against Seller or that otherwise relates to or may affect the

Business, or any of the Acquired Assets, and (ii) Seller and the Acquired Assets are not subject to any judgment, writ, award, injunction, order or decree.

5.14. Insurance. Schedule 5.14 sets forth a list of all insurance policies (specifying the insurer, the amount of coverage, the type of insurance and the annual premium) presently maintained by Seller with respect to the Business. Except as disclosed on Schedule 5.14, such policies are owned solely by Seller and such policies (or their replacements or extensions) will be outstanding and in effect until the Closing.

5.15. Warranty Claims. Except as set forth on Schedule 5.15:

(a) Each of the Products is in conformity in all material respects with the specifications and documentation for such Products. The Seller has no outstanding liability or obligation for replacement or repair thereof or other damages in ordinary course of business consistent with past practice. Schedule 5.15 includes a copy of the standard terms and conditions of sale or lease for each of the Products. Except as set forth in the agreements listed on Schedule 5.15, no Product is subject to any guaranty, warranty, or other indemnity by the Seller beyond the applicable standard terms and conditions of sale, license or lease or beyond that implied or imposed by Applicable Law. There are no outstanding claims by any Person against the Seller pursuant to any guaranty, warranty or indemnity, whether express or implied by law.

(b) There is no claim pending or, to the Seller's Knowledge, threatened against the Seller relating to any services performed by the Seller to any third party ("Services") or services agreement to which Seller is a party and, to the Seller's Knowledge, there is no reasonable basis for the assertion of any such claim. Except as set forth in the agreements listed on Schedule 5.15, the Seller has not entered into any agreement requiring the Seller to provide Services.

5.16. Recent Activities. Except as set forth on Schedule 5.16, subsequent to filing of the Bankruptcy Case:

(a) no damage, destruction or loss (whether or not covered by insurance and not including the loss of business due to Seller's restricted operations since filing the Bankruptcy Case) has occurred that individually or in the aggregate would have a material effect on the ownership, operation or use of the Acquired Assets;

(b) Seller has not sold, assigned, transferred, distributed, licensed or otherwise disposed of any of the Acquired Assets, except for fair consideration in the Ordinary Course of Business or as permitted by Order of the Bankruptcy Court; and

(c) Seller has not canceled or waived any rights in respect of the Acquired Assets, except in the Ordinary Course of Business or as permitted by order of the Bankruptcy Court.

5.17. Brokers; Finders. No broker, finder or other Person, is entitled to any brokerage fees, commissions or finder's fees (or related expenses) in connection with the transactions contemplated hereby by reason of any action taken by Seller.

5.18. Real Property. Schedule 5.18 contains a complete and correct list of all Real Property. True, correct and complete copies of all leases (including all amendments, extensions, renewals, guarantees and other agreements with respect thereto) relating to such Real Property have heretofore been delivered by Seller to Buyer.

5.19. Environmental Matters. Except as set forth on Schedule 5.19:

(a) No methylene chloride or asbestos is contained in or has been used at or released from the Facilities;

(b) All Hazardous Materials and wastes have been disposed of in accordance with all Environmental and Safety Laws;

(c) Seller has received no notice (verbal or written) of any noncompliance of the Facilities or its past or present operations with Environmental and Safety Laws;

(d) No notices, administrative actions or suits are pending or, to Seller's Knowledge, threatened relating to a violation of any Environmental and Safety Laws;

(e) Seller is not a potentially responsible party under CERCLA, or state analog statute, arising out of events occurring prior to the Closing Date;

(f) There have not been in the past, and are not now, any Hazardous Materials on, under or migrating to or from the Facilities or Real Property;

(g) There have not been in the past, and are not now, any underground tanks or underground improvements at, on or under the Real Property including without limitation, treatment or storage tanks, sumps, or water, gas or oil wells;

(h) There are no PCBs deposited, stored, disposed of or located on the Real Property or Facilities or any equipment on the Real Property containing PCBs at levels in excess of 50 parts per million;

(i) There is no formaldehyde on the Real Property or in the Facilities, nor any insulating material containing urea formaldehyde in the Facilities;

(j) The Facilities and Seller's uses and activities therein have at all times complied with all Environmental and Safety Laws; and

(k) Seller has all the permits and licenses required to be issued under applicable Environmental and Safety Laws and is in full compliance with the terms and conditions of those permits and licenses.

5.20. Accuracy of Financial Information. Seller's (i) unaudited financial statements for the period ending January 31, 2010 (including any related notes), and (ii) balance sheet, income statement and statement of cash flows for the month ending January 31, 2010 (the balance sheet included in such January 31, 2010 financial statements, the "Most Recent Balance Sheet") as set forth on Schedule 5.20, have been prepared in accordance with generally accepted accounting

principles and fairly present, in all material respects, the financial position and results of operations and cash flows of Seller as of the respective dates or for the respective periods set forth therein, in each case in accordance with GAAP, subject to normal year-end adjustments.

5.21. Tangible Personal Property. Schedule 5.21 provides an accurate list of all Tangible Personal Property owned or leased by Seller as of the date hereof and identifies the location of such Tangible Personal Property. The Tangible Personal Property listed in Schedule 5.21 are in working condition and repair, subject to normal wear and tear, consistent with the age of such Tangible Personal Property.

5.22. Accounts Receivable. The accounts receivable disclosed in the Most Recent Balance Sheet and, with respect to accounts receivable created since the date of the Most Recent Balance Sheet, as accrued on the books of Seller in the Ordinary Course of Business since the date of the Most Recent Balance Sheet, have been recorded and accrued in accordance with GAAP, represent bona fide claims arising out of sales and other charges made in the Ordinary Course of Business, and are not subject to discount except for normal cash and immaterial trade discount. The amount carried for doubtful accounts and allowances disclosed in the Most Recent Balance Sheet or accrued on such books is sufficient to provide for any losses that may be sustained on realization of such accounts receivable. Attached as Schedule 5.22 hereto is a true, correct and complete aging summary of Seller's accounts receivables as of the first Business Day immediately preceding the Execution Date.

5.23. Sufficiency of Acquired Assets. The Acquired Assets, whether real or personal, tangible or intangible, (a) comprise all of the assets, properties and rights that are necessary to conduct the Business as it is currently conducted consistent with past practice and (b) comprise all of the assets, properties and rights that are currently used by Seller to conduct the Business. No party other than Seller has any right, title or interest in the Acquired Assets.

5.24. Affiliate Transactions. Except as set forth on Schedule 2.3, there are no contracts, agreements, commitments or other continuing transactions related to the Business between (a) Seller, on the one hand, and (b) any Affiliate of Seller or any present or former director, officer or management employee of Seller, any Affiliate of Seller or any member of such director's, officer's or Employee's family.

5.25. Complete Copies of Materials. Seller has delivered or made available true and complete copies of each document that has been requested by Buyer or its counsel, accountants and other advisors in connection with their business, legal and accounting review of Seller.

5.26. Representations Complete. None of the representations or warranties made by Seller herein or in any Schedule hereto, or certificate furnished by Seller pursuant to this Agreement, when all such documents are read together in their entirety, contains or will contain at Closing any untrue statement of a material fact, or omits or will omit at Closing to state any material fact necessary in order to make the statements contained herein or therein, in the light of the circumstances under which made, not misleading.

5.27. Schedules. All Schedules attached hereto are complete as of the date of this Agreement and the Closing Date (except where such representation or warranty is made as of a specific date).

5.28. Limited Survivability of Representations and Warranties of Seller. All of the representations and warranties contained in this Article 5 shall survive the Closing.

5.29. Disclaimer of Warranties. Except for the warranties of Seller set forth in this Article 5, Seller does not make any express or implied warranties as to the condition of the Acquired Assets.

## 6. Representations of Buyer

6.1. Financial Status. Buyer has adequate funds to complete the transactions contemplated herein without any financing contingency.

6.2. No Conflict. Neither the execution nor performance of this Agreement will violate any contract or other commitment to which Buyer is a party, or by which it is bound, or will be in conflict with, or result in or constitute a breach or default on the part of Buyer under any such indenture, contract or other commitment.

6.3. Compliance with Laws. All consents, approvals and authorizations and all other requirements prescribed by any law, rule or regulation which must be obtained or satisfied by Buyer and which are necessary for the execution and delivery by Buyer of this Agreement and the documents to be executed and delivered by Buyer in connection herewith have been obtained and satisfied or shall be obtained and satisfied.

6.4. Confidentiality. It is acknowledged by Buyer that all information discovered in the course of its due diligence is in all respects of a confidential nature; provided that information in connection with, concerning or relating to the Acquired Assets and Assumed Liability (the "Transferred Information") shall cease to be subject to this provision at the Closing.

6.5. Small Business. The Buyer warrants that the acquisition of the Acquired Assets and continuation of the Business will not violate Delfasco's compliance with Small Business and Affiliation regulations.

## 7. Covenants

7.1. Covenants of Seller.

(a) Access to Information. Prior to the Closing, and upon reasonable notice received from Buyer and to the extent permitted by applicable law, Seller shall afford Buyer and its authorized officers, employees and representatives (including, its counsel, accountants and consultants) full access, during regular business hours, to the Acquired Assets, Seller's Real Property, Employees, properties, books and records and other documents and data related to the Business to complete legal, accounting and business due diligence, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of Seller, and

furnish Buyer with such additional access, financial, operating and other relevant data and information as Buyer may reasonably request, including access to Seller's customers and business partners; and otherwise cooperate and assist, to the extent reasonably requested by Buyer, with Buyer's investigation of the properties and assets of Seller. After the Closing, upon reasonable notice received from Buyer and to the extent permitted by applicable law Seller shall provide Buyer with full access, during regular business hours, to all relevant documents and other information in the possession of Seller and pertaining to the Acquired Assets, which may be needed by Buyer for the purposes of preparing Tax returns or responding to an audit by any Government Entity.

(b)     Access to Employees. Buyer may interview any of the Employees. Buyer will have reasonable access to the personnel records (including performance appraisals, disciplinary actions, grievances and, to the extent allowed by applicable law, medical records) of Seller for the purpose of preparing for and conducting employment interviews with the Employees and may conduct interviews, at the discretion of the Buyer, which, if conducted, will be completed prior to the Closing Date. Access will be provided by Seller upon reasonable notice during normal business hours. In furtherance and not in limitation of Section 2.3 above: (i) Buyer will not assume responsibility for, or assume any liabilities of, any Employee Plan or other plan or program providing benefits to the Employees or for any severance obligations arising out of the transactions contemplated hereby; (ii) Seller shall be solely responsible and liable for any and all pre-Closing salary, wages, benefits and costs with respect to any of the Employees that become employees of Buyer effective as of the Closing; (iii) Seller shall be solely responsible and liable for the giving of any notices required under applicable law to its Employees as a result of the transactions contemplated hereby; and (iv) Seller shall be solely responsible and liable for any and all claims by any terminated Employees that may arise as a result of transactions contemplated hereby, including severance and other claims as a result of employment discharge, health insurance claims, benefits claims, and any other employment related claims. Seller shall be responsible for amounts payable to Employees under COBRA.

(c)     Notification of Certain Matters. Through the Closing Date, Seller shall promptly notify Buyer in writing if it becomes aware of (i) any fact or condition that causes or constitutes a breach of any representations and warranties by Seller made as of the date of this Agreement or violation of any covenant, (ii) the occurrence after the date of this Agreement of any fact or condition that would or be reasonably likely to (except as expressly contemplated by this Agreement) cause or constitute a breach of any such representation or warranty had that representation, or warranty been made as of the time of the occurrence of, or Seller's discovery of, such fact or condition or of the occurrence of any event that may make the satisfaction of the conditions in Section 8.2 impossible or unlikely, or (iii) any Material Adverse Change.

(d)     Conduct of Business Pending the Closing. Seller covenants and agrees that, subject to any obligations as a debtor in possession under the Bankruptcy Code or any order of the Bankruptcy Court, Seller shall conduct the Business in the Ordinary Course of Business, and Seller shall use commercially reasonable best efforts to preserve the business organization of the Business intact, keep available the services of the current officers and Employees of the Business and maintain the existing relationships with customers, suppliers, creditors, business partners and others having business dealings with the Business; provided, however, that except as expressly provided in this Agreement or with the prior written consent of Buyer:

(i)     prior to the Closing, Seller shall not modify, amend or terminate any of the Assumed Contracts, except as necessary to assume and assign the Assumed Contracts pursuant to Section 365 of the Bankruptcy Code;

(ii)    Seller shall not terminate or permit to lapse any material Permits or other government authorizations of any Government Entities that are necessary for the operation of the Business and the failure to have which would cause a Material Adverse Change;

(iii)   Seller shall not lease, license, mortgage, pledge or encumber any Acquired Assets or purchase, transfer, sell or dispose of any Acquired Assets or dispose of or permit to lapse any rights to any Intellectual Property;

(iv)    Seller shall not terminate any Designated Employee;

(v)     other than in connection with a sale-related incentive or retention plan as such sale-related incentive or retention plan is approved by a Bankruptcy Court order, Seller shall not make any change to increase the rate of base compensation or bonus opportunity of any Employee;

(vi)    Seller shall not enter into any Contract or transaction relating to the Acquired Assets or the Business or enter into any new partner arrangement;

(vii)   Seller shall not take, or agree to or commit to take, any action that would or is reasonably likely to result in any of the conditions to the Closing, as applicable, set forth in Article 8, not being satisfied, or would make any representation or warranty of Seller contained herein inaccurate in any material respect at, or as of any time prior to, the Closing Date or that would materially impair the ability of Seller or Buyer to consummate the Closing in accordance with the terms hereof or materially delay such consummation;

(viii)  Seller shall conduct the Business in accordance with Applicable Law in all material respects and shall maintain in full force and effect all material Permits and other Government authorizations; and

(ix)    Seller shall not enter into any agreement, Contract, commitment or arrangement to do any of the foregoing, or authorize, recommend, propose or announce an intention to do, any of the foregoing.

(e)     Court Orders and Consents. Seller will use commercially reasonable efforts to obtain Bankruptcy Court approval of the Closing Court Orders and any other consent required for the consummation of the transactions contemplated by this Agreement.

(f)     Payment of Cure Costs. At or prior to the Closing, Seller shall pay any Cure Costs for the Assumed Contracts as determined by the Bankruptcy Court in the Confirmation Order directly to the appropriate counterparties to the Assumed Contracts, which payment shall be funded in accordance with Section 3.1(b)(i); provided, however, that in the event any such Cure Costs remain the subject of a dispute at the Closing Date, Seller must: (i)

escrow from the Cash Consideration in accordance with Section 3.1(b)(i) an amount necessary to satisfy the maximum possible amount of disputed Cure Costs for the Assumed Contracts; and (ii) pay any such Cure Cost upon the entry of an order of the Bankruptcy Court settling such dispute.

(g) Remittal of Amounts Improperly Paid. If, after the Closing, Seller receives any payment that is due to Buyer, including any payment with respect to any account receivable, Seller shall hold such payment in trust for Buyer and shall immediately remit such payment to Buyer.

(h) Internet Address/Domain Name/Corporate Name. At the Closing or as soon thereafter as is practicable, but in no event later than one month from the Closing Date, Seller will cooperate with Buyer and perform all steps reasonably necessary (i) to transfer to Buyer all the domain name registrations in which Seller has an interest, including "Delfasco.com," and (ii) to permit adoption of the corporate name of Seller by Buyer, including changing its corporate name in all relevant jurisdictions and the captions of the Bankruptcy Case.

(i) Change and Use of Business Name. At the Closing or as soon thereafter as is practicable, but in no event later than one month from the Closing Date, Seller shall amend its respective certificate of incorporation and any foreign qualifications or similar licenses or other papers, products, stamps, letterhead, business cards or other documents to eliminate any reference to the names "Delfasco" and "David B. Lilly" or any name which is phonetically or visually confusing or similar to such names, and shall provide Buyer with evidence satisfactory to Buyer that such action has been effected. After the Closing, Seller shall not, without Buyer's prior written consent, use the names "Delfasco" and "David B. Lilly" or any such confusing or similar names, except as may be necessary in connection with the Excluded Assets, payment or satisfaction of the Excluded Liabilities, as may be required under the Federal Rules of Bankruptcy Procedure and in connection with the wind down of Seller's business.

(j) Confidentiality. Following the Closing, Seller may have in its possession Transferred Information regarding the Acquired Assets and Assumed Liabilities and Seller agrees to, and agrees to cause its directors, officers and employees who have had access to the Transferred Information to maintain the confidentiality of all such information, except (i) as may be required by law, rule, regulation, judgment or order to be disclosed, in which case Buyer shall be permitted to seek confidential treatment for such disclosed information, (ii) for such information that is or becomes generally available to the public other than as a result of a disclosure by Seller or Seller's directors, officers, employees, Affiliates, representatives (including attorneys, accountants, consultants, bankers and financial and other advisors) or agents in violation of this Section 7.1(j), (iii) as is necessary to prepare Tax returns, or (iv) as is necessary for Seller to prepare financial statements.

(k) Pre-Closing Tax Returns. Prior to the Closing, upon reasonable notice received from Buyer, Seller shall (i) provide Buyer with full access, during regular business hours, to all relevant documents and other information in the possession of Seller which may be needed by Buyer for the purposes of reviewing Seller's preparation or amendment of Seller's Tax returns for periods ending on or before the Closing, and (ii) shall cooperate with Buyer in filing or amending prior to Closing Seller's Tax returns for periods ending on or before the Closing (such filings or amendments, the "Pre-Closing Tax Returns").

7.2. Covenants and Agreements of Seller and Buyer.

(a) Fulfillment of Conditions. Each of Seller and Buyer shall use commercially reasonable best efforts to perform or fulfill all conditions and obligations to be performed or fulfilled by it under this Agreement so that the transactions contemplated hereby shall be consummated. Subject to the terms and conditions hereof, each of the parties hereto agrees to use all commercially reasonable best efforts to take, or cause to be taken, all action, and to do, or cause to be done, all things necessary, proper or advisable under applicable laws and regulations to consummate and make effective the transactions contemplated by this Agreement.

(b) Further Assurances. Seller and Buyer shall cooperate and take such actions, and execute all such further instruments and documents, at or subsequent to the date hereof, as either may reasonably request in order to convey title to the Acquired Assets to Buyer, or a designee of Buyer, to record or reflect the transfer of any Acquired Asset and otherwise to effect the terms and purposes of this Agreement. Without limiting the foregoing, upon the request of the Buyer at any time after the Closing Date, Seller shall (i) execute and deliver such documents, including assignments, renewals, releases, powers of attorney and consents, (ii) take such actions, (iii) use its commercially reasonable efforts to obtain consents, assignments and other documents from third parties, and (iv) provide such information as Buyer or its counsel reasonably request to effectuate the transfer and recordation of Seller's right, title and interest in the Intellectual Property to Buyer worldwide.

(c) Refused Assets. Seller and Buyer agree that Buyer shall have the unilateral right to amend this Agreement at any time prior to Closing to remove Acquired Assets and to designate Refused Assets.

7.3. Covenants of Buyer. Buyer hereby agrees that from and after the Closing, Seller, its representatives, any bankruptcy trustee appointed in the Bankruptcy Case, counsel to the Committee and counsel duly retained to prosecute any cause of action which is an Excluded Asset, and representatives of federal and state taxing authorities shall have access during normal business hours and upon reasonable advance notice to review and copy, if necessary, all books, records and documents delivered to Buyer by Seller at Closing for purposes of inspection and copying thereof; provided, however, that the foregoing right of access shall not be exercisable in such a manner as to interfere unreasonably with the normal operations and business of Buyer. Buyer shall maintain such books, records and documents for a period of not less than two (2) years following the Closing provided, that such books, records and documents may nevertheless be destroyed by Buyer if (x) Buyer sends to Seller a written request to destroy records, specifying with particularity the contents of the records to be destroyed, and (y) Seller, in its sole discretion, provides its written consent to such request. Such records may then be destroyed after the 30th day after such written consent is provided by Seller; provided, however, that if such written consent is not provided by Seller, then Buyer shall deliver such books, records and documents to Seller.

7.4. Survival of the Covenants. Except as limited by temporal restrictions therein contained, the covenants of the parties set forth in this Article 7 shall survive the Closing as and to the extent provided in this Agreement.

## 8. Conditions to Closing and Termination

8.1. <u>Conditions to Seller's Obligation to Close</u>. The obligations of Seller to effect the transactions contemplated by this Agreement shall be subject to the fulfillment at or prior to Closing of the following conditions, any one or more of which may be waived in writing by Seller:

(a) All representations and warranties of Buyer contained in this Agreement shall be true and correct in all material respects as of the Closing as though made as of such date (except for such representations and warranties that are qualified by their terms by a reference to materiality, which representations and warranties as so qualified shall be true and correct in all respects); and Buyer shall have performed and complied in all material respects with all covenants, obligations and agreements contained in this Agreement required to be performed and complied with by it at or prior to the Closing.

(b) All documents required to have been delivered by Buyer to Seller, as set forth in <u>Section 4.3</u>, and all actions required to have been taken by Buyer, at or prior to the Closing, shall have been delivered or taken.

(c) The Closing Court Orders have been entered, approving the sale to Buyer, and are not vacated or stayed pending appeal.

8.2. <u>Conditions to Buyer's Obligation to Close</u>. The obligations of Buyer to effect the transaction contemplated by this Agreement shall be subject to the fulfillment at or prior to the Closing of the following conditions, any one or more of which may be waived in writing by Buyer:

(a) All representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the Closing as though made as of such date (except for such representations and warranties that are qualified by their terms by a reference to materiality, which representations and warranties as so qualified shall be true and correct in all respects); and Seller shall have performed and complied in all material respects with all covenants, obligations and agreements contained in this Agreement required to be performed and complied with by it at or prior to the Closing.

(b) All documents required to have been delivered by Seller to Buyer, as set forth in <u>Section 4.2</u>, and all actions required to have been taken by Seller, at or prior to the Closing, shall have been delivered or taken.

(c) Buyer shall have offered employment to the Employees listed on <u>Schedule 8.2(c)</u> (the "<u>Designated Employees</u>") on terms determined by the Buyer in its sole discretion, and such offer shall have been accepted.

(d) Seller shall have complied with all of its obligations under the Closing Court Orders.

(e) The Closing Court Orders, in form and substance acceptable to Buyer, shall have been entered and no objections shall have been filed to the Closing Court Orders, or if

objections have been filed to the Closing Court Orders, the Closing Court Orders shall have become a Final Order no later than one (1) Business Day prior to Closing. Notwithstanding any provision in this Agreement, Buyer may, in its sole and absolute discretion elect to consummate the sale contemplated in this Agreement and waive the requirement that the Closing Court Orders or any other Order shall have become the Final Order. No notice of such waiver of this or any other condition to closing need be given by Buyer to any other Person except to Seller; it being the intention of the parties hereto that Buyer shall be entitled to, and is not waiving, the protection of Bankruptcy Code § 363(m) and/or 1123, if applicable, the mootness doctrine and any similar statute or body of law if the closing occurs in the absence of a Final Order.

(f)     At the Closing, all existing Liens shall have been released.

(g)     At the Closing, Seller shall have transferred all Intellectual Property owned by it to Buyer and delivered evidence of such transfer, reasonably satisfactory in form and substance to Buyer and its counsel, to Buyer.

(h)     In the event that Buyer determines, in its sole discretion, that notwithstanding the provisions of Sections 1123(a)(5)(D) and 365 of the Bankruptcy Code, the assumption and/or assignment to Buyer of any Assumed Contract set forth on Schedule 8.2(h) may require the consent or approval of any third party for such assumption and/or assignment, each such consent or approval shall have been obtained.

(i)     The Acquired Assets, net of the Seller Cash which was applied pursuant to Section 3.1(b)(i), shall include at least $500,000 in cash.

(j)     The retired executives of Seller (and their spouses) shall have agreed to termination of all continuing obligations of Seller for health care or other benefits as set forth on Schedule 2.3 or otherwise.

(k)     The Closing Court Orders shall provide that the Plan shall be effective on the Closing Date under this Agreement.

(l)     Seller's delivery of such other documents as Buyer may reasonably request for the purpose of evidencing the accuracy of any of the representations and warranties of Seller, evidencing the performance by Seller of, or the compliance by Seller with, any covenant or obligation required to be performed or complied with by Seller, evidencing the satisfaction of any condition referred to in this Article 8 or otherwise facilitating the consummation or performance of any of the contemplated transactions.

8.3.    Mutual Conditions. The respective obligations of each of the parties to this Agreement to effect the transactions contemplated hereby shall be subject to the fulfillment at or prior to the Closing Date of the following conditions:

(a)     No party to this Agreement shall be subject on the Closing Date to any order, decree or injunction of a court of competent jurisdiction that enjoins or prohibits the consummation of this Agreement and no governmental authority shall have instituted a suit or proceeding that is then pending that seeks to enjoin or prohibit the transactions contemplated hereby. Any party who is subject to any such order, decree or injunction or the subject of any

such suit or proceeding shall take any reasonable steps within that party's control to cause any such order, decree or injunction to be modified so as to permit the Closing and to cause any such suit or proceeding to be dismissed.

(b)     No federal, state, local or foreign law, statute, regulation, code, ordinance or decree shall have been adopted or promulgated, and no temporary restraining order, preliminary or permanent injunction or other order issued by a court or other governmental authority of competent jurisdiction shall be in effect, having the effect of making the transactions contemplated herein illegal or otherwise prohibiting consummation of the transactions contemplated herein.

## 9.     Bankruptcy Court Matters And Termination

9.1.     Approval Motions. Seller hereby represents and warrants that Seller has filed with the Bankruptcy Court, and has served upon all parties required to receive notice thereof pursuant to the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and any standing orders or local rules of the Bankruptcy Court, a motion or motions (the "Approval Motions") seeking the entry of the following orders of the Bankruptcy Court:

(a)     An order to be issued by the Bankruptcy Court (the "Confirmation Order") which shall be reasonably acceptable to Seller and Buyer and, among other things:

> (i)     authorizes Seller to sell and Buyer to purchase the Acquired Assets in accordance with the terms and conditions of this Agreement;

> (ii)     provides that Buyer's purchase of the Acquired Assets shall be free and clear of all Liens and free and clear of all Claims and liabilities (other than Assumed Liabilities), including any Claims or liabilities relating to or arising out of the Excluded Liabilities (including any indebtedness, liabilities or obligations arising out of, relating to or otherwise in respect of any Environmental and Safety Laws or alleged breach thereof, including any indebtedness, liabilities or obligations arising out of, relating to or otherwise in respect of the Grand Prairie Property, whether asserted by the EPA, the TCEQ or any other Person or Government Entity), with all such Liens, Claims and liabilities to attach to the net proceeds of the sale hereunder solely as obligations of the Seller in their order of priority with the same validity, force and effect which they had against the Acquired Assets, subject to the rights, Claims, defenses and objections, if any, of Seller and all interested parties with respect to such Liens, Claims and liabilities;

> (iii)     provides that Buyer shall not be assuming and shall not be liable or responsible for any Claims and liabilities, as successor to Seller, or otherwise;

> (iv)     enjoins and bars (the "Sale Injunction") all persons or entities, including any federal, state or local Government or agency, department or instrumentality thereof or other Government Entity, from asserting by lawsuit or otherwise any of the Liens, Claims and liabilities against Buyer, the Acquired Assets and the Business which such persons or entities had, have or may have against Seller, the Acquired Assets and the Business, on any basis whatsoever

including under theories of successor liability or pursuant to Bankruptcy Code § 506(c), other than Assumed Liabilities;

(v) provides that Seller shall be responsible for any taxes under any state or local law imposing a stamp, transfer or similar tax in connection with the transfer of the Acquired Assets to Buyer;

(vi) provides that the Refused Assets may be excluded from the Acquired Assets and be reclassified as Excluded Assets, and that the Buyer shall have no liability in connection with, arising out of or otherwise in respect of the Refused Assets or other Excluded Assets;

(vii) provides that Buyer constitutes a good faith purchaser within the meaning of Bankruptcy Code § 363 or 1123 and that all facets of transactions contemplated under this Agreement, including the purchase of the Acquired Assets described herein, have been proposed, conducted, adequately disclosed, negotiated, and agreed to in good faith within the meaning of, and pursuant to, Bankruptcy Code § 363 or 1123;

(viii) provides that the Confirmation Order shall not be stayed for ten (10) days after entry as permitted by Fed. R. Bankr. P. 6004(g); and

(ix) provides that proper, adequate, timely and sufficient notice of the transactions contemplated under this Agreement and the Confirmation Hearing has been given in accordance with the terms and conditions of the Plan.

(b) An order to be entered at the conclusion of the Confirmation Hearing in conjunction with, or as an integral part of, the Confirmation Order (the "Assumption Order") which shall be reasonably acceptable to Seller and Buyer and, among other things, (i) provide that the Assumption Order shall not be stayed for ten (10) days after entry as permitted by Bankruptcy Rule 6006(d), and (ii) authorize Seller to assume, on or prior to the Closing Date, and on the Closing Date assign, the Assumed Contracts to Buyer, and to reject certain executory contracts or unexpired leases designated by Buyer for rejection by Seller prior to the conclusion of the Confirmation Hearing, in accordance with the following procedures:

(i) the Assumed Contracts to be assigned to Buyer shall be identified on an exhibit attached to the Plan. Such exhibit shall set forth the amount necessary to cure existing defaults under each such Assumed Contract as estimated in good faith by Seller based on its books and records;

(ii) Buyer may elect in its sole and absolute discretion to refrain from assuming any executory contract or unexpired lease previously identified as an Assumed Contract, in which case Seller shall reject such executory contracts and unexpired leases; and

(iii) Buyer shall, at the Closing, (i) pay or escrow for, out of the Cash Consideration as set forth in Section 7(f), the Cure Costs, and (ii) pursuant to Bankruptcy Code §365(f)(2), provide such adequate assurance of future

performance as is determined by order of the Bankruptcy Court to be necessary with respect to the Assumed Contracts.

9.2.    Bankruptcy Court Approval.

(a)    If the Confirmation Order or the Closing Court Orders or any other orders of the Bankruptcy Court relating to this Agreement shall be appealed by any party (or a petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or re-argument shall be filed with respect to any such order), Seller shall diligently defend against such appeal, petition or motion and shall use commercially reasonable best efforts to obtain expedited resolution of any such appeal, petition or motion. Seller shall not file any motion or application seeking entry of the Confirmation Order or the Closing Court Orders, or any pleading or filing relating to the Cure Costs with the Bankruptcy Court or any other court or governmental authority without the consent of Buyer, which consent shall not be unreasonably withheld or delayed.

(b)    Seller shall cooperate with Buyer and its representatives in connection with the Confirmation Order and the Closing Court Orders and the bankruptcy proceedings in connection therewith. Such cooperation shall include, but not be limited to, consulting with Buyer at Buyer's request concerning the status of such proceedings and providing Buyer with copies of requested pleadings, notices, proposed orders and other documents related to such proceedings as soon as reasonably practicable prior to any submission thereof to the Bankruptcy Court. Seller further covenants and agrees that the terms of the Plan or plan of liquidation it submits to the Bankruptcy Court shall not conflict with, supersede, abrogate, nullify or restrict the terms of this Agreement, or in any way prevent or interfere with the consummation of performance of the transactions contemplated by this Agreement, including without limitation, any transactions contemplated by or approved pursuant to the Confirmation Order or the Closing Court Orders.

9.3.    Termination.    At any time by written notice given prior to Closing, this Agreement may be terminated (without prejudice to other remedies which may be available to the parties under this Agreement, as provided in Sections 9.4 and 9.5):

(a)    by Buyer, if:

(i)    the Closing Court Orders have not been entered by April 9, 2010;

(ii)    the Closing has not occurred on the Closing Date, through no fault of Buyer, by April 26, 2010;

(iii)    Seller failed to fulfill any of the conditions to Closing for the benefit of Buyer after notice and a reasonable opportunity to cure;

(iv)    a material breach of any provision of this Agreement has been committed by Seller and such breach has not been cured within forty-eight (48) hours from the time notice of such breach has been given by Buyer or such breach has not been waived by Buyer.

(b)     by Seller, if:

(i)     the Closing Court Orders have not been entered by April 9, 2010, despite Seller's commercially reasonable efforts to obtain entry of the Closing Court Orders;

(ii)     the Closing has not occurred on the Closing Date, through no fault of Seller, by April 26, 2010;

(iii)     Buyer failed to fulfill any of the conditions to Closing for the benefit of Seller after notice and a reasonable opportunity to cure; or

(iv)     a material breach of any provision of this Agreement has been committed by Buyer and such breach has not been cured within forty-eight (48) hours from the time notice of such breach has been given by Seller or such breach has not been waived by Seller.

(c)     by mutual written consent of Buyer and Seller.

9.4.     Effect of Termination.

(a)     Buyer and Seller agree that, with respect to either party, the sole and exclusive remedy for any breach, threatened breach or other claim arising out of or in connection with this Agreement shall be termination in accordance with Section 9.3, and if Seller unjustifiably fails to close, then Buyer shall be entitled to payment of the Expense Reimbursement as provided in Section 9.5 and return of the Deposit as provided in Section 3.3; and if the obligations of the parties to effect the contemplated transactions are terminated pursuant to Section 9.3, all further obligations of the parties under this Agreement will terminate other than, in the case of Buyer, payment of the Expense Reimbursement and return of the Deposit as provided in Section 3.3, provided that Sections 10.1, 10.2, 10.3, 10.4, 10.6, 10.7, 10.9, 10.10, 10.11, 10.12, 10.14 and 10.15 will survive termination of this Agreement.

(b)     If this Agreement shall be terminated, each party will (i) redeliver all documents, work papers and other materials of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution of this Agreement, to the party furnishing the same, and (ii) destroy all documents, work papers and other materials developed by its accountants, agents and employees in connection with the transactions contemplated hereby which embody proprietary information or trade secrets furnished by any party hereto or deliver such documents, work papers and other materials to the party furnishing the same or excise such information or secrets therefrom. All information received by any party hereto with respect to the business of any other party or any of its subsidiaries (other than information which is in the public domain) shall not at any time be used for personal advantage or disclosed by such party to any third person to the detriment of the party furnishing such information or any of its subsidiaries or Affiliates. This provision shall continue in full force and effect after any termination.

9.5.     Expense Reimbursement. As provided in the Plan, Buyer shall immediately be paid a termination fee of in reimbursement of all of Buyer's reasonable documented costs and

expenses up to $100,000 subject to Bankruptcy Court approval as provided below, including the fees and expenses of its attorneys, consultants and accountants related to the Sale (the "Expense Reimbursement") if Seller unjustifiably fails to close. If Seller closes a sale or other disposition of the Business or the Acquired Assets to a Person other than the Buyer (a "Third Party Sale"), the Expense Reimbursement shall be payable from, and constitute a senior Lien on, the first proceeds of such Third Party Sale. In any event, the Expense Reimbursement shall be deemed an allowed and immediately payable administrative claim in the Bankruptcy Case. Notwithstanding the foregoing, Buyer shall not be entitled to the Expense Reimbursement, if (i) the Bankruptcy Court does not enter an order approving the Expense Reimbursement or (ii) the Buyer is in material breach of this Agreement and or any Closing Court Order.

## 10.    Miscellaneous Provisions

10.1.  Expenses. Except as specifically set forth herein and in the Closing Court Order, each party shall pay all costs and expenses incurred by such party in connection with the negotiation, preparation, execution and delivery this Agreement and the transactions contemplated hereby.

10.2.  Amendment and Modification. This Agreement may be amended, modified or supplemented only by written agreement of each party hereto.

10.3.  Waiver of Compliance. Except as otherwise provided in this Agreement, any failure of one party to comply with any obligation, representation, warranty, covenant, agreement or condition herein may be waived by any other party only by a written instrument signed by the party granting such waiver, but such waiver or failure to insist upon strict compliance with such obligation, representation, warranty, covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.

10.4.  Notices. All notices and other communications hereunder shall be in writing and shall be deemed given when delivered by hand or a reputable national over-night courier service or by facsimile transmission or three (3) Business Days after mailing when mailed by registered or certified mail (return receipt requested), postage prepaid, to the parties in the manner provided below:

> (a)    Any notice to Seller shall be given to such party at the following address:
>
> Delfasco, Inc.
> P.O. Box 10527
> Wilmington, Delaware 19850
> Attention:    Philip Kadlecek
> Telephone:    302-328-6675
> Facsimile:    302-328-0552
>
> or
>
> Delfasco, Inc.
> 15 Bellecor Drive

Industrial Park Place
New Castle, Delaware 19720
Attention:     Philip Kadlecek
Telephone:    302-328-6675
Facsimile:    302-328-0552

With a copy to:

Potter Andersen and Corroon LLP

1313 North Market Street, 6th Floor
Wilmington, Delaware 19801
Attention:     Stephen M. Yoder
Telephone:    302-984-6107
Facsimile:    302-778-6107

(b)     Any notice to Buyer shall be given to Buyer at the following address:

Delfasco Finance, LLC
c/o Pillar Capital Holdings LLC
61 Broadway, Suite 2607
New York, New York 10006
Attention:     Jack Goldenberg
Facsimile:    212-742-0111

With a copy to:

Hahn & Hessen LLP
488 Madison Avenue
New York, New York 10022
Attention:     Gilbert Backenroth, Esq.
Telephone:    212-478-7240
Facsimile:    212-478-7400

Any party may change the address to which notice is to be given by notice given in the manner set forth above.

10.5.   Binding Agreement; Assignment.   This Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, successors and permitted assigns. Neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any party hereto without the prior written consent of the other parties.

10.6.   No Third Party Beneficiaries.   Except as otherwise provided herein, no Person other than the parties hereto has or is intended to have any legal or equitable right, remedy or claim under or with respect to this Agreement or any right to enforce any of the provisions

hereof, except as such rights shall inure to a successor or permitted assignee pursuant to Section 10.5.

10.7. <u>Governing Law</u>. This Agreement and all other Transaction Documents shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Delaware (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. Notwithstanding any conversions of the Bankruptcy Case or transfer of the Bankruptcy Case or jurisdiction over the Seller, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court; <u>provided that</u>, if the Bankruptcy Court no longer accepts jurisdiction for the adjudication of any matters arising under or in connection with the Agreement, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with this Agreement, and consent to the jurisdiction of, any state or federal court located in Delaware.

10.8. <u>Counterparts</u>. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

10.9. <u>Interpretation</u>. The article and section headings contained in this Agreement are solely for the purpose of reference, are not part of the agreement of the parties and shall not in any way affect the meaning or interpretation of this Agreement. The warranties, representations, covenants, rights and remedies of the parties hereunder shall be construed as being cumulative. The parties have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

10.10. <u>Entire Agreement</u>. This Agreement, including any Schedules hereto, embodies the entire agreement and understanding of the parties with respect to the subject matter of this Agreement. This Agreement supersedes all prior agreements and understandings between the parties with respect to the transactions contemplated hereby, except that the Term Sheet shall govern the Deposit to the extent not inconsistent with this Agreement.

10.11. <u>Rights and Remedies</u>. The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of

any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.

10.12. Severability. If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

10.13. Time of Essence. With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

10.14. Construction.

(a) Unless otherwise specified therein, all terms defined in this Agreement have the meanings as so defined herein when used in any other certificate, report or document made or delivered pursuant hereto.

(b) Each term defined in the singular form in Section 1.1 or elsewhere in this Agreement shall mean the plural thereof when the plural form of such term is used in this Agreement or any other certificate, report or document made or delivered pursuant hereto, and each term defined in the plural form in Section 1.1 shall mean the singular thereof when the singular form of such term is used herein or therein.

(c) The words "hereof," "herein," "hereunder" and similar terms when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and article, section, subsection, and schedule references herein are references to articles, sections, subsections, and schedules to this Agreement unless otherwise specified. All references to this Agreement shall mean this Agreement including all Schedules hereto, as the same may be amended from time to time.

(d) Reference to any agreement, document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and as permitted herein.

(e) The word "including" (and with correlative meaning "include") means including without limiting the generality of any description preceding such term, the phrase "may not" is prohibitive and not permissive, and the word "or" is not exclusive.

(f) Unless otherwise stated in this Agreement, in the computation of a period of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each means "to and including."

10.15. Public Announcements. Neither Buyer nor Seller shall make any public statement about the transactions contemplated under this Agreement without the prior written consent of the other party, unless that party determines in good faith, on the advice of legal counsel, that public disclosure is required by law, in which case that party shall consult with the other party prior to making a statement. Seller and Buyer will consult with each other concerning the means

by which Seller's employees, customers, business partners, suppliers and others having dealings with Seller will be informed of the contemplated transactions, and Buyer will have the right to be present for any such communication.

**[Remainder of Page Intentionally Left Blank]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Asset Purchase Agreement to be signed by their respective authorized officers as of the date first written above.

DELFASCO, INC.                                    DELFASCO FINANCE, LLC

By: *Philip E Kadlecek*                          By: _____

Name: Philip E. Kadlecek                         Name: _____
Title: President and CEO                          Title: _____

**IN WITNESS WHEREOF,** the parties hereto have caused this Asset Purchase Agreement to be signed by their respective authorized officers as of the date first written above.

DELFASCO, INC.

DELFASCO FINANCE, LLC

By:_____

By:_____

Name: Philip E. Kadlecek
Title: President and CEO

Name: ＳＡＰＫ ＧαＤＥＮＢＳＧ
Title: Ｐｐᵉｓ

## Schedules

| | |
|---|---|
| Schedule 1 | Assumed Contracts |
| Schedule 2.3 | Assumed Liabilities |
| Schedule 3.1 | Source and Use of Funds Schedule |
| Schedule 5.1 | Organization and Good Standing |
| Schedule 5.8(b) | Intellectual Property |
| Schedule 5.8(h) | Intellectual Property Required Actions |
| Schedule 5.9 | Permits |
| Schedule 5.10(a) | Seller Contracts |
| Schedule 5.10(c) | Cure Costs |
| Schedule 5.11(a) | Employee/Labor Matters |
| Schedule 5.11(c) | Employees |
| Schedule 5.11(d) | COBRA |
| Schedule 5.11(f) | OSHA Violations |
| Schedule 5.12 | Taxes |
| Schedule 5.13 | Litigation |
| Schedule 5.14 | Insurance |
| Schedule 5.15 | Warranty Claims |
| Schedule 5.16 | Recent Activities |
| Schedule 5.18 | Real Property |
| Schedule 5.19 | Environmental Matters |
| Schedule 5.20 | Financial Statements, including the Most Recent Balance Sheet |
| Schedule 5.21 | Tangible Personal Property |
| Schedule 5.22 | Accounts Receivable |
| Schedule 8.2(c) | Designated Employees |
| Schedule 8.2(h) | Assumed Contracts Requiring Consent |

## TABLE OF CONTENTS

1. DEFINED TERMS ..................................................................................................................... 1

   1.1. Defined Terms.................................................................................................................. 1

2. PURCHASE AND SALE OF ASSETS..................................................................................... 8

   2.1. Agreements to Purchase and Sell ................................................................................... 8

   2.2. Excluded Assets ............................................................................................................ 10

   2.3. Assumed Liabilities....................................................................................................... 11

   2.4. Non-Assignment of Contracts....................................................................................... 11

3. PURCHASE PRICE................................................................................................................ 11

   3.1. Purchase Price ............................................................................................................... 11

   3.2. Purchase Price Allocation ............................................................................................. 12

   3.3. Deposit .......................................................................................................................... 12

4. CLOSING ............................................................................................................................... 12

   4.1. Closing .......................................................................................................................... 12

   4.2. Deliveries by Seller....................................................................................................... 12

   4.3. Deliveries by Buyer....................................................................................................... 13

5. REPRESENTATIONS AND WARRANTIES OF SELLER .................................................. 13

   5.1. Organization and Good Standing................................................................................... 13

   5.2. Authority ....................................................................................................................... 13

   5.3. Consents; No Violation ................................................................................................. 14

   5.4. Subsidiaries ................................................................................................................... 14

   5.5. Title to Acquired Assets................................................................................................ 14

   5.6. Compliance with Laws.................................................................................................. 14

   5.7. Customers, Partners and Suppliers................................................................................ 14

   5.8. Intellectual Property. ..................................................................................................... 14

   5.9. Permits .......................................................................................................................... 16

   5.10. Contracts. .................................................................................................................... 16

   5.11. Employee/Labor Matters............................................................................................. 17

   5.12. Taxes ........................................................................................................................... 18

   5.13. Litigation ..................................................................................................................... 18

   5.14. Insurance ..................................................................................................................... 19

   5.15. Warranty Claims ......................................................................................................... 19

867098/008-1822037.12

| | | |
|---|---|---|
| 5.16. <u>Recent Activities</u> | | 19 |
| 5.17. <u>Brokers; Finders</u> | | 19 |
| 5.18. <u>Real Property</u> | | 20 |
| 5.19. <u>Environmental Matters</u> | | 20 |
| 5.20. <u>Accuracy of Financial Information</u> | | 20 |
| 5.21. <u>Tangible Personal Property</u> | | 21 |
| 5.22. <u>Accounts Receivable</u> | | 21 |
| 5.23. <u>Sufficiency of Acquired Assets</u> | | 21 |
| 5.24. <u>Affiliate Transactions</u> | | 21 |
| 5.25. <u>Complete Copies of Materials</u> | | 21 |
| 5.26. <u>Representations Complete</u> | | 21 |
| 5.27. <u>Schedules</u> | | 22 |
| 5.28. <u>Limited Survivability of Representations and Warranties of Seller</u> | | 22 |
| 5.29. <u>Disclaimer of Warranties</u> | | 22 |
| 6. <u>REPRESENTATIONS OF BUYER</u> | | 22 |
| 6.1. <u>Financial Status</u> | | 22 |
| 6.2. <u>No Conflict</u> | | 22 |
| 6.3. <u>Compliance with Laws</u> | | 22 |
| 6.4. <u>Confidentiality</u> | | 22 |
| 6.5. <u>Small Business</u> | | 22 |
| 7. <u>COVENANTS</u> | | 22 |
| 7.1. <u>Covenants of Seller.</u> | | 22 |
| 7.2. <u>Covenants and Agreements of Seller and Buyer.</u> | | 26 |
| 7.3. <u>Covenants of Buyer</u> | | 26 |
| 7.4. <u>Survival of the Covenants</u> | | 26 |
| 8. <u>CONDITIONS TO CLOSING AND TERMINATION</u> | | 27 |
| 8.1. <u>Conditions to Seller's Obligation to Close</u> | | 27 |
| 8.2. <u>Conditions to Buyer's Obligation to Close</u> | | 27 |
| 8.3. <u>Mutual Conditions</u> | | 28 |
| 9. <u>BANKRUPTCY COURT MATTERS AND TERMINATION</u> | | 29 |
| 9.1. <u>Approval Motions</u> | | 29 |
| 9.2. <u>Bankruptcy Court Approval.</u> | | 31 |
| 9.3. <u>Termination</u> | | 31 |

867098/008-1822037.12

9.4. Effect of Termination. .......................................................................................................... 32

9.5. Expense Reimbursement ...................................................................................................... 32

10. MISCELLANEOUS PROVISIONS ................................................................................................ 33

10.1. Expenses........................................................................................................................... 33

10.2. Amendment and Modification .......................................................................................... 33

10.3. Waiver of Compliance ...................................................................................................... 33

10.4. Notices ............................................................................................................................. 33

10.5. Binding Agreement; Assignment...................................................................................... 34

10.6. No Third Party Beneficiaries ............................................................................................ 34

10.7. Governing Law.................................................................................................................. 35

10.8. Counterparts ..................................................................................................................... 35

10.9. Interpretation .................................................................................................................... 35

10.10. Entire Agreement ........................................................................................................... 35

10.11. Rights and Remedies....................................................................................................... 35

10.12. Severability ..................................................................................................................... 36

10.13. Time of Essence .............................................................................................................. 36

10.14. Construction. ................................................................................................................... 36

10.15. Public Announcements .................................................................................................... 36

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be signed by their respective authorized officers as of the date first written above.

DELFASCO, INC.                                      DELFASCO FINANCE, LLC

By: _Philip E. Kadlecek_                             By: _____

Name: Philip E. Kadlecek                            Name: _____
Title: President and CEO                            Title: _____

**IN WITNESS WHEREOF,** the parties hereto have caused this Asset Purchase Agreement to be signed by their respective authorized officers as of the date first written above.

DELFASCO, INC.                          DELFASCO FINANCE, LLC

By:_____             By:_____

Name: Philip E. Kadlecek                Name: _Sark Gadcazco_
Title: President and CEO                Title: _Pres_

**ASSUMED CONTRACTS**

SCHEDULE 1.0 - LIST OF OPEN CONTRACT/PURCHASE ORDERS

| Customer | Product | P.O.#/Contract # | Remaining Dollars as of 2/28/10 or Later if New Order | Contract / PO expected Completion Date |
|---|---|---|---|---|
| HQ Army Sustainment Command Rock Island, IL | BDU33 Practice Bomb | W52P1J-08-C-0052 | 1,163,956 | May, 2010 |
| General Dynamics Ordnance and Tactical Systems | PA171 Container | 13975 | 436,227 | April, 2010 |
| General Dynamics Ordnance and Tactical Systems | Yoke Assembly | 13976 | 0 | April, 2010 |
| General Dynamics Ordnance and Tactical Systems | PA116 Top Adapter Assy. | 13975 | 35,363 | April, 2010 |
| HQ AFSC Rock Island, IL | MS3314 Lug | W52P1J-06-D-0027 | 378,094 | May, 2010 |
| HQ AFSC Rock Island, IL | MK3 Lug | W52P1J-06-D-0027 | 644,560 | April, 2011 |
| GTI Systems | BDU48 | 2266 | 1,215,665 | April, 2012 |
| General Dynamics | XM643 Prototype | 122970 | 23,423 | March, 2010 |
| Lockheed Martin | FP Assy | 4300339494 | 13,438 | May, 2010 |
| General Dynamics | SDB Lugs | P0043026 | 73,726 | November, 2010 |
| General Dynamics | SDB Lugs | P0043499 | 21,724 | October, 2010 |
| Picatinny (Option - pending contract mod.) | PA117 | W15QKN-07-C-0089 | 152,603 | June, 2010 |

**ASSUMED LIABILITIES**

Schedule 2.3 – Assumed Liabilities – updated 4/5/2010 (From 2/28/2010 Balance Sheet)

**The following liabilities will be handled in the ordinary course of business with payments being made as they are due or in the case of vacation, employees will be paid when they take their accrued vacations. No cash out at closing due to these items.**

Accounts Payable – Trade – Post Petition - $201,256 (Balance Sheet shows $198,834; The difference of $2,422 is included in accrued expenses)

Accrued Employee Compensation including all vacation - $105,149

Property Tax – Tennessee - $14,434

Sales Tax Payable – Amount due where supplier did not charge sales tax - $437

Pass through payment liabilities – employees make contributions to several causes with checks payable to Delfasco. Delfasco in turn provides one check when payable to the following.

    United Way - $79
    Cancer Insurance Payable - $991
    Life Insurance Payable - $361

Notes:

**Note: Current Delfasco payable details show $1,000 for the Grand Prairie Lease Deposit. Lawler Properties paid a $1,000 deposit when the lease was initiated in 2003. $1,000 in funds must be left with the Old Corporation to cover that deposit. This has been added to the Sources / Uses of Cash schedule.**

**As of 2/28/10 the 401k payment liability was $4,318. Action has been initiated to terminate the 401k. Cash will be left with the Old Corporation to cover fees associated with termination and the final audit and has been addressed in the Sources / Uses of Cash schedule.**

The following liability will be paid at closing:

Accounts Payable – Other - $389,834 – Payable to EPA for tax refund received in Oct. 09. This payment is included in the Sources/Uses of cash schedule.

**SOURCE AND USE OF FUNDS SCHEDULE**

## Delfasco Uses and Sources of Cash for Plan Confirmation

| | Item Amount | Payment time per plan document | Subtotal / Totals |
|---|---|---|---|

### Uses of Cash

**Creditor claim, Fees and Expenses to be paid at exit**

| | Item Amount | | Subtotal / Totals |
|---|---|---|---|
| Payment of Priority Claims | $ | 354,753.66 | |
| Payment of Convenience Claims | $ | 50,000.00 | |
| Balance of Claims to be paid to General Trade Creditors - total $300,000 less contractual reduction of $33,778.90 | $ | 266,221.15 | |
| Subtotal Unsecured Trade Creditor Claims - pay at exit | | | $ 673,974.76 |
| Payment of Property Damage Claims | $ | 15,000.00 | |
| Subtotal Unsecured Property Damage Claims - pay at exit | | | 15,000.00 |
| Tax refund allocated to EPA Trust - pay at exit | $ | 398,834.00 | |
| TCEQ Environmental Claim - pay at exit | | | |
| Subtotal - EPA / TCEQ Claims to be paid at exit | $ | 825,000.00 | $ 1,014,834.00 |
| Other Expenses and assumed liabilities payable at exit | | | |
| Total Professional fees per court approved invoices - not to exceed fee cap of $889,140.38 - Pay at exit | $ | 889,140.38 | $ 889,140.38 |
| Subtotal - Professional fees due at exit - not to exceed! | | | 889,140.38 |
| Payout of retired officers health insurance - negotiated agreement - $12,000 payments to each | $ | 24,000.00 | |
| Subtotal - Payout of retired officers health insurance | $ | | 24,000.00 |
| Payout of Cure costs on Assumed contracts | $ | | 8,835.11 |
| Total Cash Payout at Exit | $ | | 2,622,784.27 |

**Cash to remain in Old Delfasco to cover following liabilities / expenses**

| | Item Amount | | Subtotal / Totals |
|---|---|---|---|
| Liability for Grand Prairie lease deposit | $ | 1,000.00 | |
| Liability for audit of 401k for 2009 plan year | $ | 16,000.00 | |
| Administrative expenses associated with termination and 2010 audit of 401k - note any final company matching obligation must be paid before closing. | $ | 15,000.00 | |
| Subtotal - cash to remain in Old Delfasco for remaining liabilities | $ | | 32,000.00 |
| Total Confirmation Claims Payout at exit plus cash to remain in Old Delfasco | $ | | 2,654,784.27 |

### Sources of Cash

Note - Current projections show that due to decreasing sales volume, and replacing inventory and reduced receivables, Delfasco will have approx. $2.0M in cash at the end of March 2010. Pillar will fund additional working capital for the future.

| | Item Amount | | Subtotal / Totals |
|---|---|---|---|
| Delfasco projection of operating cash available at closing (*) | | $2,000,000.00 | |
| Cash Sold to New Delfasco | | ($500,000.00) | |
| Net Cash to apply to transaction | | | $1,500,000.00 |
| Pillar - Shortfall at exit plus Pillar will supply additional working capital funds as needed after closing - (Note - Pillar provided $325,000 ernest money with original Term sheet – to be applied incl. interest) | $ | | 1,154,784.27 |
| Total payout at exit plus cash retention in Old Delfasco | $ | | 2,654,784.27 |

(*) Note: Delfasco cash at closing subject to adjustment to actual available cash as of closing date.

**Adding Assumed Liabilities**

Schedule 2.3 - Assumed Liabilities identify liabilities assumed by New Delfasco - payment will occur according to due dates and none will cause a cash payment specifically related to closing.

| | As of 2/28/2010 | $332,707 |
|---|---|---|

<u>SCHEDULE 5.1</u>

**ORGANIZATION AND GOOD STANDING**

**None.**

**INTELLECTUAL PROPERTY**

# Delaware

## The First State

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF DELAWARE DO HEREBY CERTIFY THAT DELAWARE FASTENER DIVISION WHOSE BUSINESS ADDRESS IS LOCATED AT P.O. BOX 10527, IN THE CITY OF WILMINGTON IN THE STATE OF DELAWARE HAS THIS THE THIRTIETH DAY OF JULY, A.D. 2007, AT 9:00 A.M. FILED A RENEWAL OF REGISTRATION OF TRADEMARK, ""DELFASCO"", A COPY OF SAID MARK IS HERETO ATTACHED.

AND I DO HEREBY FURTHER CERTIFY THE DATE OF CLAIM FOR THE FIRST USE OF THE MARK ANYWHERE IS SEPTEMBER 1, 1952 AND THE DATE OF CLAIM FOR THE FIRST USE OF THE MARK IN THE STATE OF DELAWARE IS SEPTEMBER 1, 1952.

AND I DO HEREBY FURTHER CERTIFY THE CLASS OF GOODS OR SERVICES IS NO. 06 AND THE DESCRIPTION OF THE GOODS OR SERVICES IS METAL GOODS.

AND I DO HEREBY FURTHER CERTIFY THE TERM OF REGISTRATION IS TEN YEARS.

AND I DO HEREBY FURTHER CERTIFY THE DATE OF EXPIRATION WILL BE THE EIGHTEENTH DAY OF AUGUST, A.D. 2017.

*Harriet Smith Windsor*
Harriet Smith Windsor, Secretary of State

20074201900TMREG

071189357

AUTHENTICATION: 6132454

DATE: 11-05-07



**Delfasco, INC.**

P.O. BOX 10527, WILMINGTON, DELAWARE 19850-0527 • 15 BELLECOR DRIVE, NEW CASTLE, DELAWARE 19720

EST. 1950

TELEPHONE (302) 328-6675 • FAX (302) 328-0552

SCHEDULE 5.8(h)

**INTELLECTUAL PROPERTY REQUIRED ACTIONS**

**None.**

SCHEDULE 5.9

**PERMITS**

**Schedule 5.9  Permits**
**Delfasco of Tennessee**
**2/23/2010**

| Description | Permit No. |
|---|---|
| Tennessee Department of Environment and Conservation , Air Pollution Control Division (TAPCD), Title V | # 548336 |
| Storm Water Permit | TNR050778. |
| Tennessee Department of Environment and Conservation Air Pollution Control Division (TAPCD) 1120(j) Part 1 MACT Exemption Letter | No Number |
| Environmental Assistance Center, Tennessee Department of Environment and Conservation Special Waste Approval | No Number |
| Greeneville Water Commission - Sewer Permit | # 011 |
| Boiler Permits | T04717, T46753, 61182, T46754 T35664, T46755, T04730 |

SCHEDULE 5.10(a)

**SELLER CONTRACTS**

**DELFASCO, INC**

**CONTRACTS/LEASES AS OF 12/31/09**

**Equipment and Real Estate Contract/Leases**

| Autos/Equipment | Contract/Lease Term | Monthly Lease/Payment | Remaining obligations under contract | | |
|---|---|---|---|---|---|
| | | | 2010 | 2011 | 2012 |
| **DELAWARE:** | | | | | |
| Lease Office | Month-to-Month Lease - 60 day notice | $ 3,533 | | | |
| Pitney Bowes - Postage Meter | 27 Months - Contract #3943355 | $ 54 | $ 648 | $ 648 | |
| Comcast - Internet Services | 36 Months - Contract 1312802 | $ 94 | $ 1,127 | $ 376 | |
| Accurate Office Machine | Maintenance Contract - Annual | n/a | $ 702 | | |
| Verizon Wireless - P Kidback | Month-to-Month Lease | $ 80 | | | |
| **TENNESSEE:** | | | | | |
| Sopakco - Warehouse Space | Month-to-Month Lease | $ 7,182 | | | |
| Teg Enterprise - Mobile Office & Storage Container | Month-to-Month Lease | $ 1,585 | | | |
| DeLage Lasen - Two Nissan Forklifts | Month-to-Month Lease | $ 873 | | | |
| Ricoh - Copier | 39 Months - contract # 100-3012654-100 | $ 507 | $ 6,084 | $ 3,549 | |
| Pitney Bowes - Postage Meter | 51 Months - Contract 3952087 | $ 53 | $ 160 | | |
| Made2Manage | Annual Maintenance Contract | n/a | $ 5,268 | | |
| Telecom - Internet Services | 36 Months - Contract | $ 950 | $ 11,400 | $ 11,400 | $ 950 |
| Verizon Wireless | 24 Months - AOC#218471720-00002 | $ 550 | $ 5,501 | | |
| Verizon Wireless - Broadband | 24 Months - AOC#515911723-00001 | $ 60 | $ 720 | $ 420 | |
| Verizon Wireless - M Benko | 24 Months - AOC#515911723-00001 | $ 45 | $ 273 | | |
| Monthly Totals - all leases | | $ 15,666 | | | |

**CURE COSTS**

Schedule 5.10 c Cure Costs

SOPAKO $7,182.00
Telescan $90.10
Verizon Wireless (Account # 218471720-00002) $1,094.73
Verizon Wireless (Account # 515911723-00001) $468.28

None known for product orders as long as the company proceeds to complete existing
product contracts and purchase orders.

**EMPLOYEE/LABOR MATTERS**

**None.**

**EMPLOYEES**

# Delfasco, Inc.

## Schedule 5.11 - '(C)' Employees
### (Updated 04/05/10)

| Employee Name | Employee ID | Note | Position | Status | Division | Salary/Hourly/Temporary | Hire Date | Annual Pay | Unused Vacation a/o 12/31/09 |
|---|---|---|---|---|---|---|---|---|---|
| Aker, Dwayne A | 501011 | | | Active | Tennessee | Hourly | 05/22/90 | $ 30,992.00 | $ - |
| Barnes, Terry Lynn | 501570 | | | Active | Tennessee | Hourly | 05/15/00 | $ 27,164.80 | $ 119.60 |
| Barrett, Mark | 501901 | | | Active | Tennessee | Hourly | 12/03/07 | $ 16,952.00 | $ - |
| Benko Jr., John F. | 501332 | | | Active | Tennessee | Hourly | 03/25/96 | $ 28,953.60 | $ 415.60 |
| Benko, Benjamin J. | 501533 | | | Active | Tennessee | Hourly | 07/14/99 | $ 24,107.20 | $ 384.60 |
| Bishop, Billie J. | 501921 | | | Active | Tennessee | Hourly | 05/18/82 | $ 20,800.00 | $ - |
| Booker, Terry R. | 501053 | | | Active | Tennessee | Hourly | 08/01/90 | $ 30,908.80 | $ 963.20 |
| Boyd, Billy Ray | 500426 | | | Active | Tennessee | Hourly | 08/23/87 | $ 27,976.00 | $ 126.00 |
| Boyd, Penny | 501895 | | | Active | Tennessee | Hourly | 06/02/03 | $ 19,760.00 | $ 269.00 |
| Bruce, Brenda Louise | 500483 | | | Active | Tennessee | Hourly | 06/23/87 | $ 27,456.00 | $ 998.00 |
| Burgner, Donald Ray | 501649 | | | Active | Tennessee | Hourly | 03/04/02 | $ 24,731.20 | $ 215.80 |
| Burns, Ricky | 501278 | | | Active | Tennessee | Hourly | 07/23/93 | $ 28,745.60 | $ 763.20 |
| Church, Geraldine | 500754 | | | Active | Tennessee | Hourly | 08/26/88 | $ 28,392.00 | $ 1,245.00 |
| Crum, Scott Thomas | 501451 | | | Active | Tennessee | Hourly | 03/09/98 | $ 37,648.00 | $ 159.00 |
| Doolittle, Harold J | 500880 | | | Active | Tennessee | Hourly | 09/07/89 | $ 28,454.40 | $ 1,123.20 |
| Eads, Angela Denise | 501686 | | | Active | Tennessee | Hourly | 12/02/02 | $ 23,004.80 | $ 796.80 |
| Evans, Phillip Roy | 501340 | | | Active | Tennessee | Hourly | 06/10/96 | $ 29,785.60 | $ 133.20 |
| Garber, Aaron Paul | 501799 | | | Active | Tennessee | Hourly | 11/03/03 | $ 22,339.20 | $ 196.60 |
| Haracz, Roger Andrew | 501619 | | | Active | Tennessee | Hourly | 10/01/01 | $ 22,276.80 | $ 674.10 |
| Hensley, Jack Lee | 500520 | | | Active | Tennessee | Hourly | 06/22/87 | $ 29,868.80 | $ 1,579.20 |
| Isley, Herbert Eugene | 501635 | | | Active | Tennessee | Hourly | 01/28/02 | $ 35,568.00 | $ 161.00 |
| Isley, Patricia Gail | 501746 | | | Active | Tennessee | Hourly | 08/09/03 | $ 21,424.00 | $ 276.00 |
| Jennings, Ronald Lee | 501654 | | | Active | Tennessee | Hourly | 04/15/02 | $ 26,832.00 | $ - |
| Johnston, Randall S. | 501459 | | | Active | Tennessee | Hourly | 04/13/98 | $ 26,332.80 | $ 837.20 |
| King, Charles | 501903 | | | Active | Tennessee | Hourly | 05/12/03 | $ 20,072.00 | $ 274.50 |
| King, Dean C. | 500785 | | | Active | Tennessee | Hourly | 11/18/81 | $ 22,609.60 | $ - |
| Landers, Cynthia L. | 500995 | | | Active | Tennessee | Hourly | 04/18/00 | $ 27,248.00 | $ 121.00 |
| Lawrence, Jonathan R | 501855 | | | Active | Tennessee | Hourly | 08/09/04 | $ 20,134.40 | $ 431.00 |
| Lord, Steven Ivan | 501894 | | | Active | Tennessee | Hourly | 01/17/05 | $ 21,320.00 | $ - |
| Majors, Phillip Ray | 501419 | | | Active | Tennessee | Hourly | 09/03/97 | $ 43,368.00 | $ 1,167.00 |
| Malone, Randall Wayne | 501543 | | | Active | Tennessee | Hourly | 10/11/99 | $ 35,568.00 | $ 948.00 |
| McKamey, Ross A. | 501128 | | | Active | Tennessee | Hourly | 01/31/91 | $ 39,936.00 | $ 1,080.00 |
| Metcalf, Freddie C. | 501274 | | | Active | Tennessee | Hourly | 08/18/93 | $ 24,481.60 | $ 434.80 |
| Metcalf, Patricia | 501898 | | | Active | Tennessee | Hourly | 02/17/97 | $ 21,756.80 | $ - |
| Miller, Herbert Wendale | 500908 | | | Active | Tennessee | Hourly | 07/05/89 | $ 28,080.00 | $ 123.00 |
| Miller, Mary Elizabeth | 501604 | | | Active | Tennessee | Hourly | 05/07/01 | $ 29,432.00 | $ 454.80 |
| Miller, Richard Charles | 501766 | | | Active | Tennessee | Hourly | 08/18/03 | $ 20,800.00 | $ 540.00 |
| Morgan, Anderson | 500993 | | | Active | Tennessee | Hourly | 04/05/90 | $ 26,291.20 | $ - |
| Morris, Timmy Joe | 500154 | | | Active | Tennessee | Hourly | 09/18/81 | $ 28,808.00 | $ 777.00 |
| Norton, Hobert C | 501651 | | | Active | Tennessee | Hourly | 03/18/02 | $ 24,190.40 | $ - |
| Plemons, Herbert Clifford | 500101 | | | Active | Tennessee | Hourly | 06/01/77 | $ 39,312.00 | $ 1,236.20 |
| Ricker, Charles Allen | 500183 | | | Active | Tennessee | Hourly | 06/22/82 | $ 34,736.00 | $ 1,735.20 |
| Ricker, Jeffrey G. | 501053 | | | Active | Tennessee | Hourly | 07/19/00 | $ 26,600.00 | $ 128.50 |
| Ricker, Roger Dale | 500193 | | | Active | Tennessee | Hourly | 07/22/82 | $ 30,638.40 | $ 1,082.40 |
| Taylor, Carlos H. | 501357 | | | Active | Tennessee | Hourly | 08/12/96 | $ 25,729.60 | $ 225.40 |
| Taylor, Sherree Ann | 500385 | | | Active | Tennessee | Hourly | 06/03/86 | $ 26,665.60 | $ 586.00 |
| Tipton, Diana Lynn | 500195 | | | Active | Tennessee | Hourly | 08/09/82 | $ 26,184.00 | $ 1,120.50 |
| Tullock, Chad A. | 501593 | | | Active | Tennessee | Hourly | 06/21/99 | $ 32,032.00 | $ 934.50 |
| Turner, Jeffrey Lee | 500381 | | | Active | Tennessee | Hourly | 05/27/86 | $ 27,872.00 | $ 378.00 |
| Vedrinski, Kimberly A. | 501579 | | | Active | Tennessee | Hourly | 07/03/00 | $ 24,336.00 | $ 848.00 |
| Waddell, James William | 501644 | | | Active | Tennessee | Hourly | 01/29/02 | $ 23,108.60 | $ - |
| Wilder, Joe F. (Jr.) | 501905 | | | Active | Tennessee | Hourly | 02/25/08 | $ 25,272.00 | $ - |
| Wills, Kenneth Carroll | 500591 | | | Active | Tennessee | Hourly | 07/21/87 | $ 27,164.80 | $ 1,554.80 |
| Will, Michael D. | 501096 | | | Active | Tennessee | Hourly | 10/22/90 | $ 31,720.00 | $ 1,140.00 |
| Young, Robert D. | 501534 | | | Active | Tennessee | Hourly | 07/12/99 | $ 25,584.00 | $ - |
| Benko, Mark William | 101016 | | Vice President/ General manager | Active | Tennessee | Salary | 01/01/77 | $ 154,999.92 | $ - |
| Clay, Rhonda Gwinn | 101074 | | Contract Administrator | Active | Tennessee | Salary | 11/16/94 | $ 54,995.20 | $ 4,230.40 |
| Fancher, Ricky Lynn | 101107 | | Industrial Engineer | Active | Tennessee | Salary | 07/07/03 | $ 52,000.08 | $ 3,000.00 |
| Kadelecek, Philip | 101118 | | President | Active | Corporate | Salary | 03/29/88 | $ 164,976.00 | $ 5,552.08 |
| King, Jennifer L. | 101104 | | Shipping Contractor/ Administrative Assistant | Active | Tennessee | Salary | 02/26/96 | $ 35,006.40 | $ 1,009.80 |
| Monteiro, Carlos | 101092 | | Controller | Active | Corporate | Salary | 05/19/98 | $ 79,800.00 | $ 9,015.87 |
| Powell, Stephen Allon | 101096 | | Human Resources & Environmental Manager | Active | Tennessee | Salary | 04/08/96 | $ 60,000.00 | $ 2,307.69 |
| Rohr, Tammee Marie | 101051 | | Manager of Cost Accounting | Active | Tennessee | Salary | 07/06/89 | $ 60,000.00 | $ 2,884.62 |

| Delfasco, Inc. | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|

**Schedule 5.11 - '(C)' Employees**
(Updated 04/05/10)

| Employee Name | Employee ID | Note | Position | Status | Division | Salary/Hourly/ Temporary | Hire Date | Annual Pay | Unused Vacation a/o 12/31/09 |
|---|---|---|---|---|---|---|---|---|---|
| Sams, David | 101071 | | Quality Control Manager | Active | Tennessee | Salary | 06/06/94 | $ 48,000.00 | $ 2,538.46 |
| Shipley, Randy Lynn | 101103 | | Fabrication Foreman | Active | Tennessee | Salary | 08/06/86 | $ 55,600.08 | $ 3,475.01 |
| Thomas, Karen | 101047 | | Office Manager | Active | Corporate | Salary | 11/01/91 | $ 81,600.00 | $ 5,374.61 |
| Turner, Ronald Dale | 500163 | | Manufacturing Manager | Active | Tennessee | Salary | 02/01/90 | $ 82,000.08 | $ 1,576.92 |
| Wilder, Joe F | 101085 | | Plant Engineer/ Maintenance Manager | Active | Tennessee | Salary | 04/08/96 | $ 74,000.16 | $ 3,557.70 |
| Young, William M | 501296 | | Materials Manager | Active | Tennessee | Salary | 09/27/93 | $ 60,000.00 | $ 3,750.00 |
| Carter, William R | n/a | | Quality Inspector | Active | Tennessee | Temporary | n/a | $ 62,982.40 | n/a |
| Angel,Welsey M. | 501918 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Burnsed,Joseph E. | 501916 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Cruey,Kimberly R. | 501914 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Deane,Alexander J. | 501913 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Jackson,William C. | 501917 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Knight,Trevor J. | 501911 | (a) | | Inactive | Tennessee | Hourly | 10/20/08 | $ 18,304.00 | |
| McGhee,Robbie | 501910 | (a) | | Inactive | Tennessee | Hourly | 10/06/08 | $ 18,304.00 | |
| Quinn,Randall L. | 501912 | (a) | | Inactive | Tennessee | Hourly | 08/04/03 | $ 18,200.00 | |
| Walters,Daniel S. | 501915 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Wattenbarger,Jeanette | 501920 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Wininger,Deanetta F. | 501919 | (a) | | Inactive | Tennessee | Hourly | 10/26/09 | $ 17,680.00 | |
| Totals | | | | | | | | | $ 77,000.06 |

Notes:

(a) Laid off in Jan. 2010 due to decreased sales and will be eligible to be re-employed if the sale situation improves. It is probable that some or all of these employees could be offered employment in the last half of 2010, as sales are expected to improve during that time. Benefits: No one is currently on COBRA and no one eligible at this point to elect COBRA.

**COBRA**

Schedule 5.11(d-1)  COBRA, Unemployment Claims, etc.  Comments from Steve
Powell – 4-5-10

1. There are no pending claims, or claims reasonably expected or
   threatened, against Seller for any amounts under any workers
   compensation plan or policy or for long-term disability."

> At this point we have one outstanding worker's comp claim for
> which we expect to receive future claims. They concern the
> employee Charles Reppond. Mr. Reppond is currently in the
> process of appealing a denial of procedure through the Tennessee
> Department of Labor and Workforce Development. I cannot speak
> to future claims or their amounts at this time since the matter is
> being handled by the insurance claims adjuster for Montgomery
> Insurance but can get specific information if needed.

2. "Except as set forth on Schedule 5.11(d), Seller has no obligations under
   COBRA with respect to any former Employees or qualifying beneficiaries
   thereunder."

> Schedule 5.11(d) should reflect the following: Delfasco currently
> has 9 employees that were laid off on January 4th, 2010.  Our
> insurance company has provided the appropriate COBRA
> notification and election paperwork but we have received no
> responses at this time.  However, under COBRA regulations the
> employees have sixty (60) days to make their election and an
> additional forty-five (45) days to remit their first premium
> payment.  We won't definitively know till approximately March
> 10th (60 days + approximate mailing time) who, if any, have
> elected coverage.

> 4-05-10 Update: We have no one currently on COBRA and no one
> eligible at this point to elect COBRA.

3. "Seller is not liable for any payment to any trust or other fund or to any
   governmental or administrative authority, with respect to unemployment
   compensation benefits, social security or other benefits or obligations for
   Employees (other than routine payments to be made in the normal
   course of business and consistent with past practice)."

> I have read and re-read this sentence many times. I still am not
> sure if our health insurance trust fund is exempt or not so I'll give
> you a basic breakdown of how it is structured.

> We are self-insured.  Specifically we are in the partially self-funded
> category.  We have a TPA (Third-Party Administrator) who submits
> a bill to Delfasco for monthly premiums.  They then apply the
> payment from Delfasco to pay all fixed costs (TPA Fee, Specific
> Insurance premium, transplant insurance premium, etc.) and

remit the balance into a bank account belonging to the Delfasco VEBA (Voluntary Employee Benefit Association) Trust. This VEBA Trust uses the bank account to pay the routine and ordinary claims incurred by the members of the healthcare plan.

There are numerous specifics covering the actual day-to-day administration that I won't go into detail on here, but will be more than happy to extrapolate on if additional detail is needed.

Suffice it to say, my interpretation of the "(other than routine payments to be made in the normal course of business and consistent with past practices)" portion of the sentence would apply since Delfasco itself is only seeing/paying a "premium". The trust itself is a separate entity as required by ERISA. However, the obligation for plan funding amounts is committed to based on an annual contract and is not month-to-month and Delfasco is liable for the funding the outstanding aggregate attachment amounts in the event 20 employees all board the same bus on February 25th and are involved in an accident not covered by other insurances. Additionally, we are going to be completing the renewal process this week that will further obligate Delfasco for another year to the attachment funding. n Based on current employee participation counts this will be in the $845,000 range).

4. " To the Knowledge of Seller, there are no controversies pending or threatened between Seller, on the one hand, and any of its Employees, on the other hand, which controversies have or would reasonably be expected to result in an action, suit, proceeding, claim, arbitration, audit or investigation before any agency, court or tribunal, foreign or domestic."

Again, we have an ongoing worker's compensation matter related to Charles Reppond. While we don't anticipate anything down the road outside of our insurer's coverage it is possible that Mr. Reppond pursue additional courses of action in the future.

Medicare Recovery Claim – Medicare vs. Principal Life (Karen Thomas) See Schedules 5.11 d-2 and 5.11 d-3.

January 04, 2010 – received Medicare Recovery Claim for the spouse of a former Texas employee in the amount of $26,411.71. On January 18th, Delfasco referred the claim to our health care provider, at the time, Principal Life. The claim is being investigated by Principal. On March 30th, Delfasco received a follow up Notice of Intent regarding this claim which was forwarded on to Principal Life. We have requested a status update as soon as possible.

SCHEDULE 5.11(d-2)

 MSPRC

 CENTERS for MEDICARE & MEDICAID SERVICES

 Learn about your letter at *www.msprc.info*

03/26/2010

201 1 MB 0.382
***AUTO**MIXED AADC 720- R:201 T:2 P:2 PC:5 F:40601
DELFASCO INC
PO BOX 10527
WILMINGTON DE 19850-0527
Iۤۤۤۤۤۤۤۤۤۤۤۤۤۤۤۤۤۤۤۤۤ



RE:

Past-due debt owed CMS as of 03/26/2010: $26,890.41
Date debt became past-due: 03/01/2010
Date of Demand Letter previously sent: 12/31/2009
Debt Identification Numbers: 075567939A
Beneficiary's Name: KATHERINE SHILEY
Case ID Number: I12180974143

Dear DELFASCO INC:

## NOTICE OF INTENT TO REFER DEBT TO THE DEPARTMENT OF TREASURY OR A DEPARTMENT OF TREASURY DESIGNATED DEBT COLLECTION CENTER FOR CROSS-SERVICING AND OFFSET OF FEDERAL PAYMENTS

(Please note that it is possible that this letter is being sent to you by a Medicare contractor other than the one who issued the request(s) for repayment that is (are) attached to this letter. This situation would occur whenever one contractor has assumed responsibility for a particular workload from another contractor (usually because the initial contractor is leaving or has left the Medicare program).

MAR 3 0 2010

CISB1

The Centers for Medicare & Medicaid Services (CMS) has determined that you are indebted to the Medicare program for the amount shown above and that this amount is delinquent. The amount shown includes principal and interest. This debt arose under the Medicare Secondary Payer (MSP) provisions of the Social Security Act. CMS has the right to collect this debt through offset of any payments due to the debtor. In addition, the Debt Collection Improvement Act (DCIA) of 1996 requires Federal agencies to refer delinquent debts to the Department of Treasury and/or a designated Debt Collection Center (DCC) for collection through cross-servicing, including the Treasury Offset Program (TOP). Under TOP, delinquent Federal debts are collected through offset from other Federal agency payments you may be entitled to, including the offset of your income tax refund through the referral of this debt to the Internal Revenue Service (IRS), and Federal benefit payments such as Social Security retirement or disability benefits. Treasury or a designated DCC uses various collection tools to collect the debts, including offset, demand letters, phone calls, referral to a private collection agency and/or referral to the Department of Justice or agency counsel for litigation.

The purpose of this notice is to inform you of our intention to refer your debt to Treasury/a designated DCC, under the provisions of the DCIA, Title 31 United States Code, Section 3711 to collect this debt. This referral will permit the Department of Treasury and/or a designated DCC to use the aforementioned means of collection as well as to permit administrative offset of payments you may be receiving from other Federal agencies. During this collection process, interest will continue to accrue on the debt and you will remain legally responsible for any amount not satisfied through the collection efforts.

Please read the following instructions carefully as they may assist you in resolving this matter prior to referral.

Challenging the Indebtedness:

You have the right to request an opportunity to inspect and copy records relating to the debt. This request must be submitted in writing to the address listed below. Additionally, you have a right to present evidence that all or part of your debt is not past due or legally enforceable. In order to exercise this right, this office must receive a copy of the evidence to support your position. Please include a copy of this notice when corresponding with the agency regarding this matter. You must submit any evidence that the debt is not owed or legally enforceable within 60 days of the date of this letter. We will notify you within 30 days of receipt of the information of our determination as to whether the debt is still past due and legally enforceable. Failure to present any evidence will result in the automatic referral of the debt to the Department of Treasury/a designated DCC for cross-servicing/offset actions.

Your debt will not be referred for further collection action if you make payment in full. Please be advised that payment of principal only is not considered payment in full and will not satisfy this debt. By law, payments are applied to interest first and then to principal.

The past-due debt owed to CMS as of 03/26/2010, including interest accrued through 03/30/2010, is $26,890.41. By regulation, interest is due and payable for each full 30-day period that the debt is not fully liquidated. Be advised that interest is accrued monthly and is added to the balance of the debt. If the debt remains outstanding after 03/30/2010, the amount of the debt, including interest, will be $27,129.76. If no payment is received by 04/29/2010, the amount of the debt including interest will be $27,369.11; and if no payment is received by 05/29/2010, the amount of the debt including interest will be $27,608.46. Please make your check or money order payable to MSPRC include a copy of this notice and forward both to the address below.

MSPRC DISABLED
PO BOX 33829
DETROIT MI 48232-5829



Your check should also include the "debt identification numbers" as shown at the beginning of this letter in order to ensure that you receive proper credit for your payment.

If you cannot make the payment in full, you may be allowed to enter into an extended repayment agreement.

Bankruptcy Related Information: If you have filed for bankruptcy and an automatic stay of bankruptcy is in effect, you are not subject to offset while the automatic stay is in effect. Documentation supporting your bankruptcy status, along with a copy of this notice, must be forwarded to this office at the above address in order to avoid referral.

Information for Individual Debtors Filing a Joint Federal Income Tax Return: TOP automatically refers debts to the IRS for offset. Your Federal income tax return is subject to offset under this program. If you file a joint income tax return, you should contact the IRS before filing your tax return to determine the steps to be taken to protect the share of the refund which may be payable to the non-debtor spouse.

If you have questions concerning this debt, extended repayment plans, and/or relating to the submission of evidence, you may call:

MEDICARE SECONDARY PAYER RECOVERY CONTRACTOR
Telephone Number: 1-866-677-7220
TTY/TDD: 1-866-677-7294

If you call, please be sure that you have this letter available so that you can readily provide us with the identification information provided at the beginning of the letter.

Sincerely,
MEDICARE SECONDARY PAYER RECOVERY CONTRACTOR

Enclosures:
Claims Summary
cc: PRINCEPAL LIFE

SGL200GHP

Medicare Paid Claim Summary

ReMAS Case ID: 200934608016064

HIC: 076567939A
Total Part A Paid: $ 17503.52    Total Part B Paid: $ 8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| 20623612505504 | 01/09/2006 | 01/11/2006 | 4776.22 | 565.83 | | | |
| 20623612543504 | 05/04/2006 | 05/04/2006 | 371.50 | 113.78 | | | |
| 20631801026801 | 11/09/2006 | 11/09/2006 | 1479.75 | 213.62 | | | |
| 20700303998901 | 02/01/2006 | 02/01/2006 | 8926.01 | 8286.24 | | | |
| 20719002446801 | 02/24/2006 | 02/26/2006 | 17276.60 | 8218.63 | | | |
| 20720600278701 | 07/14/2007 | 07/14/2007 | 445.25 | 106.42 | | | |
| 20710651739000 | 03/20/2006 | 03/20/2006 | 495.00 | 239.56 | 1 | 495.00 | 239.56 |
| 4515052B9130180 | 02/12/2006 | 02/12/2006 | 143.00 | 73.53 | 1 | 143.00 | 73.53 |
| 451506292026780 | 05/19/2006 | 05/19/2006 | 158.00 | 76.26 | 1 | 158.00 | 76.26 |
| 451506348031050 | 12/19/2006 | 12/19/2006 | 200.00 | 121.90 | 1 | 200.00 | 121.90 |
| 451507010002060 | 01/05/2007 | 01/05/2007 | 80.00 | 40.22 | 1 | 80.00 | 40.22 |
| 451507029165730 | 01/24/2007 | 01/24/2007 | 140.00 | 48.62 | 1 | 140.00 | 48.62 |
| 451507095001340 | 04/02/2007 | 04/02/2007 | 140.00 | 44.83 | 1 | 140.00 | 44.83 |
| 451507123012550 | 04/30/2007 | 04/30/2007 | 80.00 | 40.22 | 1 | 80.00 | 40.22 |
| 451507157716670 | 05/31/2007 | 05/31/2007 | 120.00 | 48.62 | 1 | 120.00 | 48.62 |
| 451507183223950 | 06/28/2007 | 06/28/2007 | 10.00 | 5.00 | 1 | 10.00 | 5.00 |
| 451507213205570 | 07/26/2007 | 07/26/2007 | 100.00 | 33.86 | 1 | 100.00 | 33.86 |
| 451507221227110 | 06/21/2007 | 06/21/2007 | 142.00 | 68.34 | 1 | 142.00 | 68.34 |
| 451606184824060 | 05/19/2006 | 05/19/2006 | 115.00 | 43.75 | 1 / 3 | 91.00 / 24.00 | 29.02 / 14.73 |
| 451606291802890 | 05/02/2006 | 05/02/2006 | 166.04 | 132.89 | 1 | 166.04 | 132.89 |
| 452206009417280 | 01/04/2006 | 01/04/2006 | 168.42 | 32.76 | 1 | 168.42 | 32.76 |
| 452206019460680 | 01/11/2006 | 01/11/2006 | 401.70 | 199.78 | 1 | 401.70 | 199.78 |



# Medicare Paid Claim Summary

ReMAS Case ID: 200934608016064

HIC: 075567989A
Total Part A Paid: $ 17503.52          Total Part B Paid: $ 8908.19

| CDN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| 45220620022996O | 03/21/2006 | 03/21/2006 | 200.00 | 95.82 | 1 | 200.00 | 95.82 |
| 45220620024997O | 05/23/2006 | 05/23/2006 | 200.00 | 95.82 | 1 | 200.00 | 95.82 |
| 45220620022998O | 06/19/2006 | 06/19/2006 | 120.00 | 41.15 | 1 | 120.00 | 41.15 |
| 45220620028007O | 07/14/2006 | 07/14/2006 | 75.00 | 41.97 | 1 | 75.00 | 41.97 |
| 45220620620641O | 07/18/2006 | 07/18/2006 | 423.00 | 163.61 | 1 / 2 / 3 | 198.00 / 150.00 / 75.00 | 70.25 / 45.36 / 48.00 |
| 45220624021913O | 08/15/2006 | 08/15/2006 | 75.00 | 41.97 | 1 | 75.00 | 41.97 |
| 45220624415535O | 03/31/2006 | 03/31/2006 | 160.00 | 77.40 | 1 | 160.00 | 77.40 |
| 45220625424972O | 08/30/2006 | 08/30/2006 | 423.00 | 163.61 | 1 / 2 / 3 | 75.00 / 198.00 / 150.00 | 48.00 / 70.25 / 45.36 |
| 45220626262557O | 09/13/2006 | 09/13/2006 | 75.00 | 41.97 | 1 | 75.00 | 41.97 |
| 45220627129296O | 02/01/2006 | 02/01/2006 | 2527.00 | 533.91 | 1 / 2 / 3 / 4 | 1400.00 / 515.00 / 419.00 / 193.00 | 382.13 / 42.60 / 85.52 / 23.66 |
| 45220627129298O | 03/07/2006 | 03/07/2006 | 150.00 | 45.36 | 1 | 150.00 | 45.36 |
| 45220627129309O | 02/25/2006 | 02/25/2006 | 655.00 | 207.57 | 1 | 655.00 | 207.57 |
| 45220627129319O | 05/26/2006 | 05/26/2006 | 1248.00 | 148.41 | 1 / 2 / 3 | 198.00 / 150.00 / 900.00 | 70.25 / 45.36 / 32.80 |
| 45220629741147O | 10/17/2006 | 10/17/2006 | 120.00 | 65.64 | 1 | 120.00 | 65.64 |
| 45220632122947O | 11/07/2006 | 11/07/2006 | 486.00 | 203.61 | 1 | 198.00 | 70.25 |



# Medicare Paid Claim Summary

ReMAS Case ID: 2009346080 16064

HIC: 075567939A
Total Part A Paid: $ 17503.52   Total Part B Paid: $ 8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| | | | | | 2 | 150.00 | 45.36 |
| | | | | | 3 | 139.00 | 88.00 |
| 452206349312910 | 12/07/2006 | 12/07/2006 | 110.00 | 47.97 | 1 | 83.00 | 30.80 |
| | | | | | 2 | 27.00 | 17.17 |
| 452207010783810 | 11/09/2006 | 11/09/2006 | 271.00 | 77.72 | 1 | 271.00 | 77.72 |
| 452207016162310 | 03/31/2006 | 03/31/2006 | 423.00 | 163.61 | 1 | 198.00 | 70.25 |
| | | | | | 2 | 150.00 | 45.36 |
| | | | | | 3 | 75.00 | 48.00 |
| 452207047807700 | 02/05/2007 | 02/05/2007 | 486.00 | 199.12 | 1 | 198.00 | 68.78 |
| | | | | | 2 | 150.00 | 42.34 |
| | | | | | 3 | 138.00 | 88.00 |
| 452207075522320 | 03/07/2007 | 03/07/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452207205582740 | 07/14/2007 | 07/14/2007 | 807.00 | 168.23 | 1 | 174.00 | 48.54 |
| | | | | | 2 | 433.00 | 119.69 |
| 452207212770760 | 11/27/2006 | 11/27/2006 | 3256.00 | 888.41 | 1 | 3256.00 | 888.41 |
| 452207223865600 | 05/09/2007 | 05/09/2007 | 1108.00 | 210.02 | 1 | 1108.00 | 210.02 |
| 452806214439910 | 01/18/2006 | 01/18/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 452806214439920 | 02/16/2006 | 02/16/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 452806214439930 | 03/15/2006 | 03/15/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 452806214439940 | 04/10/2006 | 04/10/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 452806214439950 | 05/02/2006 | 05/02/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 452806214439960 | 06/29/2006 | 06/29/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 452806250476670 | 01/11/2006 | 01/11/2006 | 279.37 | 64.89 | 1 | 279.37 | 64.89 |
| 452806269427190 | 09/20/2006 | 09/20/2006 | 244.00 | 42.13 | | | |

# Medicare Paid Claim Summary

ReMAS Case ID: 200934608016064

HIC: 075567939A
Total Part A Paid: $ 17503.52
Total Part B Paid: $ 8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
|  |  |  |  |  | 1 | 21.86 | 3.77 |
|  |  |  |  |  | 2 | 97.62 | 16.69 |
|  |  |  |  |  | 3 | 41.87 | 7.23 |
|  |  |  |  |  | 4 | 45.93 | 7.93 |
|  |  |  |  |  | 5 | 36.50 | 6.31 |
| 45280C030371930 | 10/06/2006 | 10/06/2006 | 506.00 | 194.41 | 1 | 75.00 | 48.00 |
|  |  |  |  |  | 2 | 93.00 | 30.80 |
|  |  |  |  |  | 3 | 198.00 | 70.25 |
|  |  |  |  |  | 4 | 150.00 | 45.36 |
| 4528070310788850 | 01/24/2007 | 01/24/2007 | 345.00 | 143.42 | 1 | 345.00 | 143.42 |
| 4528070571185900 | 02/15/2007 | 02/15/2007 | 337.75 | 50.84 | 1 | 78.25 | 14.77 |
|  |  |  |  |  | 2 | 149.50 | 12.60 |
|  |  |  |  |  | 3 | 110.00 | 23.47 |
| 4528070572B2680 | 02/12/2007 | 02/12/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 45280705B1582950 | 01/29/2007 | 01/29/2007 | 115.00 | 73.49 | 1 | 115.00 | 73.49 |
| 4528070B2739410 | 03/21/2007 | 03/21/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4528070596652B50 | 03/28/2007 | 03/28/2007 | 1125.00 | 243.38 | 1 | 600.00 | 119.05 |
|  |  |  |  |  | 2 | 300.00 | 53.67 |
|  |  |  |  |  | 3 | 225.00 | 76.66 |
| 452807103765220 | 04/17/2007 | 04/17/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4528071290109990 | 04/26/2007 | 04/26/2007 | 486.00 | 199.12 | 1 | 198.00 | 68.78 |
|  |  |  |  |  | 2 | 190.00 | 42.34 |
|  |  |  |  |  | 3 | 199.00 | 88.00 |
| 4528071351138B0 | 05/09/2007 | 05/09/2007 | 1005.00 | 412.31 | 1 | 165.00 | 71.94 |
|  |  |  |  |  | 2 | 174.00 | 90.72 |
|  |  |  |  |  | 3 | 666.00 | 249.65 |
| 4528071640571B0 | 06/08/2007 | 06/08/2007 | 593.00 | 188.58 | 1 | 165.00 | 71.94 |
|  |  |  |  |  | 2 | 200.00 | 76.23 |



ReMAS Case ID: 20099460B016064

Page 5 of 6

## Medicare Paid Claim Summary

HIC: 075567999A
Total Part A Paid: $    17503.52

Total Part B Paid: $    8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| | | | | | 3 | 8.00 | 2.23 |
| | | | | | 4 | 10.00 | 0.06 |
| | | | | | 5 | 200.00 | 36.12 |
| 45250717875520 | 06/26/2007 | 06/26/2007 | 75.00 | 47.45 | 1 | 75.00 | 47.45 |
| 45250804401238Q | 07/02/2007 | 07/02/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 45280804448670 | 06/04/2007 | 06/04/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 45280804448680 | 07/31/2007 | 07/31/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 45290603389G810 | 01/06/2006 | 01/06/2006 | 161.00 | 65.84 | 1 | 161.00 | 65.84 |
| 45290624051420 | 02/01/2006 | 02/01/2006 | 561.00 | 154.05 | 1 | 561.00 | 154.05 |
| 45290630543G530 | 08/28/2006 | 08/28/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45280630543B530 | 09/27/2006 | 09/27/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45290533984G330 | 11/20/2006 | 11/20/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45290636171285Q | 12/18/2006 | 12/18/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45290700401598Q | 12/28/2006 | 12/28/2006 | 120.00 | 77.40 | 1 | 120.00 | 77.40 |
| 4529070101398B0 | 01/04/2007 | 01/04/2007 | 1150.00 | 260.60 | 1 | 1150.00 | 260.60 |
| 45290701013986Q | 01/04/2007 | 01/04/2007 | 250.00 | 62.72 | 1 | 250.00 | 62.72 |
| 45290701038621Q | 06/27/2006 | 06/27/2006 | 150.00 | 120.00 | 1 | 150.00 | 120.00 |
| 45290703021041Q | 01/16/2007 | 01/16/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4529070370486Q0 | 02/01/2007 | 02/01/2007 | 175.00 | 73.49 | 1 | 175.00 | 73.49 |
| 45290704419763Q | 07/27/2006 | 07/27/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 4529070510761Q0 | 02/15/2007 | 02/15/2007 | 106.00 | 50.45 | 1 | 100.00 | 47.45 |

# Medicare Paid Claim Summary

ReMAS Case ID: 2009346080160G4

HIC: 075567939A
Total Part A Paid: $ 17503.52     Total Part B Paid: $ 8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| 452907107148150 | 04/04/2007 | 04/04/2007 | 100.00 | 47.45 | 2 | 6.00 | 3.00 |
| 452907110036210 | 04/18/2007 | 04/18/2007 | 1125.00 | 56.00 | 1 | 600.00 | 37.53 |
|  |  |  |  |  | 2 | 300.00 | 15.43 |
|  |  |  |  |  | 3 | 225.00 | 3.04 |
| 452907136184270 | 05/02/2007 | 05/02/2007 | 181.00 | 71.94 | 1 | 181.00 | 71.94 |
| 452907142167130 | 05/17/2007 | 05/17/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452907165372360 | 06/12/2007 | 06/12/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452907170286600 | 06/12/2007 | 06/12/2007 | 259.50 | 36.07 | 1 | 149.50 | 12.60 |
|  |  |  |  |  | 2 | 110.00 | 23.47 |
| 452907198175400 | 07/13/2007 | 07/13/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452907200061630 | 07/16/2007 | 07/16/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452907205019200 | 07/21/2007 | 07/21/2007 | 80.00 | 47.45 | 1 | 80.00 | 47.45 |
| 453107053005510 | 02/15/2007 | 02/15/2007 | 140.00 | 48.62 | 1 | 140.00 | 48.62 |
| 453206310158460 | 10/25/2006 | 10/25/2006 | 161.00 | 65.84 | 1 | 181.00 | 65.84 |

SCHEDULE 5.11(d-3)

 **MSPRC** 

CENTERS for MEDICARE & MEDICAID SERVICES

 Learn about your letter at *www.msprc.info*

12/31/2009

2524 2 MB 0.895
***AUTO**MIXED ADC 720- R:2524 T:42 P:166 PC:7 F:358(
DELFASCO INC
PO BOX 10527
WILMINGTON DE 19850-0527
lulhhlululubhhllullulublubhlllulbllhlullulj

Dear Employer:

We are writing to advise you that your organization either has sole liability or shares liability
for a debt to the Medicare program. The following explains how this happened and what you
must do to resolve this matter.

### How This Happened

This recovery claim arises because Medicare mistakenly made primary payments for services
furnished to the identified Medicare beneficiary(ies) below for which the actual primary
payment responsibility lies with a group health plan (GHP) that you sponsor or to which you
contribute. Although the identified individuals may be entitled to Medicare, when certain
conditions delineated within the Medicare laws (42 U.S.C. § 1395y(b)) and regulations (42
C.F.R. § 411.20ff) are satisfied, the Medicare Secondary Payer (MSP) statute requires GHPs
to make primary payment for services furnished to Medicare beneficiaries who are also
covered by a GHP. Medicare was not aware that these conditions were satisfied at the time it
made primary payment for certain services, but information now available indicates that
these conditions were satisfied when the services were furnished.

The MSP statute and regulations require Medicare to recover primary payments it mistakenly
made for which a GHP is the proper primary payer. We may recover from any entity
responsible for making primary payment, including employers that sponsor or contribute to
GHPs, other plan sponsors, and insurers. You are receiving this letter because you are
responsible for payment by virtue of the Medicare law, and we want to afford you the
opportunity to resolve this matter. We encourage you to contact other entities, such as the
plan itself or the plan's insurer (if any), that are also entities responsible for payment, for
assistance in resolving this matter. However, you may not transfer responsibility to resolve

**JAN 04 2010**

www.msprc.info

RCEMD1

this matter to the GHP, its insurer, or any other entity. Please also be aware that you may be subject to an excise tax under the Internal Revenue Code if any GHP to which you contribute fails to comply with the MSP requirements.

Detailed information about the beneficiary(ies) for which Medicare mistakenly paid primary are provided in the beneficiary specific enclosures in this letter. These enclosures also identify the subscriber associated with each beneficiary. **(Please note that the Medicare beneficiary may be an employee, a spouse, or other family member.)** The total amount due is    **$26,411.71.** The "Demand Summary" with this letter lists the total amount due for each beneficiary. Please be aware that the employer's copy of the demand package will no longer include individual beneficiary claim facsimiles, but will include the Medicare Paid Claims Summary.

## How to Resolve this Recovery Demand

You or someone acting on your behalf (e.g., your insurer or plan administrator) must respond within sixty (60) days of the date of this letter. The amount due Medicare is the lesser of the GHP's total primary payment obligation or the amount that Medicare paid. You may **not** reduce the amount due Medicare by the amount of any payments your GHP may have made other than full primary payments to any entity prior to the date of this demand letter. If your GHP had not previously made full primary payment, you must refund Medicare. The GHP may not now make proper primary payment to the provider or supplier.

- If you pay the entire amount demanded with respect to any Medicare beneficiary, you must indicate the payment amount associated with that particular beneficiary either on the check or via an attachment.
- If you are paying less than the amount demanded with respect to any Medicare beneficiary because the GHP's total primary payment obligation was less than the amount Medicare paid, you must document how the lesser payment was determined as well as link the payment amount to the beneficiary in question.
- You may assert and document a valid defense against all or a portion of the demand. Valid defenses are:
  - Beneficiary received services not covered by the GHP: For this defense to be accepted, you must document that the services were not covered. You may not merely assert that the "services were not covered for primary payment."
  - The GHP already made full primary payment for certain specified services, either by direct payment or by inclusion in a capitation payment: You must provide proof of payment by documentation evidencing either direct payment or payment made by virtue of inclusion in a capitated payment system.
  - Medicare's demand letter claim was not presented timely.
    - Medicare has a minimum of 3 years from the date of service to present a demand. You may not assert a timely filing defense if the date of this demand letter is less than 3 years from the date of service.
    - If more than 3 years from the date of service, a timely filing defense may still not be asserted:
      - If Medicare's demand has been presented within a GHP's longer timely filing period; or
      - If, irrespective of when Medicare makes its demand, during the period either 3 years from the date of service (or, if applicable,

the GHP's longer timely filing period), the GHP had knowledge that services had been furnished to a Medicare beneficiary. Knowledge can come from any source, e.g., a claim for secondary payment, inquiry, report, etc. For example, if the GHP's insurer or third party administrator had a crossover agreement with Medicare (i.e., Medicare forwards its primary payment data to the insurer/third party administrator) for the period when the services were provided, notice would have routinely been provided as a result of that cross-over agreement.

▶ To assert a timely filing defense, a responsible GHP official must certify on company letterhead that all systems of records for the period when services were provided exist and have been searched, but no record was found. Unavailability of records due to destruction, etc., is not a valid defense.

▶ In addition, under Medicare's right of subrogation, the GHP must consider this demand to constitute a patient's appeal of a denial of the service/claim denial on the basis of timely filing. The GHP must timely respond to the appeal and a responsible official must certify on company letterhead that the GHP has evaluated the appeal using the same policies, procedures, or rules routinely applied in situations where an appeal has been filed because a claim was denied due to untimely filing but where the delay in initial presentment was not the fault of the patient.

o The beneficiary was either not covered by any GHP sponsored, or contributed to, by the employer, or cannot be identified. Any such assertion must come directly from the employer. A responsible officer of the employer must certify on company letterhead that GHP enrollment records for the period when services were provided exist; the records identify all covered individuals; the records have been searched; and no record of the beneficiary's being covered under any GHP sponsored, or contributed to, by the employer was found. An insurer, third party administrator, or other entity may not make this certification for the employer.

Please include the beneficiaries Medicare health identification number (HICN) (noted on the Demand Summary Sheet) on all correspondence and payments. This enables Medicare to reconcile its records.

If you fail to either pay this debt to Medicare, or to fully resolve this matter within sixty (60) days of the date of this letter, Federal law authorizes Medicare to assess interest beginning with the date of this letter (42 U.S.C. § 1395y(b)(2)(B)(ii); 42 C.F.R. § 411.24(m)). Should interest become due, any payments made in satisfaction of this debt will be applied first to the amount of interest due, then to the principal.



Aside from the assessment of interest, your failure to respond within sixty (60) days of the date of this letter may also result in the initiation of additional recovery procedures by Medicare, the Department of Treasury, or the Department of Justice. The Debt Collection Improvement Act of 1996 requires Federal agencies to refer delinquent debts to the Department of the Treasury for cross-servicing action, including offset by the U.S. against any monies (including tax refunds) otherwise payable to the debtor.

Medicare may also determine that a GHP that fails to appropriately refund Medicare payments is nonconforming. The basis upon which CMS will make a determination of nonconformance is explained at 42 C.F.R. § 411.110, et seq. If a GHP is determined to be nonconforming, the Internal Revenue Service may impose a 25 percent excise tax on all health plan expenditures of employers and employee organizations that contribute to the health plan.

For further information regarding the Medicare program's rights of recovery and potential penalties for noncompliance, see 42 U.S.C. § 1395y(b) and 42 C.F.R. §§ 411.20-37, 411.100-206. If you have any questions concerning this matter, please write or call us at

MEDICARE SECONDARY PAYER RECOVERY CONTRACTOR
MSPRC/GHP
PO BOX 33829
DETROIT MI 48232-5829
Telephone Number: 1-866-677-7220
TTY/TDD: 1-866-677-7294

Sincerely,

Medicare Secondary Payer Recovery Contractor

Enclosures:
Summary of Payment Due by Beneficiary
Demand Summary
Medicare Paid Claim Summary

cc: PRINCEPAL LIFE

Note:    If the above-named insurer or TPA is not authorized to act on your behalf to resolve these debts, please notify us immediately.

# Medicare Paid Claim Summary

ReMAS Case ID: 20093460801G084

HIC: 075667999A
Total Part A Paid: $ 17503.52

Total Part B Paid: $ 8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Paid Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| 206326125205604 | 01/09/2006 | 01/11/2008 | 4776.22 | 565.83 | | | |
| 206326125240504 | 05/04/2006 | 05/04/2006 | 371.75 | 113.78 | | | |
| 20531801028801 | 11/09/2006 | 11/09/2006 | 1479.75 | 213.62 | | | |
| 207003038980 | 02/01/2006 | 02/01/2006 | 9926.01 | 8285.24 | | | |
| 207130024680 | 02/24/2006 | 02/26/2006 | 17276.60 | 8218.63 | | | |
| 207208002787 | 07/14/2007 | 07/14/2007 | 445.25 | 106.42 | | | |
| 071076517390 | 03/20/2006 | 03/20/2006 | 495.00 | 239.56 | | | |
| 45150628913018 | 02/12/2006 | 02/12/2006 | 143.00 | 73.59 | 1 | 495.00 | 239.56 |
| 451506292026780 | 05/19/2006 | 05/19/2006 | 158.00 | 76.26 | 1 | 143.00 | 73.53 |
| 451506348031050 | 12/13/2006 | 12/13/2006 | 200.00 | 121.90 | 1 | 158.00 | 76.26 |
| 451507010002060 | 01/05/2007 | 01/05/2007 | 80.00 | 40.22 | 1 | 200.00 | 121.90 |
| 451507028168730 | 01/24/2007 | 01/24/2007 | 140.00 | 48.62 | 1 | 80.00 | 40.22 |
| 451507095001340 | 04/02/2007 | 04/02/2007 | 140.00 | 44.83 | 1 | 140.00 | 48.62 |
| 451507129012550 | 04/30/2007 | 04/30/2007 | 80.00 | 40.22 | 1 | 140.00 | 44.83 |
| 451507157716670 | 05/31/2007 | 05/31/2007 | 120.00 | 48.62 | 1 | 80.00 | 40.22 |
| 451507183223850 | 06/28/2007 | 06/28/2007 | 10.00 | 5.00 | 1 | 120.00 | 48.62 |
| 451507213205570 | 07/26/2007 | 07/26/2007 | 100.00 | 33.86 | 1 | 10.00 | 5.00 |
| 451507221227110 | 06/21/2007 | 06/21/2007 | 142.00 | 68.34 | 1 | 100.00 | 33.86 |
| 451606184824050 | 05/19/2006 | 05/19/2006 | 115.00 | 43.75 | 1 | 142.00 | 68.34 |
| | | | | | 3 | 91.00 | 29.02 |
| | | | | | | 24.00 | 14.73 |
| 451606291802890 | 05/02/2006 | 05/02/2006 | 165.04 | 132.83 | 1 | 166.04 | 132.83 |
| 452206009417280 | 01/04/2006 | 01/04/2006 | 169.42 | 32.76 | 1 | 169.42 | 32.76 |
| 452205019460660 | 01/11/2006 | 01/11/2006 | 401.70 | 199.78 | 1 | 401.70 | 199.78 |

# Medicare Paid Claim Summary

ReMAS Case ID: 200934609016064

HIC: 075567936A
Total Part A Paid: $ 17503.52

| DCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| 45320620229960 | 03/21/2006 | 03/21/2006 | 200.00 | 95.82 | 1 | 200.00 | 95.82 |
| 45320620229970 | 05/23/2006 | 05/23/2006 | 200.00 | 95.82 | 1 | 200.00 | 95.82 |
| 45206520029980 | 06/19/2006 | 06/19/2006 | 120.00 | 41.15 | 1 | 120.00 | 41.15 |
| 452062002300070 | 07/14/2006 | 07/14/2006 | 75.00 | 41.97 | 1 | 75.00 | 41.97 |
| 45206206206410 | 07/18/2006 | 07/18/2006 | 423.00 | 163.61 | 1 / 2 / 3 | 198.00 / 150.00 / 75.00 | 70.25 / 45.36 / 48.00 |
| 452062402191130 | 08/15/2006 | 08/15/2006 | 75.00 | 41.97 | 1 | 75.00 | 41.97 |
| 45206244155350 | 03/31/2006 | 03/31/2006 | 160.00 | 77.40 | 1 | 160.00 | 77.40 |
| 4532062354249720 | 08/30/2006 | 08/30/2006 | 423.00 | 163.61 | 1 / 2 / 3 | 75.00 / 198.00 / 150.00 | 48.00 / 70.25 / 45.36 |
| 4532062626262570 | 09/13/2006 | 09/13/2006 | 75.00 | 41.97 | 1 | 75.00 | 41.97 |
| 4532065271292960 | 02/01/2006 | 02/01/2006 | 2527.00 | 533.91 | 1 / 2 / 3 / 4 | 1400.00 / 515.00 / 419.00 / 183.00 | 382.13 / 42.60 / 85.52 / 23.66 |
| 452062712929860 | 03/07/2006 | 03/07/2006 | 150.00 | 45.36 | 1 | 150.00 | 45.36 |
| 452062712930590 | 02/25/2006 | 02/25/2006 | 655.00 | 207.57 | 1 | 655.00 | 207.57 |
| 452062712930190 | 05/26/2006 | 05/26/2006 | 1248.00 | 148.41 | 1 / 2 / 3 | 198.00 / 150.00 / 900.00 | 70.25 / 45.36 / 32.80 |
| 452062371411470 | 10/17/2006 | 10/17/2006 | 120.00 | 65.84 | 1 | 120.00 | 65.84 |
| 452062371223470 | 11/07/2006 | 11/07/2006 | 486.00 | 203.61 | 1 | 198.00 | 70.25 |

# Medicare Paid Claim Summary

ReMAS Case ID: 20093460801606 4

HIC: 075867939A
Total Part A Paid: $ 17503.52
Total Part B Paid: $ 8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| 45220634093129 10 | 12/07/2006 | 12/07/2006 | 110.00 | 47.97 | 2 | 150.00 | 45.36 |
|  |  |  |  |  | 3 | 138.00 | 88.00 |
| 45220701078381 0 | 11/08/2006 | 11/08/2006 | 271.00 | 77.72 | 1 | 271.00 | 77.72 |
|  |  |  |  |  | 2 | 83.00 | 30.80 |
|  |  |  |  |  |  | 27.00 | 17.17 |
| 45220701616231 0 | 03/31/2006 | 03/31/2006 | 423.00 | 163.61 | 1 | 198.00 | 70.25 |
|  |  |  |  |  | 2 | 150.00 | 45.36 |
|  |  |  |  |  | 3 | 75.00 | 48.00 |
| 45220704780770 0 | 02/05/2007 | 02/05/2007 | 486.00 | 199.12 | 1 | 198.00 | 68.78 |
|  |  |  |  |  | 2 | 150.00 | 42.34 |
|  |  |  |  |  | 3 | 138.00 | 88.00 |
| 45220707552232 0 | 03/07/2007 | 03/07/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 45220720558274 0 | 07/14/2007 | 07/14/2007 | 607.00 | 168.23 | 1 | 174.00 | 48.55 |
|  |  |  |  |  | 2 | 433.00 | 119.68 |
| 45220712770760 | 11/27/2005 | 11/27/2005 | 3256.00 | 888.41 | 1 | 3256.00 | 888.41 |
| 45220723866565 00 | 05/09/2007 | 05/09/2007 | 1108.00 | 210.02 | 1 | 1108.00 | 210.02 |
| 45280621443991 0 | 01/18/2006 | 01/18/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45280621443992 0 | 02/16/2006 | 02/16/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45280621443993 0 | 03/15/2006 | 03/15/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45280621443994 0 | 04/10/2006 | 04/10/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45280621443995 0 | 05/02/2006 | 05/02/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45280621443996 0 | 06/29/2006 | 06/29/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 45280625047667 0 | 01/11/2006 | 01/11/2006 | 279.37 | 64.89 | 1 | 273.37 | 64.89 |
| 45280626094271 90 | 09/20/2006 | 09/20/2006 | 244.00 | 42.13 | 1 | 273.37 | 64.89 |



Medicare Paid Claim Summary

ReMAS Case ID: 2009346DB016034

HIC: 075567939A

Total Part A Paid: $ 17503.52

Total Part B Paid: $ 8908.19

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| | | | | | 1 | 21.88 | 3.77 |
| | | | | | 2 | 17.82 | 7.89 |
| | | | | | 3 | 41.87 | 7.23 |
| | | | | | 4 | 45.93 | 7.93 |
| | | | | | 5 | 36.50 | 6.31 |
| 452062903718930 | 10/06/2006 | 10/06/2006 | 506.00 | 194.41 | 1 | 75.00 | 48.00 |
| | | | | | 2 | 83.00 | 30.90 |
| | | | | | 3 | 198.00 | 70.25 |
| | | | | | 4 | 150.00 | 45.36 |
| 452807031078850 | 01/24/2007 | 01/24/2007 | 345.00 | 143.42 | 1 | 345.00 | 143.42 |
| 452807057185900 | 02/15/2007 | 02/15/2007 | 337.75 | 50.84 | 1 | 78.25 | 14.77 |
| | | | | | 2 | 149.50 | 12.60 |
| | | | | | 3 | 110.00 | 23.47 |
| 452807057282680 | 02/12/2007 | 02/12/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452807061582950 | 01/29/2007 | 01/29/2007 | 115.00 | 73.49 | 1 | 115.00 | 73.49 |
| 452807082739410 | 03/21/2007 | 03/21/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452807099652850 | 03/28/2007 | 03/28/2007 | 1125.00 | 249.38 | 1 | 600.00 | 119.05 |
| | | | | | 2 | 300.00 | 53.67 |
| | | | | | 3 | 225.00 | 76.66 |
| 452807109785320 | 04/17/2007 | 04/17/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 452807129010930 | 04/26/2007 | 04/26/2007 | 486.00 | 199.12 | 1 | 198.00 | 68.78 |
| | | | | | 2 | 150.00 | 42.34 |
| | | | | | 3 | 138.00 | 88.00 |
| 452807135113860 | 05/09/2007 | 05/09/2007 | 1005.00 | 412.31 | 1 | 165.00 | 71.94 |
| | | | | | 2 | 174.00 | 90.72 |
| | | | | | 3 | 666.00 | 249.65 |
| 452807164057150 | 06/08/2007 | 06/08/2007 | 583.00 | 188.58 | 1 | 165.00 | 71.94 |
| | | | | | 2 | 200.00 | 76.23 |

# Medicare Paid Claim Summary

ReMAS Case ID: 200934608016064

HIC: 075667939A
Total Part A Paid: $    17503.52

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| | | | | | | 8.00 | 2.23 |
| | | | | | | 10.00 | 0.06 |
| | | | | | | 200.00 | 39.12 |
| 4528071788759520 | 06/26/2007 | 06/26/2007 | 75.00 | 47.45 | 3 4 5 | 75.00 | 47.45 |
| 4528080440012380 | 07/02/2007 | 07/02/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4528080404448670 | 06/04/2007 | 06/04/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4528080444048680 | 07/31/2007 | 07/31/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4528060338888910 | 01/06/2006 | 01/06/2006 | 161.00 | 65.84 | 1 | 161.00 | 65.84 |
| 4528062490514420 | 02/01/2006 | 02/01/2006 | 561.00 | 154.05 | 1 | 561.00 | 154.05 |
| 4529063054365520 | 08/28/2006 | 08/28/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 4529063054365520 | 09/27/2006 | 09/27/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 4529063398463320 | 11/20/2006 | 11/20/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 4528063617112850 | 12/18/2006 | 12/18/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 4529070040159990 | 12/28/2006 | 12/28/2006 | 120.00 | 77.40 | 1 | 120.00 | 77.40 |
| 4528070101398560 | 01/04/2007 | 01/04/2007 | 1150.00 | 260.60 | 1 | 1150.00 | 260.60 |
| 4528070101398860 | 01/04/2007 | 01/04/2007 | 250.00 | 62.72 | 1 | 250.00 | 62.72 |
| 4529070103862310 | 06/27/2006 | 06/27/2006 | 150.00 | 120.00 | 1 | 150.00 | 120.00 |
| 4529070302104410 | 01/16/2007 | 01/16/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4528070370485600 | 02/01/2007 | 02/01/2007 | 175.00 | 73.49 | 1 | 175.00 | 73.49 |
| 4529070441976300 | 07/27/2006 | 07/27/2006 | 100.00 | 41.97 | 1 | 100.00 | 41.97 |
| 4529070510761100 | 02/15/2007 | 02/15/2007 | 106.00 | 50.45 | 1 | 100.00 | 47.45 |

Total Part B Paid: $    8908.19

# Medicare Paid Claim Summary

ReMAS Case ID: 2009346080160G4

HIC: 075567939A

Total Part A Paid: $ 175C3.52

Total Part B Paid: $ 8908.19

Page 6 of 6

| CCN or DCN | From Date | To Date | Total Submitted Claim Charge ($) | Total Claim Paid ($) | Part B Line No. | Total Submitted Line Charge ($) | Part B Line Paid ($) |
|---|---|---|---|---|---|---|---|
| | | | | | | 6.00 | 3.00 |
| 45290710714B150 | 04/04/2007 | 04/04/2007 | 100.00 | 47.45 | 2 | 100.00 | 47.45 |
| 45290711003G2.10 | 04/18/2007 | 04/18/2007 | 1125.00 | 56.00 | 1 2 3 | 600.00 300.00 225.00 | 37.53 15.43 3.04 |
| 45290713G194270 | 05/02/2007 | 05/02/2007 | 181.00 | 71.94 | 1 | 181.00 | 71.94 |
| 45290714216T190 | 05/17/2007 | 05/17/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 4529071G5972360 | 06/12/2007 | 06/12/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 45290717028GG00 | 06/12/2007 | 06/12/2007 | 259.50 | 36.07 | 1 2 | 149.50 110.00 | 12.60 23.47 |
| 45290719817540O | 07/13/2007 | 07/13/2007 | 100.00 | 47.45 | 2 | 100.00 | 47.45 |
| 45290720006G1630 | 07/16/2007 | 07/16/2007 | 100.00 | 47.45 | 1 | 100.00 | 47.45 |
| 45290720501920O | 07/21/2007 | 07/21/2007 | 80.00 | 47.45 | 1 | 80.00 | 47.45 |
| 453107053005910 | 02/15/2007 | 02/15/2007 | 140.00 | 48.62 | 1 | 140.00 | 48.62 |
| 4532063101584G0 | 10/25/2006 | 10/25/2006 | 181.00 | 65.84 | 1 | 181.00 | 65.84 |

# Demand Summary

12/31/2009

Debt Identification Number: I12180974143

Type of MSP Situation: Disabled

Health Insurance Claim Number (HICN): 075567939A
Beneficiary Name: KATHERINE SHILEY
   Date of Birth: 03/16/1961

Coverage Begin Date: 01/01/2005
   Coverage End Date: 07/31/2007

Reason for Entitlement:
Beneficiary entitled due to disability

Primary Payer Name: PRINCEPAL LIFE
            Address: 711 HIGH ST
                     DES MOINES IL 50392

Group Identification:
Patient Policy Identification: 451391295
Subscriber Name: CHRIS SHILEY

Employer Name:    DELFASCO INC
Employer Address: PO BOX 10527
                  WILMINGTON DE 19850-0527

## Summary of Medicare Reimbursement

## Part A Total Claims:6

Part A Total Amount Charged: $34,275.33
Part A Total Reimbursement Amount: $17,503.52
Part A Repayment Amount Due: $17,503.52

## Part B Total Claims:87

Part B Total Billed Amount: $27,998.78
Part B Total Paid Amount: $8,908.19
Part B Repayment Amount Due: $8,908.19

## Total Repayment Amount Due: $26,411.71
## Interest Rate: 10.875%

MSPRC Tax Identification Number: 52-0883104

Please ensure that the HICN listed on the summary sheet is referenced
on your check.

Make your check out to: MEDICARE

   Send your check to: MSPRC/GHP
                       PO BOX 33829
                       DETROIT MI 48232-5829



# Summary of Payment Due by Beneficiary

Demand Case ID: 200934608016064

Insurer/TPA name: PRINCEPAL LIFE
Employer name: DELFASCO INC

Total Amount Due: $26,411.71

| HICN | BENEFICIARY NAME | REPAYMENT AMOUNT DUE $ PART A | $ PART B | TOTAL AMOUNT $ DUE |
|------|------------------|-------------------------------|----------|--------------------|
| O75567939A | KATHERINE SHILEY | 17,503.52 | 8,908.19 | 26,411.71 |

CBCS1

## OSHA VIOLATIONS

**None.**

**TAXES**

**Delfasco, Inc.**

**Schedule 5.12 Taxes**

Delfasco has paid all taxes required to be paid and is not overdue for filing tax returns. There are no liens from any taxing authority on the assets of the business. Adequate reserves are maintained of Deferred taxes for the depreciation timing differences between the book and tax methods. Also, no tax return is currently under audit by any taxing authority, and no notice of an audit or examination has been received by Delfasco.

# LITIGATION

Schedule 5.13 – Litigation

The only action is the Chapter 11 filing by Delfasco, Inc.

**INSURANCE**

# Delfasco, Inc.

## Schedule 5.14

## List of Insurance Policies 4-5-10

| Company | Policy No. | Policy Description | Premium - Monthly | |
|---|---|---|---|---|
| Broker: Mauzy & Associates, for Liberty Mutual Insurance Co. | WC8275689 | Worker's Comp. - Corp, Tenn., Texas | $ | 1,868 |
| Broker: Mauzy & Associates, for Liberty Mutual Insurance Co. | CBP9702321 | Texas: Commercial - all risk coverage on bldgs & contents, including crime, inland marine & liability | $ | 140 |
| Broker: Mauzy & Associates, for Liberty Mutual Insurance Co. | BA9702021 | Auto - Tenn | $ | 297 |
| Broker: Mauzy & Associates, for Liberty Mutual Insurance Co. | CBP9701921 | Corp/Tenn. Commercial - all risk coverage on bldgs & contents, including crime, inland marine & liability | $ | 2,488 |
| Broker: Mauzy & Associates, for Liberty Mutual Insurance Co. | CU9702221 | Commercial Umbrella - limit $10mil | $ | 1,440 |
| BlueCross BlueShield of Delaware | 106808 | Health Insurance - Corporate employees and Mark Benko | $ | 8,213 |
| Corporate Systems Administration - Company Self Insured system | 0061 | Health, Life - Tenn. employees | $ | 60,463 |
| Ft. Dearborn Life Insurance Company | FHM905414 | Life, Accident, Long Term Disability - All Salary Employees | $ | 897 |
| **Employee Self- Paid Insurance Policies:** | | | | |
| Mutual of Omaha | G0008901 | Life and Disability | $ | 1,469 |
| Madison National Life Insurance Company | GP00600777 (not a duplicate #) | Life - 2 people on policy | $ | 37 |
| Life Insurance of Alabama | GP00600777 (not a duplicate #) | Cancer, Whole Life, Heart, Accident | $ | 1,130 |
| AFLAC | K7600 | Life, Accident, Cancer, Short Term Disability, Specified Health Event | $ | 1,225 |

**Note:**

We pay 30% of total premium for Mauzy & Associates in April, and pay the remaining balance over the next 9 months.

**WARRANTY CLAIMS**

Schedule 5.15 Warranty Claims

No current warranty issues nor any claims for past five years but do have product that is still under warranty.

Typical Warranty language – BDU-33 Practice Bomb Contract. W52P1J-08-C-0052

I-89 52.246-17 WARRANTY OF SUPPLIES OF A NON-COMPLEX NATURE JUN/2003

(a) Definitions. As used in this clause--

Acceptance means the act of an authorized representative of the Government by which the Government assumes for itself, or as an agent

of another, ownership of existing supplies, or approves specific services as partial or complete performance of the contract.

Supplies means the end items furnished by the Contractor and related services required under the contract. The word does not include

data.

(b) Contractors obligations.

(1) Notwithstanding inspection and acceptance by the Government of supplies furnished under this contract, or any condition of this

contract concerning the conclusiveness thereof, the Contractor warrants that for 1,095 days after acceptance

(i) All supplies furnished under this contract will be free from defects in material or workmanship and will conform with all

requirements of this contract; and

(ii) The preservation, packaging, packing, and marking, and the preparation for, and method of, shipment of such supplies will

conform with the requirements of this contract.

(2) When return, correction, or replacement is required, transportation charges and responsibility for the supplies while in transit

shall be borne by the Contractor. However, the Contractors liability for the transportation charges shall not exceed an amount equal to

the cost of transportation by the usual commercial method of shipment between the place of delivery specified in this contract and the

Contractors plant, and return.

(3) Any supplies or parts thereof, corrected or furnished in replacement under this clause, shall also be subject to the terms of

this clause to the same extent as supplies initially delivered. The warranty, with respect to supplies or parts thereof, shall be equal

in duration to that in paragraph (b)(1) of this clause and shall run from the date of delivery of the corrected or replaced supplies.

(4) All implied warranties of merchantability and fitness for a particular purpose are excluded from any obligation contained in this

contract.

(c) Remedies available to the Government.

(1) The Contracting Officer shall give written notice to the Contractor of any breach of warranties in paragraph (b)(1) of this

clause within 120 days after discovery of defects.

(2) Within a reasonable time after the notice, the Contracting Officer may either --

(i) Require, by written notice, the prompt correction or replacement of any supplies or parts thereof (including preservation,

packaging, packing, and marking) that do not conform with the requirements of this contract within the meaning of paragraph (b)(1) of
this clause; or

(ii) Retain such supplies and reduce the contract price by an amount equitable under the circumstances.

(3)(i) If the contract provides for inspection of supplies by sampling procedures, conformance of supplies or components subject to
warranty action shall be determined by the applicable sampling procedures in the contract. The Contracting Officer --

(A) May, for sampling purposes, group any supplies delivered under this contract;

(B) Shall require the size of the sample to be that required by sampling procedures specified in the contract for the quantity of
supplies on which warranty action is proposed;

(C) May project warranty sampling results over supplies in the same shipment or other supplies contained in other shipments even
though all of such supplies are not present at the point of reinspection; provided, that the supplies remaining are reasonably
representative of the quantity on which warranty action is proposed; and

(D) Need not use the same lot size as on original inspection or reconstitute the original inspection lots.

(ii) Within a reasonable time after notice of any breach of the warranties specified in paragraph (b)(1) of this clause, the
Contracting Officer may exercise one or more of the following options:

(A) Require an equitable adjustment in the contract price for any group of supplies.

(B) Screen the supplies grouped for warranty action under this clause at the Contractors expense and return all nonconforming
supplies to the Contractor for correction or replacement.

(C) Require the Contractor to screen the supplies at locations designated by the Government within the contiguous United States
and to correct or replace all nonconforming supplies.

(D) Return the supplies grouped for warranty action under this clause to the Contractor (irrespective of the f.o.b. point or the
point of acceptance) for screening and correction or replacement.

(4)(i) The Contracting Officer may, by contract or otherwise, correct or replace the nonconforming supplies with similar supplies
from another source and charge to the Contractor the cost occasioned to the Government thereby if the Contractor --

(A) Fails to make redelivery of the corrected or replaced supplies within the time established for their return; or

(B) Fails either to accept return of the nonconforming supplies or fails to make progress after their return to correct or
replace them so as to endanger performance of the delivery schedule, and in either of these circumstances does not cure such failure
within a period of 10 days (or such longer period as the Contracting Officer may authorize in writing) after receipt of notice from the
Contracting Officer specifying such failure.

(ii) Instead of correction or replacement by the Government, the Contracting Officer may require an equitable adjustment of the
contract price. In addition, if the Contractor fails to furnish timely disposition instructions, the Contracting Officer may dispose of
the nonconforming supplies for the Contractors account in a reasonable manner. The Government is entitled to reimbursement from the
Contractor, or from the proceeds of such disposal, for the reasonable expenses of the care and disposition of the nonconforming
supplies, as well as for excess costs incurred or to be incurred.

(5) The rights and remedies of the Government provided in this clause are in addition to and do not limit any rights afforded to the
Government by any other clause of this contract.
(End of Clause)

## SCHEDULE 5.16

### RECENT ACTIVITIES

**None.**

**REAL PROPERTY**

**Schedule 5.18 Real Property Description**

**DELFASCO OF TENNESSEE - BUILDING AND GROUNDS**

The legal description of the Tennessee real property is:

Prop Type: 08; Dist:13; Map no.: 075-; CTL MAP: 075-; Parcel: 023.00; S/I: 000; City: 311

PROPERTY CONSIST OF 11.98 ACRES COMERCIAL/INDUSTRIAL

ORIGINAL BUILDING CONSISTING OF 47000 SQ. FT. BUILT 1992

ADDITION CONSISTING OF 37,550 SQ. FT. BUILT 1996

1568 SQ. FT. OF INDOOR OFFICE SPACE

4500 SQ. FT. BREAK AREA AND RESTROOM (HEATED AND COOLED)

2400 SQ. FT. DETACHED OFFICE SPACE

PARTIALLY FENCED WITH PAVED PARKING

The Delaware division has no real property – the office is leased.

SCHEDULE 5.19

**ENVIRONMENTAL MATTERS**

Schedule 5.19 Environmental Matters 4-5-10 (See note on page 3)

    1.1.    Environmental Matters. Except as set forth on Schedule 5.19:

    (a)    No methylene chloride or asbestos is contained in or has been used at or released from the Facilities;

    Correct.

    (b)    All Hazardous Materials and wastes have been disposed of in accordance with all Environmental and Safety Laws;

    Using the definition of a Hazardous Material as:

    "A hazardous substance or material is any solid, liquid, or gas that can harm people, other living organisms, property, or the environment. Hazardous materials may be radioactive, flammable, explosive, toxic, corrosive, carcinogenic, mutagenic, biohazardous, an oxidizer, an asphyxiant, a pathogen, an allergen, or may have other characteristics that render it hazardous in specific circumstances."

    As a manufacturing facility we have numerous Hazardous Materials. Primarily these consist of paints, solvents phosphating chemicals and oils/waxes. However there are also many small quantity items (such as WD-40, steel blue, etc.). These are normal and routine chemicals that are used in the day-to-day operations. All wastes from these chemicals are disposed of in accordance with State and Federal laws using Special Waste permits where applicable.

    Delfasco was issued a hazardous waste permit to dispose of some obsolete paint and primer products in the late 90s. We did a one-time shipment of this paint through a company called Safety-Kleen since we can't dispose of liquid paints under our special waste permits. Once we were sure there would be no other obsolete paint generated we surrendered the permit. The surrender letter is a separate document identified as 5.19 -1

    (c)    Seller has received no notice (verbal or written) of any noncompliance of the Facilities or its past or present operations with Environmental and Safety Laws;

    We have received three in the previous ten years. Two were for failure to submit timely reports and one was for a cleaning practice we were doing at one time.

    In the case of the notices for failure to submit timely reports the agency rescinded the notices when Delfasco produced our copies of the certified mail receipts showing they had received the reports in a timely manner.

In the instance involving the cleaning practice resulted in the issuance of a warning letter from the Tennessee Department of Environment and Conservation and the matter was subsequently closed. This letter stated:

"Based on the fact that there were several mitigating circumstances surrounding the cited violations, that there were no repeat violations, that the facility returned to full compliance by the follow-up inspection, and that the company's positive actions, and procedures demonstrate a strong intent to prevent similar violations in the future, further enforcement action is not warranted at the present time."

(d) No notices, administrative actions or suits are pending or, to Seller's Knowledge, threatened relating to a violation of any Environmental and Safety Laws;

Correct.

(e) Seller is not a potentially responsible party under CERCLA, or state analog statute, arising out of events occurring prior to the Closing Date;

The properties associated with Delfasco Tennessee Division are not a potentially responsible party under CERCLA.

(f) There have not been in the past, and are not now, any Hazardous Materials on, under or migrating to or from the Facilities or Real Property;

(See answer to 5.19(b) above)

Additionally, none of these substances are under or migrating to/from the facilities. All Hazardous Materials are used in accordance with their intended uses in compliance with all safety and environmental laws and their disposal is in accordance with state and federal environmental laws.

(g) There have not been in the past, and are not now, any underground tanks or underground improvements at, on or under the Real Property including without limitation, treatment or storage tanks, sumps, or water, gas or oil wells;

As our facility is located below the city's sanitary sewer line, we have a 1,500 gallon sewage pump station. This is also used as part of our spill prevention system. This sump station was designed with the input of the local Water Department personnel to ensure any accidental spills within the plant were prevented from entering the sewer system. The sump and its pumps are maintained regularly and inspected monthly.

(h) There are no PCBs deposited, stored, disposed of or located on the Real Property or Facilities or any equipment on the Real Property containing PCBs at levels in excess of 50 parts per million;

Correct.

(i)     There is no formaldehyde on the Real Property or in the Facilities, nor any insulating material containing urea formaldehyde in the Facilities;

Correct.

(j)     The Facilities and Seller's uses and activities therein have at all times complied with all Environmental and Safety Laws; and

> To the best of our knowledge all uses and activities at our facility have complied with environmental and safety laws.

(k)     Seller has all the permits and licenses required to be issued under applicable Environmental and Safety Laws and is in full compliance with the terms and conditions of those permits and licenses.

Correct.

NOTE: A new Phase I Environmental Site Assessment Report was completed with no findings on March 10, 2010 and a copy was supplied to Jack Goldenberg.

*Delfasco*

P.O. BOX 725, GREENEVILLE, TENNESSEE 37744-0725 • 1945 SCOTT FARM ROAD, AFTON, TENNESSEE 37616
EST. 1950

February 3, 2004

Mr. Dennis Woodson
Tennessee Department of Environment
        and Conservation
Division of Solid Waste Management (DSWM)
401 Church Street
5th Floor, L & C Annex
Nashville, Tennessee 37243

**RE:    Deactivation of EPA ID Number
        Delfasco of Tennessee
        Greenville, Tennessee (TND987788494)**

Dear Mr. Woodson:

Delfasco of Tennessee in Greenville, Tennessee no longer generates hazardous waste from its
metal fabrication operation. By means of this correspondence, we request that you deactivate
our EPA ID number and remove us from the Division's database of hazardous waste generators.
We hope that this information is sufficient for your needs.

If you need more information or have any questions, please call either Amy Spann of EnSafe at
255-9300, or me. We appreciate your help in this matter.

Sincerely,

Mark W. Benko
Vice President/General Manager

Enclosures

FINANCIAL STATEMENTS

**CONSOLIDATED**

| | FEB 2010 | DEC 2009 | FEB 2009 |
|---|---|---|---|
| **ASSETS** | | | |
| | | | |
| **CURRENT ASSETS** | | | |
| Cash | 2,289,011 | 1,328,543 | 1,464,590 |
| Accounts receivable - Tenn Div. | 980,254 | 1,524,816 | 1,778,223 |
| Accounts receivable - Forge Div. | - | | 312,170 |
| Accounts receivable - Other | 4,425 | 4,697 | 60,364 |
| Inventory - Tenn Div. | 1,112,743 | 1,322,646 | 1,715,596 |
| Prepaid expenses | 11,505 | 97,944 | 104,964 |
| Prepaid dies & preparation costs | - | | 22,067 |
| Prepaid income taxes | 13,014 | 13,014 | 15,880 |
| **TOTAL CURRENT ASSETS** | 4,410,953 | 4,291,661 | 5,473,855 |
| | | | |
| **PROPERTY AND EQUIPMENT** | | | |
| Land | 109,780 | 109,780 | 109,780 |
| Buildings and Improvements | 2,407,822 | 2,407,822 | 2,407,822 |
| Equipment and fixtures | 6,191,978 | 6,191,978 | 6,149,565 |
| Depreciation allowance | (6,920,881) | (6,863,431) | (6,591,297) |
| Construction in Progress | - | | |
| **TOTAL PROPERTY AND EQUIPMENT** | 1,788,699 | 1,846,149 | 2,075,870 |
| | | | |
| **OTHER ASSETS** | | | |
| Deferred loan cost | - | | |
| Investment in affiliates | - | | |
| Miscellaneous | - | | |
| **TOTAL OTHER ASSETS** | - | - | - |
| | | | |
| | | | |
| **TOTAL ASSETS** | 6,199,663 | 6,137,810 | 7,549,725 |

| | FEB 2010 | DEC 2009 | FEB 2009 |
|---|---|---|---|
| **LIABILITIES AND STOCKHOLDERS' EQUITY** | | | |
| | | | |
| **CURRENT LIABILITIES** | | | |
| Accounts payable - Trade - Postpetition | 198,834 | 236,172 | 524,104 |
| Accounts payable - Trade - Prepetition | 1,580,149 | 1,580,149 | 1,580,168 |
| Accounts payable - Other and accrued expenses | 1,281,417 | 1,218,076 | 819,581 |
| Total Accounts payable and accrued expenses | 3,060,400 | 3,034,397 | 2,923,853 |
| | | | |
| **Accrued interest** | - | | |
| Employee compensation | 48,092 | 51,414 | 52,765 |
| Accrued warranty expense - current | - | | |
| Line of credit | - | | |
| Income tax provision | (482,628) | (496,308) | (118,010) |
| **TOTAL CURRENT LIABILITIES** | 2,625,864 | 2,589,503 | 2,858,608 |
| | | | |
| **LONG-TERM LIABILITIES** | | | |
| Deferred income taxes | 239,604 | 239,604 | 239,604 |
| Accrued warranty expense | - | | |
| Subordinated notes | - | | |
| Loss in excess of investment in affiliates | - | | |
| **TOTAL LONG-TERM LIABILITIES** | 239,604 | 239,604 | 239,604 |
| | | | |
| **TOTAL LIABILITIES** | 2,865,468 | 2,829,107 | 3,098,212 |
| | | | |
| **INTERCOMPANY TRANSFERS** | - | | |
| **PREFERRED STOCK** | - | | |
| | | | |
| **STOCKHOLDERS' EQUITY** | | | |
| Common stock | 1 | 1 | 1 |
| Additional paid-in capital, common stock | 1,018,403 | 1,018,403 | 1,018,403 |
| Retained earnings | 2,315,781 | 2,290,300 | 3,433,109 |
| | 3,334,184 | 3,308,703 | 4,451,513 |
| | | | |
| **TOTAL EQUITY** | 3,334,184 | 3,308,703 | 4,451,513 |
| | | | |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | 6,199,653 | 6,137,810 | 7,549,725 |

**BALANCE SHEETS**
**DELFASCO, INC.**
**TWO MONTHS ENDED FEBRUARY 28, 2010**

DIVISION DETAIL

| | CORP<br>FEB<br>2010 | TENN<br>FEB<br>2010 | TX<br>FEB<br>2010 |
|---|---|---|---|
| **ASSETS** | | | . |
| **CURRENT ASSETS** | . | | |
| Cash | 2,281,640 | 7,372 | - |
| Accounts receivable - Tenn Div. | | 980,254 | |
| Accounts receivable - Forge Div. | | | - |
| Accounts receivable - Other | 2,380 | 2,045 | - |
| Inventory - Tenn Div. | | 1,112,743 | |
| Prepaid expenses | 4,723 | 6,783 | - |
| Prepaid dies & preparation costs | | - | - |
| Prepaid income taxes | 13,014 | | |
| **TOTAL CURRENT ASSETS** | 2,301,756 | 2,109,197 | - |
| **PROPERTY AND EQUIPMENT** | | | |
| Land | | 53,948 | 66,832 |
| Buildings and improvements | | 2,169,472 | 238,350 |
| Equipment and fixtures | 150,207 | 6,041,771 | - |
| Depreciation allowance | (138,509) | (6,591,008) | (191,364) |
| Construction in Progress | - | - | - |
| **TOTAL PROPERTY AND EQUIPMENT** | 11,698 | 1,674,183 | 102,818 |
| **OTHER ASSETS** | | | |
| Deferred loan cost | - | | |
| Investment in affiliates | - | | |
| Miscellaneous | | - | |
| **TOTAL OTHER ASSETS** | - | - | - |
| **TOTAL ASSETS** | 2,313,454 | 3,783,380 | 102,818 |

**BALANCE SHEETS**
**DELFASCO, INC.**
**TWO MONTHS ENDED FEBRUARY 28, 2010**

DIVISION DETAIL

|  | CORP FEB 2010 | TENN FEB 2010 | TX FEB 2010 |
|---|---|---|---|
| **LIABILITIES AND STOCKHOLDERS' EQUITY** |  |  |  |
|  |  |  |  |
| **CURRENT LIABILITIES** |  |  |  |
| Accounts payable - Trade - Postpetition | 5,931 | 192,903 | - |
| Accounts payable - Trade - Prepetition | 4,757 | 689,513 | 885,879 |
| Accounts payable - Other and accrued expenses | 1,205,636 | 75,781 | (0) |
| Total Accounts payable and accrued expenses | 1,216,324 | 958,197 | 885,879 |
|  |  |  |  |
| **Accrued Interest** | - |  |  |
| Employee compensation | 19,943 | 28,149 | - |
| Accrued warranty expense - current | - | - | - |
| Line of credit | - |  |  |
| Income tax provision | (482,628) | - | - |
| **TOTAL CURRENT LIABILITIES** | 753,639 | 986,346 | 885,879 |
|  |  |  |  |
| **LONG-TERM LIABILITIES** |  |  |  |
| Deferred income taxes | 239,604 |  |  |
| Accrued warranty expense | - |  |  |
| Subordinated notes | - |  |  |
| Loss in excess of Investment in affiliates | - |  |  |
| **TOTAL LONG-TERM LIABILITIES** | 239,604 | - | - |
|  |  |  |  |
| **TOTAL LIABILITIES** | 993,243 | 986,346 | 885,879 |
|  |  |  |  |
| **INTERCOMPANY TRANSFERS** | (2,013,973) | 2,797,034 | (783,061) |
| **PREFERRED STOCK** | - |  |  |
|  |  |  |  |
| **STOCKHOLDERS' EQUITY** |  |  |  |
| Common stock | 1 |  |  |
| Additional paid-in capital, common stock | 1,018,403 |  |  |
| Retained earnings | 2,315,781 | 0 | - |
|  | 3,334,184 | 0 | - |
|  |  |  |  |
| **TOTAL EQUITY** |  |  |  |
|  |  |  |  |
| **TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY** | 2,313,454 | 3,783,380 | 102,818 |

**STATEMENT OF OPERATIONS - CONSOLIDATED**
**DELFASCO, INC.**
**TWO MONTHS ENDED FEBRUARY 28, 2010**

| | 2010 | | 2009 | |
|---|---|---|---|---|
| **REVENUE:** | | | | |
| Net sales | 1,723,966 | | 3,010,774 | |
| Commissions | - | | 25,186 | |
| Sundry, net of expenses | 6,501 | | 4,469 | |
| **TOTAL REVENUE** | 1,730,467 | 100.00% | 3,040,429 | 100.00% |
| | | | | |
| **COST AND EXPENSES:** | | | | |
| Cost of goods sold | 1,361,272 | 78.67% | 2,874,955 | 94.55% |
| | | | | |
| Selling, administrative, and general before special fees | 206,300 | | 250,199 | |
| Add: Professional fees | 120,414 | | 210,327 | |
| Add: U.S. Trustee fees | - | | | |
| Total Selling, administrative, and general | 326,714 | 18.88% | 460,526 | 15.15% |
| | | | | |
| Interest on operations | - | 0.00% | | 0.00% |
| Amortization | - | 0.00% | | 0.00% |
| **TOTAL COSTS AND EXPENSES** | 1,687,986 | 97.55% | 3,335,481 | 109.70% |
| | | | | |
| INCOME BEFORE OTHER INCOME (EXPENSE) AND INCOME TAXES | 42,481 | 2.45% | (295,052) | -9.70% |
| | | | | |
| **OTHER INCOME (EXPENSE)** | | | | |
| Expense allocation to plants | - | 0.00% | | 0.00% |
| Gain/(Loss) on sale of assets | - | 0.00% | | 0.00% |
| Grand Prairie remediation | - | 0.00% | | 0.00% |
| Subordinated notes payable interest | - | 0.00% | | 0.00% |
| Income/(Loss) from investment in affiliates | - | 0.00% | | 0.00% |
| TOTAL OTHER INCOME (EXPENSE) | - | 0.00% | - | 0.00% |
| | | | | |
| INCOME BEFORE INCOME TAXES | 42,481 | 2.45% | (295,052) | -9.70% |
| | | | | |
| PROVISION FOR INCOME TAXES | 17,000 | 0.98% | (118,010) | -3.88% |
| | | | | |
| **NET INCOME** | 25,481 | 1.47% | (177,042) | -5.82% |

**DELFASCO, INC.**
**STATEMENT OF CASH FLOWS**
**TWO MONTHS ENDED FEBRUARY 28, 2010**

|  | 2010 | 2009 |
|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Cash received from customers | 2,275,301 | 1,825,651 |
| Cash paid to suppliers and employees | (1,311,512) | (2,211,655) |
| Interest paid | - | |
| Income taxes (paid) refunded | (3,320) | 25,000 |
| Net Cash Provided by (used for) Operating Activities | 960,468 | (361,005) |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of property and equipment | - | (3,400) |
| Proceeds from sale of property | | |
| Cash paid for covenant not to compete | | |
| Investment in affiliates | - | |
| Net Cash Used for Investing Activities | - | (3,400) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Purchase of redeemable preferred stock for retirement | - | |
| Common stock redemption | | |
| Net borrowings (repayment) on line of credit | - | |
| Borrowings (repayment) of short-term and long-term debt | - | |
| Payment of debt issuance costs | | |
| Net Cash Provided by (used for) Financing Activities | - | - |
| **NET CHANGE IN CASH** | 960,468 | (364,405) |
| **CASH:** | | |
| Beginning of year | 1,328,543 | 1,828,995 |
| **End of Period** | 2,289,011 | 1,464,590 |

**DELFASCO, INC.**
**RECONCILIATION OF NET INCOME TO NET CASH**
**USED FOR OPERATING ACTIVITIES**

**TWO MONTHS ENDED FEBRUARY 28, 2010**

|  | 2010 | 2009 |
|---|---|---|
| **NET INCOME** | 25,481 | (177,042) |
| **ADJUSTMENTS TO RECONCILE NET INCOME TO NET CASH USED FOR OPERATING ACTIVITIES:** | | |
| Depreciation | 57,450 | 57,450 |
| Amortization | - | |
| Write-off of debt issuance costs | | |
| Loss on sale of property and equipment | | |
| Loss on investment in affiliate | | |
| **(Increase) decrease in:** | | |
| Accounts receivables | 544,834 | (1,214,778) |
| Inventories | 209,903 | 819,999 |
| Prepaid expenses and other | 86,439 | (8,004) |
| Prepaid income taxes | - | 25,000 |
| **Increase (decrease) in:** | | |
| Accounts payable and accrued expense | 26,004 | 252,401 |
| Employee compensation | (3,322) | 1,979 |
| Deferred income | - | |
| Income taxes payable | 13,680 | (118,010) |
| Accrued warranty expense | - | |
| Deferred income taxes | - | |
| **NET CASH FROM OPERATING ACTIVITIES** | 960,468 | (361,005) |

**TANGIBLE PERSONAL PROPERTY**

DELFASCO, INC. - CORPORATE AND TENNESSEE DIVISIONS
FIXED ASSETS AS OF 12/31/09
SCHEDULE 5.21 - TANGIBLE PERSONAL PROPERTY

**Group: Corp - Furn & Equip.**

| Asset | Property Description | Date In Service | Book Cost | Book 179 Exp | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Net Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | SAFE OFFICE STEEL | 1/10/57 | 302 | 0 | 0 | 302 | 0 | 302 | 0 | S/L | 5.0 |
| 7 | DESK CREDENZA 3 SO CHRS 1 SWV CH | 4/01/71 | 1,008 | 0 | 0 | 1,008 | 0 | 1,008 | 0 | S/L | 5.0 |
| 9 | CHAIRS - 8 BOARD ROOM | 11/02/76 | 1,213 | 0 | 0 | 1,213 | 0 | 1,213 | 0 | S/L | 5.0 |
| 45 | PROCESSOR NETWORK | 7/23/91 | 1,815 | 0 | 0 | 1,815 | 0 | 1,815 | 0 | S/L | 5.0 |
| 47 | EQUIPMENT NETWORK | 9/12/90 | 8,714 | 0 | 0 | 8,714 | 0 | 8,714 | 0 | S/L | 5.0 |
| 48 | ADDITION STATION ON FILE SERVER | 10/15/90 | 1,074 | 0 | 0 | 1,074 | 0 | 1,074 | 0 | S/L | 5.0 |
| 52 | BLACK CHAIRS - RECEPTION AREA (3) | 9/04/91 | 645 | 0 | 0 | 645 | 0 | 645 | 0 | S/L | 5.0 |
| 56 | REFRIGERATOR | 4/04/93 | 340 | 0 | 0 | 340 | 0 | 340 | 0 | S/L | 5.0 |
| 58 | UPGRADE FILE SERVER MONITOR | 8/16/93 | 5,430 | 0 | 0 | 5,430 | 0 | 5,430 | 0 | S/L | 5.0 |
| 59 | TEKSYN MADE 2 MANAGE (MEMO ONLY) | 12/29/93 | 36,370 | 0 | 0 | 0 | 0 | 0 | 36,370 | Memo | 0.0 |
| 60 | IBM SERVER (MEMO ONLY) | 12/12/93 | 18,275 | 0 | 0 | 0 | 0 | 0 | 18,275 | Memo | 0.0 |
| 61 | MICOM COMMUNICATIONS (MEMO ONLY) | 1/31/94 | 15,382 | 0 | 0 | 0 | 0 | 0 | 15,382 | Memo | 0.0 |
| 62 | HPIV SI ETHERNET BNC (MEMO ONLY) | 6/27/94 | 1,650 | 0 | 0 | 0 | 0 | 0 | 1,650 | Memo | 0.0 |
| 63 | LESS LEASE PROCEEDS ON M2M, IBM (MEMO ONLY) | 12/29/93 | -71,677 | 0 | 0 | 0 | 0 | 0 | -71,677 | Memo | 0.0 |
| 64 | HPIV SI ETHERNET BNC | 6/27/94 | 2,425 | 0 | 0 | 2,425 | 0 | 2,425 | 0 | S/L | 5.0 |
| 66 | COMPUTER NETWORK SOFTWARE | 1/27/95 | 8,365 | 0 | 0 | 8,365 | 0 | 8,365 | 0 | S/L | 5.0 |
| 67 | 16MB MEMORY UPGRADE RS/6000 | 4/17/95 | 1,390 | 0 | 0 | 1,390 | 0 | 1,390 | 0 | S/L | 5.0 |
| 68 | USED COMPUTER, COMPAQ PROLINEA 3/2 | 4/19/95 | 1,200 | 0 | 0 | 1,200 | 0 | 1,200 | 0 | S/L | 5.0 |
| 69 | M2M USER LICENSES | 9/07/95 | 11,250 | 0 | 0 | 11,250 | 0 | 11,250 | 0 | S/L | 5.0 |
| 80 | SCALE TOLEDO 3012 -038E | 11/28/67 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 81 | TYPEWRITER STAND IBM MOD 15 S/N 6558861 | 6/11/71 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 83 | CABINET SAFETY STORAGE (1) PC 20 | 10/29/82 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 85 | COMPUTER NETWORK - TEXAS | 1/19/96 | 8,512 | 0 | 0 | 8,512 | 0 | 8,512 | 0 | S/L | 5.0 |
| 87 | COMPUTER NETWORK - TENNESSEE | 3/13/96 | 1,855 | 0 | 0 | 1,855 | 0 | 1,855 | 0 | S/L | 5.0 |
| 88 | WIN95 & MODEM | 10/01/96 | 510 | 0 | 0 | 510 | 0 | 510 | 0 | S/L | 5.0 |
| 89 | DELL LAPTOP COMPUTER | 10/01/96 | 2,438 | 0 | 0 | 2,438 | 0 | 2,438 | 0 | S/L | 5.0 |
| 92 | PC UPGRADES | 8/01/97 | 3,510 | 0 | 0 | 3,510 | 0 | 3,510 | 0 | S/L | 5.0 |
| 93 | NETWORK SOFTWARE | 8/01/97 | 7,955 | 0 | 0 | 7,955 | 0 | 7,955 | 0 | Amort | 3.0 |
| 94 | CITRIX ENSEMBLE | 8/01/97 | 17,680 | 0 | 0 | 17,680 | 0 | 17,680 | 0 | S/L | 5.0 |
| 95 | DESK & CAB'S, CHERRY FINISH | 8/01/97 | 2,900 | 0 | 0 | 2,900 | 0 | 2,900 | 0 | S/L | 5.0 |
| 96 | COMPAQ EP P11/300 | 8/01/98 | 1,830 | 0 | 0 | 1,830 | 0 | 1,830 | 0 | S/L | 5.0 |
| 580 | Server, Compaq | 12/01/99 | 14,060 | 0 | 0 | 14,060 | 0 | 14,060 | 0 | S/L | 5.0 |
| 582 | Zea Compaq computers KT8JM | 8/30/99 | 3,035 | 0 | 0 | 3,035 | 0 | 3,035 | 0 | S/L | 5.0 |
| 628 | HP Server | 12/01/01 | 12,826 | 0 | 0 | 12,826 | 0 | 12,826 | 0 | S/L | 5.0 |
| 713 | M2M IMPLEMENTATION | 9/01/06 | 20,204 | 0 | 0 | 9,429 | 4,040 | 13,469 | 6,735 | S/L | 5.0 |
| 728 | TWO DELL COMPUTERS | 8/01/07 | 1,671 | 0 | 0 | 473 | 335 | 808 | 863 | S/L | 5.0 |
| 742 | Dell Power Edge Server 2003 | 1/01/09 | 6,050 | 0 | 0 | 0 | 1,210 | 1,210 | 4,840 | S/L | 5.0 |
| | Corp - Furn & Equip. | | 150,207 | 0 | 0 | 132,184 | 5,585 | 137,769 | 12,438 | | |

M:/PILLAR SCHEDULES - UPDATED 04-05-10/5.21 Schedule 5.21 Tangible Pe    Property 4-5-10

# DELFASCO, INC. - CORPORATE AND TENNESSEE DIVISIONS
## FIXED ASSETS AS OF 12/31/09
## SCHEDULE 5.21 - TANGIBLE PERSONAL PROPERTY

| Asset | Property Description | Date in Service | Book Cost | Book Sec 179 Exp | c | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Net Book Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Group: PLANT II ADD.(TENN.DIV.) - Parcel # 02300** | | | | | | | | | | | | |
| 560 | CONSTRUCTION H. S. WILLIAMS | 12/01/96 | 788,483 | 0 | | 0 | 237,366 | 19,712 | 257,078 | 531,405 | S/L | 39.0 |
| 561 | JACOBS & ASSOC | 12/31/95 | 16,406 | 0 | | 0 | 0 | 0 | 0 | 16,406 | Memo | 0.0 |
| 562 | OFFICE BLDG - PURCH & INSTALL | 12/01/96 | 18,736 | 0 | | 0 | 5,640 | 469 | 6,109 | 12,627 | S/L | 39.0 |
| 563 | INSTALL SEWER LINE | 12/01/96 | 1,265 | 0 | | 0 | 381 | 31 | 412 | 853 | S/L | 39.0 |
| 564 | SPRINKLER - OFFICE & TOOL CRIB | 12/01/96 | 2,633 | 0 | | 0 | 793 | 66 | 859 | 1,774 | S/L | 39.0 |
| 565 | CAPITALIZED INTEREST COSTS | 12/01/96 | 30,026 | 0 | | 0 | 9,039 | 751 | 9,790 | 20,236 | S/L | 39.0 |
| 566 | W F BEAM | 1/15/97 | 389 | 0 | | 0 | 296 | 24 | 320 | 69 | S/L | 39.0 |
| 567 | ELECTRICAL SUPPLIES | 6/01/97 | 5,013 | 0 | | 0 | 1,735 | 151 | 1,886 | 4,127 | S/L | 39.0 |
| 568 | SECURITY SYST | 6/01/97 | 934 | 0 | | 0 | 270 | 23 | 293 | 641 | S/L | 39.0 |
| 569 | PAINT KITCHEN DUCT | 6/01/97 | 1,420 | 0 | | 0 | 410 | 35 | 445 | 975 | S/L | 39.0 |
| | PLANT II ADD.(TENN.DIV.) | | 865,905 | 0 | c | 0 | 255,930 | 21,262 | 277,192 | 589,713 | | |
| | | | | | | | | | | | | |
| **Group: Tenn Div - Auto** | | | | | | | | | | | | |
| 610 | Ford F350 Truck | 9/01/00 | 31,642 | 0 | | 0 | 31,642 | 0 | 31,642 | 0 | S/L | 5.0 |
| | Tenn Div - Auto | | 31,642 | 0 | c | 0 | 31,642 | 0 | 31,642 | 0 | | |
| | | | | | | | | | | | | |
| **Group: Tenn Div - Bldg & Improv. - Parcel # 02300** | | | | | | | | | | | | |
| 108 | COOLING TOWER MARLEY | 9/01/92 | 5,197 | 0 | | 0 | 5,197 | 0 | 5,197 | 0 | S/L | 7.0 |
| 455 | TOOL ROOM MOVE & INSIDE FENCE | 11/02/93 | 6,927 | 0 | | 0 | 6,927 | 0 | 6,927 | 0 | S/L | 7.0 |
| 457 | CATWALK | 12/31/93 | 1,774 | 0 | | 0 | 1,774 | 0 | 1,774 | 0 | S/L | 7.0 |
| 488 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 489 | WESTINGHOUSE ENVIRONMENTAL | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 490 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 491 | BAKER WORTHINGTON CROSS | 10/10/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 492 | SOVRAN BANK RETAINER | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 493 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 494 | WESTINGHOUSE ENV | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 495 | GENERAL JOURNAL ENTRIES SEE J33 | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 496 | SOVRAN BANK CREDIT | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 497 | SOVRAN BANK | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 498 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 499 | BAKER WORTHINGTON CROSS | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 500 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 501 | BAKER WORTHINGTON CROSS | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 502 | BAKER WORTHINGTON CROSS | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 503 | J A STREET & ASSOCIATES | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 504 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |
| 505 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | S/L | 0.0 |

DELFASCO, INC. - CORPORATE AND TENNESSEE DIVISIONS

FIXED ASSETS AS OF 12/31/09

SCHEDULE 5.21 - TANGIBLE PERSONAL PROPERTY

| Asset | Property Description | Date in Service | Book Cost | Book Sec 179 Exp | c | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr. | Book Net Book Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 506 | BAKER WORTHINGTON CROSS | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 307 | J A STREET & ASSOCIATES | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 508 | J A STREET | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 509 | VAUGHN & MELTON | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 510 | C&C MILLWRIGHT | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 511 | SOVRAN BANK ESCROW & INTEREST | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 512 | C&C MILLWRIGHT | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 513 | BAKER WORRTHINGTON CROSS | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 514 | NATIONS BANK | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 515 | MALONE BROTHERS | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 516 | J A STREET | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 517 | J A STREET | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 518 | COST TO MOVE EQUIPMENT (EXPENSED) | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 519 | DEFERED LOAN COST | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 520 | MOVING EXPENSES | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 521 | ANNUAL DEPRECIATION | 1/01/92 | 1,182,769 | 0 | | 0 | 637,950 | 37,549 | 675,499 | 507,290 S/L | | 31.5 |
| 554 | PLANT II | 1/01/92 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 | | 0.0 |
| 555 | REBUILD DOCK AREA - PLANT I | 9/01/96 | 13,162 | 0 | | 0 | 4,045 | 329 | 4,374 | 8,788 S/L | | 39.0 |
| 557 | CRIB FENCE | 12/01/97 | 1,247 | 0 | | 0 | 717 | 62 | 779 | 468 S/L | | 20.0 |
| 558 | LIGHTING | 12/01/97 | 3,137 | 0 | | 0 | 1,804 | 157 | 1,961 | 1,176 S/L | | 20.0 |
| 559 | CONCRETE PAD & ARGON PIPING | 9/01/97 | 9,750 | 0 | | 0 | 2,752 | 244 | 2,996 | 6,754 S/L | | 39.0 |
| 585 | Dust Collector Modif | 10/01/99 | 9,367 | 0 | | 0 | 9,367 | 0 | 9,367 | 0 S/L | | 7.0 |
| 653 | Chain Link Fence | 2/01/02 | 12,644 | 0 | | 0 | 8,745 | 1,265 | 10,010 | 2,634 S/L | | 10.0 |
| 660 | Pad Extension to Bldg | 5/01/02 | 27,033 | 0 | | 0 | 4,621 | 693 | 5,314 | 21,719 S/L | | 39.0 |
| 695 | Office Space - Plant | 7/01/04 | 15,222 | 0 | | 0 | 1,712 | 381 | 2,093 | 13,129 S/L | | 40.0 |
| | Tenn Div - Bldg & Improv. | | 1,288,249 | 0 | c | 0 | 685,611 | 40,680 | 726,291 | 561,958 | | |
| | | | | | | | | | | | | |
| **Group: Term Div - Furn & Equip** | | | | | | | | | | | | |
| 322 | MODEL #86 MEILINK SAFE | 9/18/81 | 534 | 0 | | 0 | 534 | 0 | 534 | 0 S/L | | 5.0 |
| 324 | PHONE SYSTEM | 6/12/87 | 5,089 | 0 | | 0 | 5,089 | 0 | 5,089 | 0 S/L | | 5.0 |
| 327 | DESK, CHAIR & CREDENZA | 9/05/89 | 1,057 | 0 | | 0 | 1,057 | 0 | 1,057 | 0 S/L | | 5.0 |
| 332 | TV & VCR FOR SAFETY FILMS | 9/17/90 | 729 | 0 | | 0 | 729 | 0 | 729 | 0 S/L | | 5.0 |
| 336 | WORKCENTER | 1/31/94 | 2,691 | 0 | | 0 | 2,691 | 0 | 2,691 | 0 S/L | | 5.0 |
| 341 | SECURITY SYS - PLT II Non Prop Tax | 12/01/96 | 3,118 | 0 | | 0 | 3,118 | 0 | 3,118 | 0 S/L | | 5.0 |
| 348 | LANIER COPIER | 3/01/96 | 4,462 | 0 | | 0 | 4,462 | 0 | 4,462 | 0 S/L | | 5.0 |
| 586 | Compaq 800 Proliant Server | 12/30/99 | 5,230 | 0 | | 0 | 5,230 | 0 | 5,230 | 0 S/L | | 5.0 |
| 611 | Lanier Copier | 10/01/00 | 17,749 | 0 | | 0 | 14,643 | 1,775 | 16,418 | 1,331 S/L | | 10.0 |
| 631 | HP Server | 12/01/01 | 12,823 | 0 | | 0 | 12,823 | 0 | 12,823 | 0 S/L | | 5.0 |
| 652 | Security System - Non Prop Tax | 4/01/02 | 14,957 | 0 | | 0 | 10,096 | 1,495 | 11,591 | 3,366 S/L | | 10.0 |
| 661 | Samsung Telephone System | 6/01/02 | 9,962 | 0 | | 0 | 9,962 | 0 | 9,962 | 0 S/L | | 5.0 |
| 711 | TWO SERVERS - NEW M2M | 9/01/06 | 13,170 | 0 | | 0 | 6,146 | 2,634 | 8,780 | 4,390 S/L | | 5.0 |
| 717 | P3101 CARD PRINTER | 2/01/07 | 1,962 | 0 | | 0 | 752 | 393 | 1,145 | 817 S/L | | 5.0 |

| Asset | Property Description | Date in Service | Book Cost | Book Sec 179 Exp | Book Sec c | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Net Book Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 718 | OPTIPLEX 745 COMPUTER | 2/01/07 | 1,448 | 0 | | 0 | 555 | 290 | 845 | 603 | S/L | 5.0 |
| 719 | OPTIPLEX 745 COMPUTER | 2/01/07 | 1,222 | 0 | | 0 | 468 | 245 | 713 | 509 | S/L | 5.0 |
| 720 | LAPTOP COMPUTER | 2/01/07 | 1,070 | 0 | | 0 | 410 | 214 | 624 | 446 | S/L | 5.0 |
| 721 | LAPTOP COMPUTER | 2/01/07 | 1,070 | 0 | | 0 | 410 | 214 | 624 | 446 | S/L | 5.0 |
| 722 | EPSON PRINTER | 3/01/07 | 629 | 0 | | 0 | 231 | 125 | 356 | 273 | S/L | 5.0 |
| 723 | PRINTER | 3/01/07 | 376 | 0 | | 0 | 138 | 75 | 213 | 163 | S/L | 5.0 |
| 724 | OPTIPLEX 745 COMPUTER | 10/01/07 | 1,597 | 0 | | 0 | 399 | 320 | 719 | 878 | S/L | 5.0 |
| 725 | LATITUDE D830 COMPUTER | 10/01/07 | 1,751 | 0 | | 0 | 438 | 350 | 788 | 963 | S/L | 5.0 |
| 740 | DELL LAPTOP D830 | 3/01/08 | 1,921 | 0 | | 0 | 320 | 384 | 704 | 1,217 | S/L | 5.0 |
| 743 | Firebox X55E Router | 5/01/09 | 1,434 | 0 | | 0 | 0 | 191 | 191 | 1,243 | S/L | 5.0 |
| 744 | Dell Latitude E640 XFR | 7/01/09 | 4,525 | 0 | | 0 | 0 | 452 | 452 | 4,073 | S/L | 5.0 |
| 745 | 2 Dell Computers Vostro/Opti 360 | 11/01/09 | 1,622 | 0 | | 0 | 0 | 54 | 54 | 1,588 | S/L | 5.0 |
| **Group: Tenn Div - Land - Parcel #02300** | | | | | | | | | | | | |
| | Tenn Div - Furn & Equip | | 112,198 | | | 0 | 80,701 | 9,211 | 89,912 | 22,286 | | |
| 318 | PROPERTY PLANT II | 8/15/89 | 53,948 | 0 | c | 0 | 0 | 0 | 0 | 53,948 | Memo | 0.0 |
| | Tenn Div - land | | 53,948 | | | 0 | 0 | 0 | 0 | 53,948 | | |
| **Group: Tenn Div - Land Improve - Parcel # 02300** | | | | | | | | | | | | |
| 320 | WEEMS EXCAVATION | 1/01/97 | 5,152 | 0 | | 0 | 6,152 | 0 | 6,152 | 0 | S/L | 7.0 |
| 693 | Parking Area | 2/01/04 | 8,166 | 0 | | 0 | 2,007 | 409 | 2,416 | 5,750 | S/L | 20.0 |
| | Tenn Div - Land Improve | | 14,318 | | 0 c | 0 | 8,159 | 409 | 8,568 | 5,750 | | |
| **Group: Tenn Div - Mach & Equip** | | | | | | | | | | | | |
| 98 | ARM WELDER - TJ SNOW | 5/01/91 | 9,091 | 0 | | 0 | 9,091 | 0 | 9,091 | 0 | S/L | 7.0 |
| 103 | CINCINATTI TOOL & CUTTER GRINDER | 8/01/91 | 3,240 | 0 | | 0 | 3,240 | 0 | 3,240 | 0 | S/L | 7.0 |
| 105 | REMANUFACTUR LONG SEAM WELDER | 8/17/92 | 49,800 | 0 | | 0 | 49,800 | 0 | 49,800 | 0 | S/L | 7.0 |
| 111 | GRASSHOPPER LAWN TRACTOR | 4/14/93 | 8,732 | 0 | | 0 | 8,732 | 0 | 8,732 | 0 | S/L | 7.0 |
| 115 | RELOCATE PRESS 250 TON | 10/01/93 | 25,634 | 0 | | 0 | 25,634 | 0 | 25,634 | 0 | S/L | 7.0 |
| 133 | CINCINNATI #2 UNIVERSAL MILL S/N 4A2P5E-22 | 8/18/95 | 7,500 | 0 | | 0 | 7,500 | 0 | 7,500 | 0 | S/L | 7.0 |
| 155 | SPRAY GUN | 12/01/97 | 22,775 | 0 | | 0 | 22,775 | 0 | 22,775 | 0 | S/L | 7.0 |
| 156 | PRESSURE WASHER | 11/01/97 | 1,586 | 0 | | 0 | 1,586 | 0 | 1,586 | 0 | S/L | 7.0 |
| 157 | CONVEYOR LUBE SYST | 12/01/97 | 9,222 | 0 | | 0 | 9,222 | 0 | 9,222 | 0 | S/L | 7.0 |
| 158 | TAPPING HEAD | 8/01/97 | 779 | 0 | | 0 | 779 | 0 | 779 | 0 | S/L | 7.0 |
| 159 | PUSHER LOCATOR | 7/01/97 | 1,130 | 0 | | 0 | 1,130 | 0 | 1,130 | 0 | S/L | 7.0 |
| 160 | BOOSTER PUMP | 1/01/97 | 4,350 | 0 | | 0 | 4,350 | 0 | 4,350 | 0 | S/L | 7.0 |
| 161 | STENCIL TABLE | 6/01/97 | 8,335 | 0 | | 0 | 8,335 | 0 | 8,335 | 0 | S/L | 7.0 |
| 164 | IR SOIL COMPRESS O/H | 3/01/97 | 11,047 | 0 | | 0 | 11,047 | 0 | 11,047 | 0 | S/L | 7.0 |
| 165 | PAINT SYST HOOKS | 3/01/97 | 4,879 | 0 | | 0 | 4,879 | 0 | 4,879 | 0 | S/L | 7.0 |

## DELFASCO, INC. - CORPORATE AND TENNESSEE DIVISIONS

## FIXED ASSETS AS OF 12/31/09

## SCHEDULE 5.21 - TANGIBLE PERSONAL PROPERTY

| Asset | Property Description | Date in Service | Book Cost | Book Sec 179 Exp | c | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Net Book Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 166 | PAINT BOOTHS FINAL | 1/01/97 | 21,936 | 0 | | 0 | 21,936 | 0 | 21,936 | 0 | S/L | 7.0 |
| 167 | EXTRACTOR DRYERS | 2/01/97 | 1,668 | 0 | | 0 | 1,668 | 0 | 1,668 | 0 | S/L | 7.0 |
| 169 | CONVEYOR, ELECT INSTALLATION | 8/01/97 | 1,716 | 0 | | 0 | 1,716 | 0 | 1,716 | 0 | S/L | 7.0 |
| 170 | FINISH SYST. INSTALL. | 9/01/97 | 14,301 | 0 | | 0 | 14,301 | 0 | 14,301 | 0 | S/L | 7.0 |
| 171 | MOD TO PA117 WELDER | 10/01/98 | 34,902 | 0 | | 0 | 34,902 | 0 | 34,902 | 0 | S/L | 7.0 |
| 173 | O'HAUL WARCO & HAMILTON PRESSES | 12/31/98 | 95,230 | 0 | | 0 | 95,230 | 0 | 95,230 | 0 | S/L | 10.0 |
| 174 | HEAT SYST - FINISHING LINE | 10/01/98 | 24,047 | 0 | | 0 | 24,047 | 0 | 24,047 | 0 | S/L | 7.0 |
| 176 | HYDRAULIC PUMP | 5/01/98 | 1,743 | 0 | | 0 | 1,743 | 0 | 1,743 | 0 | S/L | 7.0 |
| 177 | DIE RACKS | 3/01/98 | 2,700 | 0 | | 0 | 2,700 | 0 | 2,700 | 0 | S/L | 7.0 |
| 178 | RELOCATE EQUIP FROM PLT I | 5/01/98 | 1,188 | 0 | | 0 | 1,188 | 0 | 1,188 | 0 | S/L | 7.0 |
| 179 | MOD TO BDU CENTER DRILL | 2/01/98 | 10,600 | 0 | | 0 | 10,600 | 0 | 10,600 | 0 | 2000B | 7.0 |
| 180 | WELD FIXTURE - 425 PALLET | 1/31/98 | 7,440 | 0 | | 0 | 7,440 | 0 | 7,440 | 0 | S/L | 7.0 |
| 181 | STRIPPIT HOLE PUNCH | 1/31/98 | 6,500 | 0 | | 0 | 6,500 | 0 | 6,500 | 0 | S/L | 7.0 |
| 185 | CINCINN. #2 GRINDER | 5/01/98 | 5,500 | 0 | | 0 | 5,500 | 0 | 5,500 | 0 | S/L | 7.0 |
| 353 | SIGMA SURFACE GRINDER | 3/30/77 | 22,628 | 0 | | 0 | 22,628 | 0 | 22,628 | 0 | S/L | 7.0 |
| 354 | SIGMA TOOL CUTTER GRINDER | 3/30/77 | 16,170 | 0 | | 0 | 16,170 | 0 | 16,170 | 0 | S/L | 7.0 |
| 355 | LATHE & GALLETS - REPUBLIC LATHE - 14 | 3/30/77 | 24,242 | 0 | | 0 | 24,242 | 0 | 24,242 | 0 | S/L | 7.0 |
| 356 | DRILL PRESS & TOOLING - SIGMA | 3/30/77 | 11,649 | 0 | | 0 | 11,649 | 0 | 11,649 | 0 | S/L | 7.0 |
| 357 | DRILL PRESS (ARTERY) | 3/30/77 | 2,434 | 0 | | 0 | 2,434 | 0 | 2,434 | 0 | S/L | 7.0 |
| 359 | MAGNETIC DRILL - BUX MAGNETIC BASE DRILL | 3/30/77 | 1,785 | 0 | | 0 | 1,785 | 0 | 1,785 | 0 | S/L | 7.0 |
| 360 | SURFACE TABLE BLACK GRANITE SURFACE PLATE | 3/30/77 | 730 | 0 | | 0 | 730 | 0 | 730 | 0 | S/L | 7.0 |
| 361 | SURFACE TABLE - BLACK GRANITE SURFACE PLATE | 3/30/77 | 813 | 0 | | 0 | 813 | 0 | 813 | 0 | S/L | 7.0 |
| 362 | GRINDER - 10" DOUBLE SPINDLE TOOL GRINDER | 3/30/77 | 1,136 | 0 | | 0 | 1,136 | 0 | 1,136 | 0 | S/L | 7.0 |
| 363 | GRINDER - DOUBLE END BENCH | 3/30/77 | 519 | 0 | | 0 | 519 | 0 | 519 | 0 | S/L | 7.0 |
| 365 | BAND SAW MODEL V-20 | 3/30/77 | 11,972 | 0 | | 0 | 11,972 | 0 | 11,972 | 0 | S/L | 7.0 |
| 366 | JAYBIRD FEEDER | 3/30/77 | 4,056 | 0 | | 0 | 4,056 | 0 | 4,056 | 0 | S/L | 7.0 |
| 367 | BLISS PRESS 75 T S/N 48129 | 3/30/77 | 83,981 | 0 | | 0 | 83,981 | 0 | 83,981 | 0 | S/L | 7.0 |
| 370 | PRESS BLISS 60 + S/N 62953 | 3/30/77 | 45,232 | 0 | | 0 | 45,232 | 0 | 45,232 | 0 | S/L | 7.0 |
| 373 | TAYLOR SPOT WELDER | 3/30/77 | 1,785 | 0 | | 0 | 1,785 | 0 | 1,785 | 0 | S/L | 7.0 |
| 374 | CHICAGO BRAKE & STAND S/N 61662 | 3/30/77 | 16,170 | 0 | | 0 | 16,170 | 0 | 16,170 | 0 | S/L | 7.0 |
| 375 | HEAT TREAT FURNACES 2 | 3/30/77 | 3,245 | 0 | | 0 | 3,245 | 0 | 3,245 | 0 | S/L | 7.0 |
| 376 | WARCO PRESS 75 T #46747L R | 3/30/77 | 16,170 | 0 | | 0 | 16,170 | 0 | 16,170 | 0 | S/L | 7.0 |
| 377 | TON PRESS 250 S/N 53309 | 3/30/77 | 122,730 | 0 | | 0 | 122,730 | 0 | 122,730 | 0 | S/L | 7.0 |
| 379 | TOLEDO SCALES MODEL 3400 S/N 41491 | 3/30/77 | 763 | 0 | | 0 | 763 | 0 | 763 | 0 | S/L | 7.0 |
| 380 | LARGE TOLEDO SCALE MODEL 2181 S/N 552851 | 3/30/77 | 4,033 | 0 | | 0 | 4,033 | 0 | 4,033 | 0 | S/L | 7.0 |
| 381 | HYSTER FORK LIFT 8000LBS #1 | 3/30/77 | 20,070 | 0 | | 0 | 20,070 | 0 | 20,070 | 0 | S/L | 7.0 |
| 383 | HYSTER 800 LBS #2 S80B 840 | 3/30/77 | 18,400 | 0 | | 0 | 18,400 | 0 | 18,400 | 0 | S/L | 7.0 |

**DELFASCO, INC. - CORPORATE AND TENNESSEE DIVISIONS**

**FIXED ASSETS AS OF 12/31/09**

**SCHEDULE 5.21 - TANGIBLE PERSONAL PROPERTY**

| Asset | Property Description | Date In Service | Book Cost | Book Sec 179 Exp | c | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Net Book Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 386 | PAINT LINE - 454 CONVEYER (2 PAINT BOOTHS) | 7/12/77 | 111,900 | 0 | | 0 | 111,900 | 0 | 111,900 | 0 S/L | | 7.0 |
| 388 | MITERING CUT OFF SAW #751-802141 | 10/31/79 | 4,802 | 0 | | 0 | 4,802 | 0 | 4,802 | 0 S/L | | 7.0 |
| 388 | BROWN & SHARP UNIVERSAL O.D. GRINDER #13 | 6/18/82 | 679 | 0 | | 0 | 679 | 0 | 679 | 0 S/L | | 7.0 |
| 394 | CHALLENGER SURFACE GRINDER MODEL H612 6"X12" | 6/18/82 | 5,092 | 0 | | 0 | 5,092 | 0 | 5,092 | 0 S/L | | 7.0 |
| 395 | BRIDGEPORT BORING HEAD & BORING TOOL SET | 6/18/82 | 340 | 0 | | 0 | 340 | 0 | 340 | 0 S/L | | 7.0 |
| 396 | MILLING MACHINE MODEL 173894 | 6/18/82 | 16,918 | 0 | | 0 | 16,918 | 0 | 16,918 | 0 S/L | | 7.0 |
| 397 | MILLING MACHINE MODEL #189757 2 HP | 6/25/82 | 20,297 | 0 | | 0 | 20,297 | 0 | 20,297 | 0 S/L | | 7.0 |
| 398 | CRAFTSMAN 12" LATHE | 6/25/82 | 1,697 | 0 | | 0 | 1,697 | 0 | 1,697 | 0 S/L | | 7.0 |
| 399 | CLAUSING - COLCHESTER 15" ENGINE LATHE | 6/18/82 | 33,813 | 0 | | 0 | 33,813 | 0 | 33,813 | 0 S/L | | 7.0 |
| 400 | SPINDLE & DRILLING MACHINE W/HYDRAULIC | 11/07/83 | 216,867 | 0 | | 0 | 216,867 | 0 | 216,867 | 0 S/L | | 7.0 |
| 401 | MK-76 PULL TEST FIXTURES | 11/07/83 | 7,981 | 0 | | 0 | 7,981 | 0 | 7,981 | 0 S/L | | 7.0 |
| 402 | MK-76 GAGE FOR TIR | 11/07/83 | 4,804 | 0 | | 0 | 4,804 | 0 | 4,804 | 0 S/L | | 7.0 |
| 403 | MK-76 GAGE 45 FIN TO LUG | 12/19/83 | 10,215 | 0 | | 0 | 10,215 | 0 | 10,215 | 0 S/L | | 7.0 |
| 405 | EXPENSED UNDER SECTION 179 | 12/22/83 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 S/L | | 0.0 |
| 405 | LINCOLN PORTABLE WELDER 225 AC 210 | 3/12/84 | 715 | 0 | | 0 | 715 | 0 | 715 | 0 S/L | | 7.0 |
| 406 | HOPPER FOR MACHINE LINE | 8/20/84 | 2,799 | 0 | | 0 | 2,799 | 0 | 2,799 | 0 S/L | | 7.0 |
| 407 | HOPPER FOR MACHINE LINE | 8/20/84 | 2,799 | 0 | | 0 | 2,799 | 0 | 2,799 | 0 S/L | | 7.0 |
| 409 | HOPPER FOR MACH LINE | 8/20/84 | 2,799 | 0 | | 0 | 2,799 | 0 | 2,799 | 0 S/L | | 7.0 |
| 410 | ECONOMY WORKLIFT PLATFORM | 11/19/84 | 962 | 0 | | 0 | 962 | 0 | 962 | 0 S/L | | 7.0 |
| 411 | EXPENSED UNDER SECTION 179 | 11/19/84 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 S/L | | 0.0 |
| 412 | EXPENSED UNDER SECTION 179 | 12/10/84 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 S/L | | 0.0 |
| 413 | MINISTER PRESS 160 TON Rebuild | 1/02/85 | 73,743 | 0 | | 0 | 73,743 | 0 | 73,743 | 0 S/L | | 7.0 |
| 413 | EXPENSED UNDER SEC.179 PRIOR 1993 | 7/21/85 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 S/L | | 0.0 |
| 420 | BOBCAT | 8/27/86 | 14,750 | 0 | | 0 | 14,750 | 0 | 14,750 | 0 S/L | | 7.0 |
| 422 | THERMAK POST GRINDER | 7/03/86 | 1,282 | 0 | | 0 | 1,282 | 0 | 1,282 | 0 S/L | | 7.0 |
| 423 | USED TOLEDO 3185 BASE DIGITAL | 4/13/87 | 647 | 0 | | 0 | 647 | 0 | 647 | 0 S/L | | 7.0 |
| 425 | SEM AUTO WELDER (SPECIAL TOOLS) | 3/01/87 | 82,464 | 0 | | 0 | 82,464 | 0 | 82,464 | 0 S/L | | 7.0 |
| 426 | MULTI DRILL(SPECIAL TOOLS) | 10/16/89 | 115,240 | 0 | | 0 | 115,240 | 0 | 115,240 | 0 S/L | | 7.0 |
| 428 | DUST COLLECTION SYSTEM | 10/16/89 | 34,626 | 0 | | 0 | 34,626 | 0 | 34,626 | 0 S/L | | 7.0 |
| 429 | LESS 179 ELECTION | 10/16/89 | 0 | 0 | | 0 | 0 | 0 | 0 | 0 S/L | | 0.0 |
| 431 | STRIPPIT | 4/25/90 | 2,500 | 0 | | 0 | 2,500 | 0 | 2,500 | 0 S/L | | 7.0 |
| 432 | FIN WELDER | 6/01/90 | 38,827 | 0 | | 0 | 38,827 | 0 | 38,827 | 0 S/L | | 7.0 |
| 433 | BOB CAT LOADER | 8/01/90 | 21,186 | 0 | | 0 | 21,186 | 0 | 21,186 | 0 S/L | | 7.0 |
| 435 | ROWE STRAIGHTENER, FEED & CRADLE | 10/26/90 | 29,400 | 0 | | 0 | 29,400 | 0 | 29,400 | 0 S/L | | 7.0 |
| 436 | AIR CONTROL | 11/16/90 | 95 | 0 | | 0 | 95 | 0 | 95 | 0 S/L | | 7.0 |
| 437 | SURFACE GRINDER | 8/28/90 | 17,280 | 0 | | 0 | 17,280 | 0 | 17,280 | 0 S/L | | 7.0 |
| 438 | PRESS | 10/01/90 | 68,450 | 0 | | 0 | 68,450 | 0 | 68,450 | 0 S/L | | 7.0 |
| 439 | HYDRAULIC SHEAR | 2/01/91 | 49,000 | 0 | | 0 | 49,000 | 0 | 49,000 | 0 S/L | | 7.0 |
| 440 | SEAM WELDER - TJ SNOW | 5/01/91 | 30,240 | 0 | | 0 | 30,240 | 0 | 30,240 | 0 S/L | | 7.0 |

| Asset | Property Description | Date In Service | Book Cost | Book Sec 179 Exp | c | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Value | Book Net | Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 441 | SPOT WELDER - TJ SNOW | 5/01/91 | 4,320 | 0 | | 0 | 4,320 | 0 | 4,320 | | 0 | S/L | 7.0 |
| 442 | PRESS SPOT WELDER - TJ SNOW | 5/01/91 | 9,428 | 0 | | 0 | 9,428 | 0 | 9,428 | | 0 | S/L | 7.0 |
| 443 | MILLER WELDER | 7/01/91 | 1,512 | 0 | | 0 | 1,512 | 0 | 1,512 | | 0 | S/L | 7.0 |
| 444 | REMANUFACTURE SEAM WELDER | 8/01/91 | 7,793 | 0 | | 0 | 7,793 | 0 | 7,793 | | 0 | S/L | 7.0 |
| 445 | KAISER AIR DRYER & SEPARATOR | 10/16/91 | 9,161 | 0 | | 0 | 9,161 | 0 | 9,161 | | 0 | S/L | 7.0 |
| 446 | REMANUFACTURE CIRCUNM SEAM WELDER | 8/17/92 | 25,804 | 0 | | 0 | 25,804 | 0 | 25,804 | | 0 | S/L | 7.0 |
| 447 | SPOT WELD-LONG SEAM WELDER FIXTURE | 9/01/92 | 45,048 | 0 | | 0 | 45,048 | 0 | 45,048 | | 0 | S/L | 7.0 |
| 448 | BLISS PRESS REBUILD | 3/01/93 | 6,456 | 0 | | 0 | 6,456 | 0 | 6,456 | | 0 | S/L | 7.0 |
| 449 | MONTGOMERY 6012-H ROTH | 4/01/93 | 30,705 | 0 | | 0 | 30,705 | 0 | 30,705 | | 0 | S/L | 7.0 |
| 450 | DUNMORE TOOL POST GRINDER | 4/23/93 | 2,485 | 0 | | 0 | 2,485 | 0 | 2,485 | | 0 | S/L | 7.0 |
| 452 | 2000D DETROIT MODEL NST | 7/16/93 | 7,352 | 0 | | 0 | 7,352 | 0 | 7,352 | | 0 | S/L | 7.0 |
| 454 | WELDER MULTI SPOT | 10/02/93 | 42,024 | 0 | | 0 | 42,024 | 0 | 42,024 | | 0 | S/L | 7.0 |
| 458 | CONTAINERS CRUSH TEST | 12/31/93 | 2,210 | 0 | | 0 | 2,210 | 0 | 2,210 | | 0 | S/L | 7.0 |
| 459 | ELECTRICAL BRACKERS | 12/31/93 | 7,102 | 0 | | 0 | 7,102 | 0 | 7,102 | | 0 | S/L | 7.0 |
| 460 | RAISING MONORAIL | 1/01/94 | 10,428 | 0 | | 0 | 10,428 | 0 | 10,428 | | 0 | S/L | 7.0 |
| 463 | FILTER - BONDERIZER | 8/01/94 | 10,684 | 0 | | 0 | 10,684 | 0 | 10,684 | | 0 | S/L | 7.0 |
| 464 | PUMP/FILTER | 8/10/94 | 4,677 | 0 | | 0 | 4,677 | 0 | 4,677 | | 0 | S/L | 7.0 |
| 465 | SECTION 179 WRITE OFF | 12/31/94 | 0 | 0 | | 0 | 0 | 0 | 0 | | 0 | | 0.0 |
| 466 | KBC AUTOMATIC CYCLE BANDSAW | 3/03/95 | 5,500 | 0 | | 0 | 5,500 | 0 | 5,500 | | 0 | S/L | 7.0 |
| 467 | USED WEBB 508 PLATE ROLL S/N 4A2P56-22 | 5/18/95 | 16,750 | 0 | | 0 | 16,750 | 0 | 16,750 | | 0 | S/L | 7.0 |
| 469 | ALLEN 8'8" 4 SPINDLE DRILL S/N 275820 | 8/18/95 | 1,875 | 0 | | 0 | 1,875 | 0 | 1,875 | | 0 | S/L | 7.0 |
| 471 | ELECTRICAL COMPONENTS (DETAIL LATE) | 12/29/95 | 1,241 | 0 | | 0 | 1,241 | 0 | 1,241 | | 0 | S/L | 7.0 |
| 472 | WILTON BENCH VISE #10225-C1 | 12/22/83 | 969 | 0 | | 0 | 969 | 0 | 969 | | 0 | S/L | 7.0 |
| 473 | PAINT SPRAY EQUIPMENT - RANSBURG | 12/01/96 | 180,350 | 0 | | 0 | 145,783 | 12,023 | 157,806 | | 22,544 | S/L | 15.0 |
| 474 | CONVEYOR SYSTEM | 12/01/96 | 268,293 | 0 | | 0 | 216,870 | 17,886 | 234,756 | | 33,537 | S/L | 15.0 |
| 475 | CNC MACHINERY - SOREL | 12/01/96 | 500,651 | 0 | | 0 | 500,651 | 0 | 500,651 | | 0 | S/L | 10.0 |
| 476 | LANCE & SPRAY BOOTHS - C&C INDUSTRIAL | 12/01/96 | 228,036 | 0 | | 0 | 184,329 | 15,202 | 199,531 | | 28,505 | S/L | 15.0 |
| 477 | PHOSPHATE & DRYING OVENS - JORDAN COMPOSITES | 12/01/96 | 435,015 | 0 | | 0 | 351,637 | 29,001 | 380,638 | | 54,377 | S/L | 15.0 |
| 478 | TWO-STATION LEAK TEST SYSTEM | 8/01/96 | 44,150 | 0 | | 0 | 44,150 | 0 | 44,150 | | 0 | S/L | 10.0 |
| 479 | SOLVENT GUN SYSTEM | 5/06/96 | 3,920 | 0 | | 0 | 3,920 | 0 | 3,920 | | 0 | S/L | 10.0 |
| 480 | MITUTOYO LINEAR SCALE | 6/01/96 | 2,688 | 0 | | 0 | 2,263 | 179 | 2,442 | | 246 | S/L | 15.0 |
| 481 | CINCINNATI PRESS BRAKE | 6/01/96 | 24,174 | 0 | | 0 | 20,346 | 1,612 | 21,958 | | 2,216 | S/L | 15.0 |
| 482 | ALMCO V26T5 DEBURRING SYSTEM | 3/01/96 | 33,338 | 0 | | 0 | 33,338 | 0 | 33,338 | | 0 | S/L | 10.0 |
| 483 | HOOKS & PENDANTS FOR CONVEYOR | 12/01/96 | 22,017 | 0 | | 0 | 22,017 | 0 | 22,017 | | 0 | S/L | 10.0 |
| 484 | TROUGH-BED CONVEYOR BELTS | 8/13/96 | 4,329 | 0 | | 0 | 4,329 | 0 | 4,329 | | 0 | S/L | 7.0 |
| 485 | CAPITALIZED INTEREST COSTS | 12/01/96 | 53,253 | 0 | | 0 | 43,046 | 3,550 | 46,596 | | 6,657 | S/L | 15.0 |
| 486 | MULTI-SPOT WELDER | 12/01/96 | 13,377 | 0 | | 0 | 13,377 | 0 | 13,377 | | 0 | S/L | 7.0 |
| 556 | EYEWASH STATION | 4/01/97 | 1,783 | 0 | | 0 | 1,025 | 89 | 1,114 | | 669 | S/L | 20.0 |
| 588 | Water Tanks for MK-84 Welders | 9/01/99 | 1,977 | 0 | | 0 | 1,977 | 0 | 1,977 | | 0 | S/L | 5.0 |

**DELFASCO, INC. - CORPORATE AND TENNESSEE DIVISIONS**

**FIXED ASSETS AS OF 12/31/09**

**SCHEDULE 6.21 - TANGIBLE PERSONAL PROPERTY**

| Asset | Property Description | Date In Service | Book Cost | Book Sec 179 Exp | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Net Book Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 590 | Rebuild 250T & 500T Presses | 3/01/99 | 56,498 | 0 | 0 | 55,556 | 942 | 56,498 | 0 | S/L | 10.0 |
| 591 | Locators for PA150/151 Welder | 2/01/99 | 1,490 | 0 | 0 | 1,490 | 0 | 1,490 | 0 | S/L | 3.0 |
| 592 | O'haul BDU Center Drill | 11/01/99 | 62,902 | 0 | 0 | 57,660 | 5,242 | 62,902 | 0 | S/L | 10.0 |
| 593 | Relocate BDU Machine Line | 10/01/99 | 40,875 | 0 | 0 | 37,809 | 3,066 | 40,875 | 0 | S/L | 10.0 |
| 594 | MK84 Welder - Elect Modf | 11/01/99 | 8,147 | 0 | 0 | 7,468 | 679 | 8,147 | 0 | S/L | 10.0 |
| 595 | Relocate MK84 Equip | 11/01/99 | 20,000 | 0 | 0 | 18,333 | 1,667 | 20,000 | 0 | S/L | 10.0 |
| 596 | Relocate Misc Equipment | 11/01/99 | 46,404 | 0 | 0 | 42,537 | 3,867 | 46,404 | 0 | S/L | 10.0 |
| 597 | Storage Racks | 4/01/99 | 10,465 | 0 | 0 | 10,204 | 261 | 10,465 | 0 | S/L | 10.0 |
| 598 | Relocate AV35 Lathe from Forge | 7/01/99 | 5,831 | 0 | 0 | 5,540 | 291 | 5,831 | 0 | S/L | 10.0 |
| 613 | Rebuild Daewoo Puma Lathe | 7/01/00 | 24,720 | 0 | 0 | 21,012 | 2,472 | 23,484 | 1,236 | S/L | 10.0 |
| 614 | Rebuild 150Ton Version Press | 4/01/00 | 14,400 | 0 | 0 | 12,600 | 1,440 | 14,040 | 360 | S/L | 10.0 |
| 615 | Rebuild Center-Drill BDU Line | 10/01/00 | 29,690 | 0 | 0 | 24,494 | 2,969 | 27,463 | 2,227 | S/L | 10.0 |
| 617 | Willaet Inkjet Printer - Lugs | 12/01/00 | 12,793 | 0 | 0 | 12,793 | 0 | 12,793 | 0 | S/L | 3.0 |
| 627 | Install Finishing System | 1/01/00 | 8,097 | 0 | 0 | 7,287 | 810 | 8,097 | 0 | S/L | 10.0 |
| 632 | Denrition 12 T Multipress | 11/19/01 | 14,850 | 0 | 0 | 14,850 | 0 | 14,850 | 0 | S/L | 7.0 |
| 634 | Printer for Lugs | 8/21/01 | 13,823 | 0 | 0 | 13,823 | 0 | 13,823 | 0 | S/L | 7.0 |
| 635 | Reed-Rico Thread Roller | 7/18/01 | 47,380 | 0 | 0 | 47,380 | 0 | 47,380 | 0 | S/L | 7.0 |
| 637 | GMX Comparator | 1/10/01 | 40,581 | 0 | 0 | 40,581 | 0 | 40,581 | 0 | S/L | 7.0 |
| 645 | Daewoo Puma BHC 2-Axis CNC Turning Center | 5/01/02 | 61,494 | 0 | 0 | 40,996 | 6,149 | 47,145 | 14,349 | S/L | 10.0 |
| 646 | Daewoo Puma 10HC 2-Axis CNC Turning Center | 5/01/02 | 71,199 | 0 | 0 | 47,466 | 7,120 | 54,586 | 16,613 | S/L | 10.0 |
| 647 | Hwacheon HI-ECO35 | 5/01/02 | 85,579 | 0 | 0 | 57,053 | 8,558 | 65,611 | 19,968 | S/L | 10.0 |
| 648 | Daewoo ACE-V35 Machining Center | 5/01/02 | 82,096 | 0 | 0 | 54,731 | 8,209 | 62,940 | 19,156 | S/L | 10.0 |
| 649 | Daewoo ACE-V35 Machining Center | 5/01/02 | 82,096 | 0 | 0 | 54,731 | 8,209 | 62,940 | 19,156 | S/L | 10.0 |
| 650 | ABB Flex Arc Robotic Weld Cell | 3/01/02 | 121,500 | 0 | 0 | 83,025 | 12,150 | 95,175 | 26,325 | S/L | 10.0 |
| 651 | Can Trimmer, Double End | 3/01/02 | 23,780 | 0 | 0 | 16,250 | 2,378 | 18,628 | 5,153 | S/L | 10.0 |
| 659 | Paint Line Cord Loop & Dip Tank | 6/01/02 | 40,000 | 0 | 0 | 40,000 | 0 | 40,000 | 0 | S/L | 5.0 |
| 662 | Bliss Press - 300 Ton | 9/01/02 | 141,974 | 0 | 0 | 128,453 | 13,521 | 141,974 | 0 | S/L | 7.0 |
| 663 | Powder Coat Booth - GEMA | 9/01/02 | 107,267 | 0 | 0 | 107,267 | 0 | 107,267 | 0 | S/L | 5.0 |
| 675 | Gema Diamond Powder Coating System | 1/01/03 | 71,426 | 0 | 0 | 61,223 | 10,203 | 71,426 | 0 | S/L | 7.0 |
| 676 | 250 Ton Minster Press | 3/01/03 | 52,084 | 0 | 0 | 43,403 | 7,441 | 50,844 | 1,240 | S/L | 7.0 |
| 677 | Rowe Coil Unwinder | 5/28/03 | 15,000 | 0 | 0 | 15,000 | 0 | 15,000 | 0 | S/L | 5.0 |
| 678 | ABBE Robotic Welder #2 | 5/01/03 | 181,747 | 0 | 0 | 147,129 | 25,964 | 173,093 | 8,654 | S/L | 7.0 |
| 679 | Kaeser CS075 Air Compressor | 5/01/03 | 23,620 | 0 | 0 | 19,121 | 3,374 | 22,495 | 1,125 | S/L | 7.0 |
| 680 | Kaeser CS0100 Air Compressor | 1/11/03 | 25,747 | 0 | 0 | 22,069 | 3,678 | 25,747 | 0 | S/L | 7.0 |
| 694 | 135 Ton Perkins Press | 3/01/04 | 18,000 | 0 | 0 | 8,700 | 1,800 | 10,500 | 7,500 | S/L | 10.0 |
| 705 | Waste Water Treatment | 8/01/05 | 134,626 | 0 | 0 | 45,997 | 13,463 | 59,460 | 75,166 | S/L | 10.0 |
| 706 | Corrosion Test Chamber | 12/01/05 | 8,990 | 0 | 0 | 2,772 | 899 | 3,671 | 5,319 | S/L | 10.0 |
| 707 | Video Jet Printer - Lugs | 6/01/05 | 45,628 | 0 | 0 | 16,350 | 4,563 | 20,913 | 24,715 | S/L | 10.0 |
| 710 | INSTAPAK - BODY PROJECT | 6/01/06 | 12,700 | 0 | 0 | 3,281 | 1,270 | 4,551 | 8,149 | S/L | 10.0 |
| 715 | 400 WATT BULBS | 7/01/07 | 10,289 | 0 | 0 | 1,543 | 1,029 | 2,572 | 7,717 | S/L | 10.0 |
| 736 | Thermal Printer | 1/01/06 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 0.0 |

**DELFASCO, INC. - CORPORATE AND TENNESSEE DIVISIONS**

**FIXED ASSETS   AS OF 12/31/09**

**SCHEDULE 5.21 - TANGIBLE PERSONAL PROPERTY**

| Asset | Property Description | Date In Service | Book Cost | Book Sec 179 Exp | c | Book Sal Value | Book Prior Depreciation | Book Current Depreciation | Book End Depr | Book Net Book Value | Book Method | Book Period |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 737 | BOMB STENCIL PRINTER | 2/01/08 | 14,311 | 0 | 0 | 0 | 2,624 | 2,852 | 5,486 | 8,825 | S/L | 5.0 |
| 738 | 5 TON BROACHING MACHINE | 2/01/08 | 40,202 | 0 | 0 | 0 | 3,685 | 4,020 | 7,705 | 32,497 | S/L | 10.0 |
| 739 | PLASMA CUTTER - ROBOT | 7/01/08 | 13,880 | 0 | 0 | 0 | 694 | 1,388 | 2,082 | 11,798 | S/L | 10.0 |
| 741 | Vibratory Debur Machine | 5/01/09 | 10,181 | 0 | 0 | 0 | 0 | 679 | 679 | 9,502 | S/L | 10.0 |
| 746 | Storage Racks for Lugs | 12/01/09 | 22,000 | 0 | 0 | 0 | 0 | 262 | 262 | 21,738 | S/L | 7.0 |
| | Tenn Div - Mach & Equip | | 5,897,931 | 0 | 0 | 0 | 5,148,256 | 252,437 | 5,400,693 | 497,238 | | |
| | | | | | | | | | | | | |
| | Grand Total | | 8,415,398 | 0 | 0 | 0 | 6,342,483 | 329,584 | 6,672,067 | 1,743,331 | | |

**ACCOUNTS RECEIVABLE**



DaVinci TENNESSEE

# Accounts Receivable Aging

Aging By Due Date, Ordered by Customer Name, Due Date

Aging Date: 02/28/2010

| Invoice No | Invoice Date | Due Date | Current | 1-30 | Days Past Due 31-60 | 61-90 | Over 90 |
|---|---|---|---|---|---|---|---|
| **Customer: 000300** | **DFAS-COLUMBUS CENTER** | | | | Phone: ( ) - | | |
| 009739 | 02/18/2010 | 02/18/2010 | 0 | 19,452.72 | 0 | 0 | 0 |
| 009738 | 02/11/2010 | 02/13/2010 | 65,616.88 | 0 | 0 | 0 | 0 |
| 009737 | 02/11/2010 | 02/13/2010 | 69,762.00 | 0 | 0 | 0 | 0 |
| 009736 | 02/11/2010 | 02/13/2010 | 69,792.00 | 0 | 0 | 0 | 0 |
| 009735 | 02/11/2010 | 02/13/2010 | 69,792.00 | 0 | 0 | 0 | 0 |
| 009745 | 02/25/2010 | 02/27/2010 | 50,940.40 | 0 | 0 | 0 | 0 |
| 009742 | 02/25/2010 | 02/27/2010 | 66,025.52 | 0 | 0 | 0 | 0 |
| 009741 | 02/25/2010 | 02/27/2010 | 69,792.00 | 0 | 0 | 0 | 0 |
| 009740 | 02/25/2010 | 02/27/2010 | 69,792.00 | 0 | 0 | 0 | 0 |
| | Total Amounts for Company: | | $531,543.80 | $19,452.72 | $0.00 | $0.00 | $0.00 |
| | Total Past Due | | | $19,452.72 | | | |
| | Total Receivable Amount | | $550,996.52 | | | | |
| **Customer: 000547** | **DM AIRCRAFT SERVICE INC** | | | | Phone: (305) 593-5799 | | |
| 009744 | 02/25/2010 | 02/25/2010 | 0 | 82,541.28 | 0 | 0 | 0 |
| | Total Amounts for Company: | | $0.00 | $82,541.28 | $0.00 | $0.00 | $0.00 |
| | Total Past Due | | | $82,541.28 | | | |
| | Total Receivable Amount | | $82,541.28 | | | | |
| **Customer: 000517** | **GENERAL DYNAMICS** | | | | Phone: (727) 578-8100 | | |
| 000729 | 01/21/2010 | 02/07/2010 | 173,358.24 | 0 | 0 | 0 | 0 |
| 009743 | 02/25/2010 | 04/11/2010 | 173,358.24 | 0 | 0 | 0 | 0 |
| | Total Amounts for Company: | | $346,716.48 | $0.00 | $0.00 | $0.00 | $0.00 |
| | Total Past Due | | | $0.00 | | | |
| | Total Receivable Amount | | $346,716.48 | | | | |



DelVesco
TENNESSEE

## Accounts Receivable Aging
Aging By Due Date, Ordered by Customer Name, Due Date
Aging Date: 02/28/2010

|  |  |  |  | Days Past Due | | |
| --- | --- | --- | --- | --- | --- | --- |
| Invoice No | Invoice Date | Due Date | Current | 1-30 | 31-60 | 61-90 | Over 90 |

| Grand Total Amounts | $ 878,260.28 | $ 101,994.00 | $ 0.00 | $ 0.00 | $ 0.00 |
| --- | --- | --- | --- | --- | --- |
| Grand Total Past Due | | $ 101,994.00 | | | |
| Grand Total Receivable | $ 980,254.28 | | | | |

Above Receivables Include
Total Prepayment Invoices not yet applied of      $ 0.00  and a Credit Memo total of      $ 0.00

_____

_This report was requested by CARLOS_

End Of Report

_____

**DESIGNATED EMPLOYEES**

# Delfasco, Inc.

## Schedule 8.2 a Designated Employees

(Updated 4/6/10)

| Employee Name | Employee ID | Note | Position | Status | Division | Salary/Hourly/Temporary | Hire Date | Annual Pay | Unused Vacation a/o 12/31/09 |
|---|---|---|---|---|---|---|---|---|---|
| Aker, Dwayne A. | 501011 | | | Active | Tennessee | Hourly | 05/22/90 | $ 30,992.00 | $ - |
| Barnes, Terry Lynn | 501570 | | | Active | Tennessee | Hourly | 05/15/00 | $ 27,164.80 | $ 119.60 |
| Barrett, Mark | 501901 | | | Active | Tennessee | Hourly | 12/03/07 | $ 16,952.00 | $ - |
| Benko Jr., John F. | 501332 | | | Active | Tennessee | Hourly | 03/25/96 | $ 28,953.60 | $ 415.60 |
| Benko, Benjamin J. | 501533 | | | Active | Tennessee | Hourly | 07/14/99 | $ 24,107.20 | $ 384.60 |
| Bishop , Billie J. | 501921 | | | Active | Tennessee | Hourly | 05/18/82 | $ 20,800.00 | $ - |
| Booker, Terry R. | 501063 | | | Active | Tennessee | Hourly | 08/01/80 | $ 30,956.80 | $ 963.20 |
| Boyd, Billy Ray | 500426 | | | Active | Tennessee | Hourly | 06/23/87 | $ 27,976.00 | $ 126.00 |
| Boyd, Penny | 501895 | | | Active | Tennessee | Hourly | 06/02/03 | $ 19,760.00 | $ 269.00 |
| Bruce, Brenda Louise | 500483 | | | Active | Tennessee | Hourly | 09/23/87 | $ 27,456.00 | $ 968.00 |
| Burgner, Donald Ray | 501649 | | | Active | Tennessee | Hourly | 03/04/02 | $ 24,731.20 | $ 215.80 |
| Burns, Ricky | 501278 | | | Active | Tennessee | Hourly | 07/23/93 | $ 28,745.60 | $ 763.20 |
| Church, Geraldine | 500754 | | | Active | Tennessee | Hourly | 08/26/88 | $ 28,392.00 | $ 1,245.00 |
| Crum, Scot Thomas | 501451 | | | Active | Tennessee | Hourly | 03/09/98 | $ 37,648.00 | $ 159.00 |
| Doolitle, Herold J. | 500680 | | | Active | Tennessee | Hourly | 09/07/89 | $ 28,454.40 | $ 1,123.20 |
| Eads, Angela Denise | 501686 | | | Active | Tennessee | Hourly | 12/02/02 | $ 23,004.80 | $ 796.80 |
| Evans, Phillip Roy | 501340 | | | Active | Tennessee | Hourly | 06/10/96 | $ 29,785.60 | $ 133.20 |
| Garber, Aaron Paul | 501799 | | | Active | Tennessee | Hourly | 11/03/03 | $ 22,339.20 | $ 196.60 |
| Haracz, Roger Andrew | 501619 | | | Active | Tennessee | Hourly | 10/01/01 | $ 22,276.80 | $ 674.10 |
| Hensley, Jack Lee | 500520 | | | Active | Tennessee | Hourly | 06/22/87 | $ 29,868.80 | $ 1,679.20 |
| Isley, Herbert Eugene | 501635 | | | Active | Tennessee | Hourly | 01/26/02 | $ 35,568.00 | $ 161.00 |
| Isley, Patricia Gail | 501746 | | | Active | Tennessee | Hourly | 05/09/03 | $ 21,424.00 | $ 276.00 |
| Jennings, Ronald Lee | 501654 | | | Active | Tennessee | Hourly | 04/15/02 | $ 26,832.00 | $ - |
| Johnston, Randall S. | 501459 | | | Active | Tennessee | Hourly | 04/13/98 | $ 26,332.80 | $ 837.20 |
| King, Charles | 501903 | | | Active | Tennessee | Hourly | 03/24/08 | $ 20,072.00 | $ 274.50 |
| King, Dean C. | 500785 | | | Active | Tennessee | Hourly | 11/18/81 | $ 22,609.60 | $ - |
| Landera, Cynthia L. | 500995 | | | Active | Tennessee | Hourly | 04/16/00 | $ 27,248.00 | $ 121.00 |
| Lawrence, Jonathan R | 501855 | | | Active | Tennessee | Hourly | 08/09/04 | $ 20,134.40 | $ 431.00 |
| Lord, Steven Ivan | 501894 | | | Active | Tennessee | Hourly | 01/17/05 | $ 21,320.00 | $ - |
| Majors, Phillip Ray | 501419 | | | Active | Tennessee | Hourly | 09/03/97 | $ 43,388.00 | $ 1,167.00 |
| Malone, Randall Wayne | 501543 | | | Active | Tennessee | Hourly | 10/11/99 | $ 35,568.00 | $ 948.00 |
| McKerney, Ross A. | 501128 | | | Active | Tennessee | Hourly | 01/31/91 | $ 39,936.00 | $ 1,080.00 |
| Metcalf, Freddie C. | 501274 | | | Active | Tennessee | Hourly | 06/18/93 | $ 24,481.60 | $ 434.80 |
| Metcalf, Patricia | 501898 | | | Active | Tennessee | Hourly | 02/17/97 | $ 21,756.80 | $ - |
| Miller, Herbert Wendale | 500809 | | | Active | Tennessee | Hourly | 07/05/89 | $ 28,080.00 | $ 123.00 |
| Miller, Mary Elizabeth | 501604 | | | Active | Tennessee | Hourly | 05/07/01 | $ 29,432.00 | $ 454.80 |
| Miller, Richard Charles | 501766 | | | Active | Tennessee | Hourly | 08/18/03 | $ 20,800.00 | $ 840.00 |
| Morgan, Anderson | 500993 | | | Active | Tennessee | Hourly | 04/05/90 | $ 26,291.20 | $ - |
| Morris, Timmy Joe | 500154 | | | Active | Tennessee | Hourly | 09/18/81 | $ 28,808.00 | $ 777.00 |
| Norton, Hobert C | 501651 | | | Active | Tennessee | Hourly | 03/18/02 | $ 24,190.40 | $ - |
| Plemons, Herbert Clifford | 500101 | | | Active | Tennessee | Hourly | 06/01/77 | $ 38,312.00 | $ 1,236.20 |
| Ricker, Charles Allen | 500183 | | | Active | Tennessee | Hourly | 06/22/82 | $ 34,736.00 | $ 1,735.20 |
| Ricker, Jeffrey G. | 501053 | | | Active | Tennessee | Hourly | 07/19/90 | $ 28,600.00 | $ 128.50 |
| Ricker, Roger Dale | 500193 | | | Active | Tennessee | Hourly | 07/22/82 | $ 30,638.40 | $ 1,082.40 |
| Taylor, Carlos H. | 501357 | | | Active | Tennessee | Hourly | 06/12/96 | $ 25,729.60 | $ 225.40 |
| Taylor, Sherree Ann | 500385 | | | Active | Tennessee | Hourly | 06/03/86 | $ 26,665.60 | $ 586.00 |
| Tipton, Diana Lynn | 500195 | | | Active | Tennessee | Hourly | 08/09/82 | $ 28,184.00 | $ 1,120.50 |
| Tullock, Chad A. | 501593 | | | Active | Tennessee | Hourly | 08/21/99 | $ 32,032.00 | $ 934.50 |
| Turner, Jeffrey Lee | 500381 | | | Active | Tennessee | Hourly | 05/27/86 | $ 27,872.00 | $ 376.00 |
| Vestinski, Kimberly A. | 501579 | | | Active | Tennessee | Hourly | 07/03/00 | $ 24,336.00 | $ 848.00 |
| Waddell, James William | 501644 | | | Active | Tennessee | Hourly | 01/28/02 | $ 23,108.80 | $ - |
| Wilder, Joe F (Jr.) | 501905 | | | Active | Tennessee | Hourly | 02/25/08 | $ 25,272.00 | $ - |
| Willis, Kenneth Carroll | 500591 | | | Active | Tennessee | Hourly | 07/21/97 | $ 27,164.60 | $ 1,554.80 |
| Witt, Michael D. | 501096 | | | Active | Tennessee | Hourly | 10/22/90 | $ 31,720.00 | $ 1,140.00 |
| Young, Robert D. | 501534 | | | Active | Tennessee | Hourly | 07/12/99 | $ 25,584.00 | $ - |
| Benko, Mark William | 101016 | | Vice President/ General manager | Active | Tennessee | Salary | 01/01/77 | $ 154,999.92 | $ - |
| Clay, Rhonda Gwinn | 101074 | | Contract Administrator | Active | Tennessee | Salary | 11/16/94 | $ 54,995.20 | $ 4,230.40 |
| Fancher, Ricky Lynn | 101107 | | Industrial Engineer | Active | Tennessee | Salary | 07/07/03 | $ 52,000.08 | $ 3,000.00 |
| Kadelecek, Philip | 101118 | | President | Active | Corporate | Salary | 03/29/88 | $ 164,976.00 | $ 5,552.08 |
| King, Jennifer L. | 101104 | | Shipping Contractor/ Administrative Assistant | Active | Tennessee | Salary | 02/26/96 | $ 35,006.40 | $ 1,009.80 |
| Monteiro, Carlos | 101092 | | Controller | Active | Corporate | Salary | 05/19/98 | $ 79,800.00 | $ 9,015.87 |
| Powell, Stephen Allon | 101086 | | Human Resources & Environmental Manager | Active | Tennessee | Salary | 04/08/96 | $ 60,000.00 | $ 2,307.69 |
| Rohr, Tammee Marie | 101051 | | Manager of Cost Accounting | Active | Tennessee | Salary | 07/06/09 | $ 60,000.00 | $ 2,884.62 |

**Delfasco, Inc.**

## Schedule 8.2 a  Designated Employees
(Updated 4/5/10)

| Employee Name | Employee ID | Note | Position | Status | Division | Salary/Hourly/ Temporary | Hire Date | Annual Pay | | Unused Vacation a/o 12/31/09 |
|---|---|---|---|---|---|---|---|---|---|---|
| Sams, David | 101071 | | Quality Control Manager | Active | Tennessee | Salary | 06/06/94 | $ | 48,000.00 | $ 2,538.46 |
| Shipley, Randy Lynn | 101103 | | Fabrication Foreman | Active | Tennessee | Salary | 08/08/88 | $ | 55,600.08 | $ 3,475.01 |
| Thomas, Karen | 101047 | | Office Manager | Active | Corporate | Salary | 11/01/91 | $ | 81,600.00 | $ 5,374.51 |
| Turner, Ronald Dale | 500163 | | Manufacturing Manager | Active | Tennessee | Salary | 02/01/90 | $ | 82,000.08 | $ 1,576.92 |
| Wilder, Joe F | 101085 | | Plant Engineer/ Maintenance Manager | Active | Tennessee | Salary | 04/08/96 | $ | 74,000.16 | $ 3,557.70 |
| Young, William M | 501296 | | Materials Manager | Active | Tennessee | Salary | 09/27/93 | $ | 60,000.00 | $ 3,750.00 |
| Carter, William R | n/a | (a) | Quality Inspector | Active | Tennessee | Temporary | n/a | $ | 82,982.40 | n/a |
| | | | | | | | | | | |
| | | | | | | | | | | |
| Totals | | | | | | | | | | $ 77,000.06 |

**Notes:**
(a) One temp employee involved with Quality System - ISO 9001 will be retained under temp agreement.

**ASSUMED CONTACTS REQUIRING CONSENT**

## SCHEDULE 8.2 f - ASSUMED CONTRACTS REQUIRING CONSENT

| Customer | Product | P.O.#/Contract # | Remaining Dollars as of 2/28/10 or Later if New Order | Contract / PO expected Completion Date |
|---|---|---|---|---|
| HQ Army Sustainment Command Rock Island, IL | BDU33 Practice Bomb | W52P1J-08-C-0052 | 1,163,956 | May, 2010 |
| | | | | |
| General Dynamics Ordnance and Tactical Systems | PA171 Container | 13975 | 436,227 | April, 2010 |
| | | | | |
| General Dynamics Ordnance and Tactical Systems | Yoke Assembly | 13975 | 0 | April, 2010 |
| | | | | |
| General Dynamics Ordnance and Tactical Systems | PA116 Top Adapter Assy. | 13975 | 35,363 | April, 2010 |
| | | | | |
| HQ AFSC Rock Island, IL | MS3314 Lug | W52P1J-06-D-0027 | 378,094 | May, 2010 |
| | | | | |
| HQ AFSC Rock Island, IL | MK3 Lug | W52P1J-06-D-0027 | 844,590 | April, 2011 |
| | | | | |
| GTI Systems | BDU48 | 2266 | 1,215,665 | April, 2012 |
| General Dynamics | XM643 Prototype | 122970 | 23,423 | March, 2010 |
| Lockheed Martin | FP Assy | 430033/9494 | 13,438 | May, 2010 |
| General Dynamics | SDB Lugs | P0043026 | 73,726 | November, 2010 |
| General Dynamics | SDB Lugs | P0043499 | 21,724 | October, 2010 |
| Picatinny (Option - pending contract mod.) | PA117 | W15QKN-07-C-0089 | 152,803 | June, 2010 |